**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANTHONY DALE, BRETT JACKSON, JOHNNA FOX, BENJAMIN BORROWMAN, ANN LAMBERT, ROBERT ANDERSON, and CHAD HOHENBERY on behalf of themselves and all others similarly situated, | Case No. |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| DEUTSCHE TELEKOM AG, T-MOBILE US, INC., and SOFTBANK GROUP CORP., | |
| Defendants. | |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................... 1

JURISDICTION AND VENUE ................................................................................... 4

PARTIES .................................................................................................................... 4

FACTUAL ALLEGATIONS ...................................................................................... 7

I.     The Relevant Markets:  Retail Mobile Wireless Telecommunications Services in the United States ................................................................................................... 7

II.    Structure of the U.S. Retail Cell Service Market ............................................. 9

III.   Pre-Merger:  T-Mobile and Sprint Drive Competition:  "Let's match it.  We have no choice.  Go for it." ...................................................................................... 13

IV.   T-Mobile and Sprint Announce an Intention to Merge ................................. 17

     A.    T-Mobile and Deutsche Telekom Plan a Merger with the Goal of Reducing Competition Throughout the Industry ................................... 17

     B.    The Merger Is Announced to Widespread Opposition ........................ 20

     C.    Widespread Opposition to the Merger Was Predictable..................... 22

     D.    The Merger Eliminated a Vibrant and Disruptive Competitor From the Field ...................................................................................... 26

V.    T-Mobile Itself Knew That DISH Network Could Never Replace Sprint as an Effective Competitor................................................................................. 29

VI.   A Federal Court, Acting as a Self-Described Judicial "Fortuneteller" Performing a "Murky Function," Makes a Difficult Decision to Decline to Enjoin the Merger ......... 32

     A.    The District Court's Conclusions About Likely Future Anticompetitive Effects Were Based on the Defendants' Misleading Promises That Consumers Would Be Better Off After the Merger............................ 33

     B.    The District Court's Conclusions About Likely Future Anticompetitive Effects Were Based on Defendants' Self-Serving Testimony About Sprint ....... 35

VII.  Real World Post-Merger Data Shows That Defendants Misled the District Court About the Effects of the Merger ...................................................................... 37

     A.    Consumers and Small Businesses Have Suffered............................... 37

     B.    T-Mobile Becomes a Vehicle for Deutsche Telekom's "Harvesting" Plan ........ 42

     C.    DISH in Fact Has Failed to Pose a Competitive Threat ..................... 44

     D.    T-Mobile Reneges on Its Commitments to Regulators........................ 46

     E.    T-Mobile Raises Prices ........................................................................ 49

**TABLE OF CONTENTS**
**(continued)**

**Page**

F.      AT&T and Verizon Have Raised Prices Post-Merger ........................................ 52

CLASS ACTION ALLEGATIONS .................................................................................... 55

A.      Numerosity (Rule 23(a)(1)): ................................................................. 55

B.      Commonality (Rule 23(a)(2)): ............................................................... 56

C.      Typicality (Rule 23(a)(3)): .................................................................... 56

D.      Adequacy (Rule 23(a)(4) and 23(g)): .................................................... 57

E.      Rule 23(b)(1): ..................................................................................... 57

F.      Rule 23(b)(2): ..................................................................................... 57

G.      Rule 23(b)(3): ..................................................................................... 58

FIRST CLAIM FOR RELIEF Claim for Violation of Section Seven of the Clayton Act .......... 58

SECOND CLAIM FOR RELIEF Claim for Violation of Section One of the Sherman
Act: Agreement in Unreasonable Restraint of Trade ....................................... 59

PRAYER FOR RELIEF ................................................................................................... 60

DEMAND FOR JURY TRIAL ......................................................................................... 61

Plaintiffs Anthony Dale, Brett Jackson, Johnna Fox, Benjamin Borrowman, Ann Lambert, Robert Anderson, and Chad Hohenbery through their counsel, on behalf of themselves and all others similarly situated, bring this class action complaint under Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 1 of the Sherman Act, 15 U.S.C. § 1, and allege as follows:

## INTRODUCTION

1. This lawsuit challenges one of the most anti-competitive acquisitions in history: the merger of T-Mobile US, Incorporated ("T-Mobile") and Sprint Corporation ("Sprint"). The merger not only consolidated the number of national retail mobile wireless carriers from four to three; it combined two fierce competitors into a single behemoth with no incentive to compete meaningfully against the equally-large AT&T Inc. ("AT&T") and Verizon Communications, Inc. ("Verizon"). As a result, small businesses and consumers in the United States who subscribe to national retail mobile wireless carriers, including AT&T and Verizon customers, have paid billions more for wireless service than they would have if the merger had never happened.

2. Before the merger, T-Mobile and Sprint were two scrappy upstarts challenging Verizon and AT&T, the industry's leviathans. According to T-Mobile's larger-than-life CEO John Legere, AT&T and Verizon "acted in their self-interest to protect their excessive margins by holding onto their base of customers rather than risk erosion by overcompeting."[1] T-Mobile and Sprint took a different tack. Using its competitors' prices as a starting point, Sprint regularly targeted each of its three rivals by name and slashed prices accordingly. T-Mobile, under Legere's leadership, dubbed itself the "Un-carrier," introducing one competition-enhancing innovation after another. Rates for retail mobile wireless services declined across the market.

---

[1] Trial Tr., Vol. 4, at 950; *New York v. Deutsche Telekom AG*, No. 19-5434 (S.D.N.Y. 2020), ECF Nos. 378-98 ("Trial Tr.").

3.     Being an "Un-carrier," however, was never the long-term plan of Deutsche Telekom AG ("DT"), T-Mobile's corporate parent in Germany.  For years, DT sought a merger partner in the United States, including an attempted sale of T-Mobile US to AT&T.  This would be the best path to extracting every possible cent from American consumers and small businesses.

4.     On April 29, 2018, T-Mobile and Sprint announced their intention to merge.  To secure approval from the United States Department of Justice ("DOJ"), T-Mobile divested some of its business to DISH Network Corp. ("DISH"), a satellite television company with no experience in mobile wireless.  According to T-Mobile, DISH would rely on leased access to T-Mobile's network while it developed its own competing network, which did not yet exist.

5.     Fourteen states and the District of Columbia sued to block the deal.  In December of 2019, the case went to trial.  The court heard expert testimony that reduced competition would result in **$9 billion**—and possibly more—in consumer harm *per year*.  But the defendants promised that the new T-Mobile would continue to compete hard, DISH would flourish as a fourth national mobile wireless carrier, and consumers would benefit.  Faced with diametrically opposed predictions, the court expressed grave reservations about its ability to perform the "murky function" of a "fortuneteller" tasked with reading the probable future effects of the merger.[2]  In that context, and without the benefit of any post-merger data, it found the states had failed to carry their burden of proof.  The merger closed on April 1, 2020, and Legere stepped

---

[2] *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 186 (S.D.N.Y. 2020) ("Trial Order").

down from his role of leading the "Un-carrier." Post-merger, DT's CEO bragged, "It's harvest time."[3]

6.      And, harvest they did.  Real world post-merger data confirms that after the merger, the competitive landscape shifted.  Verizon and AT&T are no longer competing against two smaller maverick firms incentivized to cut prices to increase their respective market shares. They are now competing against a single large competitor that is more than happy to observe a competitive détente in return for stable market shares and prices.  And, over two years later, DISH has yet to show any sign that it can replace Sprint as a fourth competitor.  In fact, T-Mobile is prematurely shutting down its 3G Code Division Multiple Access ("CDMA") network, which it agreed to lease to DISH as a condition of regulatory approval to help DISH get its mobile wireless business up and running.

7.      Competition has declined precipitously as a result.  In the decade preceding the merger announcement, the average price of a nationwide wireless plan decreased by approximately 6.3% per year.  Quality-adjusted prices consistently decreased as well.  Since the announcement of the merger, that trend has stopped:  quality-adjusted prices have inflated and stabilized because the three surviving carriers have no reason to compete as vigorously for subscribers and can focus on maximizing profits from existing customers.  And, led by T-Mobile, all three carriers have begun raising prices, both through outright increases in plan prices as well as through increases in taxes, fees, and surcharges.

---

[3] Douglas Busvine, *Deutsche Telekom Eyes Direct Control Over T-Mobile in Medium Term* Reuters (Apr. 1, 2021, 3:51 AM), https://www.reuters.com/business/media-telecom/deutsche-telekom-confirms-outlook-annual-general-meeting-2021-04-01/.

8.     Mandatory arbitration clauses purport to shield T-Mobile from claims relating to

T-Mobile's prices or services by its own customers.  But the merger harmed AT&T and Verizon

subscribers as well, because it reduced competition and affected prices and quality industry-

wide.  These AT&T and Verizon subscribers have paid billions of dollars more than they

otherwise would have if the merger had not happened.  By bringing this action, AT&T and

Verizon subscribers seek to vindicate their rights under the antitrust laws, undo the merger,

create the viable fourth competitor that was promised, and recover damages for the overcharges

sustained in the interim.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to Sections 4

and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, and 28 U.S.C. §§ 1331 and 1337.

10.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C.

§ 22, and 28 U.S.C. § 1391(b).

11.     The Court has personal jurisdiction over each Defendant under Section 12 of the

Clayton Act, 15 U.S.C. § 22, and Federal Rule of Civil Procedure 4, and one or more Defendants

may be found in this District.

## PARTIES

12.     Plaintiff Anthony Dale is a citizen and resident of the State of Indiana.  Mr. Dale

has been a subscriber of, and paid for, retail mobile wireless services provided by AT&T since at

least April 1, 2020.

13.     Plaintiff Brett Jackson is a citizen and resident of the State of Indiana.  Mr.

Jackson has been a subscriber of, and paid for, retail mobile wireless services provided by AT&T

since at least April 1, 2020.

- 4 -

14. Plaintiff Johnna Fox is a citizen and resident of the State of Indiana. Ms. Fox was a subscriber of, and paid for, retail mobile wireless services provided by Verizon from prior to April 1, 2020, until approximately March 2022.

15. Plaintiff Benjamin Borrowman is a citizen and resident of the State of Illinois. Mr. Borrowman has been a subscriber of, and paid for, retail mobile wireless services provided by AT&T since at least April 1, 2020.

16. Plaintiff Ann Lambert is a citizen and resident of the State of Illinois. Ms. Lambert has been a subscriber of, and paid for, retail mobile wireless services provided by AT&T since at least April 1, 2020.

17. Plaintiff Robert Anderson is a citizen and resident of the State of Illinois. Mr. Anderson has been a subscriber of, and paid for, retail mobile wireless services provided by Verizon since at least April 1, 2020.

18. Plaintiff Chad Hohenbery is a citizen and resident of the State of Illinois. Mr. Hohenbery has been a subscriber of, and paid for, retail mobile wireless services provided by Verizon since at least April 1, 2020.

19. Defendant Deutsche Telekom AG ("DT") is a German corporation headquartered in Bonn, Germany at Friedrich-Ebert-Alle 140. DT is publicly traded on exchanges in Germany and on the OTCQX in the United States. DT is a multinational telecommunications giant, with over 240 million wireless customers—including T-Mobile US's over 100 million subscribers— and over 100 billion euros in annual revenues. As of April 12, 2022, DT owns 48.27% of the

shares of the combined entity.[4]  DT operates two wholly-owned subsidiaries in the United States:

T-Systems North America, Inc. and Deutsche Telekom North America Inc.

20.     Defendant T-Mobile US, Inc. ("T-Mobile") is organized under the laws of

Delaware and headquartered in Bellevue, Washington at 12920 SE 38th Street and Overland

Park, Kansas at 12938 Foster Street.  T-Mobile has also maintained corporate offices in this

district at 1400 Opus Place in Downers Grove, Illinois.  T-Mobile has approximately 2,200

direct-owned retail locations throughout the United States including in this district.  T-Mobile is

the second largest wireless carrier in the United States, with 109.5 million customers as of March

31, 2022, and over $80 billion in annual revenues in 2021.[5]  T-Mobile is publicly traded on the

NASDAQ exchange.

21.     Defendant Softbank Group Corp. ("Softbank") is a holding company

headquartered in Minato, Tokyo.  In 2013, Softbank acquired 80 percent of the shares of Sprint

Nextel, which then resumed the name Sprint Corporation.  As of April 12, 2022, Softbank owned

3.17 percent of the combined entity, T-Mobile US, Inc.[6]

---

[4] Juan Pedro Tomás, *Deutsche Telekom Increases Its Stake In T-Mobile US*, RCRWireless (Apr. 14, 2022), https://rcrwireless.com/20220414/5g/deutsche-telekom-increases-stake-tmobile-us; *Institutional Holdings Report for T-Mobile*, Bloomberg Terminal 2022 (at line 1).
[5] T-Mobile US, Quarterly Report 33 (Form 10-Q) (May 6, 2022), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001283699/6b2b373f-9acb-4c7a-bfcd-e959946a97d3.pdf; T-Mobile US, Annual Report 32 (Form 10-K) (Feb. 11, 2012), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001283699/6ee75603-35bb-4aee-b237-312c6c9b0d59.pdf.
[6] *Institutional Holdings Report for T-Mobile*, Bloomberg Terminal, at 4 (2022).

## FACTUAL ALLEGATIONS

I.      **The Relevant Markets:  Retail Mobile Wireless Telecommunications Services in the United States**

22.      The mobile wireless services industry is one of the largest, most widespread, and most important businesses in the United States.  In 2019, U.S. mobile wireless service revenues topped $187 billion from over 442 million connections.[7]  Individual consumers are the largest market segment for mobile wireless carriers and comprise an estimated 61.7 percent of industry revenue.[8]  Unlike many other large sectors of the economy, just three firms dominate the market: AT&T, Verizon, and T-Mobile.

23.      A relevant product market is the national retail mobile wireless telecommunications services for cellular phones (the "Retail Cell Service Market").  Consumers and small businesses use cellular handsets to transact all aspects of daily life and business, including but not limited to accessing email, surfing the web, buying and selling physical and virtual goods and services, managing finances and healthcare, streaming video, and placing telephone calls.  To do so, in addition to a handset, the user needs access to a cellular network. That network must have several basic components:  antenna towers for the local connection; fiber optic lines connecting the towers; computer software and hardware to manage the immense flow of data; and radio frequency spectrum.

24.      A consumer or small business desiring to have reliable, ready access to phone calls and the Internet while on-the-go has no reasonable alternative to a cellular phone.  A

---

[7] Fed. Commc'ns Comm'n, 2020 Communications Marketplace Report 233, 235 (2020).
[8] Jeremy Moses, *IBISWorld Industry Report 51721: Wireless Telecommunications Carriers in the US*, at 19, IBISWorld (Aug. 2019), https://recession.com/wp-content/uploads/2020/03/51721-Wireless-Telecommunications-Carriers-in-the-US-Industry-Report.pdf.

hypothetical monopolist of the Retail Cell Service Market could therefore sustain a small but significant price increase without facing a significant loss of customers.

25.     The Retail Cell Service Market does not include plans offered to large business customers, known as "enterprise" plans.  Enterprise customers typically purchase based on a procurement process involving extensive price negotiations, where prices may be based on a business's annual revenues or number of employees.  Enterprise plans come at prices well above those of consumer or small-business plans, which services consumers and small businesses do not need, such as security features and settings designed for regulatory compliance.

26.     The Retail Cell Service Market also does not include plans for government customers that, like enterprise plans, are priced according to different processes than retail plans, and come with different features.

27.     The Retail Cell Service Market also does not include plans for non-phone connected devices, such as smartwatches and tablets, and devices that are part of the so-called Internet of Things.  Neither a smart watch, nor a tablet, nor an Internet of Things device is a reasonable substitute for a cell phone because none of them offer the same combination of voice and data capabilities, such as phone and video calls, text messages, mobile applications, and broad access to the Internet.

28.     A relevant geographic market is the United States.  Retail mobile wireless service in other countries, whether sold to businesses or consumers, is not a substitute for a retail mobile wireless plan in the United States.  To operate in the United States, a cell phone service provider must have access to radio spectrum covering the nation.  This requires a network of cell towers broadcasting and receiving on radio spectrum highly regulated by the federal government. Carriers in other countries do not have this access.  A cell phone purchased abroad with a plan

issued by a foreign carrier thus will not work in the United States, except pursuant to an expensive "roaming" arrangement with a domestic carrier. Such a "roaming" arrangement is not a reasonable substitute for a service plan offered by one of the domestic carriers.

29. The relevance of the national market is reflected in the pricing and marketing behavior of the major nationwide carriers. Within the United States, the national plans offered by each carrier from one region to another are largely the same. According to T-Mobile's description, the carriers in general price nationally, "make network engineering decisions nationally," are subject to a common national regulatory scheme, and "advertise in large part on a national scale."[9] Indeed, one of the functional principles of a nationwide retail mobile wireless services plan is that it must be portable from one area of the country to another with the same terms and network quality. A hypothetical monopolist of the Retail Cell Service Market in the United States could profitably sustain a small but significant increase in prices without fear of losing customers to carriers doing business outside the United States.

## II. Structure of the U.S. Retail Cell Service Market

30. The U.S. Retail Cell Service Market is highly concentrated. Prior to the merger, there were four firms with their own nationwide mobile wireless networks: AT&T Verizon, T-Mobile, and Sprint. These firms are known as "mobile network operators," or "MNOs." In 2018, AT&T and Verizon's consumer and business plans accounted for approximately 94 million and 118 million service lines, respectively; T-Mobile accounted for approximately 64 million, and Sprint accounted for approximately 41 million.[10] The majority of these lines are

---

[9] Trial Order, 439 F. Supp. 3d at 203.
[10] AT&T Inc., Annual Report 6 (Form 10-K) (Feb. 20, 2019),
https://otp.tools.investis.com/clients/us/atnt2/sec/sec-

consumer plans. For example, in 2018 consumer plans accounted for 95 million of Verizon's 118 million service lines.[11]

31.     The market also includes firms known as mobile virtual network operators (or "MVNOs"), which serve a relatively small number of customers. The MVNOs pay for access to the network of one of the MNOs, which they then re-sell to subscribers. Because they are wholly dependent on the MNOs, they do not truly compete with them on price or quality. Thus, the price that MVNO customers pay is tied to the cost that MVNOs pay to MNOs for access to their networks. As T-Mobile's CEO explained to its board in 2018 (according to board member Thorsten Langheim's notes), T-Mobile "has no concern or doesn't see impact on post-paid phone business from cable MVNO upcoming launches, and Comcast and Charter are referred to as 'incompetent and incompetent squared.'"[12] Indeed, Comcast's Xfinity Mobile turned a profit for the first time in the first quarter of 2021.[13] Therefore, while the relevant market includes MVNO sales to their customers, for purposes of economic analysis those subscribers should be attributed to the MNOs whose networks they use. In 2018, AT&T accounted for 8 million MVNO

_____

show.aspx?FilingId=13241251&Cik=0000732717&Type=PDF&hasPdf=1; Verizon Commc'ns Inc., Annual Report 83 (Form 10-K) (Feb. 15, 2019), https://verizon.api.edgar-online.com/EFX_dll/EdgarPro.dll?FetchFilingConvPDF1?SessionID=Ohpwk3LSYRiy1UQ&ID =13233286; T-Mobile US, Annual Report 40 (Form 10-K) (Feb. 6, 2019), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001283699/3bfba910-027f-4ec5-85a5-b8e91d073ba8.pdf; Sprint Corp., Annual Report 40 (Form 10-K) (May 29, 2019), https://d18rn0p25nwr6d.cloudfront.net/CIK-0000101830/6e85121b-8fd4-4683-9245-773404e6fa25.pdf.

[11] *Financial and Operating Information*, Verizon at 8, 10 (Jan. 31, 2020), https://www.verizon.com/about/file/40151/download?token=AB-dvjn4.
[12] Trial Tr., Vol. 2 at 287.
[13] Diana Goovaerts, *Comcast's Xfinity Mobile MVNO Finally Turns a Profit*, Fierce Wireless (Apr. 29, 2021), https://www.fiercewireless.com/wireless/comcast-s-xfinity-mobile-mvno-finally-turns-a profit.

connections, T-Mobile 16 million MVNO connections, Sprint 13 million MVNO connections, and Verizon at least 10 million MVNO connections.[14] In 2018, the market shares of the MNOs, by subscribers, were as follows:[15]



[14] AT&T Inc., Annual Report 4 (Form 10-K) (Feb. 20, 2019); T-Mobile US, Annual Report 40 (Form 10-K) (Feb. 7, 2019); Sprint Corp., Annual Report 40 (Form 10-K) (May 29, 2019); Alexandra Wilts, *S/TMUS: Opposition From Mobile Virtual Network Operators Likely to Gain Traction with DOJ*, Event-Driven.com (Dec. 31, 2017), https://www.nwida.org/files/eventdriven.pdf.
[15] Chart Sources: *Financial and Operating Information*, Verizon, at 4, 6 (June 18, 2019); AT&T Inc., Quarterly Report 137 (Form 10-Q) (Feb. 20, 2019); T-Mobile US, Quarterly Report 40 (Form 10-Q) (Feb. 6, 2019; Sprint Corp., Quarterly Report 40 (Form 10-Q) (May 29, 2019; Alexandra Wilts, *S/TMUS: Opposition From Mobile Virtual Network Operators Likely to Gain Traction with DOJ*, NWIDA at 1 (June 12, 2018), https://www.nwida.org/files/eventdriven.pdf.

32.     Through the second quarter of 2018, the market shares of the MNOs, by revenues, were as follows:[16]



**MNO Market Share, Wireless Service Revenues**
Six Months Ended June 31, 2018

**Note:** Includes revenue from connected devices and resellers.

33.     These estimates understate T-Mobile and Sprint's combined share of the relevant product and geographic market because they include service plans not only for cell phones but also other connected devices such as tablets and smart watches, where AT&T and Verizon have

---

[16] Chart Sources: T-Mobile US, Quarterly Report 49 (Form 10-Q) (Aug. 1, 2018); Verizon Commc'ns Inc., Quarterly Report 39 (Form 10-Q) (July 31, 2018); US Cellular Corp., Quarterly Report 7 (Form 10-Q) (Aug. 3, 2018); Shenandoah Telecomm. Co., Quarterly Report 38 (Form 10-Q) (Aug. 7, 2018); AT&T Inc., Quarterly Report 50 (Form 10-Q) (May 3, 2018); AT&T Inc., Quarterly Report 65 (Form 10-Q) (Aug. 2, 2018); Sprint Corp., Quarterly Report 46 (Form 10-Q) (May 24, 2018); Sprint Corp., Annual Report 37 (Form 10-K) (May 24, 2018); Sprint Corp., Quarterly Report 46 (Form 10-Q) (Feb. 5, 2018).

a larger combined market share. These estimates also understate T-Mobile and Sprint's collective share of the relevant market because they include enterprise and government connections, where AT&T and Verizon also have a larger share.

34. The industry is not only highly concentrated: it has nearly insurmountable barriers to effective entry by a potential new MNO. To threaten the three major MNOs, a new entrant would need to lease access to a nationwide network of cell towers and fiber-optic connections and then install its own equipment on those towers. Further, a new entrant would need additional spectrum in the correct frequencies to offer a quality network which would, if available at all, cost billions of dollars. A new entrant would also need a network of thousands of stores and third-party retail partners, as well as competitive contracts with phone manufacturers. Additionally, a new entrant would need legions of experienced executives and employees at various levels to operate and market that network.

## III.    Pre-Merger:  T-Mobile and Sprint Drive Competition:  "Let's match it.  We have no choice.  Go for it."

35. Prior to the merger, both Sprint and T-Mobile had positioned themselves as smaller "mavericks" willing to cut prices and make innovative offers to consumers and small businesses to take market share from AT&T and Verizon.

36. T-Mobile in particular defined itself as the "Un-carrier." As one Sprint executive testified, it was "T-Mobile that had been leading a lot of price moving and had a very good perception of being a very aggressive challenger in terms of pricing."[17] When Sprint filed suit in 2011 to block AT&T's acquisition of T-Mobile, it described T-Mobile as "a low price and

---

[17] Trial Tr., Vol. 1 at 47.

innovative maverick competitor that provides particularly disruptive competition in the marketplace."[18]  Explaining T-Mobile's rise at the trial challenging the T-Mobile-Sprint merger, T-Mobile CEO John Legere testified that Verizon's network capacity was limited as a result of the carrier having "gotten a bit lazy," while T-Mobile was ramping up its competitiveness via increased network capacity.[19]  For example, in 2015, T-Mobile's "Binge On" unlimited streaming promotion took advantage of the fact that a quarter of AT&T and Verizon subscribers reported having been hit by overages in the prior six months, which encouraged subscribers to buy more data than they could use—data allowances that could not be carried over month to month.[20]  T-Mobile also eliminated subsidized phones and two-year service contracts in favor of equipment installment plans and lower-cost monthly service plans, which made it easier for consumers to switch carriers.  It also introduced unlimited data plans.  These changes benefitted consumers and required rivals to adapt.

37.    Sprint was likewise a strong competitor and priced aggressively.  For example, Sprint's Project Samurai promotion, launched in 2015, offered customers 50 percent off the rates of AT&T, Verizon, and T-Mobile.

---

[18] Compl. ¶ 3, *Sprint v. AT&T et al.*, No. 1:11-cv-01600, 2011 WL 3891692 (D.D.C. Sept. 6, 2022), ECF No. 1.
[19] Trial Tr., Vol. 4 at 892–93.
[20] *Id.* at 894.



Its advertisements targeted each competitor specifically by name. A typical Sprint ad might

tempt an AT&T subscriber to switch with the following comparison:



38.     Sprint extended this program several times in response to strong demand.[21]

---

[21] Trial Tr., Vol. 1 at 23-27.

39.     Sprint and T-Mobile often outdid each other with discounting plans, causing ripple effects throughout the market that benefitted consumers.  For example, in January 2016, T-Mobile's Metro PCS offered up to 50 percent off Sprint's Family Share Pack pricing. According to Sprint's competitive intelligence unit, this was "T-Mobile's way of combating competitive pressure from Sprint's 50 percent-off promotion indirectly."[22]  A Sprint executive testified that Sprint and T-Mobile were "targeting or challenging both AT&T and Verizon, which are the incumbent bigger brands and companies in the marketplace."[23]  In a December 20, 2017 email about how T-Mobile would "relaunch iPhone 8 BOGO plus $300 off X," Sprint's CEO, Marcelo Claure, wrote, "Let's match it.  We have no choice.  Go for it."[24]  Sprint personnel followed this direction.[25]

40.     Unlimited data plans also show the benefits of four-way competition. T-Mobile and Sprint led the way in introducing and popularizing unlimited LTE data plans.  In August 2016, T-Mobile debuted its nationwide One Unlimited plan.  According to at least one high-level Sprint executive, in creating its One Unlimited plan, T-Mobile copied Sprint trials of unlimited data plans in several local test markets at the time.[26]  To compete, Sprint immediately introduced a nationwide Unlimited Freedom plan that was cheaper than the T-Mobile One Unlimited plan.[27] At the time, Verizon did not offer an unlimited plan, and AT&T conditioned its unlimited plan

---

[22] *Id.* at 32.
[23] *Id.* at 44.
[24] *Id.* at 60-62.
[25] *Id.* at 61.
[26] *Id.* at 36-37, 42, 45.
[27] *Id.*

on subscribing to its DirecTV services.[28]  Forced to compete, both AT&T and Verizon launched

unlimited plans.[29]  In fact, after Sprint launched a promotional unlimited offer on February 10,

2017, Verizon and AT&T responded by introducing unlimited plans of their own on February 17

and March 2, respectively.[30]  T-Mobile responded to these moves by making an improvement to

its existing promotional unlimited offer.[31]  By aggressively slashing prices and creating

innovative and flexible plans, T-Mobile and Sprint disrupted the market and challenged the low

expectations that consumers had developed over the years, forcing responses by the complacent

titans of the industry—AT&T and Verizon.

## IV. **T-Mobile and Sprint Announce an Intention to Merge**

### A. **T-Mobile and Deutsche Telekom Plan a Merger with the Goal of Reducing Competition Throughout the Industry**

41.     But the need to compete, particularly with Sprint, did not sit well with T-Mobile

executives in Germany.  For example, in 2015, during a T-Mobile board meeting, the notes of

Thorsten Langheim ("Langheim")—then DT's head of Corporate Development—stated that the

"Sprint promo" was "value destructive for everyone."[32]  The problem, according Langheim's

notes from the board meeting, was that "[w]e are now at war, despite [T-Mobile] U.S. signaling

---

[28] *See* Colin Gibbs, *T-Mobile, Sprint Pit New Unlimited Data Plans Against One Another*, Fierce Wireless (Aug. 18, 2016, 9:42 AM), https://www.fiercewireless.com/wireless/t-mobile-and-sprint-lure-users-new-unlimited-data-plans.
[29] Trial Tr., Vol. 1 at 47.
[30] *Id.* at 50; *see also Sprint Announces FIVE Lines of Unlimited Data, Talk and Text for $90/month*, Bus. Wire (Feb. 10, 2017, 9:40 AM), https://www.businesswire.com/news/home/20170210005357/en/Sprint-Announces-FIVE-Lines-of-Unlimited-Data-Talk-and-Text-for-90month.
[31] Trial Tr., Vol. 1 at 50–51.
[32] Trial Tr., Vol. 2 at 278.

price increases [and] Verizon reinserting activation fees."[33]  For example, in 2016, after Sprint introduced unlimited plans for consumers, T-Mobile had no choice but to follow suit.  Langheim emailed Peter Ewens, head of Strategy at T-Mobile, that, as a result, executives were "freaking out in Bonn" about what they characterized as T-Mobile's "needlessly aggressive" response.[34]

42.     Indeed, as far back as 2010 and 2011, DT had considered a merger with Sprint, which its executives gushed would accomplish a "4-to-3" merger of MNOs in the United States that would increase profit by "reduc[ing] price competition."[35]  In August and November 2011, the United States Department of Justice ("DOJ") and Federal Communications Commission ("FCC") each moved to block AT&T's effort to acquire T-Mobile.  Regulators understood the importance of preventing further consolidation in the four-firm national wireless industry.

43.     Then, things changed.  In January 2017, T-Mobile CEO John Legere texted Langheim and DT CEO Timotheus Höttges that the "[r]egulatory environment will never be better than now" for a "four-to-three" merger.[36]  His text could barely contain his excitement: "Big prizes.  So smile and get to the table."[37]  Of course, the "big prize" was the opportunity to ramp down competition and ramp up profits.  In March 2018, Langheim listed "market structure" as one of the deal's rationales and noted that a merger with Sprint would make T-Mobile "one of three" instead of "three of four."[38]

---

[33] *Id.* at 279.

[34] *Id.* at 283.

[35] Trial Order, 439 F. Supp. 3d at 235-36 (quoting DT slide deck highlighting "Rule of three - - potential to reduce price competition").

[36] Trial Tr., Vol. 2 at 236 (quoting text message between DT CEO and Board member explaining that the "[r]egulatory environment will never be better than now [for] 4 to 3").

[37] *Id.* at 201–02.

[38] *Id.* at 346.

44.     Everyone involved knew, indeed hoped, that the effect of the merger would be bigger profits for the entire industry.  Sprint's Chief Marketing Officer Roger Sole-Rafols texted to Claure, its CEO, that he should point out to T-Mobile during negotiations that the market consolidation resulting from the merger would support price increases and billions of dollars in additional profits.[39]  He used the example of "plus $5 of ARPU in 2022"—i.e., an increase of five dollars in average revenue per user—to illustrate that a reward for consolidation could be an additional $4 billion per year in revenue.[40]  He lamented that Sprint could not be more explicit about this particular benefit of the merger "for reg. reasons"—i.e. because of concerns about regulators.[41]  And, he added, "the most interesting thing is that this value, assuming the same market share for all, is exactly the same for AT&T and VZ, that is, it will also end up accommodating plus $5 ARPU in a three-player scenario."[42]  AT&T and Verizon, Sole-Rafols claimed, were not appreciating that "they do not pay anything for this, the benefit of a consolidated market."[43]  Elaborating on this point at the later trial on the merger, Sole-Rafols testified that he meant "it would be a price increase in the whole market."[44]

45.     Similarly, on T-Mobile's side, in November 2017, when T-Mobile and Sprint's talks were stalled, Philipp Pohlmann, then DT's Head of Mergers and Acquisitions ("Pohlmann") texted Langheim to emphasize that the parties were not appreciating the "market

---

[39] Trial Tr., Vol 1 at 75.
[40] *Id.*
[41] *Id.*
[42] *Id.* at 79.
[43] *Id.* at 80.
[44] *Id.* at 79.

repair" the merger would usher in.[45]  "Market repair" is an industry euphemism for reduced competition and increased profits.[46]

### B.     The Merger Is Announced to Widespread Opposition

46.     On April 29, 2018, T-Mobile and Sprint announced their intention to merge.  The announcement generated an immediate outcry.  The *New York Times*, for example, reported that "[p]utting together the country's third-and fourth-largest mobile service providers would be one of the most significant consolidations in the American wireless market in years."[47]  Senator Amy Klobuchar, then the ranking member on the United States Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights issued a statement that "[c]ompetition among the four largest cell phone carriers has led to lower prices, better service, and more innovation" and that she was "concerned that increased consolidation could undermine benefits to consumers."[48]  Consumer watchdog group Common Cause warned that "consumers can

---

[45] Trial Tr., Vol. 2 at 349–50.

[46] *See, e.g.*, Ian Scales, *'Market Repair' Increases Mobile Costs Across Europe (Disrepair Keeps Them Lower)*, Telecom TV (Nov. 9, 2015), https://www.telecomtv.com/content/policy-and-regulation/market-repair-increases-mobile-costs-across-europe-disrepair-keeps-them-lower-13002/ ("It's a simple theory: if you have a near monopoly (a tight oligopoly) then you'll see higher prices and the threat of price discrimination and other sub-optimal behaviour from providers. . . . Hardly surprising, then, that so-called market repair has done just this across Europe where 4 to 3 has been engineered. Meanwhile competitive 'disrepair' with multiple operators, is seeing users getting what they want.").

[47] Michael J. de la Merced & Cecilia Kang, *Sprint and T-Mobile to Merge, in Bid to Remake Wireless Market*, N.Y. Times (Apr. 29, 2018), https://www.nytimes.com/2018/04/29/business/dealbook/sprint-tmobile-deal.html.

[48] Tony Romm & Brian Fung, *T-Mobile and Sprint Announce Plans to Merge*, Wash. Post (Apr. 29, 2018), https://www.washingtonpost.com/news/the-switch/wp/2018/04/29/t-mobile-and-sprint-announce-plans-to-merge/.

expect to pay higher prices and see fewer competitive options in the marketplace."[49] Similarly, Phillip Berenbroick, Senior Policy Counsel at the nonprofit Public Knowledge, observed that T-Mobile might be able to "steer clear of price wars" once it had a larger market share.[50]

47. Opposition to a merger between the nation's four largest wireless service providers was not unprecedented. Previously, federal regulators successfully resisted attempts to combine these dominant firms based on competitive concerns.[51] The *Washington Post* reported that some analysts believed the government made the right calls by blocking the merger of AT&T and T-Mobile in 2011, and indicating in 2014 that it would block an attempt by Sprint to acquire T-Mobile, thereby preserving "lower prices and consumer-friendly business practices, such as the end of long-term customer contracts,"[52] a practice initiated by maverick T-Mobile.[53]

48. Nine senators wrote a letter to the DOJ and FCC urging the agencies to block the merger, arguing that it would increase monthly bills as much as ten percent.[54] Two United States House of Representatives committees, the House Committee on Energy and Commerce and the

---

[49] Press Release, Common Cause, A Sprint-T-Mobile Merger Would Harm Consumers and Reduce Competition (Apr. 30, 2018), https://www.commoncause.org/press-release/a-sprint-t-mobile-merger-would-harm-consumers-and-reduce-competition/.

[50] Colin Lechler, *Will Regulators Approve The Massive T-Mobile-Sprint Merger?*, The Verge (Apr. 30, 2018, 12:52 PM), https://www.theverge.com/2018/4/30/17301876/t-mobile-sprint-merger-fcc-ajit-pai-justice-department.

[51] Romm & Fung, *supra* note 48.

[52] *Id.*

[53] *See* Jacob Kastrenakes, *Two-Year Phone Contracts Are Now Dead at All Major U.S. Carriers*, The Verge (Jan. 11, 2016), https://www.theverge.com/2016/1/11/10749160/sprint-kills-two-year-phone-contracts; Brian X. Chen, *T-Mobile Shakes Up Its Service*, N.Y. Times (Mar. 26, 2013), https://www.nytimes.com/2013/03/27/technology/t-mobile-unveils-aggressive-phone-pricing-with-no-contracts.html.

[54] Press Release, Richard Blumenthal, U.S. Sen., Blumenthal Leads Eight Senators Urging Department of Justice & FCC to Reject T-Mobile & Sprint Merger (Feb. 12, 2019), https://www.blumenthal.senate.gov/newsroom/press/release/blumenthal-leads-eight-senators-urging-department-of-justice-and-fcc-to-reject-proposed-t-mobile_sprint-merger.

House Committee on the Judiciary, held hearings on the harm the merger posed. At the hearing held by the House Judiciary Committee, Subcommittee on Antitrust, Commercial and Administrative Law, experts testified that four-to-three mergers of wireless carriers in Europe had inflated prices and that the proposed merger would be especially painful for lower-income consumers by reducing choices among lower-priced plans.[55]

### C.   <u>Widespread Opposition to the Merger Was Predictable</u>

49.     Widespread opposition was unsurprising. Consolidation in mobile telecommunications markets has generally resulted in price increases. For example, one study found that the presence of a fourth firm in the mobile telecommunications market lowers prices by about seven to nine percent compared to countries with three firms.[56]

50.     The Sprint/T-Mobile merger in particular threatened to reduce competition dramatically. It would not simply condense the market from four to three firms, in practical terms it would—and ultimately did—eliminate two maverick firms responsible for much of the price competition and innovation among wireless carriers, leaving a market landscape of three dominant firms of nearly the same scale.[57]

---

[55] *See* Alex Wagner, *House Judiciary Subcommittee Hearing on T-Mobile-Sprint Merger Covers Trump Hotel Stays; Huawei Network Equipment, and More*, TmoNews (Mar. 12, 2019), https://www.tmonews.com/2019/03/house-judiciary-subcommittee-hearing-t-mobile-sprint-merger-covers-trump-hotel-stays-huawei-network-equipment.

[56] *A Cross-Country Econometric Analysis of the Effect of Disruptive Firms on Mobile Pricing*, Ofcom 2 (Mar. 15, 2016), https://www.ofcom.org.uk/__data/assets/pdf_file/0019/74107/research_document.pdf. This study also found that the presence of a disruptive firm decreases prices between approximately ten and twelve percent. *Id.*

[57] Specifically, by the later trial on several states' attempt to block the merger, the court credited evidence that the combined firm would have a national market share of 37.8% by subscribers, or 34.4% by revenue—slightly more than one third of the market, just like Verizon and AT&T. *See* Trial Order, 439 F. Supp. 3d at 206.

51.     Courts and regulators have historically assessed a merger's effect on market concentration using the Herfindahl-Hirschman Index ("HHI"), which squares the market shares of industry participants before and after the merger, then sums them.[58]  The Federal Trade Commission and United States Department of Justice Horizontal Merger Guidelines specify that a merger resulting in an increase of more than 200 points and a total HHI of more than 2,500 will be regarded as creating a "highly concentrated market" that is presumptively anticompetitive. The trial court evaluating a challenge to the Sprint/T-Mobile merger credited evidence that the national HHI would increase by 679 points for a total HHI of 3186.[59]  Therefore, the court found, the acquisition was presumptively anticompetitive under *United States v. Philadelphia National Bank*, 374 U.S. 321, 363 (1963).[60]

52.     Such a significant increase in concentration of an already concentrated market has the prospect of substantially reducing competition in two ways.  First, the elimination of a competitor does away with the pricing pressure offered by that firm's possibly superior efficiency and interest in acquiring volume.  The three remaining firms in this case—the New T-Mobile, AT&T, and Verizon—could, with the lowest-priced competitors out of the market, each expect to charge higher prices without losing customers to better deals.  Likewise, increasing the concentration of a market allows and incentivizes the surviving firms to compete less intensely.

---

[58] *Herfindahl-Hirschman Index*, U.S. Dep't of Just. (Jul. 31, 2018), https://www.justice.gov/atr/herfindahl-hirschman-index (last visited June 6, 2022) ("The term 'HHI' means the Herfindahl–Hirschman Index, a commonly accepted measure of market concentration.  The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$).").
[59] Trial Tr., Vol. 3 at 647.
[60] Trial Order, 439 F. Supp. 3d at 205-06.

All else being equal, the more concentrated a market, the easier it is for firms to avoid price wars and share the market while keeping prices high.

53.     Key features of the Retail Cell Service Market stood to exacerbate the merger's effect on competition.  From the perspective of the competing wireless service providers, pricing in the Retail Cell Service Market is straightforward and consists largely of commodity service plans offered at publicly-known standard rack rates.  The providers tracked promotional offerings and monitored each other on various metrics on a daily or weekly basis.  For example, T-Mobile's executive board was regularly shown "key metrics" including aggregated figures on weekly promotions that allowed them to observe and react to competition in the marketplace.[61] Indeed, as described above, a key way Sprint and T-Mobile competed with other wireless service providers pre-merger was by advertising with explicit price comparisons.  In a highly concentrated market, these features—commodity products, and standardized, transparent pricing—make it less likely firms will engage in price wars and more likely that they will align on price, avoid competition, and maximize profits.

54.     Even pre-merger, the carriers used public price announcements to avoid price wars.  In an internal pre-merger email discussing a planned iPhone promotion, T-Mobile executive Janice Kapner stressed the need to "include an end date on the promo to **signal to our competitors** that it was really just our turn to run our promo on iPhone for a bit, like they each have."  Kapner emphasized that, by specifying an end date, T-Mobile was signaling to its competitors that they need not "panic that this was long term."[62]  The merger, by reducing the

---

[61] Trial Tr., Vol. 3 at 675–76; Trial Tr., Vol. 10 at 2283.
[62] Trial Tr., Vol. 5 at 1109 (emphasis added).

number of competitors, amplified the ability of wireless service providers to use promotion announcements to send signals and avoid competition.

55.     Avoiding price wars was an acknowledged benefit of doing away with Sprint. During the trial to stop the merger, Langheim admitted that "T-Mobile [was] sending signals to its competitors [that it wished to dampen price competition], but competition from Sprint is still taking place."[63] He griped that Sprint's refusal to go along with the other carriers—and, instead, compete—was, in his view, "[t]otally irrational."[64]

56.     At the same time, the high barriers to entry and expansion detailed above meant that the surviving carriers need not fear that high prices would encourage new entrants.

57.     It was therefore apparent to all involved that the merger stood to increase the danger of coordinated pricing in the market: it would reduce the already small number of firms and curtail T-Mobile's incentive to compete fiercely by making its scale and cost structure more similar to that of the other two dominant firms, AT&T and Verizon.[65] Or, as Sprint itself put it when suing to block AT&T from acquiring T-Mobile in 2011, "Verizon, AT&T's most significant competitor post-merger, would not have the incentive to constrain AT&T, and would have a substantially increased incentive to coordinate with AT&T rather than compete."[66] If eliminating the "maverick" incentives of only one of the two firms exhibiting these incentives

---

[63] *Id.*

[64] *Id.*

[65] Marc Ivaldi et al., *The Economics of Tacit Collusion: Implications for Merger Control*, in 282 Contributions to Economic Analysis: The Political Economy of Antitrust 223-224 (Vivek Ghosal & Johann Stenek eds. 2007), http://www.untag-smd.ac.id/files/Perpustakaan_Digital_2/POLITICAL%20ECONOMY%20The%20Political%20Economy%20of%20Antitrust,%20Volume%20282.pdf#page=234.

[66] Compl. at ¶ 3, *Sprint v. AT&T et al*., No. 1:11-cv-01600, 2011 WL 3891692 (D.D.C. Sept. 6, 2022), ECF No. 1.

was enough to increase the chances of coordination, eliminating the incentives of *both* firms would surely increase those changes to an even greater degree. The merger thereby ensured that the surviving firm—T-Mobile—would achieve substantial market power (power over price) in the relevant market.

58. At trial, Dr. Carl Shapiro, a preeminent industrial organization economist who led the revision of the current Horizontal Merger Guidelines and is frequently retained by federal enforcers to analyze mergers,[67] concluded that the market was susceptible to coordination should it become more concentrated.[68] Based on a careful study of the industry and application of economic principles, he predicted that prices would stabilize and decline less following the merger than they had historically.[69] He estimated that the harm from the merger on this front alone would be $8.7 billion per year.[70]

**D.     The Merger Eliminated a Vibrant and Disruptive Competitor From the Field**

59. The merger thus stood to wreck competition in the industry by taking down an established upstart with a history of challenging the industry's larger incumbents. Furthermore, while Sprint was smaller, it still had a substantial, competitive network, giving it strong incentives to compete and grow its share of the market to a point where it had a more competitive cost structure. Sprint began a push to slash prices and improve its market share

---

[67] Trial Tr., Vol. 3 at 618; *see, e.g.*, *Fed. Trade Comm'n v. Qualcomm Inc.*, No. 17-CV-00220-LHK, 2018 WL 6615050, at *5 (N.D. Cal. Dec. 17, 2018) (Dr. Shapiro testifying on behalf of FTC); *United States v. AT & T Inc.*, 310 F. Supp. 3d 161, 171 (D.D.C. 2018), *aff'd sub nom. United States v. AT&T, Inc.*, 916 F.3d 1029 (D.C. Cir. 2019) (Dr. Shapiro testifying on behalf of U.S. Department of Justice).
[68] *Id.* at 671–72.
[69] *Id.* at 615–17.
[70] *Id.* at 616.

when Marcelo Claure started as CEO in 2014. Under Claure, Sprint launched new unlimited plans at lower costs, dropped prices and leveraged its high-capacity data network to offer consumers higher-value plans, and offered an industry-first leasing option for the iPhone.[71] In subsequent years, Sprint continued developing competitive offers, like adding free international data roaming in 2015 and expanding free international data service to 165 countries in 2017.[72] In 2015, Sprint rolled out its tri-band carrier aggregation LTE network in more than 200 markets, and third-party network analytics firms reported that Sprint had the fastest download speeds in several geographic areas, including New York City.[73] Recognition of Sprint's improved network continued to shake the foundations of the wireless market. In 2016, for example, J.D. Power, a leader in independent industry benchmarking, ranked Sprint's network second best ahead of AT&T and T-Mobile.[74] In 2016, T-Mobile senior management told DT management that Sprint was "gaining momentum with aggressive Promotions."[75]

60. Sprint's network performance was improving year after year. According to industry data, "Sprint was the most improved operator in 2017 based on the average download

---

[71] Marguerite Reardon, *Sprint CEO Hits Gas On Price Overhaul*, CNET (Apr. 18, 2014), https://www.cnet.com/tech/mobile/sprint-ceo-hits-gas-on-price-overhaul/.

[72] Sprint Corp., Q3 2017 Earnings Call Transcript 4 (May 3, 2017), https://s24.q4cdn.com/400059132/files/doc_financials/sprint/quarterly/2016/q4/S-US-20170503-1941373-C.pdf; Damon Poeter, *Sprint Eliminates International Roaming Charges*, PC Mag (Apr. 10, 2015), https://www.pcmag.com/news/sprint-eliminates-international-roaming-charges-in-select-countries.

[73] Sprint Corp., Q4 2015 Earnings Call Transcript 5 (May 3, 2016), https://s24.q4cdn.com/400059132/files/doc_financials/sprint/quarterly/2015/q4/S-US-20160503-1832656-C.pdf.

[74] Sprint Corp., Q4 2016 Earnings Call Transcript 5 (May 3, 2017), https://s24.q4cdn.com/400059132/files/doc_financials/sprint/quarterly/2016/q4/S-US-20170503-1941373-C.pdf.

[75] Trial Tr., Vol. 2 at 184.

speed."[76]  Ookla Speedtest found in 2018 that Sprint's average download speed improved the

most of any national carrier year-over-year and was fastest in 123 cities.[77]

61.     As a result of Sprint's price changes, network development, and other competitive

efforts, such as cost cutting, Sprint's financials improved.  At the end of the 2014 fiscal year,

Sprint had added more than 1.2 million total net customers up from a net loss of 383,000 the

previous year.[78]  In the Retail Cell Service Market, "churn" is a term used to denote a carrier's

rate of customer loss to rival carriers.  Sprint's postpaid[79] churn fell from a high of 2.3 percent in

the third quarter of 2014 to 1.84 percent for the fourth quarter of 2014,[80] meaning that the

percentage of Sprint subscribers defecting to other carriers was on the decline.  In the second

quarter of 2015, Sprint reached a major milestone in its turnaround:  on net it had added postpaid

subscribers for the first time in over two years, even though all three of Sprint's competitors

experienced decreases in net subscribers year-over-year.[81]  Momentum on this metric continued.

For fiscal year 2015, Sprint reported more postpaid phone net additions than either Verizon or

AT&T for the first time ever.[82]  In 2016, Sprint's postpaid phone net additions more than

---

[76] Trial Tr., Vol. 3 at 469.

[77] Sprint Corp., Q2 2018 Earnings Call Transcript 5 (Oct. 31, 2018),
https://s24.q4cdn.com/400059132/files/doc_financials/sprint/quarterly/2018/q2/S-US-20181031-2162998-C.pdf.

[78] Sprint Corp., Q4 2014 Earnings Call Transcript 4 (May 5, 2015),
https://s24.q4cdn.com/400059132/files/doc_financials/sprint/quarterly/2014/q4/h-transcript-03-31-15.pdf.

[79] "Postpaid" wireless customers pay a monthly bill for service.  They make up the vast bulk of
the revenues in the market.  "Prepaid" wireless customers pay in advance for a discrete allotment
of access.

[80] Sprint Corp., Q4 2014 Earnings Call Transcript, *supra* note 78, at 5.

[81] Sprint Corp., Q2 2015 Earnings Call Transcript 3–4 (Nov. 3, 2015),
https://s21.q4cdn.com/487940486/files/doc_financials/transcripts/b-transcript-09-30-15.pdf.

[82] *Id.*

doubled to 930,000.[83]  Sprint reported positive postpaid phone net additions in both 2017 and 2018.[84]

62.     Sprint was also poised to be a dominant competitor in 5G.  Jay Bluhm, Sprint's Vice President of Network Development and Engineering confirmed that as of the second quarter of 2018 (around the time of the merger announcement), Sprint had planned to compete "strong" in 5G by 2020 by making significant capital expenditures to its network infrastructure.[85] As Dr. John Saw, Sprint's Chief Technology Officer, explained to his team:  "Our 5G planning is taking on some strong momentum in recent days, and we are more determined than ever to leapfrog everyone with the launch of the first wide coverage mobile 5G network with a 5G smartphone by the first quarter calendar year 2019."[86]  Based on Sprint's numerical indicators of success, as well as the bright future for Sprint's continued 5G rollout, in May 2018 Softbank promoted Claure to Executive Chairman of both Sprint and CEO of Softbank.[87]

## V.     T-Mobile Itself Knew That DISH Network Could Never Replace Sprint as an Effective Competitor

63.     In July 2019, after over a year of review, the DOJ filed a complaint that spelled out the threat of the merger to reduce competition substantially.  It observed that United States

---

[83] Sprint Corp., Q4 2016 Earnings Call Transcript (May 3, 2017, 8:30 AM ET), https://seekingalpha.com/article/4068735-sprint-s-q4-2016-results-earnings-call-transcript.
[84] Sprint Corp., Q4 2017 Earnings Call Transcript 5 (May 2, 2018), https://s24.q4cdn.com/400059132/files/doc_financials/sprint/quarterly/2017/q4/S-US-20180502-2086348-C-(1).pdf; Sprint Corp., Q4 2018 Earnings Call Transcript (May 7, 2019 4:30 PM ET), https://seekingalpha.com/article/4261276-sprint-corporation-s-ceo-michel-combes-on-q4-2018-results-earnings-call-transcript.
[85] Trial Tr., Vol. 3 at 461–63.
[86] *Id.* at 476.
[87] Sean Kinney, *With T-Mo Merger on Table, Sprint Has Best Quarter Ever*, RCRWireless (May 3, 2018), https://www.rcrwireless.com/20180503/business/sprint-has-best-quarter-ever-tag17.

mobile wireless consumers "have benefitted from the competition T-Mobile and Sprint have brought to the mobile wireless industry," including the introduction of unlimited data plans to retail customers in 2016.[88]  The DOJ concluded that "if the merger were allowed to proceed, this competition would be lost."[89]

64.     The DOJ never litigated a challenge to the merger, however.  Instead, Sprint and T-Mobile agreed to structural and behavioral changes embodied in a consent decree filed simultaneously with the DOJ's complaint.  Enter DISH, a satellite television company that until that point had never operated a mobile wireless network.  To get the deal past the DOJ, T-Mobile sold DISH its prepaid phone business ("Boost Mobile") and other Sprint prepaid assets, for a price of $1.4 billion.  Additionally, T-Mobile agreed it would lease network access to DISH for seven years, while DISH built its own network.  The settlement also required T-Mobile and Sprint to provide certain "transition services" to DISH for up to three years, including billing, customer care, and SIM card procurement.[90]  Sprint and T-Mobile sold the arrangement to the DOJ on the theory that these concessions would enable DISH to ultimately replace Sprint as the fourth MNO in the industry.

65.     T-Mobile and its owner knew differently.  Internally, DT doubted whether DISH could build out a 5G network, and even if it did, whether it would be able to successfully compete.[91]  In June 2019, Pohlmann stated his belief that DISH "was not likely to build a

---

[88] Compl. ¶ 17, *United States v. Deutsche Telekom AG*, No. 1:19-02232, 2019 WL 3944978 (D.D.C. July 26, 2019), ECF No. 1.
[89] *Id.* ¶ 21.
[90] SIM cards are removable chips in cellular phones that enable them to make calls.
[91] Trial Tr., Vol. 2 at 209–10.

substantial wireless network of its own."[92] According to an internal company document, T-Mobile's executive team was also "very skeptical that much network would be built, as it takes so long and needs billions."[93]  Other communications from Pohlmann demonstrate DT's belief that Charles Ergen, Co-founder and Chairman of Dish Network, "has no real team to run a wireless business of substance."[94]  In sum, DT's US team had "little confidence that Charlie [Ergen] or any other buyer will have ability and incentive to build a meaningful fourth network."[95]

66.     Indeed, T-Mobile said as much—and more—when DISH initially ***opposed*** the merger:

> DISH has a track record of price increases for its services, speculative warehousing of spectrum, and failing to meet FCC-imposed deadlines to construct the facilities required to deliver wireless services to the public.  Indeed, DISH stands out for its efforts to game the regulatory system by proffering a modernized version of last century's two-way paging as a substitute for meeting its obligations to start building a real 5G network.[96]

The notion that a satellite TV company that lacked the experience or capital to develop its own cellular network could eventually compete with the established national carriers was never grounded in reality; it was merely a fig leaf to allow consummation of the deal.

---

[92] *Id.* at 318–19.

[93] *Id.* at 319.

[94] *Id.* at 321.

[95] *Id.* at 338.

[96] Letter from Nancy J. Victory, Counsel, T-Mobile Corp., to Marlene H. Dortch, Fed. Commc'n Comm'n (Mar. 11, 2019), https://ecfsapi.fcc.gov/file/1031124977749/March%2011%202019%20Pricing%20ex%20parte.pdf.

## VI.   A Federal Court, Acting as a Self-Described Judicial "Fortuneteller" Performing a "Murky Function," Makes a Difficult Decision to Decline to Enjoin the Merger

67.     On June 11, 2019, New York, California, Colorado, Connecticut, Maryland, Michigan, Mississippi, and Wisconsin, the Commonwealth of Virginia, and the District of Columbia filed suit to block the transaction.  According to their complaint:

> The cumulative effect of this merger, therefore, will be to decrease competition in the retail mobile wireless telecommunications services market and increase prices that consumers pay for mobile wireless telecommunications services. . . . The merger will also negatively impact the entire ecosystem of businesses and significant segments of the American economy that depend on mobile wireless telecommunications services.[97]

68.     The states went to trial and lost.  The district court was faced with a lofty task: to serve as a self-described judicial "fortuneteller" that had to make "a judicial reading of the future" as to whether the merger would "substantially lessen competition," thus "caus[ing] prices to increase[] and harm to consumers."[98]  The district court was constrained by realities of the merger clearance process, which forced it to reach its decision without the benefit of the real-world post-merger data.  The court therefore trusted the testimony of T-Mobile, Sprint and DISH executives that T-Mobile would continue to compete vigorously as the "Un-carrier," that Sprint would not have survived as a "strong competitor," and that DISH would enter the wireless services market as a viable competitor and live up to its commitments to build a national network to "fill the competitive gap left by Sprint's demise."[99]  The relevant parties' subsequent actions proved to be in direct conflict with their representations to the district court.

---

[97] Compl. ¶ 7, *New York v. Deutsche Telekom AG*, No. 1:19-5434 (S.D.N.Y. June 11, 2019), https://oag.ca.gov/system/files/attachments/press-docs/t-mobile-sprint-complaint-redacted-case-19-cv-5434.pdf.
[98] Trial Order, 439 F. Supp. 3d at 186.
[99] *Id.* at 189, 194.

### A. The District Court's Conclusions About Likely Future Anticompetitive Effects Were Based on the Defendants' Misleading Promises That Consumers Would Be Better Off After the Merger

69.     T-Mobile and Sprint promised the district court that, as a result of increased competition flowing from the merger, prices to consumers would likely not only be unaffected, but that they would go *down and quality would improve*.[100]  Specifically, they assured the court that the merger would generate $540 million of benefits for consumers in 2020 and unleash more than $18 billion in annual consumer "welfare gains" by 2024.[101]  Defendants also promised that by increasing their network capacity and coverage and reducing costs, the combined entity would "*lower prices* and thus *compete more effectively* against AT&T & Verizon."[102]  They claimed that the "New T-Mobile would use these advantages to decrease[] consumer prices because doing so would actually be profitable."[103]  Counter to the claims of the litigating states, the New T-Mobile would "lower its prices and advertise the higher quality of its network to attract consumers away from AT&T and Verizon, thus increasing competition."[104]

70.     Defendants justified the merger not just based on supposed pro-competitive benefits to existing T-Mobile subscribers, but also on promised benefits to AT&T and Verizon customers as well.  The court accepted that those customers—Plaintiffs and class members here—would "benefit insofar as New T-Mobile continued T-Mobile's past practice of pushing AT&T and Verizon to adopt pro-consumer offerings."[105]

---

[100] *Id.* at 187.
[101] *Id.* at 208.
[102] *Id.* (emphasis added).
[103] *Id.* at 210.
[104] *Id.*
[105] *Id.*

71.     The trial court also relied heavily on the Defendants' assurance that aggressive competition by DISH—"from day one"—would be a "substantial incentive to competition."[106] Defendants promised that DISH's sizeable spectrum holdings, its acquisition (via divestiture) of Sprint's Boost and additional spectrum, and its access to low wholesale rates provided by an MVNO agreement with T-Mobile would help make DISH a credible competitor.  In other words, a substantial part of the competitive threat posed by DISH was based on the presumption of long-term, low-cost wholesale access to the T-Mobile network while it prepared its own 5G network offering.[107]  T-Mobile would, it assured the court, make low wholesale rates available to DISH, in addition to at least 20,000 network towers that would otherwise be decommissioned as unnecessary to the merged entity.[108]  Under this scheme, DISH was supposed to become a nationwide MNO to replace Sprint within three years of the merger, even though it was at the mercy of leased access to T-Mobile networks to build the requisite customer base.

72.     The trial court also relied heavily on promises by T-Mobile executives that it would continue its past pattern of aggressive competition with AT&T and Verizon, and that the merger would therefore not result in higher prices.  Prior to the announcement of the merger, from 2014 to 2017, competition consistently drove down prices, by 6.3 percent per year on average, measured as the decline in average revenue per user.[109]  The trial court accepted that this trend would not be impaired by the merger because it believed Defendants' assurances that "T-Mobile has built its identity and business strategy on insulting, antagonizing, and otherwise

---

[106] *Id.* at 226.
[107] *Id.* at 225.
[108] *Id.* at 228–29.
[109] *Id.* at 234.

challenging AT&T and Verizon to offer pro-consumer packages and lower pricing."[110]  Based on these promises, the trial court concluded that T-Mobile would continue its historical trend of undercutting AT&T and Verizon, who would in turn be forced to reciprocate, defying the strong financial incentive to coordinate prices and otherwise compete less aggressively in a more highly concentrated market.[111]

**B.** **The District Court's Conclusions About Likely Future Anticompetitive Effects Were Based on Defendants' Self-Serving Testimony About Sprint**

73.     The trial court also relied on self-serving testimony from Sprint's executives that Sprint could not survive in the long-term as a meaningful competitor—contrary to its historical track record of growth through vigorous competition, detailed above.

74.     In fact, the Sprint and T-Mobile executives who testified stood to receive severance packages worth tens of millions dollars if the merger was completed.  For example, Sprint's Executive Chairman and former CEO Marcelo Claure had an estimated severance payment of $61.5 million in the event of a merger.[112]  Michel Combes, Sprint's current CEO, had an estimated payout of $26.1 million.[113]

---

[110] *Id.* at 237.

[111] *Id.* at 248.

[112] Sprint Corp., Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 (Schedule 14A) 55 (Aug. 7, 2018), https://d18rn0p25nwr6d.cloudfront.net/CIK-0000101830/5cd143e8-9802-4af7-8699-18c72b887e79.pdf (Claure's payout was calculated using the value of the stock options in his severance package based on Sprint's March 29, 2018 stock price of $4.88).

[113] *Id.* (same calculation method as above).

75. Similarly, T-Mobile CEO John Legere was scheduled to step down in April 2020 at the time of the trial. Legere received a payout of more than $137 million, a large portion of which was tied to the successful completion of the merger.[114]

76. Sprint would have continued to compete vigorously in the market absent the merger. Pre-merger, Sprint's executives confidently predicted that Sprint was a healthy business built for future growth. When asked about potential mergers during Sprint's first quarter of 2017 earnings call, Sprint's then-CEO Claure remarked, "[We] are very proud that we have a company that can now sustain itself on a standalone basis."[115] During a third quarter of 2017 earnings call, around the time Sprint was entertaining various merger offers, Claure told shareholders that "Sprint is best positioned to be the first carrier with [a] nation-wide mobile 5G platform." He declared that he was "very confident in Sprint's future, based on the competitive advantage that we will have with the deployment of 5G on our 2.5 spectrum."[116]

77. Sprint's business pre-merger had significant value, as demonstrated by the $26 billion T-Mobile paid to Sprint's former owners. Indeed, prior to the merger, Sprint consistently reported that it could pay its financial obligations in the years leading up to the merger, and never suggested it needed bankruptcy protection.[117]

_____

[114] T-Mobile US, Inc., Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 (Schedule 14A) 59 (Apr. 21, 2021), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001283699/f54aaeee-ac40-40e5-b76e-57be85403937.pdf; *see also* Drew FitzGerald, *T-Mobile's Former Chief Collected $137 Million After Clinching Sprint Takeover*, Wall St. J. (Apr. 21, 2021, 6:15 PM), https://www.wsj.com/articles/t-mobiles-former-chief-collected-137-million-after-clinching-sprint-takeover-11619043306.
[115] Sprint Corp., Q1 2017 Earnings Call Transcript (Aug. 1, 2017, 8:30 AM ET), https://seekingalpha.com/article/4093250-sprint-s-q1-2017-results-earnings-call-transcript.
[116] Sprint Corp., Q3 2017 Earnings Call Transcript, *supra* note 72.
[117] *See, e.g.*, Presentation, Tarek Robbiati, Chief Fin. Officer, Sprint Corp., 45th Annual UBS Global Media and Communications Brokers Conference (Dec. 15, 2017, 4:14 PM ET),

## VII. Real World Post-Merger Data Shows That Defendants Misled the District Court About the Effects of the Merger

### A. Consumers and Small Businesses Have Suffered

78.     Contrary to Defendants' promises, consumers and small businesses have not realized hundreds of millions of dollars in gains to their "welfare." Instead, they have paid billions more dollars to AT&T, Verizon, and T-Mobile than they would have absent the merger.

79.     The U.S. Department of Labor, Bureau of Labor Statistics (BLS) publishes a Consumer Price Index (CPI) estimating the costs of "personal wireless plans" for consumers in the national market.[118] BLS quality adjusts this data using a hedonic regression model that

---

https://seekingalpha.com/article/4129858-sprint-s-45th-annual-ubs-global-media-and-communications-brokers-conference-transcript ("This quarter alone we paid down about $2 billion of expensive debt between Network LeaseCo and also a legacy Clearwire notes that were costing us 14.75% points. So, we have the ability to fund our network expansion cycle out of expensive debt into cheaper debt and reduce our cost of capital over time."); Presentation, Marcelo Claure, Chief Exec. Officer of Sprint Corp. at J.P. Morgan Global Technology, Media and Telecom Conference (May 22, 2017), https://seekingalpha.com/article/4075474-sprints-ceo-marcelo-claure-presents-j-p-morgan-global-technology-media-and-telecom-conference ("I think last time we reported we were sitting on $8 billion of cash. We are sitting on $11 billion of liquidity sufficient to meet our obligations."); Sprint Corp., Q1 2016 Earnings Call Transcript (July 25, 2016), https://seekingalpha.com/article/3991225-sprint-s-r-marcelo-claure-on-q1-2016-results-earnings-call-transcript ("We expect that we will have adequate sources to provide all the capital necessary to fund the business and repay the debt maturities due in fiscal year 2016."). Sprint only changed its tune after the merger was announced; a claim that appears to be flatly contradicted by internal assurances from Softbank to satisfy Sprint's debts if necessary. *See* Lily Lieberman, *Former Sprint CEO Says Company Can Survive Without T-Mobile Merger*, Puget Sound Bus. J. (Dec. 17, 2019), https://www.bizjournals.com/seattle/news/2019/12/17/former-sprint-ceo-says-company-can-survive-without.html (describing 2017 email where Softbank founder and CEO assured Sprint's CEO Marcelo Claure: "If we need to pay back most or all of bonds, I am willing to pay back all those.").

[118] BLS publishes this data as part of its Consumer Price Index (CPI), "a measure of the average change over time in the prices paid by urban consumers for a market basket of consumer goods and services." Bureau of Lab. Stat., *Consumer Price Index* (last visited May 13, 2022), https://www.bls.gov/cpi/. BLS defines "Personal wireless/cellular telephone service" as "where the telephone instrument is portable and sends/receives signals for calls through the air waves." This includes consumer basic and smartphone postpaid and prepaid plans that offer talk, text, or

estimates the value of relevant differences in plan offerings, including the amount of high-speed data, the number of lines offered, and other characteristics.[119] BLS data reflects price increases and decreases in the national market over time, taking into account differences in plan offerings that might add or reduce value to a consumer.

80. BLS data demonstrates the harmful effect of the merger on competition. As displayed in the chart below, BLS observed significant declines in quality-adjusted pricing for consumer wireless telephone services prior to the merger. Among other things, this trend reflected the market-wide adoption of unlimited data plans necessitated by ambitious plan offerings from the two maverick competitors, T-Mobile and Sprint. Shortly after the merger closed, however, quality-adjusted prices substantially *increased* for the first time in years.

---

mobile data; connected device plans that provide data access without voice calling are not included. *See* Bureau of Lab. Stat., *Measuring Price Change in the CPI: Telecommunications Services* (last visited May 13, 2022),
https://www.bls.gov/cpi/factsheets/telecommunications.htm.

[119] For more information on BLS quality adjustment of telecommunications pricing. *See generally* Bureau of Lab. Stat., *Frequently Asked Questions About Hedonic Quality Adjustment in the CPI* (last visited May 13, 2022), https://www.bls.gov/cpi/quality-adjustment/questions-and-answers.htm.



Source: Bureau of Lab. Stats., *CPI for All Urban Consumers (CPI-U), Wireless Telephone Services in U.S. City Average, All Urban Consumers, Not Seasonally Adjusted (2012-2022)*, https://data.bls.gov/timeseries/CUUR0000SEED03?output_view=data (last visited Apr. 2022).

81. T-Mobile recognized the merger's effect on competition in real time, even before it closed. In June 2018, at a T-Mobile board of directors meeting, its CEO, John Legere, explained that T-Mobile still saw Sprint as its most aggressive competitor, with the most aggressive promotions, and the cheapest offers for their unlimited plan. But Legere also reported that as soon as the merger agreement was signed, T-Mobile observed that AT&T and Verizon started to slow their aggressiveness in responding to prices.[120] At the September 2018 board

---

[120] Trial Tr., Vol. 2 at 287–88.

meeting, Legere again explained that five months after announcement of the merger, AT&T and Verizon's competitive aggressiveness had slowed.[121]

82.     Verizon reduced its competitive efforts after the merger.  During the second quarter of 2021, Verizon stated regarding pricing that it was "very comfortable with the offers we have in the marketplace" and it was "not going to chase unprofitable growth."[122]  Like AT&T, Verizon reported lowered churn rates in response to reduced competition.  Verizon reported record low postpaid phone churn of 0.65 percent in the second quarter of 2021, even lower than AT&T.[123]  After Verizon released its 2020 financials, analyst Moffett Nathanson commented that Verizon's low churn in combination with its low net phone adds and improving wireless revenues show "a moderation of competitive intensity[.]"[124]

83.     Capitalizing on its newly consolidated market environment, Verizon projected a 3.5 to 4.0 percent increase in wireless service revenues for 2021.[125]  Verizon ended up beating its

---

[121] *Id.* at 290–91.

[122] Verizon Commc'ns Inc., Q2 2021 Earnings Call Transcript (July 21, 2021, 2:00 PM), https://www.fool.com/earnings/call-transcripts/2021/07/21/verizon-communications-inc-vz-q2-2021-earnings-cal/ (first quotation); Verizon Commc'ns Inc., Q4 2020 Earnings Call Transcript 11 (Jan. 26, 2021, 3:01 PM ET), https://seekingalpha.com/article/4401100-verizon-communications-inc-vz-ceo-hans-vestberg-on-q4-2020-results-earnings-call-transcript (second quotation).

[123] Verizon Commc'ns  Inc., Q2 2021 Earnings Call Transcript, *supra* note 122 (noting achievement of low churn in a non-COVID affected quarter).

[124] Verizon Commc'ns Inc., Q4 2021 Earnings Call Transcript 12 (Jan. 26, 2021), https://www.verizon.com/about/investors/quarterly-reports/2q-2021-earnings-conference-call-webcast

[125] Press Release, Verizon Commc'ns Inc., Verizon Reports Increased 5G Adoption and Record 2Q Performance (July 21, 2021), https://www.verizon.com/about/news/verizon-reports-increased-5g-adoption-and-record-2q-performance ("Our strong first half performance and the momentum in our business gives us the confidence to raise our total wireless service revenue growth guidance to between 3.5 percent and 4 percent.").

own projections, reporting a 4.68 percent increase in wireless service revenues for 2021.[126]  In particular, Verizon reported a 4.66% increase in wireless service revenues for consumer plans—a significant increase compared to -0.4% and 2.5% growth in 2020 and 2019, respectively.[127]

84.     Nor are consumers getting more choice for their money.  Besides increasing quality-adjusted prices, the merger's effect on competition can also be seen in the decline in the frequency of plan changes, or "introductory events," offered by the major carriers every year.



**Annual Postpaid Plan Introductory Events by Carrier**
*Monthly Plans with One Line, 2014–2021*

*Note:* Includes only postpaid, monthly, one-line cellular plans for smartphones.  Introductory events include new plan introductions and price decreases or data increases on exisiting plans.  When multiple new plans are announced together, or first appear on the same date, they are treated as a single event.

*Source:* Carrier press releases, news articles, and historic plan options listed on carrier and third-party websites.

---

[126] *See* Verizon Commc'ns Inc., Annual Report (Form 10-K), at 99 (Feb. 11, 2022), https://verizon.api.edgar-online.com/EFX_dll/EdgarPro.dll?FetchFilingConvPDF1?SessionID=KuKwktS30tPmFed&ID=15556310.

[127] *See id.* (2020 and 2021 growth statistics); Verizon Commc'ns Inc., Annual Report (Form 10-K), at 127 (Feb. 21, 2020), https://verizon.api.edgar-online.com/EFX_dll/EdgarPro.dll?FetchFilingConvPDF1?SessionID=KuKwktS30tPmFed&ID=13940645 (2019 growth statistics).

85. For example, between 2014 and 2018, AT&T tried to win new business by improving its plan offerings 2.8 times per year; from 2019 to 2021, it offered new plans only once per year. Similarly, Verizon's new-plan events have declined from 3.2 times per year between 2014 and 2018, to an average of only once per year. Before announcement of the merger, Sprint improved its plans 3.8 times per year on average, forcing the hands of AT&T and Verizon to match its blistering pace of new introductions. By contrast, in 2019 through 2021, T-Mobile offered new plans only *once*.

## B. T-Mobile Becomes a Vehicle for Deutsche Telekom's "Harvesting" Plan

86. Far from re-committing to be the "Un-carrier," everything is unfolding precisely as Defendants had hoped it would: reduced competition leading to stable or rising prices and profits. As DT CEO Tim Höttges put it, "It's harvest time."[128]

87. DT has long been concerned about excessive competition in the U.S. wireless industry, and its long-term plan relied on reducing it. On December 3, 2015, two days after DT's Thorsten Langheim engaged in internal discussions regarding a price war with Sprint, Peter Ewens, T-Mobile's head of strategy, told its CEO, John Legere: "[I]t's important to stick with Thorsten on these topics because one of his ideas is that if we can't get four to three consolidation, the industry is headed for commoditization and DT should limit their exposure to the U.S."[129]

88. With the acquisition complete, industry dynamics the way DT wanted them, and T-Mobile having abandoned the mantle of the "Un-carrier," DT CEO Tim Höttges recently told shareholders the company expects to gain direct ownership over T-Mobile. He explained that

---

[128] Busvine, *supra* note 3.
[129] Trial Tr., Vol. 2 at 308.

the capital return to shareholders by its U.S. business would fund the move, that he expected T-Mobile to return up to $60 billion to shareholders between 2023 and 2025, and that DT's share of the proceeds would allow it to increase its holding in T-Mobile from 43 percent to more than 50 percent. "Harvesting" to cover DT's sizeable group debts (over $140 **billion**) evidently will come from a buyback funded by higher profits, which in turn will come from higher prices, not volume growth.[130]

89.     T-Mobile has begun to increase secondary charges and reduce its marketing footprint to increase its profits. Soon after the merger was approved on April 18, 2020, T-Mobile increased the monthly price for its Protection 360 device protection program by $1 for customers enrolled in a Tier 3 plan, $2 for those enrolled in a Tier 4 plan, and $3 for those enrolled in a Tier 5 plan.[131] That same month, reports surfaced that T-Mobile's prepaid brand, Metro by T-Mobile, had terminated its relationship with all non-exclusive dealership stores.[132] Starting October 1, 2020, T-Mobile required Metro by T-Mobile dealers to buy 100 percent of their accessories from one vendor, adding as much as 20 percent to their costs and increasing retail prices for consumers.[133] In the competitive environment that preceded the merger, these moves would not have been possible without potentially losing market share. T-Mobile has also recently taken advantage of reduced competition and fewer choices by automatically enrolling its

---

[130] Joe Dyton, *Trouble in Paradise? DISH Accuses T-Mobile of 'Anti-Competitive' Behavior*, Connected Real Estate Magazine (Apr. 8, 2021), https://connectedremag.com/das-in-building-wireless/trouble-in-paradise-dish-accuses-t-mobile-of-anti-competitive-behavior/.
[131] Alex Wagner, *T-Mobile Raising Protection 360 Devise Insurance Prices in April*, TmoNews (Feb. 26, 2020), https://www.tmonews.com/2020/02/t-mobile-protection-360-insurance-price-increase/.
[132] *Metro Terminates Non-Exclusive Dealers*, NWIDA (Apr. 4, 2020), https://nwida.org/metro-terminates-non-exclusive-dealers.
[133] *Helping Metro Dealers*, NWIDA (Sept. 17, 2020), https://nwida.org/helping-metro-dealers.

subscribers in an ad-targeting program that will sell customers' web browsing and app data to advertisers.[134]

### C.  **DISH in Fact Has Failed to Pose a Competitive Threat**

90.  T-Mobile, Sprint, and DISH promised during the trial that DISH would emerge as a fourth major competitor in the Retail Cell Services Market, but it is now clear that future competition from DISH may never exist, and certainly has not stood as a remedy for the loss of competition caused by the merger to date.  Instead, DISH has struggled to hold onto its subscribers.  DISH lost 575,000 net subscribers in 2020 and 728,000 net subscribers in 2021.[135]

91.  DISH's future as a mobile wireless provider does not look any better.  Because T-Mobile is shutting down its legacy technology network in May 2022 that serves the majority of Boost subscribers,[136] DISH is poised to lose even more subscribers.[137]  These subscribers will need new devices or SIM cards to receive wireless services after the shutdown—a transition that

---

[134] *See* Drew FitzGerald, *T-Mobile to Step Up Ad Targeting of Cellphone Customers,* Wall St. J. (Mar. 9, 2021, 5:30 AM), https://www.wsj.com/articles/t-mobile-to-step-up-ad-targeting-of-cellphone-customers-11615285803.

[135] DISH Network Corp., Annual Report (Form 10-K), at 62 (Feb. 22, 2021), https://dish.gcs-web.com/static-files/bd86ef91-bf7a-4bbb-9773-a95c043627c4 (noting loss of 575,000 net wireless subscribers in 2020); DISH Network Corp., Annual Report (Form 10-K), at 60 (Feb. 24, 2022), https://dish.gcs-web.com/static-files/4e8db017-b1d9-4d94-a208-1233a1770f95 (noting loss of 728,000 net wireless subscribers in 2021).

[136] Monica Alleven, *T-Mobile Extends Sprint 3G CDMA Shutdown to May 31: Reports*, Fierce Wireless (Mar. 30, 2022, 9:07 AM), https://www.fiercewireless.com/wireless/t-mobile-extends-sprint-3g-cdma-shutdown-may-31-reports.

[137] Hal Singer, *The Terrible T-Mobile/Sprint Merger Must Be Undone*, Wired (Feb. 25, 2021, 9:08 AM), https://www.wired.com/story/opinion-the-terrible-t-mobilesprint-merger-must-be-undone/; *see also* Linda Hardesty, *Dish and T-Mobile Resolve Their CDMA Shut-Off Dispute*, Fierce Wireless (Feb. 24, 2022, 3:34 PM), https://www.fiercewireless.com/5g/dish-and-t-mobile-resolve-their-cdma-shut-dispute.

will cost DISH more than $250 million to prevent service disruptions and to keep some of the affected subscribers.[138]

92.     Meanwhile, DISH still claims it will build a greenfield 5G network that covers seventy percent of the country using untried technology by 2023 with only $10 billion in capital.[139]  Outside observers believe that DISH ultimately plans to sell its vast unused spectrum holdings and realize immense profits—just as T-Mobile, before the merger, had said DISH would.  For example, Peter Adderton, the founder of Boost Mobile, estimated that the cost of building a national network would likely be closer to $20 billion.[140]  Similarly, one industry analyst stated that he did not see a financial benefit to DISH building its own network and taking on the MNOs.[141]  Noted industry analyst Moffett Nathanson has looked at how Boost is maintaining high profit margins despite heavy subscriber losses.  He interprets DISH as being "focused on generating cash short-term by cutting costs and pulling back on subscriber acquisition while taking hits to its subscriber base—the same approach for its pay TV business."[142]  Just as T-Mobile told the FCC, DISH's modus operandi appears to be to acquire assets and raise prices to harvest profits.

---

[138] Hardesty, *supra* note 137.

[139] Dish Network Corp., Q1 2022 Earnings Call Transcript (Feb. 24, 2022), https://seekingalpha.com/article/4490184-dish-network-corporations-dish-ceo-erik-carlson-on-q4-2021-results-earnings-call-transcript.

[140] Joshua Fineman, *Amazon Likely to Partner with DISH on Mobile Service, Boost Mobile Founder Says*, Seeking Alpha (Feb. 21, 2021, 9:00 AM ET), https://seekingalpha.com/news/3664173-amazon-likely-to-partner-with-dish-on-mobile-service-boost-mobile-founder-says.

[141] Liz Moyer, *DISH Network Is Digging Deeper Into Wireless. Why One Analyst Doesn't Think It's A Good Idea.*, Barron's (Dec. 4, 2020, 12:06 PM ET), https://www.barrons.com/articles/dish-network-digs-deeper-into-wireless-not-everyone-agrees-its-a-good-idea-51607101610.

[142] Singer, *supra* note 137.

93.     Well-informed economists noted at the time of merger approval that it would not make economic sense for DISH to build its own network.[143]  The fine of $2.2 billion and possible license forfeitures if DISH fails to build a national network that provides 5G broadband service to at least 70 percent of the U.S. population by June 2023, do not change this conclusion.  Together, these penalties are small for a strategy that allows DISH to sell spectrum valued at more than *$34.4 billion*, and small compared to DISH's anticipated $10 billion-plus build cost.[144]

94.     In short, DISH would be better off continuing to milk profits out of Boost as it continues hemorrhaging subscribers.  Some predict that rather than trying to compete in the relevant market, DISH may simply wait out the six-year DOJ consent decree and then proceed to sell its spectrum holdings.[145]  Indeed, it would not be a first for DISH if it fails to build its network by 2023.  DISH has already failed to meet buildout requirements for the spectrum it held before acquiring Boost.[146]

### D.     T-Mobile Reneges on Its Commitments to Regulators

95.     To make matters worse, although T-Mobile argued at trial that it would provide assistance so that DISH could become a formidable competitor within the consumer wireless industry, it has not done so.  Indeed, since the merger, T-Mobile has taken steps to make sure DISH fails.  For example, DISH planned to rely on T-Mobile's legacy CDMA network technology while building out its own 5G network.[147]  But it will reportedly take several years to

---

[143] Nicholas Economides et al., *Assessing DOJ's Proposed Remedy in Sprint/T-Mobile: Can Ex Ante Competitive Conditions in Wireless Markets Be Restored?* ¶ 22 (NET Instit., Working Paper No. 19-14, 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3467663.
[144] *Id.*; Dyton, *supra* note 130.
[145] Economides et al., *supra* note 143, ¶ 22.
[146] *Id.* ¶ 20.
[147] Dyton, *supra* note 130.

replace the old service and transition the majority of Boost's nine million customers.[148] DISH was expecting T-Mobile to shut down the CDMA network in three to five years, which might have allowed enough time to transition.[149] But T-Mobile began shutting down the network on March 31, 2022 and expected it to be completely decommissioned by May 31, 2022.[150] That is too soon for the migration DISH will have to undertake.[151]

96. As DISH's CEO explained in a letter to the FCC on April 1, 2021, "During its earlier life as the 'Un-carrier,' T-Mobile championed policies that promoted competition, diverse spectrum ownership, and efficient spectrum use. How quickly things change . . . Now, T-Mobile opposes measures that would help new entrants and smaller providers compete . . . ."[152] Cutting off CDMA access was not some industry imperative; even Verizon delayed its CDMA shutdown several times over the years.[153]

97. DISH therefore had to turn to AT&T—its supposed future competitor—as its main network partner. In July 2021, DISH signed a new 10-year network-services agreement that gives DISH wholesale access to AT&T's network in exchange for at least $5 billion annually. Far from becoming a true competitor to the MNOs, DISH is now heavily incentivized not to undercut either company because it exists at the mercy of AT&T and T-Mobile, who could easily crush DISH because they have lower operating costs and provide the sole infrastructure by

---

[148] *Id.*

[149] *Id.*

[150] T-Mobile, *Update on Our CDMA Network Transition Plans* (Oct. 22, 2021), https://www.t-mobile.com/news/business/update-on-our-cdma-network-transition-plans.

[151] Dyton, *supra* note 130.

[152] Letter from Jeffrey H. Blum, Dish Network Corp., to Marlene H. Dortch, Fed. Commc'n Comm'n 1 (Apr. 1, 2021), https://www.documentcloud.org/documents/20536971-2021-04-01_dish-ex-parte-response-to-tmo-re-cbrs-power-levels-19-348-1.

[153] Dyton, *supra* note 130.

which DISH can have customers at all. Unless and until DISH can somehow construct its own wireless network—unlikely given DISH's lack of progress and available capital—DISH will always be subordinate to the three established national MNOs, just like the other MVNOs who resell wireless services.

98.     T-Mobile has also reneged on its commitments to the California Public Utilities Commission (CPUC). On June 23, 2020, only a few months after the merger closed, T-Mobile filed a Petition of Modification with the CPUC to overturn several of the conditions imposed by CPUC on approval of the merger. Among other things, T-Mobile asked to delay the compliance date for providing 300 Mbps wireless service coverage to 93 percent of Californians from 2024 to 2026. T-Mobile also argued that it should not be subject to CalSPEED, a test used to verify the carrier's speed and coverage claims and measure its compliance with California-specific conditions.[154]

99.     On November 20, 2020, the CPUC denied T-Mobile's petition to be exempted from CalSPEED. The Commission begrudgingly agreed to extend T-Mobile's 5G buildout timeline, even though T-Mobile had repeatedly represented in testimony and briefs that it would deliver comprehensive high-speed 5G coverage by 2024.[155]

100.     T-Mobile also previously represented to the Commission in pre-merger proceedings that it did not need PCS spectrum to build and maintain its 5G network, and that its

---

[154] Joint Applicants' Pet. for Modification of Decision 20-04-008, *In re Joint Appl. Sprint Commc'n Co. L.P. & T-Mobile USA, Inc., In re Joint Appl. Sprint Spectrum L.P., Virgin Mobile USA, L.P., and T-Mobile USA, Inc.,* Appl. Nos. 18-07-011, 18-07-012 (Cal. Pub. Util. Comm'n June 23, 2020),
https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M340/K668/340668671.PDF.
[155] Decision on Pet. for Modification of Decision 20-04-008, Nos. 18-07-011, 18-07-012 (Cal. Pub. Util. Comm'n Nov. 20, 2020),
https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M351/K799/351799867.PDF.

CDMA network would be available for three years while Boost customers are being migrated to DISH. On August 13, 2021, the CPUC directed T-Mobile to show cause as to why it should not be sanctioned for making false statements, omissions, and misleading statements to the Commission. The CPUC noted that "it appears that these false statements, omissions and/or misleading assurances and the related time references were intended to induce the Commission to approve the merger."[156]

101. Taken together, T-Mobile's broken promises to the court and regulators show that its commitments to create a viable fourth competitor and continue to improve its network were not serious or credible. After T-Mobile obtained the market landscape it wanted, it showed its true and long-standing desire for complacent competition that maximized profits of the three surviving national MNOs at the expense of consumers.

**E.     T-Mobile Raises Prices**

102. T-Mobile has raised prices following the merger in violation of the spirit of pricing commitments it made to regulators. In a February 4, 2019 letter to the FCC, T-Mobile committed that for three years after the merger closed, it would not raise the price of legacy T-Mobile and Sprint plans until lower-priced plans or plans with higher data allowances are made available.[157] In its post-trial settlement with some of the states that sought to enjoin the merger,

---

[156] Ruling to Show Cause, Appl. Nos. 18-07-011, 18-07-012 (Cal. Pub. Util. Comm'n Aug. 13, 2021), https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M398/K955/398955746.PDF.

[157] Mem. Op. & Order, Decl. Ruling, & Order of Proposed Modification *In re Appl. of T-Mobile US, Inc. & Sprint Corp.*, WT Dkt. No. 18-197, at 92, (Fed. Commc'n Comm'n Nov. 5, 2019), https://www.fcc.gov/document/fcc-approves-t-mobilesprint-transaction-conditions ("In February 2019, the Applicants committed to offer T-Mobile and Sprint legacy rate plans available as of February 4, 2019 for three years following consummation of the transaction or until better plans that offer a lower price or more data are made available.").

T-Mobile agreed that in accordance with its FCC commitments, it would not raise prices for five years after the close of the merger.[158] However, T-Mobile's pricing commitment contained loopholes that would allow it to raise legacy plan prices by (1) increasing taxes, fees, and surcharges; (2) passing through increases in the cost of third-party benefits, such as streaming services or free in-flight Wi-Fi service; (3) modifying or canceling third-party benefits; and (4) increasing the cost of device and handset offerings.[159]

103. T-Mobile has taken advantage of these loopholes to increase the price of legacy plans following the merger. In January 2022, T-Mobile announced that it would be increasing the "Regulatory Programs & Telco Recovery Fee" for customers with lower-cost "taxes and fees excluded" plans by $0.31 per line per month for all voice lines and by $0.24 per line per month for all data-only lines.[160]

---

[158] Settlement Agreement and Release of Claims Among T-Mobile US, Inc., Sprint Corporation, and Plaintiff States, at 2 (Mar. 10, 2020), https://ag.hawaii.gov/wp-content/uploads/2020/03/Plaintiff-States-Settlement-Agreement-Fully-Executed-1.pdf. ("Additionally, for at least five (5) years following the Closing Date, New T-Mobile will make available in Plaintiff States the same or better smartphone consumer rate plans as T-Mobile and Sprint plans offered on February 4, 2019, in accordance with the terms of T-Mobile's commitments to the FCC"); *id.* ("Additionally, for at least five (5) years following the Closing Date, New T-Mobile will make available in the State of California the same or better smartphone consumer rate plans as T-Mobile and Sprint plans offered on February 4, 2019, in accordance with the terms of T-Mobile's commitments to the FCC.").

[159] *In re Appl. of T-Mobile US, Inc. & Sprint Corp.*, WT Dkt. No. 18-197, *supra* note 157, at 92–93 ("The pricing commitment includes certain stipulations that would allow the Applicants to modify or raise prices of legacy plans, including (1) to pass through cost increases in taxes, fees and surcharges as well as service from third party partners included in the rate plans; and (2) to modify or discontinue third party partner benefits based on changes in terms of the offering initiated by the third party partner.").

[160] *Regulatory Programs and Telco Recover Fee*, T-Mobile.com, https://www.t-mobile.com/responsibility/consumer-info/additional-info/regulatory-programs-fee (last visited May 23, 2022) ("Effective February 19, 2022, the combined Regulatory Programs & Telco Recovery Fee is increasing from $3.18 to $3.49/line/month for voice lines ($0.31/line/month increase), and from $1.16 to $1.40/line/month for data only lines ($0.24/line/month increase).");

104.    A cornerstone of T-Mobile's "Un-carrier" campaign was that taxes and fees are included in the service plan price.  Yet in March 2020, T-Mobile launched T-Mobile Connect, a set of "low-cost" plans it agreed to offer as a condition of merger approval, without taxes and fees included.[161] And in February 2022, T-Mobile started charging taxes and fees separately to Magenta and Magenta MAX customers for added or upgraded services, including but not limited to scam blocking protection, stateside international calling, and parental controls.[162]

105.    T-Mobile charges an "Assisted Support Charge" and "Upgrade Support Charge" when a customer activates a new line of service or when an existing customer adds a line of service using an in-store, online, or call-in support specialist.  Whereas prior to the merger, T-Mobile bragged that it had the "best damn care team in the business," since the merger, T-Mobile has penalized consumers for using customer service by raising its activation and upgrade fee three times in two years.  T-Mobile increased the fee from $20 to $25 in April 2021, to $30 in

---

*see also T-Mobile To Charge Taxes On Account Add-Ons, Even For Tax-Included Plans*, T-Mo Rep. (Jan. 18, 2022), https://tmo.report/2022/01/t-mobile-to-charge-taxes-on-account-add-ons-even-for-tax-included-plans/.

[161] Settlement Agreement & Release of Claims, State of Cal. (Mar. 9, 2020); Settlement Agreement and Release of Claims among T-Mobile US, Inc., Sprint Corporation and Plaintiff States (Mar. 10, 2020); Monica Chin, *T-Mobile's budget $15 Connect plan will launch on March 25th*, The Verge (Mar. 23, 2020, 11:23 AM), https://www.theverge.com/2020/3/23/21190796/t-mobile-connect-sprint-merger-coronavirus-prepaid-plan.

[162] *View Your Bill & What's Impacting It*, T-Mobile.com, https://www.t-mobile.com/support/account/whats-impacting-your-bill (last visited May 23, 2022) ("Many T-Mobile plans, such as Magenta and Magenta MAX, include recurring monthly taxes and fees in the service plan price.  For plans that have taxes and fees excluded, taxes, fees, and other charges apply.  Additionally, beginning 2/19/2022, for upgraded or optional add-on services, including but not limited to Stateside International Talk and Text, Global Plus, and Family Mode, taxes and fees apply separately, even for customers with service plans with taxes and fees included."); *see also* Adrian Diaconescu, *T-Mobile Is Increasing the Taxes On Your 'Tax-Inclusive' Plans Starting February*, Phone Arena (Jan. 18, 2022, 5:01 AM), https://www.phonearena.com/news/t-mobile-increasing-taxes-all-plans-starting-february_id137871.

May 2021, and to $35 in June 2022.[163]  Another example of T-Mobile's Un-carrier moves in

2015 was the "Un-contract," a guarantee that a customer's bill would never go up unexpectedly.

As part of the original Un-contract guarantee, if a customer added lines to their account, they

would pay the extra line price for the plan *at the time* the account was activated, regardless of the

current line price.  On April 27, 2022, T-Mobile downgraded the terms of the "Un-contract"

guarantee for existing customers, who now have to pay the *current* rather than legacy price of an

extra line if they add new lines to their account.[164]  In short, T-Mobile "Un-contract" subscribers

may not be getting the price they bargained for because T-Mobile is now charging current, not

legacy, prices for adding extra lines.

### F.    AT&T and Verizon Have Raised Prices Post-Merger

106.    Defendants promised that prices at all carriers would "go down" following the

merger.[165] Instead, like T-Mobile, AT&T and Verizon have reaped the benefit of inflated prices.

107.    At AT&T's Analyst & Investor Day on March 11, 2022, CEO John Stankey

pointed to "a more normalized industry backdrop" and "surgical price increases" as sources of

Earnings Before Interest, Taxes, Depreciation, and Amortization (EBITDA) growth for its

---

[163] *Assisted Support Charge Increasing to $25*, T-Mo Report (Mar. 2021),
https://tmo.report/2021/03/assisted-support-charge-increasing-to-25/; *Assisted Support Fee Increasing to $30, SIM Fee Dropping to $0*, T-Mo Report (May 2021),
https://tmo.report/2021/05/assisted-support-fee-increasing-to-30-sim-fee-dropping-to-0/; Press Release, T-Mobile US, It's Official – T-Mobile #1 in Customer Service Satisfaction (Jan 31, 2017), https://www.t-mobile.com/news/press/1-customer-service-satisfaction; *T-Mobile Is Raising Their Support Fees Again*, T-Mo Report (May 2022), https://tmo.report/2022/05/t-mobile-is-raising-their-support-fees-again/.
[164] *T-Mobile's New "Price Lock" Guarantee Affects Existing Customers Too*, T-Mo Rep (Apr. 29, 2022), https://tmo.report/2022/04/t-mobiles-new-price-lock-guarantee-affects-existing-customers-too/.
[165] Trial Tr., Vol. 2, at 262.

mobility division.[166]  In an April 2022 *Wall Street Journal* interview and subsequently on

AT&T's 2022 first quarter earnings call, Stankey signaled that he saw room to "start maybe

taking some price," and that prices would rise across the telecom industry "over the next several

quarters."[167]  Then on May 3, 2022, AT&T announced that it would be raising rates on older

wireless plans by $6 per month for single-line users and as much as $12 per month for customers

with multiple lines.  AT&T justified the price increase by encouraging legacy customers to

switch to its premium unlimited offerings.[168]

---

[166] Edited Transcript, Refinitiv StreetEvents, T.N – AT&T Inc Analyst & Investor Day, at 17 (Mar. 11, 2022, 3:00 PM), https://investors.att.com/~/media/Files/A/ATT-IR-V2/events-and-presentations/11mar22-transcript.pdf. ("The balance will come from growth in adjusted EBITDA of approximately $3 billion per year for our core connectivity business including transformation. We believe adjusted EBITDA growth will be driven by 4 factors.  First, mobility EBITDA.  We expect growth in the low single-digit range driven by subscriber growth.  We expect a more normalized industry backdrop, surgical price increases and a ramp of the DISH MVNO subscribers to support our outlook.").

[167] Drew FitzGerald, *AT&T Boss Sees Room to Raise Prices, Cut Costs After Media Exit*, Wall St. J. (Apr. 9, 2022, 5:30 AM), https://www.wsj.com/articles/at-t-boss-sees-room-to-raise-prices-cut-costs-after-media-exit-11649496605 ("In an interview, Mr. Stankey said the company might have some latitude to raise some prices to reflect the value of its services if inflation continues driving up the cost of other goods and services.  'You'll probably start to see it over the next several quarters, not just telecom—more broadly in the economy because of the patterns that we're seeing,' he said"); *see also* AT&T Inc., Q1 2022 Earnings Call Transcript, (Apr. 21, 2022), https://www.fool.com/earnings/call-transcripts/2022/04/21/att-t-q1-2022-earnings-call-transcript/ ("And as I shared earlier, there's a lot of different ways you can deal with price adjustments. There's a lot of different tactics and approaches you can use.  But when we're looking at the customer base as satisfied as we are, when we look at a customer base with some of the value we've been putting back into the product and service over time, when we look at our current churn levels do we believe we're in a position if we're forced into a situation where we have to start maybe taking some price that we can do that and move it through?  Our history would suggest that we know how to do that, and we can do that. And we'll be very smart and judicious as we have to apply it.").

[168] Drew FitzGerald, *AT&T Raises Prices for Older Wireless Plans*, Wall St. J. (May 3, 2022, 3:57 PM), https://www.wsj.com/articles/at-t-raises-prices-for-older-wireless-plans-11651606994.

108.     Verizon publicly signaled the possibility of raising prices following AT&T's announcement.  On March 4, 2022, *Bloomberg* reported that according to a person with knowledge of Verizon's deliberations, the company was exploring increasing prices through added fees or introducing a higher-priced unlimited plan.[169]  At Verizon's 2022 first quarter earnings call, CEO Hans Vestberg admitted the company is "looking into what we can do with pricing."[170]  Then Verizon announced that starting in June 2022, it will raise the administrative fee it charges postpaid customers by $1.35 per voice line.  A household with a four-line Verizon family plan will see a monthly price increase of $5.40 and a yearly price increase of $64.80.  Verizon is also adding a new "Economic Adjustment Charge" to some business accounts starting June 16, 2022.  The new business fee will include "a $2.20 monthly charge per line for each smartphone and data device and 98 cents for each basic phone and tablet on an account."[171]

---

[169] Scott Moritz & Todd Shields, *Verizon Mulls Price Increase in Response to Rising Costs*, Bloomberg (May 5, 2022, 6:37 AM), https://www.bloomberg.com/news/articles/2022-05-04/verizon-mulls-price-increase-in-response-to-rising-cost-pressure ("Verizon Communications Inc. is considering raising prices for wireless service -- one of several possible options to pass along inflation-related costs to consumers following AT&T Inc.'s decision this week to increase rates on older calling plans by $6 or more.  An increase like AT&T's isn't likely for Verizon, but alternatives such as the introduction of a higher-priced unlimited plan or added fees are among the possibilities, according to a person with knowledge of the company's deliberations.  Either way, if costs keep rising, Verizon customers will see higher monthly bills.").

[170] Verizon Commc'ns Inc., Q1 2022 Earnings Call Transcript, (Apr. 22, 2022, 8:30 AM), https://seekingalpha.com/article/4503010-verizon-communications-inc-s-vz-ceo-hans-vestberg-on-q1-2022-results-earnings-call-transcript ("On the inflation, I mean as Matt said in a prepared remarks, I mean we haven't seen so much impact so far of it.  But of course, this is the high in 40 years of an inflation.  So we are planning for all scenarios.  We have plans to be prepared for what it takes.  So that will of course include different type of cost adjustments, but also looking into what we can do with pricing. But again, we don't know how this will impact us, but clearly these levels of inflation we have never seen before in the wireless industry.").

[171] Allison Johnson, *Verizon Customers' Bills Are Going Up Starting in June for . . . Reasons*, The Verge (May 16, 2022, 4:54 PM), https://www.theverge.com/2022/5/16/23075448/verizon-phone-bill-increase-administrative-fee.

## CLASS ACTION ALLEGATIONS

109.     Plaintiffs bring this action as representatives of a class under Rule 23, Federal

Rules of Civil Procedure § 23(b)(1) and (b)(2).  Plaintiffs also bring this action as representatives

of a class seeking damages under Rule 23(b)(3).

110.     The Class is defined as follows:

> All persons or entities in the United States who, on or after April 1,
> 2020 ("the Class Period") paid for a national retail mobile wireless
> plan offered by Verizon or AT&T, on a prepaid or postpaid basis.

111.     The following persons and claims are excluded from the Class:

a.      Defendants, including their officers, directors, employees, subsidiaries,

and affiliates;

b.      federal, state, and local or municipal government entities;

c.      all claims arising from the purchase of enterprise plans; and

d.      all judges assigned to this case and any members of their immediate

families.

### A.     Numerosity (Rule 23(a)(1)):

112.     The Class is so numerous that joinder of all persons in the class is impracticable.

Members of the Class are widely dispersed throughout the country.  AT&T reported over 95

million branded consumer and business connections in 2020, as well as 7 million MVNO

connections.[172]  Verizon reported 121 million branded wireless connections in 2020, including

94 million consumer connections and 27 million branded postpaid business connections.[173]

---

[172] AT&T Inc., Annual Report (Form 10-K), at 33 (Feb. 25, 2021).
[173] Verizon Communications Inc., Annual Report (Form 10-K), at 4 (Feb. 25, 2021).

**B.** **Commonality (Rule 23(a)(2)):**

113. There are common questions of law and fact affecting the rights of the members of the Class, including, without limitation:

      a. Whether Defendants' merger increased the likelihood of coordinated anticompetitive effects in the relevant market;

      b. The definition of the relevant market and whether Defendants collectively had power in that market;

      c. Whether the merger had anticompetitive effects in the relevant market;

      d. Whether prices charged by AT&T and Verizon for retail mobile telecommunications services were artificially inflated as a result of the merger;

      e. Whether, and to what extent, Defendants' conduct caused injury to Plaintiffs and the Class;

      f. Whether the alleged conduct violated the Clayton Act as alleged in the First Claim for Relief;

      g. Whether the alleged conduct violated the Sherman Act as alleged in the Second Claim for Relief;

      h. What injunctive and other equitable relief is appropriate; and

      i. What classwide measure of damages is appropriate.

**C.** **Typicality (Rule 23(a)(3)):**

114. The claims of the named class representatives are typical of the claims of the proposed Class. Plaintiffs and all members of the proposed Class sustained the same or similar injuries arising out of and caused by Defendants' common course of conduct in violation of

applicable Federal law, in that each Plaintiff and Class member paid artificially inflated prices as a result of the merger.

### D.   Adequacy (Rule 23(a)(4) and 23(g)):

115.   The named representatives will fairly and adequately protect the interests of the proposed Class.  There are no conflicts between the interests of the named Class representatives and the other members of the proposed Class.

### E.   Rule 23(b)(1):

116.   This action is maintainable as a class action under Fed. R. Civ. P. 23(b)(1) because prosecuting separate actions by individual class members would create a risk of (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.  Specifically, separate actions by individual class members could produce varying adjudications as to, inter alia, whether T-Mobile caused AT&T, Verizon, or both to compete less intensely than they would have but for Defendants' merger.

### F.   Rule 23(b)(2):

117.   This action is maintainable as a class action under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate monetary, injunctive and other equitable relief in favor of the Class.

G. **Rule 23(b)(3):**

118.    Questions of law and fact common to the Class members, including legal and factual issues relating to violation and damages, predominate over any questions that may affect only individual Class members, because Defendants have acted on grounds generally applicable to the entire Class.

119.    Class treatment is a superior method for the fair and efficient adjudication of the controversy, because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

## FIRST CLAIM FOR RELIEF

### Claim for Violation of Section Seven of the Clayton Act

120.    Plaintiffs incorporate the above-referenced Paragraphs as though fully set forth herein.

121.    Defendants' anticompetitive conduct set forth in this Complaint has violated Section Seven of the Clayton Act.  *See* 15 U.S.C. § 18.

122.    The Defendants' merger agreement has substantially reduced actual and potential competition in the sale of retail mobile wireless telecommunications services by MNOs in the United States.  As a result, AT&T and Verizon have charged higher prices for nationwide wireless plans than they would have otherwise.

123. Defendants' conduct affected interstate commerce by inflating prices for nationwide wireless plans above what they would be without the merger.

124. Plaintiffs have been, and will continue to be, injured by the reduced competition described above in the form of paying artificially inflated prices in the relevant market.

125. Pursuant to Section Four of the Clayton Act, 15 U.S.C. § 15, Plaintiffs seek to recover treble damages for their injuries.

**SECOND CLAIM FOR RELIEF**

**Claim for Violation of Section One of the Sherman Act: Agreement in Unreasonable Restraint of Trade**

126. Plaintiffs incorporate the above-referenced Paragraphs as though fully set forth herein.

127. Defendants' anticompetitive conduct set forth in this Complaint has violated Section One of the Sherman Act. *See* 15 U.S.C. § 1.

128. Defendants were separate and distinct entities at the time they entered into an agreement to merge; neither was a subsidiary or agent of the other. Defendants were economically independent from each other prior to their merger agreement.

129. The Defendants' merger agreement had the purpose and effect of restraining competition in the sale of consumer mobile wireless services by MNOs in the United States. Since April 29, 2018, T-Mobile, AT&T, and Verizon have been able to profitably maintain prices in the relevant market substantially above what they would have been able to charge absent the merger.

130. Since the merger agreement's completion, Defendants have collectively had, and will continue to have, substantial market power in the retail mobile wireless telecommunications services market in the United States.

131.    Defendants' merger agreement had no procompetitive benefits; despite Defendants' claims, it did nothing to increase competition in the relevant market.  Instead, the merger agreement has already inflicted substantial competitive harms, and will continue to do so, by eliminating actual and potential competition between Sprint and T-Mobile, reducing competition among the three surviving national carriers, and inflating prices for nationwide retail mobile wireless plans above what they would have been otherwise.

132.    Defendants' conduct affected interstate commerce by inflating prices for nationwide retail mobile wireless plans above what they would have been without the merger agreement.

133.    As a result of Defendants' unreasonable restraint of trade, Plaintiffs have suffered, and will continue to suffer, an antitrust injury, because Plaintiffs paid, and will continue to pay, higher prices than they would have if the Defendants had not unreasonably restricted trade in the relevant market.

134.    Pursuant to Section Four of the Clayton Act, 15 U.S.C. § 15, Plaintiffs seek to recover treble damages for their injuries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully pray for the following relief:

A.    An order certifying the action as a class action pursuant to Federal Rule of Civil Procedure 23, and appointing Plaintiffs as the representatives of the Class, and appointing their counsel as Class Counsel;

B.      An order declaring that Defendants' transaction was (1) an unlawful merger of assets and (2) an unlawful restraint of trade, in violation of the federal statutes cited herein;

C.      An order enjoining Defendants' transaction and requiring them to divest assets, whether possessed originally by Sprint, T-Mobile, or both sufficient to enable the creation of a separate, distinct, and viable firm that can replicate Sprint's competitive significance in the consumer mobile wireless telecommunications services market or otherwise restore competition in that market to the extent it existed before the illegal merger;

D.      Treble damages to members of the Class, for their purchases of national retail mobile wireless telecommunications services from AT&T or Verizon at inflated prices;

E.      Equitable relief in the form of restitution or disgorgement of all unlawful or illegal profits received by Defendants as a result of the anticompetitive conduct alleged herein;

F.      The costs of bringing this suit, including reasonable attorneys' fees;

G.      An award of pre- and post-judgment interest, to the extent allowable; and

H.      Such other further relief that the Court deems reasonable and just.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury on their claims.

Dated: June 17, 2022  */s/    Joel Flaxman*

Joel Flaxman
ARDC No. 6292818
Kenneth N. Flaxman
ARDC No. 830399
LAW OFFICES OF KENNETH N. FLAXMAN P.C.
200 S Michigan Ave., Suite 201
Chicago, IL 60604
Phone: (312) 427-3200
jaf@kenlaw.com
knf@kenlaw.com

Brendan P. Glackin (*pro hac vice* pending)
Lin Y. Chan (*pro hac vice* pending)
Nicholas Lee (*pro hac vice* pending)
Sarah Zandi (*pro hac vice* pending)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Phone: (415) 956-1000
bglackin@lchb.com
lchan@lchb.com
nlee@lchb.com
szandi@lchb.com

Eric L. Cramer (*pro hac vice* pending)
Najah A. Jacobs (*pro hac vice* pending)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (415) 215-0962
Phone: (215) 715-3256
ecramer@bm.net
njacobs@bm.net

Robert Litan (*pro hac vice* pending)
BERGER MONTAGUE PC
2001 Pennsylvania Avenue, NW, Suite 300
Washington, D.C. 20006
Phone: (202) 559-9745
rlitan@bm.net

Joshua P. Davis (*pro hac vice* pending)
BERGER MONTAGUE PC
59A Montford Avenue
Mill Valley, CA 94941
Phone: (415) 215-0962
jdavis@bm.net

Gary I. Smith Jr. (*pro hac vice* pending)
HAUSFELD LLP
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Phone: (267)-702-2318
gsmith@hausfeld.com

*Counsel for Plaintiffs*