**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ANTHONY DALE, BRETT JACKSON, JOHNNA FOX, BENJAMIN BORROW-MAN, ANN LAMBERT, ROBERT ANDERSON, and CHAD HOHENBERY on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>DEUTSCHE TELEKOM AG et al.,<br><br>*Defendants.* | Case No. 22-cv-3189<br><br>Judge Thomas M. Durkin<br><br>Magistrate Judge Jeffrey Cole |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS T-MOBILE US, INC.
AND SOFTBANK GROUP CORP.'S MOTION TO DISMISS THE COMPLAINT**

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ................................................................................................ 1

II.    SUMMARY OF ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS .......... 3

       A.    The FCC Concludes That The Merger Would Be In The Public Interest .............. 4

       B.    The DOJ And A Federal Judge Review And Approve The Merger ...................... 6

       C.    State AGs And Individual Litigants Unsuccessfully Sue To Enjoin The Merger .. 7

       D.    Customers Of Verizon And AT&T Belatedly Sue To Undo The Merger ............. 8

III.   LEGAL STANDARD ........................................................................................... 9

IV.    ARGUMENT ..................................................................................................... 10

       A.    Plaintiffs' Claims Should Be Dismissed For Lack Of Antitrust Standing ........... 10

             1.    Plaintiffs Cannot Establish A Direct Causal Connection Due To The
                   Intervening Decisions Of Verizon And AT&T. ....................................... 12

             2.    T-Mobile Customers Are The More Efficient Enforcers. ......................... 20

             3.    Plaintiffs' Damages Are Speculative. ..................................................... 23

       B.    Plaintiffs Fail To Plausibly Allege That The Merger Was Anticompetitive ........ 24

             1.    Plaintiffs Have Alleged No Direct Evidence of Anticompetitive Effects. 25

             2.    Plaintiffs Have Failed To Plead Indirect Proof of Anticompetitive Effects.
                   ............................................................................................................. 29

       C.    Laches Bars Plaintiffs' Claim For Divestiture .................................................... 34

             1.    Plaintiffs Failed To Pursue Their Claims With Diligence. ...................... 35

             2.    Divestiture Will Prejudice T-Mobile, DISH, And Their Customers. ....... 37

       D.    Plaintiffs' Claims Against SoftBank Group Corp. Fail For Independent Reasons 39

             1.    SoftBank Cannot Be Liable Under Clayton Act Section 7. ...................... 39

             2.    SoftBank Is Not Liable Under The Sherman Act. ................................... 40

**TABLE OF CONTENTS** (*continued*)

Page

V.    CONCLUSION .................................................................................................................... 40

# TABLE OF AUTHORITIES

Page(s)

CASES

*Allen v. Dairy Farmers of Am., Inc.*,
2014 WL 2610613 (D. Vt. June 11, 2014) ................................................................17

*In re Aluminum Warehousing Antitrust Litig.*,
520 F. Supp. 3d 455 (S.D.N.Y. 2021)..................................................................17, 21

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
19 F.4th 127 (2d Cir. 2021) ..............................2, 13, 16, 20, 21, 22, 23

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013)...................................................................................................22

*AMG Cap. Mgmt., LLC v. FTC*,
141 S. Ct. 1341 (2021) ...............................................................................................38

*In re AMR Corp.*,
625 B.R. 215 (Bankr. S.D.N.Y. 2021)........................................................................28

*Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*,
116 F. Supp. 2d 1159 (C.D. Cal. 2000) ........................................15, 21, 23, 35, 36, 38

*Arbitron Co. v. Tropicana Prod. Sales, Inc.*,
1993 WL 138965 (S.D.N.Y. Apr. 28, 1993)...............................................................39

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................................24, 32

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*,
15 F.4th 831 (7th Cir. 2021) ........................................................................................9

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983)...................................................2, 10, 11, 12, 13, 16, 19, 20, 21, 23

*Bank of Am. Corp. v. City of Miami, Fla.*,
137 S. Ct. 1296 (2017).................................................................................................13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).................................................................................................9, 26

*Berlyn, Inc. v. The Gazette Newspapers, Inc.*,
157 F. Supp. 2d 609 (D. Md. 2001) ............................................................................39

Page(s)

*Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995) ...............................................................28

*Blue Shield of Va. v. McCready*,
457 U.S. 465 (1982)............................................................................19

*Bradt v. T-Mobile US, Inc.*,
2020 WL 1809716 (N.D. Cal. Feb. 28, 2020) ..................................8, 31, 33

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
441 U.S. 1 (1979)..........................................................................24, 34

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)........................................................................25, 28

*Cal. v. Am. Stores Co.*,
495 U.S. 271 (1990).........................................................................35, 37

*In re Citric Acid Antitrust Litig.*,
145 F. Supp. 2d 1152 (N.D. Cal. 2001) .............................................17

*Cohen v. Am. Sec. Ins. Co.*,
735 F.3d 601 (7th. Cir. 2013) ...........................................................10

*In re Coordinated Pretrial Proc. in Petrol. Prod. Antitrust Litig.*,
691 F.2d 1335 (9th Cir. 1982) ..........................................................14

*Dailey v. Quality School Plan, Inc.*,
380 F.2d 484 (5th Cir. 1967) ............................................................39

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
2013 WL 4506000 (N.D. Ill. Aug. 23, 2013) ....................................11

*Daniel v. Am. Bd. of Emergency Med.*,
428 F.3d 408 (2d Cir. 2005)..............................................................23

*DeHoog v. Anheuser-Busch InBev SA/NV*,
899 F.3d 758 (9th Cir. 2018) ....................................25, 29, 30, 31, 34

*In re Digital Music Antitrust Litig.*,
812 F. Supp. 2d 390 (S.D.N.Y. 2011).................................................40

*Edstrom v. Anheuser–Busch InBev SA/NV*,
2013 WL 5124149 (N.D. Cal. Sept. 13, 2013) ..................................34

Page(s)

*Edstrom v. Anheuser-Busch Inbev SA/NV,*
647 F. App'x 733 (9th Cir. 2016) ............................................29

*Fisher v. Aurora Health Care, Inc.,*
558 F. App'x 653 (7th Cir. 2014) ......................................11, 20

*FTC v. Credit Bureau Ctr., LLC,*
937 F.3d 764 (7th Cir. 2019) ................................................39

*FTC v. Mylan Labs., Inc.,*
62 F. Supp. 2d 25 (D.D.C. 1999) ......................................17, 23

*Gatt Commc'ns, Inc. v. PMC Assoc., LLC,*
711 F.3d 68 (2d Cir. 2013) ...............................................10, 23

*In re Generic Pharms. Pricing Antitrust Litig.,*
2022 WL 2047964 (E.D. Pa. June 7, 2022) ..............................38

*Ginsburg v. InBev NV/SA,*
623 F.3d 1229 (8th Cir. 2010) ....................................35, 36, 38

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.,*
998 F.2d 391 (7th Cir. 1993) ................................................20

*Gross v. New Balance Athletic Shoe, Inc.,*
955 F. Supp. 242 (S.D.N.Y. 1997) ....................................14, 17

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.,*
392 U.S. 481 (1968) ...........................................................19

*Hot Wax, Inc. v. Turtle Wax, Inc.,*
191 F.3d 813 (7th Cir. 1999) ................................................35

*Ill. Brick Co. v. Illinois,*
431 U.S. 720 (1977) ...........................................................19

*Intel Corp. v. Fortress Inv. Grp. LLC,*
2022 WL 16756365 (9th Cir. Nov. 8, 2022) ..................25, 26, 28

*IQ Dental Supply, Inc. v. Henry Schein, Inc.,*
924 F.3d 57 (2d Cir. 2019) ...............................................11, 22

*Kaiser Aluminum & Chem. Corp. v. F.T.C.,*
652 F.2d 1324 (7th Cir. 1981) ..............................................29

Page(s)

*Kochert v. Greater Lafayette Health Servs., Inc.*,
463 F.3d 710 (7th Cir. 2006) ...............................................11, 12, 16, 20

*Kubiak v. City of Chicago*,
810 F.3d 476 (7th Cir. 2016) ...........................................................10

*Laydon v. Coöperatieve Rabobank U.A.*,
51 F.4th 476 (2d Cir. 2022) .............................................................13, 17

*Leeder v. Nat'l Ass'n of Realtors*,
2022 WL 1307100 (N.D. Ill. May 2, 2022) ...............................................11

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)..............................................................2, 10, 12, 20

*Loeb Indus., Inc. v. Sumitomo Corp.*,
306 F.3d 469 (7th Cir. 2002) ......................................................17, 18, 19, 20

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
332 F. Supp. 3d 885 (S.D.N.Y. 2018)...................................................17

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
29 F.4th 337 (7th Cir. 2022) ...........................................................18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)....................................................................21

*McCauley v. City of Chicago*,
671 F.3d 611 (7th Cir. 2011) ...........................................................26

*Mid-W. Paper Prod. Co. v. Cont'l Grp., Inc.*,
596 F.2d 573 (3d Cir. 1979)..........................................................14, 21, 22

*Nat'l R.R. Passenger Corp. v. Morgan*,
536 U.S. 101 (2002).....................................................................35

*New York v. Deutsche Telekom AG*,
439 F. Supp. 3d 179 (S.D.N.Y. 2020)...............................7, 8, 24, 31, 32, 33

*New York v. Facebook, Inc.*,
549 F. Supp. 3d 6 (D.D.C. 2021) ...........................................35, 36, 37, 38

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018).................................................................25, 28, 29

*In re Online DVD Rental Antitrust Litig.*,
2011 WL 1629663 (N.D. Cal. Apr. 29, 2011) ................................................................17

*Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*,
814 F.2d 358 (7th Cir. 1987) ................................................................33

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
471 F. Supp. 3d 981 (N.D. Cal. 2020) ................................................................35, 38

*S. Pac. Co. v. Darnell-Taenzer Lumber Co.*,
245 U.S. 531 (1918) ................................................................13

*Sanner v. Bd. of Trade*,
62 F.3d 918 (7th Cir. 1995) ................................................................18

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
22 F.4th 103 (2d Cir. 2021) ................................................................13, 16, 20, 21, 23

*Siva v. Am. Bd. of Radiology*,
38 F.4th 569 (7th Cir. 2022) ................................................................9

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
2014 WL 2002887 (E.D. Tenn. May 15, 2014) ................................................................17

*S. Austin Coal. Cmty. Council v. SBC Commc'ns Inc.*,
191 F.3d 842 (7th Cir. 1999) ................................................................30

*Squires-Cannon v. Forest Pres. Dist. of Cook Cnty.*,
897 F.3d 797 (7th Cir. 2018) ................................................................10

*Supreme Auto Transp. LLC v. Arcelor Mittal*,
238 F. Supp. 3d 1032 (N.D. Ill. 2017) ................................................................10, 14

*U.S. Gypsum Co. v. Ind. Gas Co.*,
350 F.3d 628 (7th Cir. 2003) ................................................................17, 18, 19

*United States v. Baker Hughes Inc.*,
908 F.2d 981 (D.C. Cir. 1990) ................................................................33

*United States v. Deutsche Telekom AG*,
2020 WL 1873555 (D.D.C. Apr. 14, 2020) ................................................................7, 30, 31

*United States v. Int'l Harvester Co.*,
564 F.2d 769 (7th Cir. 1977) ................................................................29, 33

Page(s)

*United States v. Marine Bancorporation*,
418 U.S. 602 (1974) ................................................................................34

*United States v. UnitedHealth Grp. Inc.*,
2022 WL 4365867 (D.D.C. Sept. 21, 2022) ......................................30, 34

*United States v. Waste Mgmt., Inc.*,
743 F.2d 976 (2d Cir. 1984) ....................................................................32

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) ................................................................................34

*In re Vitamins Antitrust Litig.*,
2001 WL 855463 (D.D.C. July 2, 2001) ..................................................15

*In re Zetia Antitrust Litig.*,
2019 WL 6122017 (E.D. Va. Oct. 15, 2019) ...........................................15

**STATUTES**

15 U.S.C. § 16 ............................................................................................6

15 U.S.C. § 18 ......................................................................................7, 39

47 U.S.C. § 307 ..........................................................................................4

**OTHER AUTHORITIES**

1 Dan B. Dobbs, Law of Remedies § 4.1(1) (2d ed. 1993) ......................39

# I. INTRODUCTION

The merger of T-Mobile and Sprint has delivered to T-Mobile consumers lower prices and higher-quality, faster network services than either company could have offered alone, just as the Department of Justice's Antitrust Division, the Federal Communications Commission, two federal judges, and others found that it would. The merger benefitted consumers, particularly by accelerating the industry's deployment of 5G networks around the country, something the FCC described as "of critical importance to our nation" when it approved the merger. In other words, the merger dramatically *improved* circumstances for T-Mobile customers and was *procompetitive* and should not be undone.

Plaintiffs here are not customers of T-Mobile, do not purchase T-Mobile services, and have no basis to complain about the quality of those services or T-Mobile's prices. Rather, Plaintiffs are customers of T-Mobile's rivals, Verizon and AT&T—nonparties not involved in the merger, not named as defendants, and not alleged to have conspired with T-Mobile. The gravamen of Plaintiffs' unprecedented lawsuit is that, despite having no relationship with T-Mobile, they should be permitted to unwind the long-consummated T-Mobile/Sprint merger and seek treble damages for prices independently set by T-Mobile's rivals because of their alleged unhappiness with the prices they pay to T-Mobile's competitors. But if Plaintiffs are unhappy with Verizon and AT&T, there is a remedy available in the highly competitive market that wireless consumers enjoy today— they should switch to T-Mobile, not sue it. Plaintiffs' extraordinary lawsuit seeks to turn the antitrust laws on their head and fails as a matter of law.

The Complaint suffers from a fatal threshold defect: Plaintiffs lack antitrust standing to challenge a consummated merger when they are not customers of the merged entity. Under the applicable "efficient enforcer" test for antitrust standing set forth by the Supreme Court in

1

*Associated General Contractors of California, Inc. v. California State Council of Carpenters* ("*AGC*"), 459 U.S. 519 (1983), customers of AT&T and Verizon are not the proper plaintiffs here. The purported causal link between the merger and Plaintiffs' asserted injury—paying higher prices for AT&T's and Verizon's services—is far too attenuated and remote, given the necessary intervening actions taken by AT&T and Verizon. Antitrust standing is limited to "plaintiffs whose injuries were proximately caused by a defendant's antitrust violations." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014). For this reason, the overwhelming majority of courts have denied efficient-enforcer standing over so-called "umbrella" claims brought by plaintiffs who, despite not purchasing from the defendants, claim that the defendants' conduct raised the prices charged by other suppliers from whom the plaintiffs *did* purchase. *See, e.g.*, *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 134-35 (2d Cir. 2021). Allowing this case to proceed would open the floodgates to stale litigation of consummated mergers from non-customers of the merging parties, in direct contravention of binding precedent.

Plaintiffs lack antitrust standing for another reason, too: the existence of T-Mobile's customers who are directly affected by the merger and thus best situated to enforce any related antitrust violation. *See AGC*, 459 U.S. at 542. Plaintiffs allege that arbitration agreements between T-Mobile and its own customers "shield T-Mobile from claims relating to T-Mobile's prices or services by its own customers." Dkt. 1 ¶ 8. But that is incorrect, as any T-Mobile customer actually aggrieved by the merger is free to pursue an antitrust claim in arbitration. While the agreement's class action waiver may limit the potential fee for a plaintiff's lawyer, that is not a relevant consideration in assessing whether Plaintiffs are the most efficient enforcers. The most efficient enforcer is not the one who promises the biggest potential payday for a plaintiff's lawyer.

Even if Plaintiffs could clear this formidable antitrust-standing hurdle, their claims *still*

would fail because they do not plausibly allege that the merger substantially lessened competition. Plaintiffs point to alleged higher prices Plaintiffs paid to Verizon and AT&T after the merger, but their Complaint is bereft of any allegations plausibly establishing that such increases resulted from the merger as opposed to a host of other obvious alternative explanations, including record-high inflation, rising labor costs, and the industry's transition to higher-quality 5G services. Plaintiffs' proffered market statistics likewise do not plausibly establish that the merger was unlawful, as these figures do not account for the competition-enhancing conditions imposed on the merger, including the divestiture of Sprint's lucrative Boost Mobile prepaid business to DISH and other conditions designed to establish DISH as a fourth service provider to replace Sprint. Unmoored from these realities, Plaintiffs' market share and concentration data are insufficient to state a claim that the merger was anticompetitive.

Finally, Plaintiffs' request for the extreme remedy of divestiture is barred by the doctrine of laches. For more than four years after the merger's highly publicized announcement, Plaintiffs did not file suit or otherwise object to the merger. The Complaint offers no excuse for this tardiness, despite affirmatively asserting that the merger's allegedly harmful effects were entirely foreseeable when the merger was announced. Plaintiffs' belated divestiture request, if granted, would rip apart T-Mobile's nationwide 5G network, one constructed only with the benefit of the merging entities' combined facilities. The result would prejudice millions of T-Mobile customers who would lose access to those nationwide, integrated 5G services on which they have come to rely.

Allowing this case to proceed would stretch beyond their breaking point the antitrust laws limiting who can sue, when, and for what relief. The Court should dismiss the case with prejudice.

## II.  SUMMARY OF ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS

On April 29, 2018, T-Mobile and Sprint (collectively, the "Merging Entities") announced

an agreement to merge. Dkt. 1 ¶ 46. That announcement was highly publicized and deeply scrutinized—by the FCC, the DOJ Antitrust Division, dozens of State Attorneys Generals, and two federal judges, among others. Dkt. 1 ¶¶ 63-64, 67-68. Regulators and the courts uniformly concluded that the merger, with certain conditions, would benefit the public and promote competition.

## A.  The FCC Concludes That The Merger Would Be In The Public Interest

On June 18, 2018, the Merging Entities applied to the FCC for approval of the transfer of Sprint's licenses and authorizations to T-Mobile. Decl. of Rachel S. Brass ("Brass Decl."), Ex. 1 ("FCC Order") ¶ 20.[1] The FCC investigated the proposed transaction, analyzing its likely impact on competition and the public interest. *Id.* ¶¶ 4-11; 47 U.S.C. § 307. The FCC sought public input and received almost 20 petitions, over 70 comments, and hundreds of *ex parte* filings. FCC Order ¶¶ 21-24, App'x B.

The FCC concluded that the merger, subject to conditions accepted by the Merging Entities and nonparty DISH, would benefit the public interest and promote competition. FCC Order ¶ 11, 385. Among other things, the Merging Entities "committed to offer T-Mobile and Sprint legacy rate plans available as of February 4, 2019 for three years following consummation of the transaction or until better plans that offer a lower price or more data are made available." *Id.* ¶ 209; Dkt. 1 ¶ 102.[2] The Merging Entities also agreed to divest Sprint's prepaid business, Boost Mobile, and to execute a wholesale agreement with the buyer on terms that "will ensure that New Boost will be an aggressive competitor." FCC Order ¶¶ 25, 202-03. The Merging Entities further committed to build out a high-quality 5G service on a faster schedule and with more extensive coverage than

---

[1]  For the reasons set forth in the concurrently filed request for judicial notice, the Court may consider the FCC Order, as well as Exhibits 1-20. *See* Defs.' Req. for Jud. Not. ¶ 1.

[2]  The commitment allowed limited modifications to legacy plans (1) to pass through increased taxes, fees, and surcharges, as well as price changes for third-party services; and (2) to modify or discontinue third-party partner benefits based on changes they initiated. FCC Order ¶ 209.

either company could have delivered alone. *Id*. ¶¶ 5, 26-29. The Merging Entities agreed to several verification mechanisms to ensure compliance with these commitments, including testing and interim reporting requirements. *Id.* ¶¶ 30-32. And they agreed that should T-Mobile fail to meet a commitment, it could face a maximum penalty of $2.4 billion. *Id.* ¶ 32.

DISH, which agreed to purchase Sprint's prepaid assets as part of the merger, also made ongoing commitments. It agreed to build out a nationwide 5G broadband network by June 2023 and to deploy its 5G service across its various spectrum licenses to 20% of the population by June 14, 2022, and 70% of the population by June 14, 2023. FCC Order ¶¶ 368-69. DISH pledged to spend $10 billion to achieve these goals and further committed to refrain from transferring control of its licenses for six years without the advance approval of both the FCC and the DOJ. *Id.* ¶¶ 376-79. Like the Merging Entities, DISH agreed to reporting and verification requirements to ensure compliance with its commitments. *Id.* ¶¶ 378-81. In the event DISH fails to launch its 5G service as promised, it faces a maximum penalty of $2.2 billion and forfeiture of its spectrum licenses. *Id.* ¶¶ 12, 378-81.

The FCC concluded that the merger, as conditioned, would have "significant public interest and competitive benefits" and "would serve the public interest, convenience, and necessity." FCC Order ¶ 385; *see also id.* ¶ 11. Specifically, the FCC determined the merger would yield significant quality improvements for consumers, especially in rural areas, far beyond what the Merging Entities could deliver absent the merger; it would also "encourag[e] the rapid deployment of a new 5G mobile wireless network." *Id.* ¶¶ 5, 384. The combined company's increased network quality also would lead to enhanced competition and growth in industries that rely on high-speed networks. *Id.* The FCC thus approved the transfer of Sprint's licenses on October 16, 2019. *Id.*

**B.     The DOJ And A Federal Judge Review And Approve The Merger**

The DOJ's Antitrust Division conducted a comprehensive fifteen-month review of the proposed merger's likely effect on competition and U.S. consumers.  Dkt. 1 ¶ 63.  The DOJ concluded that the merger, inclusive of the divestiture to DISH and the Merging Entities' other commitments, would significantly benefit consumers and promote—not reduce—competition.

As required under the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16 (the "Tunney Act"), on July 26, 2019, the DOJ filed a civil antitrust complaint under Section 7 of the Clayton Act, along with a proposed Final Judgment containing the terms of the settlement, in the United States District Court for the District of Columbia.  Dkt. 1 ¶ 63; Brass Decl. Exs. 2, 12; *see also* Brass Decl. Ex. 14 (joinder by 10 State AGs as *parens patriae*).  The Tunney Act gives any member of the public an opportunity to comment on or object to an antitrust settlement reached by DOJ.  Plaintiffs did not participate.  In response to public comments received, the DOJ stated that the merger "will provide substantial long-term benefits for American consumers by ensuring that large amounts of currently unused or underused spectrum are made available to American consumers in the form of advanced 5G networks that this proposed Final Judgment will help facilitate," and that "the merged firm will combine T-Mobile's and Sprint's existing complementary spectrum resources and build out a 5G network to deliver network capacity that exceeds the sum of what either carrier could achieve on its own."  Brass Decl. Ex. 13 at 2.

The Merging Entities agreed to divest Boost Mobile to DISH and to provide DISH with an exclusive option to acquire T-Mobile's cell sites and retail stores.  Brass Decl. Ex. 12 at 6-18.  The Merging Entities and DISH also entered into a "Full MVNO Agreement" for a term of at least seven years, providing DISH with network assets, access, and support services to operate as a mobile virtual network operator ("MVNO") while DISH builds out its 5G network.  *Id.* at 19-20.  The proposed Final Judgment also included appointment of a trustee to monitor T-Mobile and

DISH.  *Id.* at 25-28.  The court would retain jurisdiction to enforce compliance with, and punish violations of, the Final Judgment for seven years.  *Id.* at 34, 36.

On April 1, 2020, the court approved the proposed Final Judgment.  Brass Decl. Ex. 15 at 36.  The court explained that it had "spent considerable time" evaluating the merger, including considering "hundreds of pages of public comments, amicus briefs, and responsive filings from the parties" about the merger.  *United States v. Deutsche Telekom AG*, 2020 WL 1873555, at *5 (D.D.C. Apr. 14, 2020).  In light of the conditions imposed by the DOJ and FCC, the court found the proposed Final Judgment in the public interest.  *Id.* at *6.

## C. State AGs And Individual Litigants Unsuccessfully Sue To Enjoin The Merger

On June 11, 2019, AGs from nine states and the District of Columbia, acting as *parens patriae*, sued to enjoin the merger.  Dkt. 1 ¶ 67.  They alleged that the proposed merger "would substantially lessen competition in interstate trade and commerce across the nation for mobile wireless telecommunications services, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18."  Brass Decl. Ex. 16 ¶ 109.  Ultimately, fourteen State AGs proceeded to trial.

Judge Marrero held a two-week bench trial.  *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 186 (S.D.N.Y. 2020).  After weighing voluminous evidence and personally observing witnesses and assessing their credibility and demeanor, the court rejected the AGs' challenge. *Id.* at 189.  In a 170-page opinion, the court explained its ruling, which was supported by the totality of the circumstances, focusing around three central findings.  *Id.* at 207.  First, the combination of network assets through the proposed merger would allow T-Mobile to compete more vigorously by offering faster and higher-quality service and accelerating the company's transition to 5G.  *Id.* at 207-17.  Second, Sprint, with its tainted reputation and perilous financial condition, was unlikely to continue competing vigorously nationwide as a standalone company as the costly shift to 5G approached.  *Id.* at 217-24.  Third, the existing regulatory remedies, including those

aimed at establishing DISH as a fourth competitor, ameliorated any concerns of potential anticompetitive effect. *Id.* at 224-33. The court expected the new T-Mobile to become "a company reinforced with a massive infusion of spectrum, capacity, capital, and other resources, and chomping to take on its new market peers and rivals in head-on competition." *Id.* at 245.

The states did not appeal Judge Marrero's decision finding that the merger was unlikely to substantially lessen competition. Instead, twelve of the fourteen states settled their claims in exchange for additional commitments, including an extension of the consumer pricing commitments made to the FCC from three years to five (ending in 2025). Dkt. 1 ¶ 102; Brass Decl. Ex. 3 ¶ 1. In addition, the Merging Entities agreed to offer two low-cost price plans that provide unlimited talk, text, and at least 2GB of high-speed data for $15 per month, and unlimited talk, text, and at least 5GB of high-speed data for $25 per month for five years. Brass Decl. Ex. 3 ¶ 1.

While the State AG action was pending, a group of consumers also sued to enjoin the merger. *See* Brass Decl. Ex. 17. The court denied those plaintiffs' motion for a temporary restraining order because, among other things, the court concluded that they were not likely to succeed on the merits of their Sherman and Clayton Act claims. *Bradt v. T-Mobile US, Inc.*, 2020 WL 1809716, at *3 (N.D. Cal. Feb. 28, 2020). The plaintiffs subsequently dismissed their claims with prejudice. Brass Decl. Ex. 18.

### D.     Customers Of Verizon And AT&T Belatedly Sue To Undo The Merger

T-Mobile and Sprint consummated the merger on April 1, 2020. Dkt. 1 ¶ 5. T-Mobile has since fully integrated the businesses and built a nationwide 5G network using the companies' combined facilities. DISH has filed regular reports with the FCC regarding its parallel efforts, including its most recent report certifying that it had met the June 2022 5G buildout milestone requiring its network to cover 20% of the U.S. population and that it had launched standalone 5G services in numerous cities across the country. Brass Decl. Ex. 19 at 4-5.

On June 17, 2022, four years after the merger was announced and two years after it closed, Plaintiffs filed this lawsuit, alleging the merger agreement violated Section 7 of the Clayton Act and Section 1 of the Sherman Act. Dkt. 1 ¶ 121, 127. Plaintiffs are residents of Indiana and Illinois who subscribed to retail mobile wireless services offered by nonparties AT&T and Verizon. *Id.* ¶¶ 12-18. None are customers of T-Mobile, nor do they purport to represent the interests of such customers. Instead, they purport to represent customers who "paid for a national retail mobile wireless plan offered by Verizon or AT&T, on a prepaid or postpaid basis." *Id.* ¶ 110. They seek (1) trebled damages for allegedly inflated prices they paid to Verizon and AT&T (not T-Mobile), (2) injunctive relief ordering the divestiture of T-Mobile's assets to create a new company replicating Sprint, and (3) disgorgement or restitution of T-Mobile's profits. *Id.* at 61.

According to Plaintiffs, it was apparent as soon as the merger was announced in April 2018 that competition for mobile wireless services would be reduced and consumer prices would increase. Dkt. 1 ¶¶ 46-58. Yet they took no action to challenge the merger, nor to submit objections or comments during the FCC investigation or the Tunney Act proceedings. The Complaint offers no explanation for their years-long silence and delay.

### III.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff "bears the burden of alleging facts giving rise to a plausible inference that, after discovery, he will be able to prove each element of his [antitrust] claim." *Siva v. Am. Bd. of Radiology*, 38 F.4th 569, 575 (7th Cir. 2022). This "pleading burden 'requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 835 (7th Cir. 2021) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554-56 (2007)). Instead, "to properly state a claim, a plaintiff's complaint must contain

allegations that plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Kubiak v. City of Chicago,* 810 F.3d 476, 480 (7th Cir. 2016) (cleaned up).

In assessing whether a complaint meets this standard, courts may consider "the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 604 & n.2 (7th. Cir. 2013). Courts need not accept as true allegations that contradict matters properly subject to judicial notice or materials attached to or incorporated by reference into the complaint. *See Squires-Cannon v. Forest Pres. Dist. of Cook Cnty.*, 897 F.3d 797, 802 (7th Cir. 2018).

## IV. ARGUMENT

### A. Plaintiffs' Claims Should Be Dismissed For Lack Of Antitrust Standing

Like all private plaintiffs who bring suit for treble damages and injunctive relief under the Clayton Act, Plaintiffs "must demonstrate antitrust standing." *Supreme Auto Transp. LLC v. Arcelor Mittal*, 238 F. Supp. 3d 1032, 1038 (N.D. Ill. 2017), *aff'd* 902 F.3d 735 (7th Cir. 2018). "Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property." *AGC*, 459 U.S. at 535 (cleaned up). Recovery instead is limited to those with *antitrust standing*—that is, "plaintiffs whose injuries were proximately caused by a defendant's antitrust violations." *Lexmark*, 572 U.S. at 126; *see also AGC*, 459 U.S. at 535-36 (setting forth multi-factor test for proximate causation in antitrust cases). "The purpose of the proximate causation requirement . . . is to avoid speculative recovery by requiring a *direct relation* between the plaintiff's injury and the defendant's behavior." *Supreme Auto Transp.*, 902 F.3d at 743 (emphasis added). This is "a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement [the Court] must dismiss it as a matter of law." *Gatt Commc'ns, Inc. v. PMC*

*Assoc., LLC*, 711 F.3d 68, 75 (2d Cir. 2013) (quotation omitted).

A plaintiff seeking to establish antitrust standing must allege that it can "most efficiently vindicate the purposes of the antitrust laws" under the "efficient enforcer" test. *Kochert v. Greater Lafayette Health Servs., Inc*., 463 F.3d 710, 718 (7th Cir. 2006). That question is determined by applying the six proximate-cause factors set forth by the Supreme Court in *AGC*: (1) the causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) improper motive; (3) whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) the existence of more direct victims of the alleged antitrust violation; (5) the speculative nature of the damages; and (6) the risk of duplicate recoveries or complex damages apportionment. 459 U.S. at 716-18. These factors "need not be given equal weight." *IQ Dental Supply, Inc. v. Henry Schein, Inc*., 924 F.3d 57, 65 (2d Cir. 2019). "Because the concept of antitrust standing was developed with common law proximate causation standards in mind," the first and fourth factors are "particularly important," as they examine the directness of the plaintiff's alleged injury. *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2013 WL 4506000, at *12 (N.D. Ill. Aug. 23, 2013). The same general analysis applies to determine antitrust standing for damages claims under Section 4 and for injunctive-relief claims under Section 16, although the fifth and sixth factors (about damages) drop out of the injunctive relief analysis. *Leeder v. Nat'l Ass'n of Realtors*, 2022 WL 1307100, at *7 (N.D. Ill. May 2, 2022).

Application of the *AGC* factors—including the critical first (direct causal connection), and fourth (direct victim) factors—demonstrates that Plaintiffs lack antitrust standing. *See Kochert*, 463 F.3d at 718-19 (finding the plaintiff "does not have antitrust standing" based on the first, second and fourth factors); *Fisher v. Aurora Health Care, Inc*., 558 F. App'x 653, 656 (7th Cir.

2014) (dismissing plaintiff's claim for lack of antitrust standing based on the first and fourth factors). This case is brought not by T-Mobile or Sprint customers, but instead by AT&T and Verizon customers on behalf of a purported class of AT&T and Verizon customers. Dkt. 1 ¶ 8. Plaintiffs admit they structured their case this way to avoid T-Mobile's arbitration provisions. *Id.* That ploy, however, results in Plaintiffs lacking antitrust standing. The alleged connection between the merger and Plaintiffs' alleged injury is far too remote and attenuated, given the intervening independent pricing decisions of Verizon and AT&T. Moreover, T-Mobile's customers, who were more directly affected by the merger, are better situated to enforce any alleged antitrust violation. And because Plaintiffs' alleged injury is not direct, their damages claim is impermissibly speculative. For these reasons, Plaintiffs lack antitrust standing and are *not* proper parties here. Plaintiffs' Complaint should be dismissed. *AGC*, 459 U.S. at 535-36.

1.      **Plaintiffs Cannot Establish A Direct Causal Connection Due To The Intervening Decisions Of Verizon And AT&T.**

The first factor requires a "causal connection between the alleged anti-trust violation and the harm to the plaintiff." *Kochert*, 463 F.2d at 718. This essential element of a proximate-cause analysis allows the Court to determine "whether the harm alleged has sufficiently close connection to the conduct the statute prohibits." *Lexmark*, 572 U.S. at 133; *accord AGC*, 459 U.S. at 540 (explaining that this factor examines the "the directness or indirectness of the asserted injury"). It is not enough to allege that a defendant's purported antitrust violation caused "ripples of harm to flow through the Nation's economy" that eventually reached the plaintiff. *AGC*, 459 U.S. at 534. Instead, a plaintiff must show that a defendant's alleged antitrust violation is *proximately linked* to an injury he suffered. *Cf. AGC*, 459 U.S. at 540 (holding the district court properly dismissed the case where plaintiff's claimed injuries were removed from defendant's alleged violation by "several somewhat vaguely defined links"); *Kochert*, 463 F.3d at 719 (affirming dismissal for lack of

antitrust standing given tenuous causal connection between alleged injury and violation); *Laydon v. Coöperatieve Rabobank U.A.,* 51 F.4th 476, 489 (2d Cir. 2022) (affirming dismissal of umbrella-standing claims where "theory of liability depends on a series of causal steps that separate Defendants' conduct and . . . purported injury").

In the context of antitrust standing, proximate cause generally follows the "first-step rule." *Am. Express*, 19 F.4th at 139; *see also AGC*, 459 U.S. at 534 ("The general tendency of the law, in regard to damages at least, is not to go beyond the first step." (quoting *S. Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533 (1918) (Holmes, J.))). The first-step rule requires "some direct relation between the injury asserted and the injurious conduct alleged," *Bank of Am. Corp. v. City of Miami, Fla.,* 137 S. Ct. 1296, 1299 (2017), such that injuries at the first step following the alleged conduct are proximately caused by that conduct. *Am. Express*, 19 F.4th at 140.

Here, Plaintiffs do not allege that they were directly injured at the "first step" following the merger. Plaintiffs are not customers of the Merging Entities, and they do not claim injury from any "overcharge" from the merged entity. Nor could they, as they are not subscribers of T-Mobile's wireless services. Plaintiffs do not allege that T-Mobile conspired with Verizon and AT&T or that T-Mobile otherwise controlled or set the prices of its competitors. Instead, Plaintiffs allege that they were indirectly injured by independent decisions made by Verizon and AT&T multiple steps down the line: (1) Sprint and T-Mobile merged, (2) the merged T-Mobile entity allegedly raised certain prices, and (3) in the two years since the merger closed, a period of acknowledged intense inflation and other pressures, AT&T and Verizon allegedly made their own independent decisions to raise certain prices. Plaintiffs' alleged injury is thus too remote to bestow antitrust standing as a matter of law. *See Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC,* 22 F.4th 103, 116-19 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2852 (2022) (plaintiffs who purchased

financial instruments from nonparties through transactions "over which Defendants had no control, in which Defendants had no input, and from which Defendants did not profit" failed to establish direct causal link with alleged violation); *Gross v. New Balance Athletic Shoe, Inc.,* 955 F. Supp. 242, 247 (S.D.N.Y. 1997) (granting motion to dismiss claims by plaintiffs who purchased shoes from non-conspiring suppliers because "the causal connection between the alleged injury and the conspiracy is attenuated by significant intervening causative factors (i.e., independent pricing decisions of non-conspiring retailers)"); *cf. Supreme Auto*, 238 F. Supp. 3d at 1040 (holding that plaintiffs' conclusory assertions about causal connections and the directness of the injury are insufficient to establish standing because they failed to acknowledge the actions of interceding parties). Here, Plaintiffs have failed to allege facts plausibly supporting *any* causal connection between the merger and the harm they allegedly suffered from AT&T and Verizon's decisions, making their claims of antitrust standing all the more defective. *See* Section IV(B)(1).

Because Plaintiffs do not purchase mobile wireless services from T-Mobile, they must resort to a highly dubious "umbrella theory" of antitrust standing. Dkt. 59 at 7 (claiming antitrust plaintiffs have "standing to sue even if they purchased from a non-defendant"). The "umbrella" theory arose out of a wholly distinct legal and economic context—cases involving alleged price-fixing cartels. *See Mid-W. Paper Prod. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573, 581 (3d Cir. 1979). Under this theory, plaintiffs who did not purchase products from defendants asserted that they had standing to sue because defendants' price-fixing conspiracy elevated prices throughout the market, which then enabled non-conspiring suppliers to sell products to plaintiffs at higher prices under the cartel's price umbrella. *Id.* At its core, the umbrella theory "seeks to hold price fixers liable for harm allegedly flowing from the illegal conduct even though the price-fixing defendants received none of the illegal gains and were uninvolved in their competitors' pricing decisions." *In*

*re Coordinated Pretrial Proc. in Petrol. Prod. Antitrust Litig.*, 691 F.2d 1335, 1339 (9th Cir. 1982). Courts overwhelmingly reject umbrella antitrust standing even in price-fixing cases because the plaintiffs have not transacted directly with defendants: the plaintiffs' claims are "simply too remote to confer antitrust standing," and "[t]he causal connection between plaintiffs' injury and the alleged conspiracy is necessarily attenuated by significant intervening factors, such as independent pricing decisions of the nonconspiring suppliers." *In re Vitamins Antitrust Litig.,* 2001 WL 855463, at *4 (D.D.C. July 2, 2001) (the "overwhelming majority of recent court decisions that have addressed the viability of the 'umbrella' theory after *AGC* have rejected 'umbrella' claims"); *In re Zetia (Ezetimibe) Antitrust Litig.,* 2019 WL 6122017, at *10 (E.D. Va. Oct. 15, 2019) ("most courts" reject the umbrella theory).

The umbrella theory has been even less successful in the rare instances in which plaintiffs have attempted to invoke it outside the context of cartel price-fixing. For example, in *Antoine L. Garabet, M.D., Inc. v. Autonomous Technologies Corp.*, 116 F. Supp. 2d 1159, 1167-69 (C.D. Cal. 2000), the court rejected an umbrella theory of antitrust standing in a merger case. In *Garabet*, the plaintiffs—who did not purchase from the merging parties—claimed a merger was anticompetitive because of its umbrella effects. *Id.* at 1167. Applying the *AGC* factors for proximate causation, the court "decline[d] to recognize purchases from a non-conspirator non-defendant as a sufficient basis to assert antitrust standing," because the "causative links between Defendants' alleged conduct and injuries allegedly suffered by Plaintiffs [we]re simply too attenuated." *Id.* at 1169. Here, as in *Garabet*, any injury Plaintiffs allegedly suffered could not be direct "due to the necessary intervening actions taken by [Verizon and AT&T]." *Id.*

Similarly, the Second Circuit recently affirmed a decision granting a motion to dismiss on the basis that plaintiffs who did not transact business directly with the defendant lacked antitrust

standing because their injury was too remote under the *AGC* factors. In that case, a class of merchants who did not accept American Express cards sued American Express over an "anti-steering" provision in American Express' merchant contracts. *Am. Express*, 19 F.4th at 138. Just as here, American Express "did not raise the [plaintiffs]' fees. Nor could it have: the [plaintiffs] do not accept American Express cards." *Id.* at 140. Despite having no direct connection to American Express or its anti-steering provision, the plaintiffs alleged that the anti-steering provision raised fees for merchants who do accept American Express cards, which then enabled Visa and other competitors of American Express to charge higher fees to the plaintiffs. *Id.* at 141. Like the Seventh Circuit, the Second Circuit assesses whether a plaintiff is an "efficient enforcer" based on the multi-factor analysis of *AGC*. *Compare id.* at 138, *with Kochert*, 463 F.3d at 717. The court in *American Express* concluded that the alleged violation bore far too tenuous a connection to the claimed injury to warrant antitrust standing. *Am. Express,* 19 F.4th at 139-43. Even if the plaintiffs were in fact injured when American Express' competitors, covered by American Express' price umbrella, raised their prices, "'enabling' other credit card companies to raise the [plaintiffs'] fees does not establish the 'direct relation' between injury and antitrust violation" that the antitrust laws require. *Id.* at 141. "[J]udicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing." *Id.* at 139 (quoting *AGC*, 459 U.S. at 536).

Here, Plaintiffs are asserting exactly the type of remote and attenuated injury that does not confer standing under the antitrust laws. Plaintiffs claim to have been harmed when AT&T and Verizon—who were not involved in the merger and were free to set their own prices—decided to charge higher prices. Dkt. 1 ¶¶ 122, 124, 129, 133. "Such independent decisions snap the chain of causation linking Plaintiffs' injury to the [Defendants' alleged] misconduct." *Schwab*, 22 F.4th at 116 (affirming dismissal of umbrella antitrust claims under the "first-step rule" of antitrust

standing); *accord Laydon*, 51 F.4th at 489 (similar); *In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 904-12 (S.D.N.Y. 2018) (similar); *FTC v. Mylan Labs., Inc.*, 62 F. Supp. 2d 25, 38-39 (D.D.C. 1999) (similar); *Gross*, 955 F. Supp. at 245-47 (similar); *see also In re Aluminum Warehousing Antitrust Litig.,* 520 F. Supp. 3d 455, 486 (S.D.N.Y. 2021) (granting defendants' summary judgment motion on umbrella claims where the intervening independent decision by non-defendant sellers broke the chain of causation); *Allen v. Dairy Farmers of Am., Inc.*, 2014 WL 2610613, at *28 (D. Vt. June 11, 2014) (rejecting umbrella theory in granting defendants' motion for summary judgment); *In re Skelaxin (Metaxalone) Antitrust Litig.*, 2014 WL 2002887, at *7-11 (E.D. Tenn. May 15, 2014) (granting motion in limine to exclude umbrella damages because the causal connection between the claimed injury and the alleged violation was too attenuated); *In re Online DVD Rental Antitrust Litig.,* 2011 WL 1629663, at *7 (N.D. Cal. Apr. 29, 2011) (granting summary judgment where plaintiffs' theory of causal link—that defendant's prices constituted the maximum ceiling that dictated the prices charged by third parties from whom plaintiffs rented DVDs—was "simply too attenuated to be considered sufficiently direct"); *In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152, 1155 (N.D. Cal. 2001) (excluding umbrella plaintiffs from class settlement because "the 'price umbrella' is not a legal basis for conferring standing on an antitrust plaintiff").

Plaintiffs have cited two Seventh Circuit decisions as being at odds with this great weight of authority rejecting umbrella claims as a basis for antitrust standing. Dkt. 59 at 7 (citing *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002), and *U.S. Gypsum Co. v. Indiana Gas Co.* ("*Gypsum*"), 350 F.3d 628 (7th Cir. 2003)). Neither case supports Plaintiffs' position.

To the contrary, the Seventh Circuit recognized that the umbrella theory poses potentially difficult issues, although it never had occasion to test the theory under the efficient enforcer test.

In *Loeb*, a price-fixing case, the defendants objected to the possibility that they might be held liable for higher prices charged by non-conspiring suppliers, rather than just for the sales made by the alleged cartel members. 306 F.3d at 484. The court recognized that, where "cartel members A and B sell to customers X and Y, and then non-cartel member firm C makes sales at or near the enhanced cartel price to customer Z, the question arises whether A and B are liable to Z for the overcharges it paid," but expressly left the issue "open." *Id*. It was unnecessary to resolve that question given that the defendants rigged prices for the physical copper market by manipulating a commodity futures exchange incorporated into pricing formulas used by all dealers. *Id.* at 476, 483; *accord Sanner v. Bd. of Trade*, 62 F.3d 918, 929 (7th Cir. 1995) (prices plaintiffs received moved in "lockstep" with commodity exchange manipulated by defendants). Prices of mobile wireless services are not listed on any commodity exchange, nor are there any allegations establishing this type of inescapable linkage between T-Mobile's prices and those charged by AT&T or Verizon. *Cf. Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 346 (7th Cir. 2022) (dismissing antitrust claims based on alleged price fixing of medical products for lack of standing and noting that, unlike in *Loeb*, "[s]yringes and catheters are not like soybeans and copper because the prices of medical products are not listed on a commodity exchange"). Accordingly, *Loeb* does not support Plaintiffs' standing to sue here.

Likewise, *Gypsum* did not address whether umbrella claims could establish the proximate causation required under *AGC*'s efficient enforcer test. In *Gypsum*, a plaintiff sought injunctive relief against defendants who allegedly hoarded gas pipeline capacity through a joint venture. 350 F.3d at 625-28. The plaintiff did not purchase capacity from the defendants or their joint venture; instead, the plaintiff purchased capacity directly from pipelines. The district court dismissed the plaintiff's claim on several grounds, one of which was that the plaintiff had not suffered an antitrust

injury because it did not buy from the defendants' joint venture.

The Seventh Circuit reversed, holding that, in resolving the antitrust injury question, the district court incorrectly applied the direct-purchaser doctrine of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968). As the Seventh Circuit explained, the plaintiff's claim was for injunctive relief only, and "the direct-purchaser doctrine does not foreclose equitable relief, nor does it apply when no purchaser could obtain damages, for then there is no risk of double recovery (and no need to calculate elasticities in order to apportion damages among multiple tiers)." 350 F.3d at 627. Moreover, the court found, purchasers from sellers who have not conspired with defendants could suffer an antitrust injury when they pay higher prices caused by the defendants' output restriction. *Id.*

The court also recognized that, because the plaintiff did not purchase gas transportation from the defendants, the plaintiff's claim could pose potential antitrust standing problems, but that it need not resolve that issue:

> We noted and reserved in *Loeb Industries, Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002), a number of potentially difficult issues about the design of relief when the customer of a fringe firm sues the (supposed) cartel members and the injury is derivative. *See also* [*AGC*]*,* 459 U.S. 519 (1983); *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982). Courts sometimes label this "antitrust standing," despite the potential for confusion with Article III standing (which requires only injury in fact plus redressability.). *We did not resolve these issues in* Loeb *and need not do so here either.*

350 F.3d at 627 (emphasis added).

In spite of *Gypsum's* clear reservation, Plaintiffs improperly rely on *dicta* noting that it was "enough to reiterate" that "buyers from fringe firms suffer antitrust injury," and that "the potential to establish injury through elevation of price in the affected market satisfies any distinct 'antitrust standing' requirement." *Id.* at 627-28. That passing reference to standing does not actually apply the required *AGC* factors: all that *Gypsum* held was that the plaintiff had alleged antitrust injury

and alleging an antitrust injury in and of itself is not sufficient to establish antitrust standing; antitrust plaintiffs must also allege that they are efficient enforcers under the *AGC* factors. *Kochert*, 463 F.3d at 718 (even if a plaintiff "could establish antitrust injury, she would still fail to establish antitrust standing [if] she is not the party who can most efficiently vindicate the purposes of the antitrust laws" (internal quotations omitted)); *Fisher*, 558 F. App'x at 655 ("Fisher must not only establish an antitrust injury, but also antitrust standing."). This requirement is consistent with the Supreme Court's subsequent holding in *Lexmark* that statutory causes of action like those at issue here are "limited to plaintiffs whose injuries are proximately caused by violations of the statute." 572 U.S. at 132-33.

In sum, just like other circuits, and as mandated by Supreme Court precedent, the Seventh Circuit requires a direct causal link between the plaintiff's claimed injury and the defendant's alleged antitrust violation. *See Kochert*, 463 F.3d at 718; *Fisher*, 558 F. App'x at 655; *Schwab*, 22 F.4th at 116; *Am. Express*, 19 F.4th at 138. As such a direct causal link is not, and cannot be, alleged here, this factor mandates dismissal of Plaintiffs' claims.

### 2. T-Mobile Customers Are The More Efficient Enforcers.

The fourth *AGC* factor also militates against any contention that Plaintiffs have antitrust standing. This factor focuses on "the presence of more immediate victims of an antitrust violation in a better position to maintain a treble damages action." *Loeb*, 306 F.3d at 484. The existence of such an identifiable class of persons "underscor[es] the attenuated nature" of the more remote party's claims. *Schwab*, 22 F.4th at 118. It also "diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general." *AGC*, 459 U.S. at 542. Courts have thus limited antitrust standing to persons with a direct connection to the defendant to avoid "overdeterrence" and "chilling economically efficient competitive behavior." *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co*., 998 F.2d 391, 394 (7th Cir. 1993); *accord Schwab*, 22

F.4th at 117 (umbrella standing would yield liability "that is far too sweeping" and "disproportionate to wrongdoing"); *Aluminum Warehousing*, 520 F. Supp. 3d at 488-89 (allowing umbrella plaintiffs to hold defendants liable for transactions in the entire industry would expand defendants' liability 200-fold, creating "a significant risk of disproportionate liability"). Even where the challenged conduct is *per se* illegal, such as price-fixing, courts have been reticent to extend antitrust standing to remote parties lest antitrust lawsuits become a "destructive force" that "may unduly cripple a defendant and lead to an overall deleterious effect upon competition." *Mid-West Paper* , 596 F.2d at 587. These concerns are even more acute in lawsuits like this one, where Plaintiffs are challenging a merger that regulators and courts have found would have enormous procompetitive benefits. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986) (lawsuits challenging conduct with procompetitive benefits "are especially costly, because they chill the very conduct the antitrust laws are designed to protect.").

Here, were the merger to have had any anticompetitive effects, the obvious "efficient enforcers" to challenge the merger between T-Mobile and Sprint are the Merging Entities' customers, as they would be the potential direct victims at the first step in the causal chain. *AGC*, 459 U.S. at 542. A customer who purchased directly from T-Mobile is thus a clearly superior plaintiff to pursue any claims regarding the merger, as his or her damages (if any) would be more demonstrable and the causal connection more direct. *Garabet*, 116 F. Supp. 2d at 1170 (purchasers who have purchased from defendants directly are superior plaintiffs to challenge a merger); *accord Am. Express*, 19 F.4th at 141 (holding that the existence of merchants with a direct contractual relationship with American Express who could arbitrate their claims against the company weighed against finding antitrust standing); *Schwab*, 22 F.4th at 118 (existence of customers who purchased financial products directly from defendants weighs against antitrust standing).

This case is brought not by T-Mobile or Sprint customers, but instead by AT&T and Verizon customers, on behalf of a purported class of AT&T and Verizon customers. Dkt. 1 ¶ 8. Plaintiffs admit they structured their case this way as a litigation tactic because T-Mobile's arbitration provisions supposedly "shield T-Mobile from claims relating to T-Mobile's prices or services by its own customers." Dkt. 1 ¶ 8. But nothing in T-Mobile's arbitration agreement prevents its customers from pursuing an antitrust claim. Those who have agreed to resolve any disputes with T-Mobile through binding arbitration can still assert an antitrust claim in that forum, *see* Brass Decl. Ex. 11 at 3-6; those who have opted out of arbitration can bring an antitrust lawsuit in state or federal court, *see id.* at 4.

As the Supreme Court has explained, an agreement to pursue remedies through arbitration does not "constitute the elimination of the right to pursue that remedy." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 236 (2013). This is true regardless of whether a party agreed to arbitrate any treble damages action on a non-class basis. *Id.* Accordingly, the fact that the most efficient enforcers have agreed to arbitrate their claims cannot confer antitrust standing on remote parties. *Am. Express*, 19 F.4th at 137, 141 (umbrella plaintiffs lack antitrust standing even though the merchants who contracted with American Express had been compelled to arbitration). New antitrust plaintiffs should not spring into existence based on whether the more efficient enforcers have arbitration clauses; or put differently, the existence of antitrust standing cannot turn on the happenstance of whether the better enforcers agreed to arbitrate their claims. *See Mid-West Paper*, 596 F.2d at 586 n.49 ("[I]nasmuch as we are fashioning a rule of [antitrust] standing, we must consider the general situation and not the unusual exception."); *IQ Dental*, 924 F.3d at 67 ("Indeed, it would be strange and unworkable if new efficient enforcers sprang up simply by operation of the statute of limitations on the other enforcers.").

That T-Mobile's customers have not yet requested to arbitrate does not support recognizing Plaintiffs' standing either. *Gatt*, 711 F.3d at 79; *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 444 (2d Cir. 2005) (absence of action by efficient enforcers "does not support recognizing plaintiffs' standing"). Rather, it suggests perhaps "that the facts were other than as alleged by plaintiff." *Gatt*, 711 F.3d at 79; *accord AGC,* 459 U.S. at 542, n.47 ("Indeed, if there is substance to the Union's claim, it is difficult to understand why these direct victims of the conspiracy have not asserted any claim in their own right."). This factor also weighs against finding antitrust standing here.

### 3.    Plaintiffs' Damages Are Speculative.

The fifth factor, the speculative nature of the damages, also weighs against finding antitrust standing. Where a plaintiffs' alleged injuries are "derivative rather than direct, the potential recovery is often highly speculative." *Am. Express*, 19 F.4th at 141 (cleaned up); *AGC*, 459 U.S. at 542 ("Partly because it is indirect, and partly because the alleged effects on the Union may have been produced by independent factors, the Union's damages claim is also highly speculative."). Where, as in this case, intervening decisions of nonparties are involved, ascertaining damages for injuries that hinge on pricing decisions for differentiated products by multiple competitors requires "creat[ing] . . . an alternative universe" built on "multiple layers of speculation." *Schwab*, 22 F.4th at 119. Given the myriad potential intervening factors, any attempt to parse the merger's impact, if any, on the wholly independent decisions of AT&T and Verizon would be entirely speculative. *Garabet*, 116 F. Supp. 2d at 1170 ("[T]he very complexity of a damages determination weighs against standing in this case."); *Mylan Labs., Inc.*, 62 F. Supp. 2d at 39 (explaining on motion to dismiss that "ascertaining the appropriate measure of damages" in umbrella cases is difficult because it "is a highly speculative endeavor" that depends on "numerous pricing variables[,] . . . including the cost of production, marketing strategy, elasticity of demand, and the

price of comparable items").  This factor also weighs against standing.

*   *   *

In sum, Plaintiffs have not alleged a plausible basis to establish antitrust standing under the governing *AGC* proximate-cause factors.  Nor could they amend to do so.  The Court should dismiss the Complaint with prejudice.

## B.    Plaintiffs Fail To Plausibly Allege That The Merger Was Anticompetitive

Plaintiffs' Complaint rests on the implausible allegation that the DOJ, the FCC, and two federal judges—including one who presided over a full trial and heard weeks of testimony and other evidence—all erred in concluding that the merger was lawful and would deliver enormous benefits to consumers.  Where, as here, "federal regulators have carefully scrutinized the challenged merger, imposed various restrictions on it, and 'stand ready to provide further consideration, supervision, and perhaps invalidation of asserted anticompetitive practices[,] . . . we have a unique indicator that the challenged practice may have redeeming competitive virtues and that the search for those values is not almost sure to be in vain.'" *Deutsche Telekom*, 439 F. Supp. 3d at 224 (quoting *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.* ("*BMI*"), 441 U.S. 1, 13 (1979)).  While it may technically be permissible (albeit vanishingly rare) for private plaintiffs to challenge mergers that have received government approval, a suit like this one challenging a merger that has been through the crucible of intense judicial and regulatory scrutiny is all but unprecedented.  To allow such a suit to proceed would flout "judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  For that reason, Plaintiffs should be strictly held to their burden under *Twombly* to allege *specific facts* that *plausibly* support their claim that the merger substantially lessened competition in the alleged mobile wireless services market.  Plaintiffs have not met, and cannot meet, that burden.

To state a Section 1 claim, Plaintiffs must plausibly allege that the challenged restraint will

lead to "substantial anticompetitive effect[s]." *Ohio v. Am. Express Co.* ("*Ohio*"), 138 S. Ct. 2274, 2284 (2018). A Section 7 claim similarly requires Plaintiffs to plausibly allege "'an appreciable danger' or 'a reasonable probability' of anticompetitive effects" in the relevant markets. *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 (9th Cir. 2018). A plaintiff can allege either "direct evidence" or "[i]ndirect evidence" of anticompetitive effects. *Ohio*, 138 S. Ct. at 2284. Plaintiffs' claims must be dismissed because they have failed to allege sufficient facts supporting an antitrust violation under either theory.

### 1. Plaintiffs Have Alleged No Direct Evidence of Anticompetitive Effects.

"Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Ohio*, 138 S. Ct. at 2284. "Because price increases can be the natural result of growing demand (or increasing marginal costs)," however, merely alleging a price increase is insufficient. *Intel Corp. v. Fortress Inv. Grp. LLC*, 2022 WL 16756365, at *2 (9th Cir. Nov. 8, 2022) (citing *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993)). Instead, a plaintiff must plausibly "plead that any price increases were the result of [the merger]." *Fortress*, 2022 WL 16756365, at *2. Plaintiffs have failed to meet that burden.

Plaintiffs identify only one set of price increases in their Complaint: an increase by AT&T in May 2022, followed by an increase by Verizon in June, *two years* after the merger. Dkt. 1 ¶¶ 107-08. Verizon and AT&T are competitors of T-Mobile who make independent pricing decisions. Plaintiffs do not allege a single fact suggesting otherwise, much less that there was any agreement to fix or coordinate prices. Rather, the Complaint points to the merger and alleged price increases two years later and *assumes* the latter were caused by the former—with *no facts* linking them at all. That deficiency is fatal to Plaintiffs' claims. *See Fortress*, 2022 WL 16756365, at *2.

The very documents on which Plaintiffs rely to support their allegations about Verizon's

and AT&T's prices point to obvious alternative explanations for those price increases—inflation and increasing cost pressures. Dkt. 1 ¶¶ 106-08, nn. 167-68; *see also* Brass Decl. Ex. 4. Plaintiffs' theory that these price increases are linked to the merger "stop[s] short of the line between possibility and plausibility of entitlement to relief," given these "obvious alternative explanations" for the prices charged by AT&T and Verizon. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (cleaned up); *accord Fortress*, 2022 WL 16756365, at *2.

Plaintiffs' allegations regarding T-Mobile's post-merger pricing further demonstrate the lack of any direct evidence linking purported price increases to the merger. Under the FCC Order, the Merging Entities committed to offer legacy rate plans "for three years following consummation of the transaction or until better plans that offer a lower price or more data are made available." FCC Order ¶ 209. And as Plaintiffs acknowledge, under further commitments made to the FCC, DOJ, and various State AGs, T-Mobile is precluded from raising prices on those plans until 2025. Dkt. 1 ¶ 102; *see* FCC Order ¶ 209; Brass Decl. Ex. 3 at ¶ 1. Plaintiffs do not allege that the regulators monitoring T-Mobile have identified any violation of its commitments. Instead, as noted in an article relied on by Plaintiffs, "T-Mobile has been holding firm and offering a range of price plans to attract customers from rivals."[3] *Cf. Twombly*, 550 U.S. at 569 (courts are "entitled to take notice of the full contents of the published articles referenced in the complaint").

While pointedly failing to allege that T-Mobile has broken its pricing commitments, Plaintiffs assert T-Mobile somehow violated their "spirit." Dkt. 1 ¶ 102. Here too, their own allegations and documents incorporated into the Complaint refute that claim. For example, Plaintiffs allege

---

[3] Scott Moritz & Todd Shields, *Verizon Mulls Price Increase in Response to Rising Costs*, Bloomberg (May 5, 2022, 6:37 AM), https://www.bloomberg.com/news/articles/2022-05-04/verizon-mulls-price-increase-in-response-to-rising-cost-pressure, cited in Complaint at ¶ 108 (Brass Decl. Ex. 5).

that "T-Mobile launched T-Mobile Connect, a set of 'low-cost' plans it agreed to offer as a condition of merger approval, without taxes and fees included," even though the "cornerstone of T-Mobile's 'Un-carrier' campaign was that taxes and fees are included in the service plan price." Dkt. 1 ¶ 104. But whether taxes and fees were excluded says nothing at all about whether the new plan *actually* costs more or less than T-Mobile's pre-existing plans. The very document that Plaintiffs cite confirms this plan was T-Mobile's *lowest-priced option ever*[4]—which is unsurprising since these plans were negotiated with State AGs that have ongoing authority to seek relief should T-Mobile violate the settlement terms. Brass Decl. Ex. 3 ¶ 1.

Plaintiffs also point to T-Mobile's January 2022 announcement that it would be increasing a "Regulatory Programs & Telco Recovery Fee." Dkt. 1 ¶ 103. But as Plaintiffs acknowledge, the FCC Order expressly allows T-Mobile to make such adjustments. *Id.* ¶ 102. For good reason: as documents referenced in the Complaint explain, the fee reflects third-party charges over which T-Mobile has no control, such as "charges imposed on [T-Mobile] by other carriers for delivery of calls from [T-Mobile] customers to theirs and for certain network facilities (e.g., leases)."[5]

Plaintiffs' reliance on CPI data from the Bureau of Labor Statistics, alleged to demonstrate the harmful effects of the merger on competition, is inapt. *See* Dkt. 1 ¶ 80. According to Plaintiffs' interpretation, the CPI data purportedly shows that shortly after the merger, in July 2020, "quality-adjusted prices substantially increased for the first time in years." *Id.* That interpretation is flatly contradicted by Plaintiffs' own allegations, as well as the Bureau's own explanation of its data.

---

[4] Monica Chin, *T-Mobile's budget $15 Connect plan will launch on March 25th*, The Verge (Mar. 23, 2020, 11:23 AM), https://www.theverge.com/2020/3/23/21190796/t-mobile-connect-sprint-merger-coronavirus-prepaid-plan, cited in Complaint at ¶ 104 (Brass Decl. Ex. 6).

[5] Regulatory Programs and Telco Recover Fee, T-Mobile.com, https://www.t-mobile.com/responsibility/consumer-info/additional-info/regulatory-programs-fee, cited in Complaint at ¶ 103 (Brass Decl. Ex. 7).

Among other things, Plaintiffs have not and cannot identify *any* price increases by Verizon, AT&T, or T-Mobile that occurred in July 2020. To the contrary, Plaintiffs allege that Verizon and AT&T raised their prices in 2022, two years later. Dkt. 1 ¶¶ 107-08. As for T-Mobile, Plaintiffs acknowledge that T-Mobile introduced new *lower* price plans in March 2020 and cite an article stating that T-Mobile has been holding firm on its prices. *Id.* ¶ 104. Even the alleged changes in third-party charges (which are not increases in T-Mobile's prices)—such as Regulatory Programs & Telco Recovery Fees and higher device costs reflected in T-Mobile's insurance program—did not occur in July 2020. *Id.* ¶¶ 89, 103. The Bureau's description of its data, which Plaintiffs failed to disclose, directly contradicts Plaintiffs' assertion that quality-adjusted prices went up: "[T]he CPI [Consumer Price Index] records changes in wireless telephone plans from 4G networks to 5G networks, *but does not quality adjust for these changes*." Brass Decl. Ex. 9 at 2. In other words, the average urban increase shown in the CPI data (the *only* data cited by Plaintiffs) can be entirely explained by increases in quality from the 5G services introduced in 2020. *See Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic,* 65 F.3d 1406, 1412 (7th Cir. 1995) ("Generally you must pay more for higher quality.").

Regardless, that alleged price increase cannot, without more, be attributed to the merger. *See Fortress*, 2022 WL 16756365, at *2; *accord In re AMR Corp.*, 625 B.R. 215, 266 (Bankr. S.D.N.Y. 2021) (fact that defendant airline started charging baggage fees after the merger insufficient to show adverse competitive effects); *Ohio*, 138 S. Ct. at 2288 (anticompetitive effects cannot be inferred from price increase alone); *Brooke*, 509 U.S. at 237 ("Even in a concentrated market, the occurrence of a price increase does not in itself permit a rational inference of . . . supracompetitive pricing."). Plaintiffs' conclusory allegations are insufficient to establish anticompetitive effects on the basis of any purported "direct evidence." *See Fortress*, 2022 WL 16756365, at *2.

### 2. Plaintiffs Have Failed To Plead Indirect Proof of Anticompetitive Effects.

Plaintiffs' reliance on indirect evidence cannot salvage their claims either because Plaintiffs' allegations fail to account for the conditions imposed on the merger. "Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." *Ohio*, 138 S. Ct. at 2284. To survive a motion to dismiss on this basis, Plaintiffs must "first establish a prima facie case that a merger is anticompetitive." *DeHoog*, 899 F.3d at 763. Market share and concentration data are "insufficient to constitute a prima facie case" where circumstances surrounding the merger demonstrate that such evidence provides "an inaccurate account of the acquisitions' probable effects on competition." *United States v. Int'l Harvester Co.*, 564 F.2d 769, 773 (7th Cir. 1977); *accord Kaiser Aluminum & Chem. Corp. v. F.T.C.*, 652 F.2d 1324, 1341 (7th Cir. 1981) (courts must consider factors such as future entry of competitors and weakness of acquired company in assessing the persuasive quality of market concentration statistics). Where such considerations are apparent from the plaintiff's allegations and documents referenced in the complaint, a Section 7 claim must be dismissed at the pleadings stage. *See Edstrom v. Anheuser-Busch Inbev SA/NV*, 647 F. App'x 733, 735 (9th Cir. 2016) (affirming dismissal where plaintiffs failed to plausibly allege a prima facie case in light of the conditions imposed on the merger); *DeHoog*, 899 F.3d at 763 (similar).

Here, Plaintiffs allege that the merger is anticompetitive because it "condense[d] the market from four to three firms." Dkt. 1 ¶ 50. According to Plaintiffs, market share data and the Herfindahl-Hirschman Index demonstrate harmful effects of this concentration. *Id.* ¶¶ 31-32, 51. While Plaintiffs acknowledge that the DOJ and FCC reviewed the proposed merger for more than a year and imposed broad conditions before approving it, *id.* ¶¶ 63-64, 102, their allegations reflect neither those remedial measures nor ongoing monitoring. Because Plaintiffs' allegations are unmoored from the realities of the merger, Plaintiffs have failed to plausibly state a claim under either

Section 1 or Section 7.  This deficiency alone requires dismissal of Plaintiffs' claims.

The Seventh Circuit has specifically recognized that regulatory restrictions imposed on a merger are relevant to determining its legality.  In *South Austin Coalition Community Council v. SBC Communications Inc.*, the Court affirmed dismissal of a claim challenging a merger that was pending FCC approval, explaining that conditions imposed by government agencies "may shape the litigation."  191 F.3d 842, 844 (7th Cir. 1999).  The effect of a merger thus cannot be assessed without "understanding the barriers to entry that future rivals must surmount."  *Id.*  "Regulatory agencies can raise or lower these barriers" by "condition[ing] its approval on changes that facilitate rivals' entry."  *Id.*  Accordingly, without considering such conditions, "it is impossible to perform the sort of antitrust analysis that is integral to a potential competition case."  *Id.*

Plaintiffs' allegations of market concentration are insufficient to establish anticompetitive effects because they do not reflect the enforceable conditions imposed on the merger by the DOJ and the FCC.  For example, as a condition of the merger, T-Mobile was required to divest Sprint's Boost Mobile business to DISH, provide DISH with the opportunity to acquire cell sites and stores, and enter into a full MVNO agreement, providing benefits "unprecedented in the industry." *Deutsche Telekom*, 2020 WL 1873555, at *6; *see also supra* Section II.B.  Plaintiffs acknowledge that, as a result of these conditions, DISH (not T-Mobile) acquired Sprint's prepaid business and assets.  Dkt. 1 ¶ 64.  Hence, the transaction the Court must assess is the "acquisition *together with* the divestiture," not a fictional transaction that never happened.  *See United States v. UnitedHealth Grp. Inc.*, 2022 WL 4365867, at *9-10 (D.D.C. Sept. 21, 2022); *DeHoog*, 899 F.3d at 763.

Other FCC and DOJ conditions to facilitate DISH's entry as a fourth competitor further render Plaintiffs' market share statistics inapt.  Even before any condition was imposed, DISH was well equipped to enter the mobile wireless services industry.  As Plaintiffs allege, one of the main

barriers to entry is the "spectrum in the correct frequencies to offer a quality network which would, if available at all, cost billions of dollars." Dkt. 1 ¶ 34. But DISH owns spectrum valued at more than $34.4 billion. *Id.* ¶ 93. The conditions imposed on the merger built on that baseline. In addition to the jumpstart acquisition of Boost, DISH committed to build out a 5G network that would cover 70% of the U.S. population by 2023. Dkt. 1 ¶ 90; FCC Order ¶ 369; Brass Decl. Ex. 15 at 23. DISH must comply with regular reporting requirements for *years*—and if the company fails to meet its strict milestone commitments, the regulatory agencies and the District of Columbia can immediately implement coercive measures, including $2.2 billion in fines, forfeiture of DISH's very valuable spectrum licenses, and contempt orders. Dkt. 1 ¶ 93; FCC Order ¶¶ 12, 378-81; *see also Deutsche Telekom*, 2020 WL 1873555, at *5; *Deutsche Telekom*, 439 F. Supp. 3d at 226-32; *Bradt*, 2020 WL 1809716, at *2.

Despite acknowledging these conditions, Plaintiffs speculate "that future competition from DISH may never exist," claiming that DISH *might* simply hoard spectrum licenses until it can resell them at a profit while making minimal investments in the mobile wireless business in the meantime. Dkt. 1 ¶ 90. "This allegation is a classic speculative conclusion" that is insufficient to survive a motion to dismiss. *DeHoog*, 899 F.3d at 765. Generalized allegations about DISH's behavior in the past or other lines of business, *see* Dkt. 1 ¶¶ 92, 94, do not alter the equation, as the DOJ and FCC conditions were specifically designed to address such concerns. *See DeHoog*, 899 F.3d at 765. Indeed, Plaintiffs' speculation makes little sense, given that DISH must forfeit its licenses if it fails to build out its 5G network and it is precluded from selling any of its spectrum for six years, well after its 5G network is required to be completed. Dkt. 1 ¶ 93; Brass Decl. Ex. 15 at 12. Plaintiffs' speculation is also implausible in view of the (directly contrary) findings of regulators and multiple federal judges—surely "judicial experience" that bears cognizance here,

*see Iqbal*, 556 U.S. at 679—as well as their own allegations and judicially noticeable facts about DISH since the merger closed.

Plaintiffs acknowledge that DISH has entered into a long-term contract with AT&T, obligating it to spend $5 billion over ten years to serve its Boost customers.  Dkt. 1 ¶ 97.  And as DISH's Chairman explained in a document cited in the Complaint, DISH has a new deal with T-Mobile that further "improved the economics" for DISH and enhanced integration and a "good spirit of cooperation between the teams."  Brass Decl. Ex. 8, cited in Dkt. 1 ¶ 92.  Moreover, Plaintiffs acknowledge that DISH has reiterated its commitment to continue investing the $10 billion it pledged to build out its 5G network, and documents cited in the Complaint state that DISH has already constructed a substantial portion of its 5G network, with its standalone 5G services already available in Las Vegas and broader expansion expected in June 2022.  *Id.*; Brass Decl. Ex. 10 at 8-9.  A periodic report filed with the FCC on July 14, 2022, confirms that those events did indeed happen:  DISH has deployed a 5G core network and its standalone 5G services are now available in *more than 120 cities across the country*.  Brass Decl. Ex. 19 at 4-5.  In view of Plaintiffs' allegations and judicially noticeable facts about DISH's ongoing investments and progress, as well as the concrete effects of the DOJ and FCC conditions, Plaintiffs' rank speculation that DISH is running out the clock until it can sell its spectrum is implausible.

"FCC and DOJ remedies, and particularly those designed to ensure that DISH becomes an aggressive fourth national MNO, significantly reduce the concerns and persuasive force of [Plaintiffs'] market share statistics."  *Deutsche Telekom*, 439 F. Supp. 3d at 233; *accord United States v. Waste Mgmt., Inc.,* 743 F.2d 976, 983 (2d Cir. 1984) ("[E]ntry by potential competitors may be considered in appraising whether a merger will 'substantially lessen competition.'").  While Plaintiffs lament that DISH's entry "has not stood as a remedy for the loss of competition"

during the two years since the merger closed, Dkt. 1 ¶ 90, there is no requirement that the entry of competitors be "quick and effective" to render market statistics an inaccurate predictor of the probable effects of a merger. *United States v. Baker Hughes Inc*., 908 F.2d 981, 987-88 (D.C. Cir. 1990). Indeed, even "the *threat* of entry can stimulate competition in a concentrated market, regardless of whether entry ever occurs." *Id.* at 988 (emphasis in the original).

Moreover, as Plaintiffs acknowledge, Judge Marrero found that Sprint "could not survive in the long-term as a meaningful competitor." Dkt. 1 ¶ 73. Plaintiffs attempt to discount this finding by alleging that Judge Marrero's conclusion was based on "self-serving testimony from Sprint's executives." *Id.* But that statement mischaracterizes Judge Marrero's order, which cites voluminous evidence in reaching the conclusion that "Sprint's probable transformation into a regional player would by default result in a 4-to-3 market consolidation, significantly undermining the strength of [plaintiff's] prima facie case." *Deutsche Telekom*, 439 F. Supp. 3d at 217-24; *accord Int'l Harvester*, 564 F.2d at 773-79 (market share data insufficient to establish a prima facie case where the acquired company's weaknesses "would not allow it to be as strong a competitor as the bald statistical projections indicate"); *see also Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n, Inc*., 814 F.2d 358, 359 (7th Cir. 1987) (explaining that respect should be given to non-precedential decisions involving the same facts and circumstances).

Plaintiffs have failed to meet their burden to plausibly allege that the merger, as reviewed, litigated, consummated, and conditioned, substantially lessened competition. Courts that reviewed the merger emphasized the importance of the regulatory conditions imposed on the transaction. *See Deutsche Telekom*, 439 F. Supp. 3d at 224 ("[T]he reality remains that the Court must now assess the Proposed Merger as conditioned by both regulators after lengthy review."); *Bradt*, 2020 WL 1233939, at *3 (plaintiffs failed to establish likelihood of success on their Section 1 and

Section 7 claims because, among other things, "the measures required by the DOJ and FCC—especially the divestiture to DISH to create a fourth market competitor—would sufficiently ameliorate the anticompetitive effects of the proposed merger"). Yet Plaintiffs' market share data and HHI figures do not account for any of the conditions imposed, as if T-Mobile acquired the entirety of Sprint's business and the commitments DISH made to launch its standalone 5G services did not exist. Dkt. 1 ¶¶ 31-32, 51. Plaintiffs "cannot meet [their] prima facie burden" based on "a fictional transaction and fictional market shares." *UnitedHealth*, 2022 WL 4365867, at *10 & n.5. Moreover, the DOJ, the FCC, various State AGs, and the District of Columbia continue to monitor the transaction and stand ready to enforce any violation of those conditions, "a fact of economic and legal life" against which any competitive effect must be assessed. *BMI,* 441 U.S. at 13; *accord United States v. Marine Bancorporation*, 418 U.S. 602, 627 (1974) (application of antitrust doctrine to bank mergers "must take into account the unique federal and state restraints on [defendant's conduct]," because "[f]ailure to do so would produce misconceptions that go to the heart of the doctrine itself"); *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 412 (2004) ("[T]he existence of a regulatory structure designed to deter and remedy anticompetitive harm" is of "particular importance" in assessing whether conduct violates antitrust laws). Plaintiffs' failure to allege facts that the actual merger that was consummated, as conditioned and subject to ongoing monitoring, substantially lessened competition requires dismissal of their claims. *See DeHoog*, 899 F.3d at 761; *Edstrom v. Anheuser–Busch InBev SA/NV*, 2013 WL 5124149, at *1, 6 (N.D. Cal. Sept. 13, 2013).

## C.    Laches Bars Plaintiffs' Claim For Divestiture

Even if Plaintiffs had alleged standing and a plausible violation (they did not), their delay in bringing suit precludes their claim for injunctive relief requiring T-Mobile to divest its assets and reanimate Sprint. Divestiture is an extreme remedy that courts are reluctant to impose because

it "can have far-reaching effects on persons who are not parties to the litigation." *Garabet*, 116 F. Supp. 2d at 1172. Here, T-Mobile customers have come to rely on the extensive nationwide 5G network, enhanced rural and home internet services, and low-cost plans for low-income and prepaid customers made possible by the merger. Divestiture would throw their wireless services into chaos and likely cause their prices to rise. For this reason, "*[n]ever* has a federal court ordered divestiture at the request of a private party who was neither a customer nor a competitor of the merging parties." *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1234 (8th Cir. 2010) (emphasis added). Plaintiffs' attempt to seek just that is barred by laches.

In an action seeking divesture, the defense of laches "protect[s] consummated transactions from belated attacks by private parties." *Cal. v. Am. Stores Co.*, 495 U.S. 271, 296 (1990). "For laches to apply in a particular case, the party asserting the defense must demonstrate: (1) an unreasonable lack of diligence by the party against whom the defense is asserted and (2) prejudice arising therefrom." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999); *accord Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002). Because both requirements are clearly shown on the face of the Complaint and other materials that may be considered on a Rule 12(b)(6) motion, Plaintiffs' request for injunctive relief should be dismissed now. *See New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 35 (D.D.C. 2021) (granting motion to dismiss plaintiffs' claim for injunctive relief in an action belatedly challenging an acquisition); *Reveal Chat Holdco, LLC v. Facebook, Inc.,* 471 F. Supp. 3d 981, 991-92, 996 (N.D. Cal. 2020) (same).

## 1. Plaintiffs Failed To Pursue Their Claims With Diligence.

Plaintiffs unreasonably delayed bringing this lawsuit despite having ample opportunity to timely do so. The merger agreement Plaintiffs challenge was publicly announced on April 29, 2018. Dkt. 1 ¶ 46. That announcement received intense public attention from national newspapers, members of Congress, and consumer watchdog groups. *Id.* ¶¶ 46, 48. According to

Plaintiffs (blinding themselves to all contrary evidence), it has been entirely foreseeable since that announcement that the proposed transaction risked reducing competition in the mobile wireless services market and causing consumer prices to increase. *Id.* ¶¶ 46-58 (alleging that "[t]he announcement generated an immediate outcry" that was "predictable" because "[c]onsolidation in mobile telecommunications markets has generally resulted in price increases").

Following the merger announcement, the FCC and DOJ publicized their investigations and requested public participation in the review process. In response, the FCC received over 19 petitions, more than 70 comments, and numerous *ex parte* filings, and 32 comments were filed in connection with the Tunney Act proceedings. Not only that, AGs of multiple states and a group of individual plaintiffs sued to enjoin the merger in June and November of 2019, respectively. Judge Marrero held a two-week bench trial in the action brought by the State AGs and issued a published opinion on February 2020. After clearing all regulatory and legal hurdles, and in full view of the public, the merger closed on April 1, 2020.

More than four years after the merger announcement and two years after its consummation, Plaintiffs belatedly filed this suit. Their long period of inaction is plainly unreasonable. Where, as here, the challenged merger was publicly announced, courts frequently find litigation delays of "months or even days after the merger's announcement" inexcusable. *See Facebook*, 549 F. Supp. 3d at 35 (granting motion to dismiss); *accord Ginsburg*, 623 F.3d at 1235 (concluding that plaintiff who waited only two months after announced merger agreement to bring lawsuit engaged in "inexcusable delay[]"); *Garabet*, 116 F. Supp. 2d at 1172 (laches bars claim where Section 16 plaintiffs "were on notice of the merger, yet took no significant action prior to its consummation"). As Justice Kennedy once observed, a plaintiff's election not to act during the time period established by the government for merger review "should bear upon the ultimate disposition of the

case," including "the bar of laches." *Am. Stores*, 495 U.S. at 297-98 (concurring). Because Plaintiffs failed to act during that time period or for two years thereafter, a lack of reasonable diligence has clearly been shown.

## 2. Divestiture Will Prejudice T-Mobile, DISH, And Their Customers.

An order of divestiture and a subsequent unwinding of the merger at this juncture would grossly prejudice T-Mobile, the other Defendants in this case, DISH, and many other entities and individuals affected by such an order. As one court put it, an order of divestiture after the merger has closed "will usually prejudice the defendant by inflicting substantial hardship and competitive disadvantage, especially where its business operations have been combined with those of the acquired company." *Facebook*, 549 F. Supp. 3d at 35.

As Plaintiffs acknowledge, the merger was fully consummated two years ago. Dkt. 1 ¶ 5. T-Mobile and Sprint have now fully combined their business operations, including physical infrastructure. Since the merger closed, T-Mobile has expended enormous resources constructing a nationwide 5G network using the combined facilities and resources of the merged companies—a network that could not be established without Sprint's bandwidth. That investment has resulted in the only standalone 5G network, comprising tens of thousands of 5G sites located throughout the country, which has allowed T-Mobile to deliver 5G coverage to 94% of the U.S. population overall and a vast majority of underserved rural areas. *See* Brass Decl. Ex. 20 at 9.

For its part, nonparty DISH has paid $1.4 billion dollars to acquire Sprint's prepaid Boost Mobile business and has entered into long-term contracts valued at over $5 billion to service those customers. Dkt. 1 ¶ 64, 97. DISH has also continued to invest billions of dollars constructing its own 5G network and has launched in more than 120 cities. *See* Brass Decl. Ex. 19 at 1-2, 5. To support its network, DISH has opened 39 offices across 28 states. *Id.* at 3.

Plaintiffs ask this Court to unravel all that progress, something that would put many T-

Mobile customers, especially those in rural areas, at risk of losing the high-quality, low-cost 5G services on which they have come to rely. Customers in the states where State AGs obtained commitments to low-cost pricing would lose those guarantees. DISH would need to return the assets it purchased from Sprint, which would in turn require DISH to build a mobile wireless business from scratch, delaying the build out of its 5G services. DISH's long-term contracts with AT&T and T-Mobile would need to be nullified as well, since DISH will no longer have customers to support. Meanwhile, Boost Mobile customers would likely face disruptions in their services.

Undoubtedly, "the hardship and competitive disadvantage resulting from forced divestiture would be both dramatic and certain." *Ginsburg*, 623 F.3d at 1235; *accord Facebook, Inc.,* 549 F. Supp. 3d at 37 (finding that prejudice was "manifest" on a motion to dismiss where Facebook "made business decisions and allocated firm resources based on holding Instagram and WhatsApp, and it has also integrated their offerings to some extent into its core business"); *Reveal Chat,* 471 F. Supp. 3d at 990-92 (granting motion to dismiss on the ground that the plaintiffs' request for divestiture after the consummation of the merger was barred by laches); *Garabet,* 116 F. Supp. 2d at 1173 (finding "serious prejudice and hardship" would be caused by divestiture given investment "spent on integrating the [merged] companies" and restructuring defendants' workforces). In light of Plaintiffs' unreasonable and inexcusable delay in challenging the merger, and the clear prejudice to T-Mobile, other Defendants in this case, and third parties, this Court should dismiss Plaintiffs' injunctive-relief claim on laches grounds.[6]

---

[6] Plaintiffs also seek "[e]quitable relief in the form of restitution or disgorgement of all unlawful or illegal profits received by Defendants." Dkt. 1 at 61. That request must be dismissed because it is not authorized by any statute. *See In re Generic Pharms. Pricing Antitrust Litig.*, 2022 WL 2047964, at *3 (E.D. Pa. June 7, 2022) (dismissing claim for restitution and disgorgement because equitable monetary relief is not a permitted form of "injunctive relief under § 16 of the Clayton Act"); *cf. AMG Cap. Mgmt., LLC v. FTC,* 141 S. Ct. 1341, 1347 (2021) ("[A]n 'injunction' is not

**D.  Plaintiffs' Claims Against SoftBank Group Corp. Fail For Independent Reasons**

Plaintiffs' claims against SoftBank Group Corp. ("SoftBank") should be dismissed for the additional reason that they fail to allege any connection between SoftBank and the post-merger pricing decisions that allegedly harmed Plaintiffs. In fact, although the Complaint spans 61 pages and 134 paragraphs, the Complaint's only allegations relating specifically to SoftBank are that it (i) is a holding company headquartered in Tokyo, and (ii) "acquired 80 percent of the shares of Sprint" in 2013. Dkt. 1 ¶ 21. Neither allegation states a viable claim against SoftBank.

**1.  SoftBank Cannot Be Liable Under Clayton Act Section 7.**

Plaintiffs allege that "Defendants" violated Section 7 of the Clayton Act by executing the merger agreement. *See* Dkt. 1 ¶ 122. By its plain terms, however, Section 7 applies only to *acquirers* in a corporate acquisition: "No person . . . shall *acquire*, directly or indirectly, the whole or any part of the stock or other share capital . . . where . . . the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18 (emphasis added). For over half a century, courts have read that language to bar Section 7 claims against shareholders of the acquired company like SoftBank. *See, e.g.*, *Dailey v. Quality School Plan, Inc.*, 380 F.2d 484, 488 (5th Cir. 1967) (affirming dismissal of Section 7 claim because "clear" language of statute "proscribes only the acquiring corporation"); *Berlyn, Inc. v. The Gazette Newspapers, Inc.*, 157 F. Supp. 2d 609, 623 (D. Md. 2001) (dismissing Section 7 claim because "the acquired company . . . cannot be the subject of an action brought under Section 7"); *Arbitron Co. v. Tropicana Prod. Sales, Inc.*, 1993 WL 138965, at *4 (S.D.N.Y. Apr. 28, 1993) ("Courts have consistently dismissed section 7 claims

---

the same as an award of equitable monetary relief."); *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 771 (7th Cir. 2019) ("[S]tatutory authorizations for injunctions don't encompass other discrete forms of equitable relief like restitution."). Nor does restitution make any sense here, as Plaintiffs never paid anything to T-Mobile. *See* 1 Dan B. Dobbs, Law of Remedies § 4.1(1), at 551 (2d ed. 1993) ("Restitution is a return or restoration of what the defendant has gained in a transaction."); *Credit Bureau*, 937 F.3d at 772.

against the seller of stock or assets.").

### 2. SoftBank Is Not Liable Under The Sherman Act.

Plaintiffs' claim against SoftBank under Section 1 of the Sherman Act is equally defective. Plaintiffs claim that they were injured by AT&T's and Verizon's decisions to raise their prices after the merger. Dkt. 1 ¶¶ 106-08, 133. While Plaintiffs attempt to tie those price increases to T-Mobile's alleged post-merger prices, *see, e.g.*, *id.* ¶¶ 89, 102-05, there is no allegation that Soft-Bank had any role whatsoever in the post-merger pricing decisions of T-Mobile, AT&T, or Verizon. Plaintiffs thus fail to implicate *SoftBank* in the conduct that allegedly injured them.

Although Plaintiffs also assert that the merger agreement itself led to the post-merger price increases that purportedly injured Plaintiffs, *see* Dkt. 1 ¶ 129, those conclusory allegations are insufficient as to all Defendants for the reasons explained above. *See* Section IV(B). Indeed, Plaintiffs' allegations focus on alleged post-merger price increases in which SoftBank had no role, and Plaintiffs fail to plead any connection between those independent price increases and the merger itself. *See* Section II(B)(1); Dkt. 1 ¶¶ 102-03, 107-08. Finally, and most fundamentally, the Complaint is wholly silent on *SoftBank's* role in the merger. To be sure, SoftBank gave up its shares of Sprint as a part of the merger, *see* Dkt. 1 ¶ 21, but it is well settled that SoftBank's mere "ownership interest" in Sprint is not enough to establish antitrust liability. *See In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 417-19 (S.D.N.Y. 2011). To hold otherwise would expand the antitrust laws and subject *any* shareholder of an acquired entity to treble damages liability.

## V. CONCLUSION

For the foregoing reasons, T-Mobile and SoftBank respectfully request that the Court grant their motion and dismiss Plaintiffs' claims with prejudice.

DATED:  December 5, 2022                     Respectfully submitted,


/s/ *Josh Krevitt*

Clifford C. Histed
ARDC No. 6226815
Michael E. Martinez
ARDC No. 6275452
K&L GATES LLP
70 West Madison Street
Suite 3300
Chicago, IL  60602-4207
Phone: 312-807-4448
clifford.histed@klgates.com
michael.martinez@klgates

Josh Krevitt (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Phone: 213-351-4000
JKrevitt@gibsondunn.com

Theodore J. Boutrous, Jr. (*pro hac vice*)
Daniel G. Swanson (*pro hac vice*)
Rodney J. Stone (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Phone: 213-229-7000
TBoutrous@gibsondunn.com
DSwanson@gibsondunn.com
RStone@gibsondunn.com

Rachel S. Brass (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105-0921
Phone: 415-393-8200
RBrass@gibsondunn.com

*Counsel for Defendant T-Mobile US, Inc.*


/s/ *Henry B. Liu*


Rachel S. Morse
MASSEY & GAIL LLP
50 East Washington Street, Suite 400
Chicago, IL 60602
Tel:  (312) 283-1590
rmorse@masseygail.com

Robert D. Wick
Henry B. Liu (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001-4956
Tel:  (202) 662-6000
rwick@cov.com
hliu@cov.com

Michael B. Miller (*pro hac vice*)
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10119
Tel:  (212) 468-8000
MBMiller@mofo.com


*Counsel for Defendant SoftBank Group Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2022, I electronically filed a copy of the foregoing through the Court's CM/ECF system, which will send notifications of the filing to all counsel of record.

/s/ Josh Krevitt
Josh Krevitt