# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ANTHONY DALE, BRETT JACKSON,
JOHNNA FOX, BENJAMIN
BORROWMAN, ANN LAMBERT,
ROBERT ANDERSON, and CHAD
HOHENBERY on behalf of themselves and
all others similarly situated,

   *Plaintiffs,*

  v.

DEUTSCHE TELEKOM AG, T-MOBILE
US, INC., and SOFTBANK GROUP CORP.,

  *Defendants.*

Case No. 1:22-cv-03189

Hon. Thomas M. Durkin

Hon.  Jeffrey Cole

## PLAINTIFFS' OPPOSITION TO T-MOBILE US, INC. AND SOFTBANK GROUP CORP.'S MOTION TO DISMISS THE COMPLAINT

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................... 1

II.    FACTUAL BACKGROUND ........................................................................ 2

    A.    Pre-Merger:  Sprint and T-Mobile Lowered Prices and Drove Innovation. .......... 2

    B.    Pre-Merger Review:  Confounded by Misrepresentations ..................................... 4

    C.    Post-Merger:  Prices Have Increased and Consumer Choice Has Decreased. .......................................................................................................... 6

III.    LEGAL STANDARD ................................................................................. 7

IV.    ARGUMENT .............................................................................................. 9

    A.    Plaintiffs Have Antitrust Standing. ...................................................................... 9

        1.    Plaintiffs Need Not Be "Customers of the Merging Entities" to Demonstrate the First and Fourth *AGC* Factors ...................................... 11

        2.    Plaintiffs Have Antitrust Injury—the Sole Required *AGC* Factor .......... 16

        3.    The First Factor—Causal Connection—Supports Antitrust Standing. ............................................................................................... 17

        4.    Defendants Concede Improper Motive. .................................................. 19

        5.    Plaintiffs Suffered Direct Injury. ........................................................... 19

        6.    Damages Are Ascertainable ................................................................... 21

        7.    Plaintiffs Are the Most Efficient—and Only—Enforcers. ...................... 22

    B.    The Complaint Plausibly Alleges Anticompetitive Effects. ................................ 22

        1.    Direct Anticompetitive Effects. ............................................................. 23

        2.    Indirect Anticompetitive Effects ............................................................ 29

    C.    Dismissal of Plaintiffs' Divestiture Claim Based on Laches Is Unwarranted ....................................................................................................... 33

    D.    SoftBank Is a Proper Defendant. ........................................................................ 37

V.    CONCLUSION ........................................................................................ 40

# TABLE OF AUTHORITIES

**Page**

### Cases

*Allen v. Dairy Farmers of Am., Inc.*,
No. 5:09-cv-230, 2014 WL 2610613 (D. Vt. June 11, 2014) .................................................. 19

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999) ......................................................................................... 9, 16

*Am. Exp. Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) .............................................................................................................. 22

*AMG Cap. Mgmt., LLC v. FTC*,
141 S. Ct. 1341 (2021) ......................................................................................................... 33

*Antoine L. Garabet, M.D., Inc. v. Autonomous Technologies Corp.*,
116 F. Supp. 2d 1159 (C.D. Cal. 2000) ................................................................. 16, 35, 36

*Apple Inc. v. Pepper*,
139 S. Ct. 1514 (2019) .................................................................................................... 20, 21

*Arbitron Co. v. Tropicana Prod. Sales, Inc.*,
No. 91 CIV. 3967 (PKL), 1993 WL 138965 (S.D.N.Y. Apr. 28, 1993) .............................. 39

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......................................................................................................... 8, 23

*Assoc. Gen. Contractors v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983) ....................................................................................................... passim

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................................... 8

*Berlyn, Inc. v. The Gazette Newspapers, Inc.*,
157 F. Supp. 2d 609 (D. Md. 2001) ..................................................................................... 39

*Blue Cross & Blue Shield United v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995) ............................................................................................... 25

*Blue Shield of Va. v. McCready*,
457 U.S. 465 (1982) ........................................................................................................ 13, 14

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ........................................................................................................ 17, 26

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) .............................................................................................................. 29

*California v. Am. Stores Co.*,
495 U.S. 271 (1990) .............................................................................................................. 35

*Cargill, Inc. v. Monfort of Colo., Inc.*,
479 U.S. 104 (1986) .............................................................................................................. 12

*Carnegie v. Household Int'l, Inc.*,
376 F.3d 656 (7th Cir. 2004) ............................................................................................... 22

*Carter v. Stanton*,
  405 U.S. 669 (1972) ........................................................................... 9

*Chi. Bridge & Iron Co. v. FTC*,
  534 F.3d 410 (5th Cir. 2008) ......................................................... 29

*Cooper v. Cooper*,
  No. 1:19-CV-6855, 2020 WL 11193050 (N.D. Ill. July 21, 2020) ......................................... 36

*Dailey v. Quality Sch. Plan, Inc.*,
  380 F.2d 484 (5th Cir. 1967) ......................................................... 39

*DeHoog v. Anheuser-Busch InBev SA/NV*,
  899 F.3d 758(9th Cir. 2018) ......................................................... 32

*Denver & R. G. W. R..R. Co. v. United States*,
  387 U.S. 485 (1967) ................................................................. 38, 39

*Early v. Bankers Life & Cas. Co.*,
  959 F.2d 75 (7th Cir. 1992) ........................................................... 8

*Edstrom v. Anheuser-Busch Inbev SA/NV*,
  647 F. App'x 733 (9th Cir. 2016) ................................................... 32

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974) ................................................................. 22

*Fisher v. Aurora Health Care, Inc.*,
  558 F. App'x 653 (7th Cir. 2014) ................................................... 20

*Fricke-Parks Press, Inc. v. Fang*,
  149 F. Supp. 2d 1175 (N.D. Cal. 2001) ......................................... 38

*FTC v. Advocate Health Care Network*,
  841 F.3d 460 (7th Cir. 2016) ....................................................... 23

*FTC v. CCC Holdings Inc.*,
  605 F. Supp. 2d 26 (D.D.C. 2009) ............................................... 17

*FTC v. Credit Bureau Ctr., LLC*,
  937 F.3d 764 (7th Cir. 2019) ....................................................... 33

*FTC v. Univ. Health, Inc.*,
  938 F.2d 1206 (11th Cir. 1991) ................................................... 29

*FTC v. Warner Commc'ns*,
  742 F.2d 1156 (9th Cir. 1984) ..................................................... 17

*Geinosky v. City of Chicago*,
  675 F.3d 743 (7th Cir. 2012) ................................................. 8, 9, 36

*Gelboim v. Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2016) ....................................................... 15

*Gibson v. City of Chicago*,
  910 F.2d 1510 (7th Cir. 1990) ............................................................. 32

*Ginsburg v. InBev NV/SA*,
  623 F.3d 1229 (8th Cir. 2010) ...................................................... 34, 36

*Gunn v. Cont'l Cas. Co.*,
  968 F.3d 802 (7th Cir. 2020) .............................................................. 33

*Holmes v. Sec. Inv'r Prot. Corp.*,
  503 U.S. 258 (1992)............................................................................ 14

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
  191 F.3d 813 (7th Cir. 1999) .............................................................. 33

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977)............................................................................ 13

*In re Aluminum Warehousing Antitrust Litig.*,
  520 F. Supp. 3d 455 (S.D.N.Y. 2021) ................................................ 19

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
  19 F.4th 127 (2d Cir. 2021) ............................................................... 15

*In re AMR Corp.*,
  625 B.R. 215 (Bankr. S.D.N.Y. 2021) ............................................... 25

*In re Ariz. Dairy Prods. Litig.*,
  627 F. Supp. 233 (D. Ariz. 1985) ...................................................... 16

*In re Beef Indus. Antitrust Litig.*,
  600 F.2d 1148 (5th Cir. 1979) ........................................................... 15

*In re Bristol Bay, Alaska, Salmon Fishery Antitrust Litig.*,
  530 F. Supp. 36 (W.D. Wash. 1981)................................................... 16

*In re Broiler Chicken Antitrust Litig.*,
  290 F. Supp. 3d 772 (N.D. Ill. 2017) ........................................... passim

*In re Delta Dental Antitrust Litig.*,
  484 F. Supp. 3d 627 (N.D. Ill. 2020) ................................................... 8

*In re Digital Music Antitrust Litig.*,
  812 F. Supp. 2d 390 S.D.N.Y. 2011) .................................................. 37

*In re Evanston Nw. Healthcare*,
  No. 07 CV 4446, 2008 WL 2229488 (N.D. Ill. May 29, 2008) ............ 33

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
  No. 13 CIV. 7789 (LGS), 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016).............................. 21

*In re Generic Pharm. Pricing Antitrust Litig.*,
  No. 16-MD-2724, 2022 WL 2047964 (E.D. Pa. June 7, 2022) ............... 34

*In re Juul Labs., Inc.*,
    555 F. Supp. 3d 932 (N.D. Cal. 2021) ........................................................................ 38

*In re London Silver Fixing, Ltd. Antitrust Litig.*,
    332 F. Supp. 3d 885 (S.D.N.Y. 2018) ......................................................................... 19

*In re Lower Lake Erie Iron Ore Antitrust Litig*,
    998 F.2d 1144 (3d Cir. 1993) .................................................................................... 15

*In re Online DVD Rental Antitrust Litig.*,
    No. M 09-2029 PJH, 2011 WL 1629663 (N.D. Cal. Apr. 29. 2011) ........................ 19

*In re Outpatient Med. Ctr. Emp. Antitrust Litig.*,
    No. 21-cv-00305, 2022 WL 4465929 (N.D. Ill. Sept. 26, 2022) .............................. 8

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    586 F. Supp. 2d 1109 (N.D. Cal. 2008) .............................................................. 9, 16

*In re Uranium Antitrust Litig.*,
    552 F. Supp. 518 (N.D. Ill. 1982) ............................................................................ 20

*In re Vitamins Antitrust Litig.*,
    No. 99CIV5134, 2001 WL 855463 (D.D.C. July 2, 2001) ...................................... 16

*In re Zetia (Ezetimibe) Antitrust Litig.*,
    No. 2:18-md-2836, 2019 WL 6122017 (E.D. Va. Oct. 15, 2019) ........................... 16

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
    No. 11-cv-05514, 2016 WL 6246736 (N.D. Cal. Oct. 26, 2016) ................ 16, 18, 20

*Intel Corp. v. Fortress Inv. Grp. LLC*,
    No. 21-16817, 2022 WL 16756365 (9th Cir. Nov. 8, 2022) ................................... 25

*Kaiser Aluminum & Chem. Corp. v. FTC*,
    652 F.2d 1324 (7th Cir. 1981) .................................................................................. 29

*Killingsworth v. HSBC Bank Nev., N.A.*,
    507 F.3d 614 (7th Cir. 2007) ...................................................................................... 8

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) .................................................................................... 21

*Kochert v. Greater Lafayette Health Servs., Inc.*,
    463 F.3d 710 (7th Cir. 2006) .................................................................................... 20

*Laydon v. Coöperatieve Rabobank U.A.*,
    51 F.4th 476 (2d Cir. 2022) ...................................................................................... 19

*Lee v. City of Chicago*,
    330 F.3d 456 (7th Cir. 2003) .................................................................................... 27

*Levenstein v. Salafsky*,
    164 F.3d 345 (7th Cir. 1998) ...................................................................................... 9

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ................................................................ 14, 19

*Liqui-Box Corp. v. Scholle IPN Corp.*,
    449 F. Supp. 3d 790 (N.D. Ill. 2020) ..................................... 32

*Loeb Indus., Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) ............................................ passim

*Loeb v. Eastman Kodak Co.*,
    183 F. 704 (3d Cir. 1910) ....................................................... 14

*Mace v. Van Ru Credit Corp.*,
    109 F.3d 338 (7th Cir. 1997) ................................................. 22

*Mann v. Vogel*,
    707 F.3d 872 (7th Cir. 2013) ................................................. 27

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
    29 F.4th 337 (7th Cir. 2022) ................................................. 13

*McTamney v. Stolt Tankers & Terminals (Holdings), S.A.*,
    678 F. Supp. 118 (E.D. Pa. 1987) ........................................ 39

*Mid-W. Paper Prods. Co. v. Cont'l Grp., Inc.*,
    596 F.2d 573 (3d Cir. 1979) .................................................. 15

*Mr. Frank, Inc. v. Waste Mgmt, Inc.*,
    591 F. Supp. 859 (N.D. Ill. 1984) .................................... 38, 39

*Nalco Co. v. Chem-Mod, LLC*,
    883 F.3d 1337 (Fed Cir. 2018) ............................................. 32

*Nat'l Gerimedical Hosp. & Gerontology Ctr. v. Blue Cross*,
    452 U.S. 378 (1981) ............................................................... 30

*Nelson v. Pac. Sw. Airlines*,
    399 F. Supp. 1025 (S.D. Cal. 1975) ..................................... 39

*New York v. Deutsche Telekom AG*,
    439 F. Supp. 3d 179 (S.D.N.Y. 2020) .............................. 29, 35

*New York v. Facebook, Inc.*,
    549 F. Supp. 3d 6 (D.D.C. 2021) ...................................... 34, 36

*Ohio v. American Express Co.*,
    138 S. Ct. 2274 (2018) ........................................................... 25

*Oliver v. SD-3C LLC*,
    751 F.3d 1081 (9th Cir. 2014) .......................................... 34, 35

*Orthmann v. Apple River Campground, Inc.*,
    757 F.2d 909 (7th Cir. 1985) ................................................... 8

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
572 U.S. 663 (2014)................................................................. 35

*Porter v. Warner Holding Co.*,
328 U.S. 395 (1946)................................................................. 34

*Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*,
814 F.2d 358 (7th Cir. 1987) .......................................... 16, 32

*ProMedica Health Sys., Inc. v. FTC*,
749 F.3d 559 (6th Cir. 2014) ............................................... 17

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979)............................................... 10, 16, 22

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
471 F. Supp. 3d 981 (N.D. Cal. 2020) ................................. 36

*Richards v. Mitcheff*,
696 F.3d 635 (7th Cir. 2012) ............................................... 33

*S. Austin Coal. Cmty. Council v. SBC Commc'ns Inc.*,
191 F.3d 842 (7th Cir. 1999) ............................................... 32

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
778 F.3d 775 (9th Cir. 2015) ............................................... 29

*Sanders v. St. Joseph Cnty.*,
806 F. App'x 481 (7th Cir. 2020) ....................................... 33

*Sanner v. Bd. of Trade*,
62 F.3d 918 (7th Cir. 1995) ................................................. 11

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
22 F.4th 103 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2852 (2022).......................................... 19

*Serfecz v. Jewel Food Stores*,
67 F.3d 591 (7th Cir. 1995) ................................................. 20

*Shouse v. Pierce Cnty.*,
559 F.2d 1142 (9th Cir. 1977) ............................................. 34

*Spearman v. Elizondo*,
230 F. Supp. 3d 888 (N.D. Ill. 2016) ..................................... 7

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
988 F.3d 690 (4th Cir. 2021) .......................................... 34, 35

*Supreme Auto Transport LLC v. Arcelor Mittal*,
238 F. Supp. 3d 1032 (N.D. Ill. 2017) ................................. 18

*Swanson v. Citibank, N.A.*,
614 F.3d 400 (7th Cir. 2010) ................................................. 8

*Toys "R" Us, Inc. v. F.T.C.*,
221 F.3d 928 (7th Cir. 2000) ............................................................ 26

*U.S. Gypsum Co. v. Ind. Gas. Co.*,
350 F.3d 623 (7th Cir. 2003) .................................................... passim

*United States v. Baker Hughes Inc.*,
908 F.2d 981 (D.C. Cir. 1990) ................................................. 30, 32

*United States v. Coca-Cola Bottling Co.*,
575 F.2d 222 (9th Cir. 1978) ............................................................ 38

*United States v. Columbia Pictures Corp.*,
189 F. Supp. 153 (S.D.N.Y. 1960) ................................................... 38

*United States v. Dairy Farmers of Am., Inc.*,
426 F.3d 850 (6th Cir. 2005) ............................................................ 39

*United States v. E.I. du Pont de Nemours & Co.*,
366 U.S. 316 (1961) ......................................................................... 38

*United States v. H & R Block, Inc.*,
833 F. Supp. 2d 36 (D.D.C. 2011) ................................................... 17

*United States v. Int'l Harvester Co.*,
564 F.2d 769 (7th Cir. 1977) ............................................................ 29

*United States v. Int'l Paper Co.*,
No. 12-cv-227 (D.D.C. Feb. 10, 2012) ............................................ 17

*United States v. ITT Cont'l Baking Co.*,
485 F.2d 16 (10th Cir. 1973), *rev'd on other grounds*, 420 U.S. 223 (1975).......................... 39

*United States v. Marine Bancorporation, Inc.*,
418 U.S. 602 1974) ........................................................................... 32

*United States v. Mich. Nat'l Corp.*,
No. 74-71882, 1974 WL 982 (E.D. Mich. Dec. 6, 1974) .................. 38

*United States v. Pabst Brewing Co.*,
183 F. Supp. 220 (E.D. Wisc. 1960) ................................................ 38

*United States v. Phila. Nat'l Bank*,
374 U.S. 321 (1963) .................................................................. 38, 39

*United States v. Radio Corp. of Am.*,
358 U.S. 334 (1959) ......................................................................... 30

*United States v. Rockford Mem'l Corp.*,
898 F.2d 1278 (7th Cir. 1990) ................................................. 23, 30

*United States v. Union Pac. R.R. Co.*,
226 U.S. 61 (1912) ........................................................................... 37

*United States v. UnitedHealth Grp. Inc.*,
   No. 1:22-cv-0481 (CJN), 2022 WL 4365867 (D.D.C. Sept. 21, 2022) .................................... 32

*United States v. Waste Mgmt., Inc.*,
   743 F.2d 976 (2d Cir. 1984) ............................................................ 30

*Vasquez v. Ind. Univ. Health, Inc.*,
   40 F.4th 582 (7th Cir. 2022) .......................................................... 33, 34

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ...................................................................... 31

*Viamedia, Inc. v. Comcast Corp.*,
   951 F.3d 429 (7th Cir. 2020), *cert. denied*, 41 S. Ct. 2877 (2021) .......................................... 10

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
   627 F.3d 85 (3d Cir. 2010) ............................................................. 23

**Statutes**

15 U.S.C. § 15(a) ............................................................................. 10

**Rules**

Fed. R. Civ. P. 12(d) ......................................................................... 9

Fed. R. Civ. P. 8(a)(2) ....................................................................... 8

**Treatises**

Phillip Areeda & Donald F. Turner,
   Antitrust Law (1st ed. 1978) ........................................................... 23

Phillip E. Areeda & Herbert Hovenkamp,
   Antitrust Law (5th ed. Supp. 2022) ........................................... passim

**Other Authorities**

Fed. Commc'ns Comm'n, 2020 Communications Marketplace Report (2020) ........................... 29

## I. __INTRODUCTION__

Defendants proclaim that this "lawsuit seeks to turn the antitrust laws on their head."[1]  This case involves no gymnastics.  It advances claims that go to the heart of the Clayton and Sherman Acts:  two enormous corporations combined to reduce competition and increase profits at the expense of consumers.  This consumer injury lies at the root of the enactment of our antitrust laws and every case brought to enforce them against a business combination.  If any party here has shown a predilection for legal contortions, it would be defendants, who ask the court to accept their facts as true, draw all inferences in their favor, and then dismiss the case.

That is not the law.  Part A of the Argument first explains that accepting defendants' standing argument means rejecting binding Seventh Circuit authority, namely *Gypsum* and *Loeb*.  The Seventh Circuit has already resolved the question of whether antitrust plaintiffs must be in privity with the violator to state a claim:  they need not be.  Despite their intense familiarity with cases such as *Amex* and *Schwab*, defendants fail to cite the one relevant Second Circuit case: *Gelboim*, another LIBOR decision, which correctly characterizes Seventh Circuit law as approving umbrella standing, and then charts a different path for the Second.  The plaintiffs here qualify as efficient enforcers under the doctrine of *Associated General Contractors*.

Part B of the Argument addresses the claim that plaintiffs have failed to allege any anticompetitive effects.  This comes as some surprise, as the levels of concentration caused by the merger plainly meet the standard for a *prima facie* case of anticompetitive harm, as even the New York court found.  Defendants seem to concede this as well.  Rather, they treat the issue as they would a summary judgment motion after full-blown fact and expert discovery, weaving together selective quotations from material outside the complaint to try to persuade the Court that the

---

[1] Def.'s Mem. Supp. of Mot. to Dismiss ("Mot.") at 1, ECF No. 79.

regulatory conditions on the merger worked.

The reality is simpler.  Before the merger, retail wireless prices declined for years.  After the merger, according to the best public data available, quality adjusted prices jumped and stayed high, and all three carriers either raised nominal prices or did so surreptitiously through new taxes, fees, and surcharges.  This was no accident—*it was planned*.  The very executives who plotted the merger hypothesized that merging Sprint Corporation ("Sprint") and T-Mobile US, Incorporated ("T-Mobile") could support a $5 increase in "ARPU"—Average Revenue Per User—across the entire market, *including Verizon Communications, Inc*. ("Verizon") *and AT&T Inc.* ("AT&T") *customers*.

Part C of the Argument explains that, by bringing the case within the statute of limitations, plaintiffs presumptively acted in a timely manner, meaning their request for divesture may not be dismissed on the pleadings.  And Part D addresses SoftBank Group Corp.'s ("Softbank") special request to be excused from the litigation.  The violation is the merger agreement itself.  As a signatory, SoftBank bears just as much liability under the Sherman Act as every other defendant.  It also qualifies as an acquirer under the Clayton Act, because SoftBank did not merely passively tender its shares in exchange for money.  SoftBank engineered the merger, acquired shares and influence with Deutsche Telekom AG ("DT") over the merged entity, and preserved its ability to profit from the violation.

Defendants' motion should be denied.

## II.     FACTUAL BACKGROUND

### A.     Pre-Merger:  Sprint and T-Mobile Lowered Prices and Drove Innovation.

The market for national retail mobile wireless telecommunications services for cellular phones ("retail cell service market") is highly concentrated with high barriers to entry, such as

tightly-regulated radio spectrum licenses and expensive network and retail infrastructure.[2]  Pre-merger, the four major Mobile Network Operator ("MNO") carriers—Verizon, AT&T, T-Mobile, and Sprint—commanded more than a 98% market share.[3]  Nevertheless, both nominal and quality-adjusted prices for Retail Cell Services had been trending downwards for years.[4]  T-Mobile and Sprint, the mavericks of the market, drove this trend by competing on price and offering innovative plans that increased consumer flexibility and savings.[5]  T-Mobile branded itself the "Un-carrier," pricing aggressively and launching innovations such as eliminating the industry's two-year service contracts and rollover data caps.[6]  Sprint often directly challenged competitors by name, including by advertising in 2015 that it would slash 50 percent off the price charged by the other three.[7]  The two mavericks continually moved the goalposts for pricing and innovation for the entire market, such as by pioneering and introducing the first nationwide unlimited data plans, which forced AT&T and Verizon to follow suit.[8]

Four-way competition benefited the customers of all four carriers.[9]  But Sprint, T-Mobile, and their parent companies, SoftBank and DT, grew increasingly impatient.[10]  As early as 2010, DT considered merging T-Mobile with Sprint to realize a "4-to-3" merger that, in DT's words, would "reduce price competition" and increase profits.[11]  And shortly after acquiring a majority interest of Sprint in 2014, SoftBank's Chairman, Masayoshi Son, went on American news

---

[2] Class Action Compl. ("Compl.") ¶¶ 31–34 (June 17, 2022), ECF No. 1.

[3] *Id*. ¶¶ 32, 34.

[4] *Id*. ¶¶ 7, 80.

[5] *Id*. ¶ 35.

[6] *Id*. ¶¶ 36, 40.

[7] *Id*. ¶¶ 37, 39.

[8] *Id*. ¶¶ 36, 39–40.

[9] *Id*. ¶ 81.

[10] *Id*. ¶¶ 19–21, 39, 41.

[11] *Id*. ¶ 42.

programs to promote a new attempt at a merger between the two companies.[12]   Both times, regulators held their ground and rebuffed their attempts to combine.[13]

However, in December 2016, Son rushed to Trump Tower to meet with then-President-Elect Trump, who reportedly told Son "that he would do a lot of deregulation" during his term.[14] Similarly, T-Mobile CEO John Legere told DT executives in 2017 that the "[r]egulatory environment will never be better than now" for a "four-to-three" merger.[15]   He added that "[b]ig prizes" were in store, "[s]o smile and get to the table."[16]   During negotiations, Sprint executives excitedly texted each other that there could hypothetically be profit increases of $5 in average revenue per user across the entire industry, including Verizon and AT&T customers, by 2022.[17] On April 29, 2018, T-Mobile and Sprint announced the merger agreement.[18]

### B.       Pre-Merger Review:  Confounded by Misrepresentations.

Experts, consumer groups, news media, and members of Congress criticized the merger, predicting that it would bring an end to the fierce competition that had benefited consumers.[19]  This time around, however, the merging entities offered regulators a package of commitments they claimed would preserve—and even enhance—competition.[20]  These included restrictions on price

---

[12] Jonathan Berr, *Masayoshi Son Cranks Up His Battle For T-Mobile*, CBS News (Mar. 12, 2014), https://www.cbsnews.com/news/masayoshi-son-cranks-up-his-battle-for-t-mobile/.

[13] Compl. ¶¶ 42, 47.

[14] Landon Thomas Jr., *T-Mobile-Sprint Merger Would Give Japan's SoftBank Bigger Foothold in U.S.*, N.Y. Times (Apr. 29, 2018), https://www.nytimes.com/2018/04/29/business/tmobile-sprint-softbank-masayoshi-son.html.

[15] Compl. ¶ 43.

[16] *Id.* ¶ 43.

[17] *Id.* ¶ 44. (Sprint's Chief Marketing Officer confided to Claure pre-merger that AT&T and Verizon would "not pay anything for . . . the benefit of a consolidated market" and later testified at trial that he meant there "would be a price increase in the whole market").

[18] *Id.* ¶ 46.

[19] *Id.* ¶¶ 46–48.

[20] *Id.* ¶ 69.

increases for three years and concessions to DISH Network Corp. ("DISH") that would supposedly position it to replace Sprint as the fourth MNO.[21] The Department of Justice ("DOJ") and the Federal Communications Commission ("FCC") approved the merger.[22]

Fourteen states and D.C. (the "States"), however, went to trial to block it in *New York v. Deutsche Telekom AG*, No. 19-5434 (S.D.N.Y.).[23] They alleged: "The cumulative effect of this merger . . . will be to decrease competition in the retail mobile wireless telecommunications services market and increase prices that consumers pay[.]"[24] In response, Sprint and T-Mobile portrayed Sprint as the sick man of the industry, barreling towards failure.[25] Shortly before the merger announcement, however, Sprint had touted that it was "very confident in [its] future" and "best positioned to be the first carrier with [a] nation-wide mobile 5G platform."[26] Similarly, when DISH initially opposed the merger, T-Mobile represented to the FCC that DISH "has a track record of price increases for its services, speculative warehousing of spectrum, and failing to meet FCC-imposed deadlines to construct the facilities required to deliver wireless services to the public."[27] But at trial, the merging entities instead sold DISH as an aggressive competitive force "from day one," that could meet its buildout deadlines and become a fully-functioning fourth MNO within three years.[28] The interested parties knew better: following the announcement, a DT executive internally gloated that DISH "was not likely to build a substantial wireless network of its own"

---

[21] *Id.* ¶¶ 64, 102, 104.

[22] *Id.* ¶¶ 5, 64.

[23] *Id.* ¶ 5.

[24] *Id.* ¶ 67.

[25] *Id.* ¶ 73.

[26] *Id.* ¶¶ 62, 76.

[27] *Id.* ¶ 66.

[28] *Id.* ¶¶ 4, 71.

because it lacked the necessary human and financial capital.[29]

The States lost.  Although the court found the merger presumptively anticompetitive, it credited T-Mobile, Sprint, and DISH executives who testified that their regulatory commitments would ensure that combining T-Mobile and Sprint's network infrastructure, together with the creation of DISH as a fourth MNO, would lower prices.[30]  The merger closed on April 1, 2020.  A year later, their self-professed "long-term strategic partnership" underway,[31] DT and SoftBank abandoned all pretexts.  DT's CEO triumphantly declared, "it's harvest time," and SoftBank bragged that its investments were "finally in the harvesting stage."[32]

### C.    Post-Merger:  Prices Have Increased and Consumer Choice Has Decreased.

Post-merger, the worst fears of a 4-to-3 merger have been realized:  prices have increased, innovation and consumer options have decreased, and DISH appears to have no chance of becoming a viable fourth competitor.  After decades of decline, Bureau of Labor Statistics ("BLS") Consumer Pricing Index ("CPI") data show that immediately following the merger announcement, quality-adjusted prices flat-lined and then markedly increased post-merger.[33]  Additionally, "churn"—the rate at which consumers switch carriers—has remained low since the merger announcement.[34]  Lower churn is unsurprising—the combination of the market's fiercest competitors has left consumers with fewer options.[35]  Likewise, new plan offerings, which were

---

[29] *Id.* ¶ 65.

[30] *Id.* ¶¶ 51, 67–69.

[31] Press Release, SoftBank Enters into Long-Term Strategic Partnership and Equity Share Agreement with Deutsche Telekom (Sept. 7, 2021), https://group.softbank/en/news/press/20210907.

[32] Compl. ¶ 86; Robert Olsen, *Japan's Richest Person Promises More 'Golden Eggs' After Fund Posts Best Quarter Yet* (Feb. 9, 2021, 5:15 AM ET), https://www.forbes.com/sites/robertolsen/2021/02/09/japans-richest-person-promises-more-golden-eggs-after-posting-best-quarter-yet/?sh=1765996a202e.

[33] *See* Compl. ¶ 80.

[34] *Id.* ¶ 82.

[35] *Id.*

hallmarks of aggressive pre-merger innovation, have also cratered.[36]

The various regulatory commitments that were supposed to preserve competition have been ineffective.[37]  The sale of T-Mobile's prepaid phone business to DISH was supposed to give it a foothold in the marketplace.[38]  But T-Mobile revoked DISH's promised access to T-Mobile's legacy network a year ahead of schedule.[39]  This has forced DISH to depend on network access from yet another competitor, AT&T, effectively making it a reseller of service rather than a true competitor.[40]  DISH has floundered, it has lost nearly a million and a half subscribers.[41]

Meanwhile, although T-Mobile agreed to extend its moratorium on price increases from three to five years post-trial,[42] it has exploited loopholes in its commitments to increase profits through new taxes, fees, and service charges.[43]  Indeed, a recent T-Mobile ad campaign launched in the wake of this lawsuit promises never to raise prices—but this promise prominently excludes fees and taxes.[44]  As predicted, Verizon and AT&T have also raised prices and reaped profits.[45]

## III.   LEGAL STANDARD

A motion to dismiss can only challenge the sufficiency of a complaint and not its merits.[46]

---

[36] *Id.* ¶¶ 84–85.

[37] *Id.* ¶ 68.

[38] *Id.* ¶¶ 64, 71.

[39] *Id.* ¶ 91; *see also* Decision Finding that T-Mobile USA, Inc. Should Be Sanctioned by the Commission for Violating Rule 1.1 of the Commission's Rules of Practice and Procedure ("Sanctions Decision"), Nos. 18-07-011, 18-07-012, at 13–17 (Cal. Pub. Util. Comm'n Apr. 25, 2022), https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M398/K955/398955746.PDF (instituting $5 million fine for false representations regarding network shutdown).

[40] Compl. ¶ 97.

[41] *See id.* ¶¶ 90–91.

[42] *Id.* ¶ 102.

[43] *Id.* ¶¶ 102–105.

[44] *Id.* ¶ 104.

[45] *Id.* ¶¶ 82–83.

[46] *Spearman v. Elizondo*, 230 F. Supp. 3d 888, 891 (N.D. Ill. 2016).

The complaint need only advance "'a short and plain statement of the claim showing that the pleader is entitled to relief,' sufficient to provide defendant[s] with 'fair notice' of the claim and the basis for it."[47]  Although "threadbare recitals of a cause of action's elements" are insufficient, the Court must accept as true all of the allegations in the complaint[48] and "draw[] all reasonable inferences in favor of the non-moving party."[49]  Having done so, the Court should "then determine whether they plausibly give rise to an entitlement to relief."[50]  "Plausibility" "does not imply that the district court should decide whose version to believe, or which version is more likely than not"; rather, plaintiffs need only "give enough details about the subject-matter of the case to present a story that holds together," and this Court need only ask itself "*could* these things have happened, not *did* they happen."[51]  The Federal Rules do not impose a heightened pleading standard in antitrust cases.[52]

Furthermore, plaintiffs have "much more flexibility" in opposing a motion to dismiss[53] than defendants have in bringing one and may "allege without evidentiary support any facts [they] please[] that are consistent with the complaint, in order to show that there is a state of facts within the scope of the complaint that if proved (a matter for trial) would entitle [them] to judgment."[54]

---

[47] *In re Broiler Chicken Antitrust Litig.,* ("*Broilers*"), 290 F. Supp. 3d 772, 779 (N.D. Ill. 2017) (Durkin, J.) (quoting Fed. R. Civ. P. 8(a)(2) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[48] *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Twombly*, 550 U.S. at 555); *see also In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, No. 21-cv-00305, 2022 WL 4465929, at *1 (N.D. Ill. Sept. 26, 2022) (citing *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007)).

[49] *Broilers*, 290 F. Supp. 3d at 779.

[50] *Iqbal*, 556 U.S. at 679.

[51] *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

[52] *Twombly*, 550 U.S. at 570 ("[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."); *In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 639 (N.D. Ill. 2020).

[53] *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

[54] *Early v. Bankers Life & Cas. Co.*, 959 F.2d 75, 79 (7th Cir. 1992) (citing *Orthmann v. Apple River Campground, Inc.*, 757 F.2d 909, 915 (7th Cir. 1985)).

By contrast, defendants may not rely on additional materials without converting a Rule 12(b)(6) motion into a motion for summary judgment.[55] "[I]t is improper at this stage of the proceedings to weigh alternatives and which [explanation] is more plausible."[56]

## IV. ARGUMENT

### A. Plaintiffs Have Antitrust Standing.

As consumers in the restrained market, plaintiffs have antitrust standing under the six-factor test set forth in *Associated General Contractors* ("*AGC*"):

> (1) the "causal connection between [the] antitrust violation and [the] harm"; (2) the presence of "improper motive"; (3) "the nature of the plaintiff's alleged injury" and whether it was one Congress sought to redress; (4) "the directness or indirectness of the asserted injury"; (5) how speculative or identifiable the damages are; and (6) "the risk of duplicative recoveries . . . or the danger of complex apportionment of damages."[57]

Antitrust injury (3) is the primary and necessary factor.[58]  The other factors serve to promote enforcement and prevent problems of duplicative or complex recovery.[59]  And although there is a "similarity" between analysis of "proximate cause" and antitrust standing, the full *AGC* analysis,

---

[55] *Geinosky*, 675 F.3d at 745 n.1 (citing Fed. R. Civ. P. 12(d)).  *See also Carter v. Stanton*, 405 U.S. 669, 671 (1972) (district court failed "to treat the motion to dismiss as one for summary judgment and to dispose of it as provided in Rule 56" where "matters outside the pleadings were presented and not excluded by the court"); *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998) (refusing to consider documents attached to motion to dismiss because the limited exception "is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment, and the defendants' perfunctory arguments . . . [were] unpersuasive").

[56] *Broilers*, 290 F. Supp. 3d at 788.

[57] *Id.* at 813 (quoting *Assoc. Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 537–38, 540–42, 544 (1983)).

[58] *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1118 (N.D. Cal. 2008) (quoting *AGC*, 459 U.S. at 538) ("[t]he Court identified the 'nature' of the injury as the most important factor"); *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999) ("[W]e give great weight to the nature of the plaintiff's alleged injury . . . antitrust injury is necessary." (citations omitted)); Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 335e (5th ed. Supp. 2022) (antitrust injury is essential element).

[59] *See AGC*, 459 U.S. at 543–44.

and not just proximate cause, controls whether plaintiffs have antitrust standing.[60]  At the

pleadings stage, the same standards apply to questions of antitrust standing as to any other issue:

all pleaded facts must be assumed to be true; all factual inferences must be drawn in favor of the

plaintiffs; and the complaint need only allege a plausible basis for relief in order to be

sustained.[61]

Section 4 of the Clayton Act provides a broad right of action for redress of antitrust

injuries, such as plaintiffs':  "[A]ny person who shall be injured in his business or property by

reason of anything forbidden in antitrust laws may sue therefore[.]"[62]  As the Supreme Court

explained in *Reiter v. Sonotone*, "where petitioner alleges a wrongful deprivation of her money

because the price of the [product] she bought was artificially inflated by reason of respondents'

anticompetitive conduct, she has alleged an injury in her 'property' under § 4."[63]  The Court

drove home the simplicity of the injury analysis a mere four years later.  In *AGC*, the Court

explained that in enacting the Clayton Act, "Congress was primarily interested in creating an

effective remedy for consumers who were forced to pay excessive prices by the giant trusts and

combinations that dominated certain interstate markets."[64]  Accordingly, the Court's "prior cases

have emphasized the central interest in protecting the economic freedom of participants in the

relevant market."[65]  Therefore, market participants—"'consumer[s] [and] competitor[s] in the

market in which trade was restrained'"—"generally have antitrust standing" under *AGC*.[66]  *AGC*

---

[60] *See id.* at 532–46.

[61] *U.S. Gypsum Co. v. Ind. Gas. Co.*, 350 F.3d 623, 626–27 (7th Cir. 2003) ("Because all we have to go on is USG's complaint, it is too soon to determine whose understanding of these events is superior.").

[62] 15 U.S.C. § 15(a).

[63] *Reiter v. Sonotone Corp.,* 442 U.S. 330, 342 (1979).

[64] 459 U.S. at 530.

[65] *Id.* at 538.

[66] *Broilers*, 290 F. Supp. 3d at 814 (Durkin, J.) (quoting *AGC*, 459 U.S. at 539); *see also Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 482 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 2877 (2021); Areeda &

filters out claims by those hurt by *competition* in favor of claims by "persons [like consumers here] whose self-interest would normally motivate them [to enforce the antitrust laws]."[67]

### 1. Plaintiffs Need Not Be "Customers of the Merging Entities" to Demonstrate the First and Fourth *AGC* Factors.

Defendants, however, contend that a so-called "first-step rule" bars these claims: because plaintiffs "are not customers of the merging entities" (T-Mobile and Sprint) they did not suffer harm at the "first step" and as a matter of law cannot show "proximate cause" under the Clayton Act.[68] Seventh Circuit authority—that is consistent Supreme Court jurisprudence—directly contradicts this assertion.

**The Seventh Circuit Does Not Require Privity.** Two leading Seventh Circuit decisions flatly contradict this assertion: *Loeb Industries*[69] and *U.S. Gypsum*.[70] In *Loeb*, purchasers of copper products sued defendants for manipulating the price of copper contracts in the futures market, which increased the price they paid for physical copper.[71] The plaintiffs did not transact with defendants. The Seventh Circuit held that the plaintiffs nevertheless had antitrust standing.[72] *Loeb* explicitly held that Supreme Court precedent authorizes "suits between plaintiffs and defendants not in privity with each other."[73] In rejecting any privity requirement, it observed that "The reason the plaintiffs' suit in *Illinois Brick* failed was not because the defendants did *not* sell to them. Rather it was because the defendants *did* sell to a third party

---

Hovenkamp, *supra* note 58, ¶ 345a (explaining that end-use purchasers suing for overcharge damages resulting from illegal price fixing, monopolization, or a merger have antitrust standing).

[67] *U.S. Gypsum Co.*, 350 F.3d at 626-27; *see AGC*, 459 U.S. at 542.

[68] Mot. at 13.

[69] *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 474, 489 (7th Cir. 2002) (Easterbrook, J.).

[70] 350 F.3d at 627; *see also Sanner v. Bd. of Trade*, 62 F.3d 918, 929 (7th Cir. 1995).

[71] 306 F.3d at 482.

[72] *Id.* at 498 ("[T]heir injury is direct, predictable, and unlikely to produce duplicate recovery or speculative damages."), 482.

[73] *Id.* at 482.

who (after *Hanover Shoe*) could recover for any injury they [the plaintiffs] claimed."[74]

In *Gypsum*, the plaintiff, U.S. Gypsum ("USG"), bought gas at the wellhead and bought transportation directly from pipelines.[75] USG contended that the defendant joint venture, Proliance, which also bought gas transportation from pipelines, had raised the prices of transportation above competitive levels. USG accused Proliance of being an illegal combination under the Sherman Act in possession of market power. Citing *AGC*, the Seventh Circuit found USG had standing even though it did not transact with Proliance, reasoning: "A cartel cuts output, which elevates price throughout the market; customers of fringe firms (sellers that have not joined the cartel) pay this higher price, and thus suffer antitrust injury, **just like customers of the cartel's members**."[76] The court's holding flowed directly from *Loeb*:

> It is enough to reiterate, **as *Loeb* holds**, that the buyers from fringe firms suffer antitrust injury, that their complaints cannot be dismissed at the outset under the *Illinois Brick* doctrine, and that the potential to establish injury through elevation of price in the affected market satisfies any distinct 'antitrust standing' requirement.[77]

*Gypsum*—in which the Seventh Circuit held that a non-customer market participant plausibly alleged standing to challenge a combination of two other firms with market power—controls the outcome of this case, and dictates denial of defendants' motion. The fact that USG did not seek damages does not make the language *obiter dictum*. The Seventh Circuit had to reach this issue because the causal connection and directness factors of *AGC* apply to claims for injunctive relief; only the damages-specific elements (speculativeness and duplicativeness) fall away.[78]

---

[74] *Id.*

[75] 350 F.3d at 625–26.

[76] *Id.* at 627 (emphasis added).

[77] *Id.* at 627–28 (emphasis added).

[78] *Broilers*, 290 F. Supp. 3d at 813 (citing *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986)).

Defendants incorrectly claim that *Loeb* left open the privity question for cases of "umbrella standing," where the cartelists only intend to raise prices as to their own customers, and then other suppliers raise prices under the "umbrella" of the cartel.[79]  Again, the Seventh Circuit did *not* leave open the question of whether the plaintiffs in *Loeb* suffered a sufficiently direct and proximate injury to support standing.  It only noted that on remand there might be factual questions about how the other *AGC* factors related to damages, "now that we have clarified how the direct purchaser rule and the remoteness doctrine of *AGC* apply here."[80]  The *Gypsum* panel read this footnote the same way in the following year, noting that *Loeb* had only reserved "potentially difficult issues about the design of relief."[81]

**The Supreme Court Is Consistent with the Seventh Circuit.**  *Gypsum* and *Loeb* align with the Supreme Court's antitrust standing jurisprudence.  The Court has always prioritized the claims of *buyers who participate directly in the restrained market*; it has only applied special scrutiny to the claims of participants in *other markets*, which might otherwise extend the Clayton Act to every "ripple[] of harm [that] flow[s] through the Nation's economy[.]"[82]  For instance, in *Illinois Brick*, it held that indirect purchasers—those who buy from an "innocent intermediary" that re-sells a price-fixed product—do not have a claim under most circumstances.  Their injury is derivative of the injury of the direct purchaser, raising complex issues of proof of damages and apportionment.  Similarly, in *AGC*, the Court rejected claims by a labor union whose *members*

[79] Mot. at 18.

[80] *Loeb Indus.*, 306 F.3d at 483 n.4.

[81] *Gypsum*, 350 F.3d at 627–28.  Defendants also suggest that AT&T and Verizon prices need to be linked to T-Mobile's prices to the same degree as futures and physical copper prices per *Marion Diagnostic Center, LLC v. Becton Dickinson & Co.*, 29 F.4th 337 (7th Cir. 2022).  However, the *Marion* plaintiffs were indirect purchasers under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and did not allege the conspiracy affected market prices.  *Id.* at 346–48.

[82] *Blue Shield of Va. v. McCready*, 457 U.S. 465, 476–77 (1982).

might have been injured by an antitrust violation and cited "a creditor [or] stockholder of a corporation . . . injured by a violation of the antitrust laws," as additional examples of claims going beyond the "first step" of harm to a market participant.[83]  Even here, though, such claims can sometimes be brought.  In *McCready*,[84] the Court held that an employee had standing to bring claims against her employer's health insurance company, even though she never transacted with the insurer herself.  The Court explained that the Clayton Act "does not *confine* its protection to consumers, or to purchasers, or to competitors, or to sellers . . . . The Act . . . protect[s] all who are made victims of the forbidden practices by whomever they may be perpetrated."[85]

The Supreme Court recently elaborated the on meaning of the "first step" in the *Lexmark*[86] case relied on by defendants.[87]  In *Lexmark*, the plaintiff sold inputs to a remanufacturer of printer cartridges, which competed with the brand, Lexmark.  The plaintiff complained that Lexmark's false advertising had damaged the remanufacturer, and by extension itself, as the supplier.  The Court identified this "causal chain" as "not direct" because it included the "intervening link of injury to the remanufacturers."[88]  Thus, the complaint "might not support standing under a strict application of the general tendency not to stretch proximate causation beyond the first step."[89] Tellingly, though, the Court in *Lexmark* nevertheless held that the plaintiff *did* have a claim, because limiting damages to the "first step" is at most a "tendency," rather than a rule.

---

[83] *AGC*, 459 U.S. at 533 (citing *Loeb v. Eastman Kodak Co.*, 183 F. 704, 709 (3d Cir. 1910)).

[84] *McCready,* 457 U.S. 465.

[85] *Id.* at 472 (emphasis added) (citation omitted).

[86] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

[87] Mot. at 12.

[88] 572 U.S. at 139.

[89] *Id.* (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 271 (1992) (interpreting RICO based on *AGC*) (cleaned up) (emphasis added)).

**Other Circuits Do Not "Overwhelmingly" Require Privity.**[90] In fact, the Seventh Circuit accords with the Fifth Circuit, which held in *Beef Industries*[91] that plaintiffs alleging a buyer-side cartel who sold to non-defendants had antitrust standing because they alleged "the conspirators' activities caused a general depression in wholesale prices"[92] across the entire market. Similarly, the Areeda treatise, which explains that "purchasers from [] innocent suppliers [may] pay a monopoly overcharge just as certainly as if they had bought from the conspirators."[93] These purchasers' antitrust "injury can be compensated only by allowing them to sue the conspirators."[94]

Defendants principally rely on *Amex*, which denied standing to plaintiff merchants that did not transact with defendant American Express.[95] However, the Second Circuit itself acknowledges that *Gypsum* states a different rule.[96] Defendants' Third Circuit *Mid-West Paper* decision[97] similarly lies on the other side of that split. And, *Mid-West Paper* pre-dated *AGC*; the Third Circuit has since held that plaintiffs who transacted with non-conspirator suppliers *did have* antitrust standing because defendants' conduct—delaying adoption of more efficient technology—increased prices plaintiffs paid.[98] Defendants' reliance on the Ninth Circuit's decision in *Petroleum Products*[99] ignores the fact that the court explicitly limited its analysis to *multi-tiered*

---

[90] Mot. at 2, 15.

[91] *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148 (5th Cir. 1979).

[92] *Id.* at 1153, 1166 n.24.

[93] Areeda & Hovenkamp, *supra* note 58, ¶ 347.

[94] *Id.*

[95] *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 140–41 (2d Cir. 2021).

[96] *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 778–79 (2d Cir. 2016) ("The antitrust standing of umbrella purchasers under such circumstances [where the cartel controls only a portion of the market] has produced a split of authority among our sister circuits.") (contrasting *Gypsum* and *Mid-W. Paper Prods. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573 (3d Cir. 1979)).

[97] *Mid-W. Paper Prods. Co.*, 596 F.2d at 581, 584 n.45.

[98] *In re Lower Lake Erie Iron Ore Antitrust Litig*, 998 F.2d 1144, 1167–70 (3d Cir. 1993).

[99] *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335 (9th Cir. 1982).

- 15 -

*distribution chains*, and declined to decide whether such claims may be pursued in situations involving a single level of distribution—as is the case here.[100]   Moreover, courts in the Ninth Circuit have since recognized that umbrella plaintiffs have antitrust standing.[101]

Defendants' out-of-circuit district court cases have zero relevance in the face of well-developed Seventh Circuit jurisprudence, and can be readily distinguished in any event.[102]   In short, defendants' supposed "first-step rule" contradicts binding authority of this Circuit.

## 2.   Plaintiffs Have Antitrust Injury—the Sole Required *AGC* Factor.

Turning to the multi-factor test itself, *AGC*'s third factor—the nature of the plaintiff's alleged injury and whether Congress sought to redress it—strongly supports antitrust standing.[103]   Antitrust injury is the most important and only required *AGC* factor.[104]   As discussed above, both *Reiter* and *AGC* itself confirm the centrality of consumer remedies to the Clayton Act.[105]   Unlike *AGC*, plaintiffs here are exactly who Congress intended to protect:  customers who paid artificially inflated prices within the restrained market.[106]   This factor is satisfied.

---

[100] *Id.* at 1340.

[101] *See, e.g.*, *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, No. 11-cv-05514, 2016 WL 6246736, at *6 (N.D. Cal. Oct. 26, 2016); *In re Ariz. Dairy Prods. Litig.*, 627 F. Supp. 233, 236 (D. Ariz. 1985); *In re Bristol Bay, Alaska, Salmon Fishery Antitrust Litig.*, 530 F. Supp. 36, 38–39 (W.D. Wash. 1981).

[102] *In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18-md-2836, 2019 WL 6122017, at *8 (E.D. Va. Oct. 15, 2019) (no indirect purchaser standing; "Par *purchased* the generic product from Glenmark and *resold* it to Plaintiffs"); *In re Vitamins Antitrust Litig.*, No. 99CIV5134, 2001 WL 855463, at *4 (D.D.C. July 2, 2001) (plaintiffs were not the first purchasers in the distribution chain).  The reasoning in *Antoine L. Garabet, M.D., Inc. v. Autonomous Technologies Corp.*, 116 F. Supp. 2d 1159, 1167–69 (C.D. Cal. 2000), has been roundly criticized as committing fundamental errors, including deciding that "innocent suppliers" could sue the violator.  *See CRT*, 2016 WL 6246736, at *6.

[103] *See AGC*, 459 U.S. at 538–39.

[104] *LCD*, 586 F. Supp. 2d at 1118 (quoting *AGC*, 459 U.S. at 538) ("The Court identified the 'nature' of the injury as the most important factor"); *Am. Ad Mgmt.*, 190 F.3d at 1055 ("[W]e give great weight to the nature of the plaintiff's alleged injury . . . antitrust injury is necessary" (citation omitted)); Areeda & Hovenkamp, *supra* note 58, ¶ 335e (antitrust injury is essential element).

[105] *AGC*, 459 U.S. at 538; *Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 368 (7th Cir. 1987) ("principal purpose of the antitrust laws is to prevent overcharges to consumers."); *Reiter*, 442 U.S. at 342.

[106] Compl. ¶¶ 8, 124.

### 3.    The First Factor—Causal Connection—Supports Antitrust Standing.

The first *AGC* factor—strength of the causal relationship between conduct and injury—favors antitrust standing because plaintiffs plausibly allege a straightforward and widely accepted theory of harm.  "In the § 7 context, it has long been settled that excessive concentration, and the oligopolistic price coordination *it portends*, may be the injury to competition the Act prohibits."[107] Plaintiffs allege that the merger increased concentration and reduced competition, directly leading to higher quality-adjusted prices than there would have been otherwise.  No antitrust lawyer or economist can seriously dispute that mergers in concentrated markets can plausibly lead to reduced competition and increased prices via both direct and coordinated effects.[108]  The DOJ's merger guidelines—the very creation of the merger review process itself—embody this principle.[109]

Indeed, the parties sought to merge *because* the result would be higher prices and profits. For example, Sprint's CMO Roger Sole-Rafols told CEO Claure to stress during merger negotiations that consolidating the market would support price increases and billions of dollars in additional profits, *including for AT&T and Verizon*.[110]  T-Mobile and DT shared this purpose. Before negotiations began, T-Mobile CEO Legere said there would be "big prizes" from a four-to-three merger.[111]  And during negotiations, DT's Head of Mergers and Acquisitions Philipp

---

[107] *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 230 (1993) (emphasis added).

[108] *See United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 77–78 (D.D.C. 2011); *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 568 (6th Cir. 2014) (Coordinated effects refers to markets with few competitors, in which firms may "coordinate their behavior, either by overt collusion or implicit *understanding* in order to restrict output and achieve profits above competitive levels." (emphasis added)); *FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 66–67 (D.D.C. 2009); *see also FTC v. Warner Commc'ns*, 742 F.2d 1156, 1160 (9th Cir. 1984) ("Section 7 . . . requires far less than a showing of collusion," rather requiring "only a showing of reasonable probability of anticompetitive effect").

[109] *See, e.g.*, U.S. Dep't of Justice, Competitive Impact Statement at 7–8, *United States v. Int'l Paper Co.*, No. 12-cv-227 (D.D.C. Feb. 10, 2012) (explaining how increased concentration would change the incentives of competitors in a way that would facilitate mutual accommodation and price increases), https://www.justice.gov/atr/case-document/file/499691/download.

[110] Compl. ¶¶ 43–44.

[111] *Id.* ¶ 43.

Pohlmann said that the merger would result in "market repair," an industry euphemism for decreased competition and higher prices.[112]  Defendants achieved their objective:  the merger's observable effect is a market-wide price increase.[113]  Plaintiffs paid that elevated market price.[114]  Therefore, plaintiffs' "potential to establish injury through elevation of price in the affected market satisfies any distinct 'antitrust standing' requirement," including proximate causation.[115]

Defendants claim the "independent" pricing decisions of AT&T and Verizon "snap" the causal chain.[116]  This argument simply repackages defendants' incorrect "privity" requirement.  Moreover, the concept of independent pricing "is a misnomer to the extent it suggests price emerges based largely on individual considerations relating to a firm's particular circumstances as opposed to factors that for the most part are endogenous to the market" such as cartel supply decreases or merger concentration increases.[117]  The "pricing decisions" of AT&T, Verizon, and defendant T-Mobile did not happen in black-box isolation.  They depended on the market consolidation defendants created via the merger.[118]

Defendants' other cases do not support their position that non-defendant supplier's pricing decisions break the causal chain.  The single case they rely on from this district, *Supreme Auto Transport LLC v. Arcelor Mittal*, denied standing to indirect purchasers, as opposed to direct participants in the restrained market, like plaintiffs here.[119]  Furthermore, defendants depend

---

[112] *Id.* ¶ 45.

[113] *Id.* ¶¶ 78–85, 102–08.

[114] Areeda & Hovenkamp, *supra* note 58, ¶ 347.

[115] *Gypsum*, 350 F.3d at 627–28, *see also* Section IV.A.1.

[116] Mot. at 16.

[117] *CRT*, 2016 WL 6246736, at *7.

[118] *Id.* at *6 n.8.

[119] 238 F. Supp. 3d 1032, 1037, 1040–41 (N.D. Ill. 2017), *aff'd* 902 F.3d 735 (7th Cir. 2018); *see also* Section I.A.1.

primarily on authority from the Second Circuit, which lies on the other side of this issue.[120] Plaintiffs in *Online DVD Rental* and *Dairy Farmers of America* only lacked standing on summary judgment based on unique evidence produced in discovery.[121] And the *In re Citric Acid Antitrust Litigation* court applied the settlement approval standard, not *AGC*, to a proposed settlement plan that included distributions for purchases class members made from a non-settling defendant who prevailed on summary judgment.[122]

### 4. Defendants Concede Improper Motive.

Defendants appropriately never contest (or even mention) the second factor: improper motive. The Complaint alleges written evidence that defendants knew and intended that the merger would facilitate price increases across the entire market, including AT&T and Verizon. As Sprint's chief marketing officer texted during negotiations, "the most interesting thing is that this [ARPU increase], assuming the same market share for all, is exactly the same for AT&T and VZ, that is, it will also accommodating plus $5 ARPU in a three-player scenario."[123] The fact that defendants explicitly targeted plaintiffs for price increases weighs in favor of standing.

### 5. Plaintiffs Suffered Direct Injury.

The fourth factor, "the directness or indirectness of the asserted injury," also favors antitrust standing here. As discussed above, the Supreme Court has explained in *AGC*, *Lexmark*

---

[120] *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 116–19 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2852 (2022); *see also Laydon v. Coöperatieve Rabobank U.A.*, 51 F.4th 476, 486-87 (2d Cir. 2022) (alleging price-fixing of the Yen-LIBOR and Euroyen TIBOR); *In re Aluminum Warehousing Antitrust Litig.*, 520 F. Supp. 3d 455, 464 (S.D.N.Y. 2021) (alleging price-fixing of aluminum regional benchmark known as Midwest Premium); *In re London Silver Fixing, Ltd. Antitrust Litig.*, 332 F. Supp. 3d 885, 906 (S.D.N.Y. 2018).

[121] *In re Online DVD Rental Antitrust Litig.*, No. M 09-2029 PJH, 2011 WL 1629663, at *6–7 (N.D. Cal. Apr. 29. 2011); *Allen v. Dairy Farmers of Am., Inc.*, No. 5:09-cv-230, 2014 WL 2610613 (D. Vt. June 11, 2014).

[122] 145 F. Supp. 2d 1152, 1156 (N.D. Cal. 2001).

[123] Compl. ¶ 44.

and other cases, that to be "indirect," an injury must be derivative of an injury suffered by an actual participant in the restrained market. This factor favors antitrust standing for the first buyers of the affected product, because such plaintiffs do not risk duplicative recovery or complex apportionment.[124] Plaintiffs here are the first—and only—step in distribution: AT&T and Verizon sell retail cell service directly to the proposed class, including plaintiffs.[125] Plaintiffs do not own shares in the victim, did not lend money to the victim, and did not sell inputs to the victim. Rather, at the first step of distribution, they *are* the victims.[126]

Defendants' arguments to the contrary lack merit. To start, several of their cases recognize that consumers in the affected market, like plaintiffs, suffer direct injury.[127] Furthermore, the fact that the merger also injured T-Mobile customers—*because it raised prices in the entire market*— is irrelevant. Defendants cannot use the fact that their conduct harmed the entire market to shield themselves from liability.[128] Indeed, the Supreme Court recently rejected this argument in *Apple v. Pepper*. In that case, smartphone app consumers alleged Apple monopolized and attempted to monopolize the market for iPhone apps. Defendants argued that the proper antitrust plaintiffs were app developers.[129] Dismissing that argument, the Court held that the antitrust laws' directness

---

[124] *See AGC*, 459 U.S. at 544; *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1524–25 (2019) (this factor disfavors standing when "multiple parties at different levels of a distribution chain are trying to all recover the same passed-through overcharge").

[125] Compl. ¶¶ 8, 22–23, 124.

[126] *See In re Uranium Antitrust Litig.*, 552 F. Supp. 518, 524 (N.D. Ill. 1982) (recognizing that customers of defendants' competitors are direct purchasers*); CRT*, 2016 WL 6246736, at *7 ("[T]here is no risk of duplicative recovery because there is no pass-on.").

[127] *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 718–19 (7th Cir. 2006); *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 598–99 (7th Cir. 1995) (recognizing that consumers would be efficient claimants); *see also Fisher v. Aurora Health Care, Inc.*, 558 F. App'x 653, 655 (7th Cir. 2014) (same).

[128] *See, e.g.*, *Loeb*, 306 F.3d at 493 ("The defendants' entire case theory . . . seems to be the troubling one because their scheme was so evil . . . we should simply give them a pass from the antitrust laws. This is not now and never has been the law.").

[129] *Apple*, 139 S. Ct. at 1524–25.

requirement does not "bar multiple liability that is unrelated to passing an overcharge down a chain of distribution."[130]  "[B]asic antitrust law tells us that the 'mere fact that an antitrust violation produces two different classes of victims hardly entails that their injuries are duplicative of one another.'"[131]

### 6. <u>Damages Are Ascertainable.</u>

The fifth *AGC* factor, speculativeness of damages, also supports antitrust standing.[132] Here, the Complaint plausibly alleges, in detail, how the merger reduced competition and increased market prices.[133]  Estimates of such harm are commonplace in antitrust.  Both sides of the pre-merger trial estimated welfare harms and benefits that they claimed it would cause.[134]  At trial, the States said prices would go up; T-Mobile and Sprint promised they would go down; and each side quantified its projections.[135]  Plaintiffs here can do the same and with far more accuracy by using actual post-merger data.[136]  The fact that the analysis may have to control for other supply and demand factors does not make it speculative; this calculation "occurs in every [antitrust] case."[137]

---

[130] *Id.* at 1525.

[131] *Id.* (quoting Areeda & Hovenkamp, *supra* note 58, ¶ 339d); *Loeb*, 306 F.3d at 487 (that defendants "may have caused additional harms to [other] physical copper purchasers . . . has no impact on Viacom's ability to recover under the *AGC* factors").

[132] *AGC*, 459 U.S. at 542; *Loeb*, 306 F.3d at 484.  In *AGC*, the plaintiff unions did not "identify any specific component" from which they calculated their alleged $25 million in damages.  For example, the complaint did not allege any effect on dues payments or that unionized contractors had lost business worth that amount.  *See AGC*, 459 U.S. at 522–24.

[133] Compl. ¶¶ 50–58, 78–85, 102–08.

[134] *Id.* ¶ 58.

[135] *Id.* ¶¶ 5, 58, 69, 72, 106.

[136] *Id.* ¶ 5.

[137] *Loeb*, 306 F.3d at 493; *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 991 (9th Cir. 2000) (rejecting the argument "that because other factors influence milk prices, the harm to plaintiffs is speculative"); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789 (LGS), 2016 WL 5108131, at *11 (S.D.N.Y. Sept. 20, 2016) (same).

Indeed, defendants argue that T-Mobile's customers would be proper plaintiffs, but they would face the exact same challenge proving damages.[138]

### 7. Plaintiffs Are the Most Efficient—and Only—Enforcers.

Finally, although individual T-Mobile customers could hypothetically arbitrate, the unavailability of a class action mechanism means they never will: what individual subscriber would spend millions in attorneys' fees and costs to recover a few dollars? *Italian Colors* itself acknowledged that while requiring arbitration did not eliminate all remedies, it would effectively prevent enforcement by consumers bound by arbitration clauses because it would not be "worth the expense involved" to do so.[139] "Economic reality dictates that [plaintiffs'] suit proceed as a class action or not at all."[140] As the Seventh Circuit has observed, "the *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30."[141] It follows that T-Mobile's customers are not a "class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement."[142] The Supreme Court in *Reiter v. Sonotone* noted that private cases, including class actions, "provide a significant supplement to the limited resources available to the Department of Justice for enforcing the antitrust laws and deterring violations."[143]

### B. The Complaint Plausibly Alleges Anticompetitive Effects.

Plaintiffs' Complaint details direct and indirect anticompetitive effects of the merger,

---

[138] Mot. at 21; *see also Loeb*, 306 F.3d at 493 (proper plaintiffs identified by defendants face "the [same] task of gauging the damages recoverable").

[139] *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 229 (2013).

[140] *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 161 (1974).

[141] *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004); *see also Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997) (class action "overcomes the problem" of small individual damages).

[142] *AGC*, 459 U.S. at 542.

[143] 442 U.S. at 344.

including allegations of increased quality-adjusted prices, decreased price competition between mobile carrier competitors, statements by defendants about the anticompetitive effects of the merger, the failure of T-Mobile to comply with its commitments to support DISH, DISH's failure to emerge as an effective competitor, and the dramatic increase in industry concentration following the merger. Such allegations more than plead violations of the antitrust laws.[144] Defendants propose their own alternate explanations, the precise opposite of what is required of the Court on a motion to dismiss—"assume the[] veracity [of well-pleaded factual allegations] and then determine whether they plausibly give rise to an entitlement to relief."[145]

## 1.      Direct Anticompetitive Effects.

**Increased Quality-Adjusted Prices.**  The Complaint makes detailed factual allegations about the increase in quality-adjusted prices following the merger.  Prior to the merger announcement, prices for nationwide wireless plans had dropped by 6.3% per year for a decade.[146] According to the BLS, the official government agency which measures consumer prices, *quality-adjusted* consumer prices had been on a downward trend since at least January 2014.[147]  Yet in the first three months after the merger closed (on April 18, 2020), quality-adjusted prices, as measured by official government price statistics, *jumped*.[148]

---

[144] *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1281–82 (7th Cir. 1990) (citing 2 Phillip Areeda & Donald F. Turner, Antitrust Law ¶ 304 (1st ed. 1978); *id.* 4 ¶ 906); *see also FTC v. Advocate Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016) (Section 7 requires a showing that the merger's effect may substantially lessen competition); *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 101 (3d Cir. 2010) (anticompetitive effects in the relevant market must merely be plausible).

[145] *Iqbal*, 556 U.S. at 679.

[146] Compl. ¶ 7.

[147] *Id.* ¶ 80.

[148] *Id.*



Source: Bureau of Lab. Stats., *CPI for All Urban Consumers (CPI-U), Wireless Telephone Services in U.S. City Average, All Urban Consumers, Not Seasonally Adjusted (2012-2022)*, https://data.bls.gov/timeseries/CUUR0000SEED03?output_view=data (last visited Apr. 2022).

This happened despite T-Mobile's promise to the district court that the merger would lead to *lower* prices and improved quality, not just for T-Mobile customers, but also AT&T's and Verizon's.[149]

Defendants contend that the BLS data—the best, most impartial public data—has not been quality-adjusted *enough*, because it does not account for the shifting of plans from 4G to 5G. But defendants ignore the fact that the BLS, as the Complaint explains, makes multiple quality adjustments, such as by accounting for differences like the amount of high-speed data, the number of lines offered, and other factors.[150] Defendants want the BLS to account for 5G, but BLS believes it can publish accurate, usable data without making that adjustment, and that the benefits of 5G above and beyond the adjustments it *does make*, if any, cannot be quantified. Defendants also

---

[149] *Id.* ¶¶ 69–70, 80, 106.

[150] *Id*. ¶ 79.

forget to mention that very few customers had 5G at the time of the price jump.[151] "Defendants are asking the Court to undertake a weighing of evidence that is not appropriate at the pleading stage, and must be rejected."[152] "Both sides should . . . have the opportunity to argue to the Court why these statistics may not be what they seem, which necessarily cannot take place at the pleading stage."[153]

Given the proximity between the close of the merger and the dramatic change in cell phone pricing trends, defendants' reliance on *Fortress* for the proposition that price increases must be linked to the merger in question is particularly inapt.[154] The court in *Fortress* focused on plaintiff's failure to allege that the harm "is even a cognizable 'price' for purposes of the antitrust laws,"[155] but here, plaintiffs allege they paid the classic antitrust overcharge as a result of the merger.[156] Defendants' reliance on *AMR Corp.* is similarly inapt; the price increases discounted by the court in *AMR* were implemented *before* the merger, not *after* the merger, as is the case here.[157] Similarly, *Ohio v. American Express Co.*[158] followed a trial on the merits and the Supreme Court found, based on the factual record, that American Express's "increased merchant fees reflect[ed] increases in the value of its services and the costs of its transactions."[159] And defendants' reliance on *Brooke*

---

[151] Mot. at 28; Ericsson, Ericsson Mobility Report (Nov. 2020), https://www.ericsson.com/en/reports-and-papers/mobility-report/reports (estimating the 5G share of total mobile subscriptions in North America at just 4%).

[152] *Broilers*, 290 F. Supp. 3d at 802. Reliance on *Marshfield Clinic* is misplaced because, in that case, plaintiff sought to use high prices as the sole proof of monopoly power, and plaintiff "itself stressed the quality" of the defendants' care. *Blue Cross & Blue Shield United v. Marshfield Clinic*, 65 F.3d 1406, 1411–13 (7th Cir. 1995).

[153] *Broilers*, 290 F. Supp. 3d at 794.

[154] Mot. at 28 (citing *Intel Corp. v. Fortress Inv. Grp. LLC*, No. 21-16817, 2022 WL 16756365, at *2 (9th Cir. Nov. 8, 2022)).

[155] *Fortress*, 2022 WL 16756365, at *2.

[156] Compl. ¶¶ 124, 132.

[157] *In re AMR Corp.*, 625 B.R. 215, 266 (Bankr. S.D.N.Y. 2021).

[158] 138 S. Ct. 2274 (2018).

[159] *Id.* at 2288.

*Group* for the proposition that plaintiffs can only state a claim by alleging a nominal price increase is wrong; the Court explained its holding by stating, "[A] jury may not infer competitive injury from price and output data *absent some evidence that tends to prove that output was restricted or prices were above a competitive level.*"[160]   Here, wireless prices stopped declining and then increased almost immediately after the merger was closed, direct evidence that the subsequent higher prices were supracompetitive.[161]   As the Seventh Circuit explained in *Toys "R" Us, Inc. v. F.T.C.*, arresting a price decline qualifies as an anticompetitive effect just as surely as a price increase.[162]

**Higher Prices and Revenue.**   DT itself acknowledged, indeed celebrated, the effects of the merger by announcing post-merger that it was "harvest time."[163]   DT promptly increased its share in T-Mobile to nearly 50% (from 43% pre-merger).[164]   And on the heels of the merger, T-Mobile increased prices for its device protection plans.[165]   The Complaint also cited AT&T's and Verizon's price increase announcements for their service plans in 2022.[166]

Defendants, however, argue that because the AT&T and Verizon price increases in 2022 occurred two years later, the merger didn't cause them.[167]   Defendants have no support—economic or otherwise—for the proposition that the anticompetitive effects of the merger evaporated in two

---

[160] *Brooke Grp. Ltd.,*. 509 U.S. at 237 (1993).

[161] Compl. ¶¶ 78–80.

[162] 221 F.3d 928, 937 (7th Cir. 2000) ("Taking steps to prevent a price collapse through coordination of action among competitors has been illegal at least since *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150 (1940).").

[163] *Id.* ¶ 86.

[164] Bevin Fletcher, *Deutsche Telekom Raises Stake in T-Mobile US, Swaps Shares with Softbank* (Sept. 7, 2021, 12:43 PM), https://www.fiercewireless.com/financial/deutsche-telekom-raises-stake-t-mobile-us-swaps-shares-softbank.

[165] Compl. ¶ 89.

[166] *Id.* ¶¶ 107–08.

[167] Mot. at 25.

years.  Defendants ignore the data, which show that after decades of pre-merger price declines, post-merger prices quickly jumped and stayed high.  This pattern provides at least a *prima facie* case for causation, *i.e.*, a "reasonable inference," which must be drawn "in favor of the non-moving party," and is all that is required at the pleading stage.[168]

Similarly, defendants' innocent explanations, such as inflation and increasing cost pressure, are irrelevant at the pleading stage and wrong.[169]  Government inflation statistics for input costs in delivering wireless services show that inflation did *not* cause the price increases that occurred immediately after the merger.  The monthly annualized percentage change in the BLS's Producer Price Index for Cellular Phone and Other Wireless Telecommunications Services was essentially flat from 2019 through January 2020, then sharply *declined* until May 2021, over a year *after* prices for wireless consumers had increased, when the index briefly went up.[170]  Furthermore, defendants' articles discussing nominal price increases in *2022* and possibly into the future[171] do not contradict the fact that quality-adjusted wireless service prices, according to BLS, have jumped in the *first quarter after the merger's close*, which happened *two years earlier*.[172]  Defendants' articles just show the merger may yet cause more price increases.

**Decreased Price Competition.**  Plaintiffs also alleged that the merger decreased price competition.  Immediately after the merger agreement was signed, T-Mobile's President observed

---

[168] *Broilers*, 290 F. Supp. 3d at 779 (quoting *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013)); *see also Lee v. City of Chicago*, 330 F.3d 456, 459 (7th Cir. 2003).

[169] Mot. at 25–26.  *See Broilers*, 290 F. Supp. 3d at 802 ("By asking the Court to choose its innocent explanations over Plaintiffs' claims, Defendants are asking the Court to undertake a weighing of evidence that is not appropriate at the pleading stage, and must be rejected.").

[170] St. Louis Fed. Reserve Bank, Economic Data (the FRED data base), https://fred.stlouisfed.org/series/WPS3721#0 (chart displayed for percent change in the index, each month, for a year ago) (last visited Jan. 9, 2023).

[171] Mot. at 25.

[172] Compl. ¶¶ 7, 80, 89, 102–08.

that AT&T and Verizon started to slow their aggressiveness in responding to prices, repeating that assessment five months later.[173]  Customers switching carriers, or "churn," can indicate the strength of competition in mobile services, and churn declined at both AT&T and Verizon after the merger.[174]  Likewise, the frequency of price plan changes by the major carriers, another indicator of the strength of competition, also plummeted after the merger's close.[175]

**Increased Fees.**  The Complaint also alleges that despite regulatory commitments not to raise the price of legacy T-Mobile and Sprint plans until certain conditions were met, T-Mobile took advantage of "loopholes that allowed it to raise legacy plan prices by (1) increasing taxes, fees, and surcharges; (2) passing through increases in the cost of third-party benefits, such as streaming services or free in-flight Wi-Fi service; (3) modifying or canceling third-party benefits; and (4) increasing the cost of device and handset offerings."[176]  Defendants' counterargument, that T-Mobile promised the FCC, DOJ, and various state regulators that it would not increase nominal prices on legacy plans until 2025, *matches* plaintiffs' allegations.[177]  T-Mobile claims that its "Mobile Connect" plan, launched in March 2020, was its *lowest-priced option ever*."[178]  But this response does not contradict the allegation that the nominal prices on this plan broke with prior practice by excluding taxes and fees,[179] and it overlooks that Mobile Connect applied only to prepaid plans, a small portion of total wireless connections in the U.S.[180]

---

[173] *Id.* ¶ 81.

[174] *Id.* ¶ 82.

[175] *Id.* ¶¶ 84–85.

[176] *Id.* ¶¶ 102–105.

[177] Mot. at 26; *see, e.g.*, *Broilers*, 290 F. Supp. 3d at 802 ("Defendants['] 'alternative explanation' does not fatally undermine the alleged motivation for their conspiracy and in fact could be understood to bolster it.").

[178] Mot. at 27.

[179] Compl. ¶ 104.

[180] *Connect by T-Mobile*, T-Mobile, https://prepaid.t-mobile.com/prepaid-plans/connect (last visited Jan. 9, 2023).  According to the FCC, out of an estimated 478 million wireless mobile connections in the US at the

## 2.    Indirect Anticompetitive Effects.

The Complaint also details the merger's indirect anticompetitive effects.  Indirect effects refers to "show[ing] that the defendants have market power in the relevant market and that the challenged restraint harms competition."[181]  Plaintiffs may carry their burden "simply by showing high market share," through other evidence such as high barriers to entry, a high level of concentration, and higher prices, or the market's "structure, history and probable future."[182]  Defendants' own *Kaiser Aluminum* case confirms this approach.[183]

**Structural Evidence.**  The Complaint exceeds these requirements.[184]  Indeed, both the trial court in the states' case against the merger and the DOJ found the merger to be *prima facie* anticompetitive based on the resulting level of market concentration.[185]  The *de facto* 4-to-3 merger is precisely the kind that the academic literature has identified as threatening competition, in large part by dramatically increasing industry concentration as measured by the Herfindahl-Hirschman Index (HHI).[186]  Moreover, this *particular* merger raised anticompetitive concerns because it eliminated the most competitively disruptive carrier in the mobile services industry,[187] Sprint,

---

end of 2019, approximately 59% were postpaid plans, and just 15% prepaid. Fed. Commc'ns Comm'n, 2020 Communications Marketplace Report 1314 (2020).

[181] *PLS.Com*, 32 F.4th at 834 (citation omitted).

[182] *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 785–86 (9th Cir. 2015) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 322 n.38 (1962)); *see also Chi. Bridge & Iron Co. v. FTC*, 534 F.3d 410, 431–32 (5th Cir. 2008); and *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1219-20 & n.27 (11th Cir. 1991).

[183] *Kaiser Aluminum & Chem. Corp. v. FTC*, 652 F.2d 1324, 1341 (7th Cir. 1981) (market share statistics "alone can support a finding of a s 7 violation" if they are "an accurate measure of future ability to compete in a relevant market").

[184] Defendants' authority does not undermine the Complaint's sufficiency.  *See United States v. Int'l Harvester Co.*, 564 F.2d 769, 773 (7th Cir. 1977) (refusing to rely on market share statistics only where market context revealed that no anticompetitive effects occurred or were threatened).

[185] *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 197–98, 206 (S.D.N.Y. 2020).

[186] Compl. ¶ 51.

[187] *Id.* ¶ 59.

which pre-merger had been putting price pressure on the incumbents.[188]  Post-merger, Verizon's competitive zeal has waned.[189]  Defendants' two cases involved industries with *low barriers to entry* that alleviated concerns about concentration.[190]  The Complaint here alleges "nearly insurmountable" barriers to entry, including billions upon billions of dollars a new entrant would spend on cell towers, fiber optic lines, spectrum, stores, and personnel.[191]

T-Mobile, in fact, knew even *before* the merger that the DISH spinoff would never effectively replace the competition provided by Sprint.[192]  Since the merger, even with access to AT&T's infrastructure, DISH has never been a competitive threat to the three remaining MNOs. Through 2021, DISH had lost nearly 1.3 million customers,[193] and has continued to lose more.[194]

**T-Mobile Reneges on Assurances Made to Regulators.**  Defendants claim regulatory approval contradicts these allegations—another argument that cannot be resolved on the pleadings. And, regulatory approvals, which are often wrong,[195] do not bar private actions.  "[T]he existence of regulation [does not] work an implied repeal of the antitrust laws."[196]

---

[188] *Id.* ¶¶ 79–81.

[189] *Id.* ¶ 82.

[190] *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 982-83 (2d Cir. 1984) (trash collection); *United States v. Baker Hughes Inc.*, 908 F.2d 981, 988 (D.C. Cir. 1990) ("*threat* of entry can stimulate competition" *only if* "barriers to entry are insignificant").

[191] Compl. ¶¶ 34, 56.

[192] *Id.* ¶¶ 65–66.

[193] *Id.* ¶ 90.

[194] Sue Marek, *Dish Drops Another 210k Wireless Subs in Q2*, Fierce Wireless (Aug. 3, 2022), https://www.fiercewireless.com/wireless/dish-drops-another-210k-wireless-subs-2q.

[195] The FTC found many failures and some significant competitive harm in 33% of merger consent decrees. *See* Fed. Trade Comm'n, The FTC's Merger Remedies 2006-2012: A Report of the Bureaus of Competition and Economics, at 7 (Jan. 2017), https://www.ftc.gov/system/files/documents/reports/ftcs-merger-remedies-2006-2012-report-bureaus-competition-economics/p143100_ftc_merger_remedies_2006-2012.pdf.

[196] *Rockford*, 898 F.2d at 1285; *see also United States v. Radio Corp. of Am.*, 358 U.S. 334, 343–44 (1959) (the FCC's approval of agreement for exchange of television stations did not bar a civil antitrust action by the U.S. alleging the exchange furthered an alleged conspiracy to violate federal antitrust laws); *Nat'l Gerimedical Hosp. & Gerontology Ctr. v. Blue Cross*, 452 U.S. 378, 389 (1981) ("Even when an industry

In any event, here, T-Mobile reneged on the pre-merger commitments and assurances to regulators that it now trumpets. T-Mobile told the trial court that it would assist DISH in becoming a formidable competitor by making its CDMA network for available three to five years. Instead, T-Mobile announced in May 2021 it would shut that network down.[197] The shutdown completed on March 31, 2022, which forced DISH to turn to AT&T as its network supplier.[198]

This also broke a central promise to California's Public Utility Commission ("CPUC").[199] In November 2022, as a matter of public record actually worthy of judicial notice, the CPUC *sanctioned* T-Mobile, imposing a $3.6 million penalty for falsely representing to the Commission "that it would continue to operate the CDMA network for three years after the close of the merger to permit DISH time to migrate the Boost T-Mobile customers [those with prepaid wireless plans sold by a Sprint subsidiary] to the DISH network," a misrepresentation on which "the Commission relied . . . when it approved the merger."[200] The Commission also found this commitment applied to all former Sprint customers (with post-paid plans).[201]

Thus, defendants' cases cited for the proposition that courts must account for conditions

---

is regulated substantially, this does not necessarily evidence an intent to repeal the antitrust laws with respect to every action taken within the industry."); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 412–13 (2004) (finding an analysis of the operative regulatory structure relevant but not deeming it dispositive).

[197] Compl. ¶¶ 6, 91, 95, 101.

[198] *Id*. ¶¶ 95, 97; *T-Mobile Network Evolution*, T-Mobile, https://www.t-mobile.com/support/coverage/t-mobile-network-evolution (last visited Jan. 17, 2023).

[199] Compl. ¶¶ 91, 98–101.

[200] Sanctions Decision, *supra* note 39, at 13.

[201] *Id.* at 17–18, 21–22.

imposed on mergers[202] in fact *contradict* their argument.[203]  The Seventh Circuit's decision in *South Austin Coalition Community Council*, for instance, affirmed dismissal of the pre-merger challenge because it was premature given the fact that not all government regulators had weighed in and "[r]egulatory agencies can raise or lower [] barriers [to entry by future rivals]."[204]  Here, in contrast, regulators have acted, T-Mobile has allegedly violated its commitments to those regulators, and competition has been harmed.  Similarly, in *Edstrom*, plaintiffs failed to allege how the merger (that included conditions designed to prevent anticompetitive conduct) would *nevertheless lead to anticompetitive outcomes*.[205]

**DISH Has Not Replaced Sprint.**  Defendants improperly ask the Court to conclude on the pleadings that Sprint's "probable transformation into a regional player" would "by default result in a 4-3 combination."[206]  But the Complaint alleges the contrary:  Sprint's executives

---

[202] Mot. at 29–34.  *See Edstrom v. Anheuser-Busch Inbev SA/NV*, 647 F. App'x 733, 735 (9th Cir. 2016) (finding a Section 7 claim implausible only where plaintiffs did not allege the conditions imposed on the merger would fail to prevent anticompetitive outcomes); *S. Austin Coal. Cmty. Council v. SBC Commc'ns Inc.*, 191 F.3d 842, 845 (7th Cir. 1999) (finding dismissal proper only where plaintiffs brought suit before FCC ruled on the merger and analysis of "barriers to entry that future rivals must surmount" was "impossible"); *Baker Hughes*, 908 F.2d at 988 (holding that the "*threat* of entry can stimulate competition in a concentrated market," *only if* "barriers to entry are insignificant" (emphasis in original)).

[203] *See United States v. UnitedHealth Grp. Inc.*, No. 1:22-cv-0481 (CJN), 2022 WL 4365867, at *9–10 (D.D.C. Sept. 21, 2022) (finding divestiture restored competition where defendant did *not* renege on commitments post-merger); *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 (9th Cir. 2018) (same, and additionally, anticompetitive effects not found because acquirer "did not acquire any business interests" in the relevant market post-merger due to acquired company's proper divestiture); *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 642 (1974) (courts may consider "the economic feasibility and likelihood of de novo entry, the capabilities and expansion history of the acquiring firm," and the target market's structure "[i]f regulatory restraints are not determinative").

[204] 191 F.3d at 845.

[205] 647 F. App'x at 735.

[206] Mot. at 33.  *See Liqui-Box Corp. v. Scholle IPN Corp.*, 449 F. Supp. 3d 790, 800 (N.D. Ill. 2020) (defendants' challenge to the accuracy of the plaintiffs' allegations "is not a basis for dismissal"); *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1350 (Fed. Cir. 2018) (quoting *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990)) ("The 'purpose of a motion to dismiss is to *test the sufficiency of the complaint, not to decide the merits*.'").  T-Mobile's citation to *Premier Elec. Constr. Co.*, 814 F. 2d at 359, is inapt because it addressed the binding effect on opt-out class members of a judgment in the class case.

expressed confidence in the company's future financial viability before the merger.[207]

Although T-Mobile asserts that DISH has been deploying 5G as it promised, having already built out a 5G network in 120 cities, including Las Vegas and Spokane,[208] the question is not whether DISH has any network at all; the question is whether swapping DISH for Sprint increased competition or reduced it. This cannot be resolved on a motion to dismiss, especially given T-Mobile's violation of the regulatory commitments that would supposedly support DISH. Even in Las Vegas, where DISH's 5G service has the most towers, "there are still basic features missing which make it clear the service *isn't for the general public*."[209]

### C.  Dismissal of Plaintiffs' Divestiture Claim Based on Laches Is Unwarranted.

At the pleading stage, plaintiffs are "not required to plead around potential affirmative defenses"[210] such as laches. Defendants must show "that the allegations of the complaint and an answer showed that an affirmative defense *conclusively* defeated all of [plaintiff's] claims *as a matter of law*."[211] Defendants therefore must conclusively demonstrate:  (1) plaintiffs showed an unreasonable lack of diligence causing (2) prejudice to defendants.[212] They have not done so.[213]

---

[207] Compl. ¶¶ 74, 76.

[208] Mot. at 31.

[209] Mitchell Clark, *After Three Months, Dish's 5G Service Still Feels Like a Beta*, The Verge (Sept. 27, 2022), https://www.theverge.com/2022/9/27/23373064/dish-project-genesis-5g-accounts-service (emphasis added).

[210] *Sanders v. St. Joseph Cnty.*, 806 F. App'x 481, 484 (7th Cir. 2020); *see also Vasquez v. Ind. Univ. Health, Inc.*, 40 F.4th 582, 588 (7th Cir. 2022) ("Timeliness is an affirmative defense.").

[211] *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 807 (7th Cir. 2020) (emphasis added); *see also Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012) (complaint's "allegations [must] show that there is an *airtight defense*." (emphasis added)); *In re Evanston Nw. Healthcare*, No. 07 CV 4446, 2008 WL 2229488, at *4 (N.D. Ill. May 29, 2008) (in merger case under the Clayton Act, diligence could not be resolved at the pleadings stage).

[212] *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999).

[213] Defendants also mistakenly argue that a request for restitution is not authorized by statute. Mot. at 38 n.6. Those cases either analyzed the availability of an "injunction" under a different statute—Section 13(b) of the FTC Act—that does not authorize restitution or were based on inapplicable Third Circuit law. Mot. at 38 n.6; *see AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1347 (2021); *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 783 (7th Cir. 2019); *In re Generic Pharm. Pricing Antitrust Litig.*, No. 16-MD-2724,

**Reasonable Diligence.** Defendants cannot conclusively establish that plaintiffs lacked diligence. Courts use the antitrust laws' four-year statute of limitations as a guideline for evaluating diligence for Section 16 claims.[214] "This presumptive four-year laches period is particularly appropriate for challenges to acquisitions."[215] Plaintiffs presumptively acted diligently by bringing their Section 16 claims approximately 2 years after the merger closed.[216] That alone defeats defendants' motion as to laches.[217]

Defendants try to shift the starting point from the merger's consummation to its announcement.[218] But neither the law nor the facts of this case support doing so, particularly because plaintiffs claim an increase in quality-adjusted prices post-merger, as well as taxes, fees, and surcharges.[219] Plaintiffs reasonably relied on state enforcers to litigate a pre-merger challenge. They then reasonably relied on Judge Marrero's conclusion that the commitments T-Mobile and

---

2022 WL 2047964, at *3 (E.D. Pa. June 7, 2022). When, as with Section 16 of the Clayton Act, the text uses language broader than the term "injunction," statutes providing for injunctive relief encompass restitution. *See Porter v. Warner Holding Co.*, 328 U.S. 395, 399 (1946) (a statute authorizing "a permanent or temporary injunction, restraining order, or other order" expressly "contemplates a remedy other than that of an injunction or restraining order," such as "restitution of illegal rents").

[214] *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014); *see also Vasquez*, 40 F.4th at 588 ("[W]e treat the laches defense at issue here as rising or falling with the statute of limitations defense . . . .").

[215] *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 35 (D.D.C. 2021).

[216] *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 717, n.13 (4th Cir. 2021) ("If there is a presumptive deadline for Clayton Act injunctive claims, it's four years after the challenged action, tracking that statute's limitations period for damages claims."); *Shouse v. Pierce Cnty.*, 559 F.2d 1142, 1147 (9th Cir. 1977) ("It is extremely rare for laches to be effectively invoked when a plaintiff has filed his action before limitations in an analogous action at law has run.").

[217] *See Oliver*, 751 F.3d at 1087 ("Because Plaintiffs allege that they were injured within the four-year limitations period . . . laches does not bar their federal antitrust claim.").

[218] *See* Mot. at 35–36 (focusing the analysis on T-Mobile's merger announcement).

[219] *See Facebook*, 549 F. Supp. 3d at 35–36 (measuring diligence from merger completion date, and concluding that plaintiffs were not diligent because they waited six-to-eight years after merger completion to file suit); *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1235 (8th Cir. 2010) (factoring into its denial of plaintiffs' requested post-merger relief the fact that it had denied plaintiffs' eleventh-hour motion for preliminary injunctive relief filed six days before the merger closed).

Sprint made to regulators would protect consumers in a post-merger world.[220]  When T-Mobile breached those commitments and price increases became evident, plaintiffs promptly filed suit.[221]

Defendants rely on a few out-of-district decisions, like *Antoine L. Garabet*, that applied laches to claims brought shortly after merger completion and whose holdings rest entirely on Justice Kennedy's concurrence in *American Stores* expressing a preference for the time limits in Hart–Scott–Rodino actions.[222]  However, Justice Kennedy blended the diligence and prejudice elements into a single analysis, by focusing on how suing after a completed FTC merger review "would upset labor agreements and other matters influenced in important ways by the FTC proceeding."[223]  While the hardships of unwinding a completed merger "factor into the prejudice stage of the laches analysis, they don't obviate [the court's] need to consider whether the plaintiff's delay was unreasonable."[224]  Thus, courts looking for "a degree of objectivity" have preferred the four-year statute of limitations under the Clayton Act as the laches guideline.[225]

**Lack of Prejudice.**  Defendants also cannot conclusively show prejudice.  Defendants broke their own promises to Judge Marrero that T-Mobile's concessions to the FCC and DOJ would make DISH "a competitive force from day one," leaving customers with DISH whose "service isn't for the general public."[226]  Moreover, they cite no allegations that conclusively

---

[220] *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d at 224–25.

[221] *See* Compl. ¶¶ 95–101.

[222] *See Garabet*, 116 F. Supp. 2d at 1172 (citing Justice Kennedy's concurrence in *California v. Am. Stores Co.*, 495 U.S. 271, 297–98 (1990)).  *Garabet* is further distinguishable procedurally because it did not decide laches on a Rule 12(b)(6) motion.  *Id.*

[223] *Am. Stores*, 495 U.S. at 298.

[224] *Steves & Sons, Inc.*, 988 F.3d at 717; *see also Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 685 (2014) ("For laches, timeliness is the essential element.").

[225] *See, e.g.*, *Oliver*, 751 F.3d at 1086.

[226] Defs.' Pretrial Mot. at 3, *New York v. Deutsche Telekom AG*, No. 1:19-cv-05434-VM-RWL (S.D.N.Y. 2020), ECF No. 296; Clark, *Dish's 5G Service Still Feels Like a Beta*, *supra* note 209; *see also* Sanctions Decision, *supra* note 39.

establish prejudice to defendants or their customers.[227]  Their assertion that some T-Mobile customers might lose 5G coverage relies on a self-serving declaration that is not properly before this Court under Rule 12.[228]  Defendants' lack of factual support distinguishes this case from *Facebook*, a decision where the "facts *alleged in the Complaint*" established economic prejudice on the pleadings, and *Antoine L. Garabet*, a summary judgment decision.[229]  The other cases defendants cite fare no better, ignoring prejudice, applying a legal standard at odds with Seventh Circuit precedent, or remaining silent on laches entirely.[230]

Moreover, alleged prejudice to *DISH and its customers* cannot compensate for the lack of prejudice to *defendants*.  First, none of defendants' cases held that prejudice to a third party's customers is sufficient to justify a laches defense.[231]  Second, defendants' factual basis for prejudice to third parties comes from another self-serving declaration that should not be considered in a Rule 12 motion.[232]  Third, plaintiffs anticipate discovering evidence that will show DISH and its customers would benefit, not suffer, from divestiture.[233]  Rather than leave DISH "to build a

---

[227] *See* Mot. at 37–38 (only citing portions of the complaint to establish the merger date or to show alleged prejudice to DISH).

[228] *Id.* at 37–38 (citing ECF No. 79-22, Ex. 20 at 9); *see Cooper v. Cooper*, No. 1:19-CV-6855, 2020 WL 11193050, at *2 (N.D. Ill. July 21, 2020) (holding that defendant's declaration attached to its motion for judgment on the pleadings was "not the type of document that is the proper subject of judicial notice" because it was "a (potentially) self-serving affidavit that introduces new facts into this litigation").

[229] *Facebook*, 549 F. Supp. 3d at 37 (emphasis added) (defendant integrated assets from the acquired company into defendant's business, canceled projects after the acquisition, integrated user accounts, and mingled data across services); *Garabet*, 116 F. Supp. 2d at 1173.

[230] *Reveal Chat Holdco, LLC v. Facebook, Inc.,* 471 F. Supp. 3d 981, 990–92 (N.D. Cal. 2020) (applying laches based on plaintiffs not suing until more than four years after claims accrued, but not separately analyzing prejudice contrary to Seventh Circuit precedent); *Ginsburg*, 623 F.3d at 1235 (withholding any judgment on whether plaintiffs' timing triggered laches).

[231] *See Facebook*, 549 F. Supp. 3d at 37 (analyzing prejudice only as to defendant and its shareholders); *Garabet*, 116 F. Supp. 2d at 1159 (analyzing prejudice only as to defendant and its customers).

[232] Mot. at 37–38 (citing ECF No. 79-21, Ex. 19 at 1–3, 5); *see Cooper*, 2020 WL 11193050, at *2; *Broilers*, 290 F. Supp. 3d at 794.

[233] "[A] party opposing a Rule 12(b)(6) motion may submit materials outside the pleadings to illustrate the facts the party expects to be able to prove." *Geinosky*, 675 F.3d at 745 n.1.

mobile wireless business from scratch," the targeted injunctive relief plaintiffs seek may include shifting more assets to DISH so that it can fill the void left by Sprint.[234]

### D.    SoftBank Is a Proper Defendant.

**The Sherman Act Applies to Softbank.**  SoftBank contends that it may not be held liable under the Sherman Act because it did not participate in T-Mobile's pricing decisions post-merger. SoftBank's authority stands for the irrelevant proposition that a Section 1 claim is not plausible where a parent company did not directly participate in the anticompetitive behavior of a subsidiary.[235]   But, Section 1 of the Sherman Act applies to *merger* agreements,[236] and this Complaint alleges that the T-Mobile/Sprint merger violated the Sherman Act by restraining competition.[237]   SoftBank signed the merger agreement, which is a standalone violation of Section 1, regardless of the post-merger conduct of T-Mobile.[238]   By its own admission, SoftBank also helped negotiate the merger.[239]   Specifically, Claure, worked simultaneously as the COO of Softbank (2018-January 2022), a SoftBank Board member (2017-2020), and the CEO (2014-2020), then CEO of Sprint as the merger came together.[240]   Similarly, the dual Chairman/CEO of SoftBank and Chairman of Sprint, Masayoshi Son, met with Sprint executives in January 2018 to "discuss possible business combinations for Sprint in Tokyo," and three months later hosted negotiations between Sprint and T-Mobile at his house in Tokyo.[241]   Three SoftBank witnesses

---

[234] Mot. at 38.

[235] *See In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 417–19 (S.D.N.Y. 2011).

[236] *United States v. Union Pac. R.R. Co.*, 226 U.S. 61 (1912).

[237] *See* Compl. ¶¶ 1, 3, 6, 7, 41–45, 50–59, 65–66, 78–89, 102–08, 122, 129; *see also* Section IV.B.

[238] T-Mobile US, Current Report (Form 8-K), (Apr. 1, 2020), https://www.sec.gov/Archives/edgar/data/1283699/000119312520093622/d886127d8k.htm.

[239] *See* ECF No. 77 ¶¶ 10–11.

[240] Compl. ¶¶ 59, 62; Marcelo Claure, LinkedIn, https://www.linkedin.com/in/marcelo-claure/ (last visited Feb. 1, 2022).

[241] Opp. to the Motion to Transfer Venue at 11 n.66 (Sept. 19, 2022), ECF No. 59; Trial Tr., Vol. 7, at 1341–42, *Deutsche Telekom AG*, No. 19-54-34; Drew Fitzgerald, *Sprint, T-Mobile Rekindle Deal Talks,*

(Claure, Samuel Schwartz, a former member of SoftBank's Advisory Board,[242] and Michel Combes, SoftBank's current CEO and then-President[243]) testified at the merger trial.[244]

**The Clayton Act Applies to SoftBank.** SoftBank contends that it was not an "acquirer" that can be held liable under the Section 7 of the Clayton Act. SoftBank is wrong.

First, SoftBank ignores the fact that Section 7 claims for *equitable* relief may be maintained against *both* the acquirer and acquired, as the Supreme Court ruled in *E.I. du Pont*.[245] Hence, "sellers may be joined in a section 7 action against a purchaser when the plaintiff seeks rescission or divestiture[.]"[246] Second, SoftBank also fits within the broad definition of "acquirer" under Section 7. "A company *need not acquire control* of another company in order to violate the Clayton Act."[247] Rather, the statute "is primarily concerned with the end result of a transfer of a sufficient part of the bundle of legal rights and privileges . . . to the acquiring person to give the transfer economic significance and the proscribed adverse economic 'effect'".[248] Hence, the

*Again*, MarketWatch (Apr. 10, 2018), https://www.marketwatch.com/story/sprint-t-mobile-restart-deal-talks-again-2018-04-10.

[242] Samuel Schwartz, LinkedIn, https://www.linkedin.com/in/samuelschwartz/ (last visited Jan. 30, 2022).

[243] Mamta Mayani, *Michel Combes Named As CEO of SoftBank Group International*, Seeking Alpha (Jan. 27, 2022), https://seekingalpha.com/news/3792882-michel-combes-named-as-ceo-of-softbank-group-international.

[244] *Deutsche Telekom AG*, No. 19-54-34.

[245] *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 326–31 (1961).

[246] *In re Juul Labs., Inc.*, 555 F. Supp. 3d 932, 965 (N.D. Cal. 2021) (quoting *Fricke-Parks Press, Inc. v. Fang*, 149 F. Supp. 2d 1175, 1185 (N.D. Cal. 2001)); *see also United States v. Coca-Cola Bottling Co.*, 575 F.2d 222, 230 (9th Cir. 1978); *United States v. Pabst Brewing Co.*, 183 F. Supp. 220, 221 (E.D. Wisc. 1960); *United States v. Mich. Nat'l Corp.*, No. 74-71882, 1974 WL 982, at *3 (E.D. Mich. Dec. 6, 1974).

[247] *Denver & R. G. W. R..R. Co. v. United States*, 387 U.S. 485, 501 (1967) (emphasis added).

[248] *Mr. Frank, Inc. v. Waste Mgmt, Inc.*, 591 F. Supp. 859, 866 (N.D. Ill. 1984) (cleaned up) (quoting *United States v. Columbia Pictures Corp.*, 189 F. Supp. 153, 182 (S.D.N.Y. 1960)); *see also United States v. Phila. Nat'l Bank*, 374 U.S. 321, 346 (1963) ("[A]cquisition of 'assets' as used in amended s 7 was not meant to be a simple equivalent of acquisition by merger, but was intended . . . to ensure against the blunting of the antimerger thrust of the section by evasive transactions such as had rendered the original section ineffectual.").

acquisition of "assets" "may mean [the acquisition of] anything of value,"[249] including the acquisition of stock,[250] a sales agreement,[251] an interest in a facility,[252] or control over the decision-making process.[253]

SoftBank qualifies as an acquirer under this definition.[254] First, SoftBank negotiated and signed the merger with the stated purpose of reducing competition and supporting price increases and billions of dollars of additional profits.[255] Second, it "acquired" T-Mobile stock, exchanging eleven shares of Sprint common stock for every T-Mobile share it acquired, thereby "acquiring" *24%* of new T-Mobile's shares.[256] Third, SoftBank acquired the right to name *four* directors to T-Mobile's Board,[257] an initial step towards developing SoftBank and DT's "long-term strategic partnership."[258] Fourth, SoftBank acquired a degree of control over T-Mobile by placing its executives on T-Mobile's Board. For instance, SoftBank's Claure and Ronald Fisher (Vice Chairman from 2016 to 2022) have both served on T-Mobile's Board since the merger.[259] Fifth,

---

[249] *Mr. Frank*, 591 F. Supp. at 866 (citation omitted).

[250] *Phila. Nat'l Bank*, 374 U.S. at 346; *Denver*, 387 U.S. at 501.

[251] *United States v. ITT Cont'l Baking Co.*, 485 F.2d 16, 20 (10th Cir. 1973), *rev'd on other grounds*, 420 U.S. 223 (1975).

[252] *Mr. Frank*, 591 F. Supp. at 866.

[253] *United States v. Dairy Farmers of Am., Inc.*, 426 F.3d 850, 858–59 (6th Cir. 2005); *McTamney v. Stolt Tankers & Terminals (Holdings), S.A.*, 678 F. Supp. 118, 120–21 (E.D. Pa. 1987) (same); *Nelson v. Pac. Sw. Airlines*, 399 F. Supp. 1025, 1028–29 (S.D. Cal. 1975).

[254] SoftBank's out-of-circuit authority did not involve companies that acquired assets or were otherwise involved in the company post-merger. *See Dailey v. Quality Sch. Plan, Inc.*, 380 F.2d 484, 488 (5th Cir. 1967) (no transfer of stock or involvement in the acquired/acquiring company post-merger); *Berlyn, Inc. v. The Gazette Newspapers, Inc.*, 157 F. Supp. 2d 609, 623 (D. Md. 2001) (same); and *Arbitron Co. v. Tropicana Prod. Sales, Inc.*, No. 91 CIV. 3967 (PKL), 1993 WL 138965, at *4 (S.D.N.Y. Apr. 28, 1993) (would-be defendant did not acquire any assets in the post-merger company).

[255] Compl. ¶¶ 41–45.

[256] T-Mobile US, Current Report (Form 8-K), *supra* note 238.

[257] *Id.*

[258] Press Release, *SoftBank Enters into Long-Term Strategic Partnership*, *supra* note 31.

[259] Claure, LinkedIn, *supra* note 240; *Mike Sievert CEO on T-Mobile-Sprint Merger Completion* (Apr. 1, 2020, 1:46 PM), ValueWalk, https://www.valuewalk.com/mike-sievert-ceo-t-mobile-sprint-merger/; *Ronald D. Fisher Resigns from the Board as Director of T-Mobile US, Inc*, Market Screener (June 22,

SoftBank acquired the right to require T-Mobile to consult with it regarding its business.[260]

## V.  **CONCLUSION**

Defendants' motion should be denied.  Alternatively, if the Court believes the Complaint requires amendment to bring in any additional material cited herein, plaintiffs so request.

Dated: February 3, 2023         _/s/ Brendan P. Glackin_

Brendan P. Glackin (*pro hac vice*)
Lin Y. Chan (*pro hac vice*)
Nicholas W. Lee (*pro hac vice*)
Sarah D. Zandi (*pro hac vice*)
Jules A. Ross (*pro hac vice* forthcoming)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Phone: (415) 956-1000
bglackin@lchb.com
lchan@lchb.com
nlee@lchb.com
szandi@lchb.com
jross@lchb.com

Eric L. Cramer (*pro hac vice*)
Najah A. Jacobs (*pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (415) 215-0962
Phone: (215) 715-3256
ecramer@bm.net
njacobs@bm.net

Robert Litan (*pro hac vice*)
BERGER MONTAGUE PC
2001 Pennsylvania Avenue, NW, Suite 300
Washington, D.C. 20006
Phone: (202) 559-9745
rlitan@bm.net

---

2020), https://www.marketscreener.com/quote/stock/T-MOBILE-US-24717887/news/Ronald-D-Fisher-Resigns-from-the-Board-as-Director-of-T-Mobile-US-Inc-33825324/; Ron Fisher, LinkedIn, https://www.linkedin.com/in/fisherron (last visited Feb. 2, 2023).

[260] T-Mobile US, Current Report (Form 8-K), *supra* note 238.

Joshua P. Davis (*pro hac vice* forthcoming)
BERGER MONTAGUE PC
59A Montford Avenue
Mill Valley, CA 94941
Phone: (415) 215-0962
jdavis@bm.net

Gary I. Smith Jr. (*pro hac vice*)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Phone: (267) 702-2318
gsmith@hausfeld.com

Hill Brakefield (*pro hac vice* forthcoming)
HAUSFELD LLP
888 16th Street N.W., Suite 300
Washington, D.C. 20006
Phone: (202) 540-7200
hbrakefield@hausfeld.com

Joel Flaxman
ARDC No. 6292818
Kenneth N. Flaxman
ARDC No. 830399
LAW OFFICES OF KENNETH N. FLAXMAN P.C.
200 S Michigan Ave., Suite 201
Chicago, IL 60604
Phone: (312) 427-3200
jaf@kenlaw.com
knf@kenlaw.com

*Counsel for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

I, Brendan P. Glackin, an attorney, hereby certify that this **Plaintiffs' Opposition to T-Mobile US, Inc. and SoftBank Group Corp.'s Motion to Dismiss the Complaint** was electronically filed on February 3, 2023 and will be served electronically via the Court's ECF Notice system upon the registered parties of record.

Respectfully submitted,

*/s/ Brendan P. Glackin*
Brendan P. Glackin (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
(415) 956-1000
bglackin@lchb.com

*Counsel for Plaintiffs and the Proposed Class*