UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTHONY DALE, BRETT JACKSON, JOHNNA FOX, BENJAMIN BORROWMAN, ANN LAMBERT, ROBERT ANDERSON, and CHAD HOHENBERY, on behalf of themselves and all others similarly situated, | No. 1:22-cv-03189 |
| | Judge Thomas M. Durkin |
| Plaintiffs, | |
| v. | |
| DEUTSCHE TELEKOM AG, T-MOBILE US, INC., and SOFTBANK GROUP CORP., | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs, representing a proposed class of AT&T and Verizon customers, filed this suit under the federal antitrust statutes challenging the April 2020 merger between T-Mobile and Sprint. Defendant SoftBank Group Corp. ("SBG") moves to dismiss under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3) and joins Defendant T-Mobile US, Inc. ("T-Mobile") in moving to dismiss under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, SBG's motion to dismiss for lack of jurisdiction and improper venue [76] is granted, and T-Mobile and SBG's motion to dismiss for failure to state a claim [78] is denied.

**Background**

On April 29, 2018, wireless service providers T-Mobile and Sprint ("Merging Entities") announced an agreement to merge. R. 1 ¶ 46. What followed was significant

1

scrutiny by the Federal Communications Commission ("FCC"), the U.S. Department of Justice ("DOJ") Antitrust Division, 14 State Attorneys General, two federal judges, and others. R. 1 ¶¶ 63–64, 67–68; *see also* R. 79-3 ("FCC Order"); R. 79-4 ("DOJ Complaint"); R. 79-5 ("Settlement Agreement"); R. 79-14 ("Proposed Final Judgment"); R. 79-17 ("Final Judgment Order"); R. 79-20 ("Bradt Dismissal"); *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 186 (S.D.N.Y. 2020); *United States v. Deutsche Telekom AG*, No. 19-2232, 2020 WL 1873555, at *5 (D.D.C. Apr. 14, 2020); *Bradt v. T-Mobile US, Inc.*, No. 19-cv-07752, 2020 WL 1809716, at *1 (N.D. Cal. Feb. 28, 2020).[1]

First, on June 18, 2018, the Merging Entities applied for FCC approval. After investigating the potential impact of the proposed transaction, the FCC concluded that "as conditioned, the transaction would not substantially lessen competition and would be in the public interest." FCC Order ¶ 11; *see also id.* ¶¶ 21–24, 385. The Merging Entities committed "to offer T-Mobile and Sprint legacy rate plans available as of February 4, 2019 for three years following consummation of the transaction or

---

[1] Plaintiffs oppose the Court taking judicial notice of certain parts of certain of these documents and filings. *See* R. 87-1; R. 87-2. Essentially, Plaintiffs oppose judicial notice of the factual findings made by the FCC and federal courts. *Id.* The Court relies on these court filings and public records in relaying the history of the merger at issue in order to set the stage for the case at bar. Regardless of whether or not the documents are incorporated by reference into the complaint, the Court can certainly take judicial notice of the fact that these filings and records exist and that the courts and the FCC held what they held. *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 794 (N.D. Ill. 2017). Moreover, it is well settled that "[c]ourts may take judicial notice of court filings and other matters of public record when the accuracy of those documents reasonably cannot be questioned." *Parungao v. Cmty. Health Sys., Inc.*, 858 F.3d 452, 457 (7th Cir. 2017); *see also* Fed. R. Evid. 201(b)(2).

until better plans that offer a lower price or more data are made available," *id.* ¶ 209, divest Sprint's Boost Mobile business and provide a wholesale agreement to the buyer with terms to "ensure that New Boost will be an aggressive competitor," *id.* ¶ 25, and "build out" and "deploy" 5G service to certain percentages of the U.S. population and at certain speeds on a specified schedule for the next six years, *id* ¶¶ 26–29. Accordingly, on October 16, 2019, the FCC approved the transfer of Sprint's licenses. *Id.* ¶¶ 5, 384.

Further, the DOJ Antitrust Division conducted a fifteen-month review of the merger's likely effect on competition and U.S. consumers. R. 1 ¶ 63. On July 26, 2019, the DOJ filed a civil antitrust complaint along with a Proposed Final Judgment that contained the terms of the settlement. *See id.* ¶ 64; DOJ Complaint; Proposed Final Judgment. The Merging Entities agreed, among other things, to divest Boost Mobile and other Sprint assets to DISH and to lease network access to DISH for seven years, while DISH built out its 5G network. R. 1 ¶ 64; Proposed Final Judgment at 6–20. On April 1, 2020, the court approved the Proposed Final Judgment in light of the conditions imposed by the FCC and the DOJ. *Deutsche Telekom AG*, 2020 WL 1873555, at *5, *6.

Additionally, on June 19, 2019, State Attorneys General from thirteen States and the District of Columbia sued to enjoin the merger in the Southern District of New York. R. 1 ¶ 67; *see also Deutsche Telekom*, 439 F. Supp. 3d at 186. They alleged that the proposed merger would substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. *Id.* After a two-week bench trial, the

court entered judgment in favor of the defendants and denied the request to enjoin the merger. *Id.* at 187–89. Following the court's decision, in early March 2020, T-Mobile and Sprint settled with the State Attorneys General for Illinois and eleven other states. *See* Settlement Agreement. The Merging Entities made additional commitments, including an extension of the consumer pricing commitments from three years to five, low-cost plans, and a nationwide broadband Internet access program. *Id.* at ¶¶ 1–4. The Settlement Agreement remains in force through April 2025, and all disputes arising out of the agreement are to be heard in the Southern District of New York. *Id.* ¶¶ 9, 17.

Moreover, on November 25, 2019, a group of consumers of national mobile service providers sued to enjoin the merger in the Northern District of California. *See Bradt*, 2020 WL 1809716, at *1. After the Southern District of New York court denied the States' request to enjoin the merger, the *Bradt* court denied the motion for a temporary restraining order, and the plaintiffs subsequently dismissed their claims with prejudice. *See id.* at *3; Bradt Dismissal.

The merger closed on April 1, 2020. Just over two years later, Plaintiffs brought this putative class action on behalf of themselves and other AT&T and Verizon customers against Deutsche Telekom AG, T-Mobile, and SBG. In Plaintiffs' telling, the concerns that the merger would cause price increases and harm consumers have come to fruition. Specifically, they allege that the reduced competition following the merger has caused class members to pay billions of dollars more for wireless services than they would have without the merger, in violation of

4

Section 7 of the Clayton Act (15 U.S.C. § 18) and Section 1 of the Sherman Act (15 U.S.C. § 1). With this action, Plaintiffs seek to unwind the T-Mobile-Sprint merger, create a viable fourth competitor in the marketplace, and recover damages for the overcharges they allegedly paid. As described above, this suit was not filed on a blank slate. The merger was reviewed several times over before it was consummated. However, this case does not focus on the wisdom of the merger, but rather its consequences.

This Court previously denied T-Mobile's motion to transfer the case to the Southern District of New York. *See* R. 63. Since then, certain defendants filed motions to dismiss. SBG moves to dismiss for lack of personal jurisdiction and improper venue under Rules 12(b)(2) and 12(b)(3). R. 76. And both SBG and T-Mobile ("Defendants") move to dismiss for failure to state a claim under Rule 12(b)(6). R. 78. The Court held oral argument on both motions. *See* R. 110 ("Tr.").

## Legal Standard

When a defendant moves to dismiss under Rule 12(b)(2), the plaintiff bears the burden of demonstrating that jurisdiction exists. *See Purdue Res. Found. v. Sanofi– Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). The Court must read the complaint "liberally, in its entirety, and with every inference drawn in favor" of the plaintiff to determine whether it has set forth a prima facie case for personal jurisdiction. *Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d 870, 877–78 (7th Cir. 2006). "[O]nce the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go

beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Purdue*, 338 F.3d at 783. Likewise, when a defendant moves for dismissal under Rule 12(b)(3), the plaintiff bears the burden of showing that venue is proper. *Brunswick Corp. v. Thorsell*, No. 13 C 9222, 2014 WL 1612668, at *2 (N.D. Ill. Apr. 21, 2014) (citing *Int'l Travelers Cheque Co. v. BankAmerica Corp.*, 660 F.2d 215, 222 (7th Cir. 1981)). The Court takes the allegations in the complaint as true unless they are contradicted by the defendant's affidavits and may look beyond the complaint to determine if venue is proper. *Deb v. SIRVA, Inc.*, 832 F.3d 800, 809 (7th Cir. 2016).

Additionally, a Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "Facial plausibility exists 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for

6

the misconduct alleged.'" *Thomas v. Neenah Joint Sch. Dist.*, 74 F.4th 521, 523 (7th Cir. 2023) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *See Hernandez v. Ill. Inst. of Tech.*, 63 F.4th 661, 666 (7th Cir. 2023).

## Discussion

### I.    SBG's Motion to Dismiss

An antitrust plaintiff can establish personal jurisdiction and venue through (1) "the rules that govern in the general case," namely Federal Rule of Civil Procedure 4(k) for personal jurisdiction and 28 U.S.C. § 1391 for venue, or (2) Section 12 of the Clayton Act, 15 U.S.C. § 22. *See KM Enters. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 724 (7th Cir. 2013). SBG contends that it is not subject to personal jurisdiction in the Northern District of Illinois and that venue is improper under Section 12.[2] The Court begins its analysis with the latter argument.

### A. Section 12 of the Clayton Act

Section 12 "sets venue anywhere the corporation is an 'inhabitant,' is 'found,' or 'transacts business,'" and "provides for nationwide (indeed, worldwide) service of process and therefore nationwide personal jurisdiction." *Id.* (quoting 15 U.S.C. § 22). Relevant here, the phrase "transacts business" refers to "the practical, everyday business or commercial concept of doing business or carrying on business," but that

---

[2] SBG does not assert that personal jurisdiction is improper under Section 12, only venue.

business must be of a "substantial character." *Id.* at 731 (quoting *United States v. Scophony Corp. of Am.*, 333 U.S. 795, 807 (1948)).

SBG is a foreign corporation that has no physical presence in Illinois, is not registered to conduct business in Illinois, and does not have a registered agent in Illinois. R. 77-1 ¶¶ 6–7. Further, Mamoru Fujimura, the Head of the Overseas Business Group II at SBG, attests that the company does not conduct and has never conducted business in Illinois, *id.* ¶ 4, and has not made any direct investments in companies in Chicago, R. 95-1 ¶ 2. Plaintiffs nonetheless argue that SBG "transacts business" in the district by producing "golden eggs," that is, investing in Chicago-based companies and helping them grow through its "turbocharger strategy." R. 86 at 1–2, 4 (citing SBG Q3 2020 earnings presentation and materials). The problem is that it is not SBG that invests in those Chicago-based companies. Rather, it is a subsidiary of SBG called SoftBank Vision Fund II-2 L.P. ("Vision Fund II"), which is a separate legal entity. R. 95-1 at ¶ 2.

Plaintiffs argue that corporate distinction is not fatal for two reasons. First, they assert that while Vision Fund II may do the investing, SBG itself provides strategic advice to those Chicago-based "golden eggs." Tr. at 25–26. But that claim is controverted by the fact that SBG's business activities are limited to "making investments and holding its subsidiaries." R. 77-1 ¶ 22. What's more, Vision Fund II is solely managed by a corporate entity that is wholly separate from SBG. R. 95-1 ¶ 3. Put differently, SBG has "no direct role in managing or directing" Vision Fund II's investments. R. 95-1 ¶ 3.

8

Second, Plaintiffs urge the Court to attribute Vision Fund II's contacts with the district to SBG. Generally, Section 12 does not require that a company's transacted business be related to the underlying antitrust violation. But courts outside of this Circuit have held that "looking to the contacts of subsidiaries not involved in the [alleged anticompetitive conduct] would not serve the purpose of Section 12 of the Clayton Act," which was enacted to "hold offending corporations accountable in the areas where their offensive conduct took place." *Diamond Chem. Co. v. Atofina Chems., Inc.*, 268 F. Supp. 2d 1, 12 (D.D.C. 2003); *see also United States v. Smithfield Foods, Inc.*, 332 F. Supp. 2d 55, 62 (D.D.C. 2004). In this Court's view, that reasoning is sound and applicable here. Indeed, the two Seventh Circuit cases examining whether parent companies "transacted business" under Section 12 involved subsidiaries that were directly involved in the allegedly anticompetitive conduct. *See KM Enters.*, 725 F.3d at 722 (plaintiff sued parent and its subsidiary for allegedly interfering with competitive bidding on public contracts and engaging in other monopolistic activity); *Tiger Trash v. Browning-Ferris Indus., Inc.*, 560 F.2d 818, 821 (7th Cir. 1977) (plaintiff sued parent and its Indiana subsidiary for attempting to monopolize the Evansville-Henderson market). Here, in contrast, Plaintiffs do not allege that Vision Fund II is in any way connected to the merger. As such, to the extent that Vision Fund II transacts business in Chicago, those contacts are irrelevant to the Section 12 inquiry.

Even if the Court were to consider Vision Fund II's contacts, a parent corporation may only be said to "transact business" if "there is enough control and

9

direction from parent to subsidiary." *Tiger Trash*, 560 F.2d at 823. That assessment "must be made in the total factual setting, i.e., what the subsidiary does itself and what the parent does for the subsidiary." *Id.* A subsidiary need not be "controlled to an ultimate degree," *id.*, but the control must be "extensive," *see KM Enters.*, 725 F. 3d at 731. *See also Scophony*, 333 U.S. at 814 (considering parent's "supervision over and intervention in" subsidiary's affairs); *Tiger Trash*, 560 F.2d at 823 (stating that "a parent-subsidiary relationship consisting of mere investment holding by the parent would not be sufficient").

Here, the record does not indicate that SBG has "extensive" control over Vision Fund II. Instead, it shows that in both corporate structure and in practice, SBG is several steps removed from the operations of Vision Fund II. It is SB Global Advisors Limited that currently manages Vision Fund II, and before June 2022, it was SB Investment Advisors (UK) Limited. R. 95-1 at ¶ 3. Both of those entities are wholly separate from SBG. *Id.*; *see also* R. 77-1 ¶ 22 ("SBG is a holding company that makes investments and that holds subsidiaries that themselves make investments and conduct business."). Further, SBG and Vision Fund II maintain separate corporate records and account separately for their assets. R. 77-1 at ¶¶ 24–25. In sum, even if the Court were to consider Vision Fund II's investments in Chicago, which are unrelated to the alleged anticompetitive conduct, SBG does not exert the degree of control over Vision Fund II that would allow the Court to conclude that SBG transacts business in this district.

Plaintiffs further assert that SBG's "promotional and recruiting efforts" in Illinois show that it "transacts business" in the district. While Plaintiffs assert that SBG presented at a 2022 M&A conference in Chicago and recruits new employees from the University of Chicago business school, SBG apparently did not do either of those things.[3] In any case, even if SBG had undertaken those activities, such activities fall short of "carrying on business of any substantial character." *Scophony*, 333 U.S. at 807; *see, e.g.*, *In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 231 (S.D.N.Y. 2019) (attending one bond conference in New York was not sufficient to meet the venue requirement); *American Medicorp, Inc. v. Humana, Inc.*, 445 F. Supp. 573, 579 n.2 (E.D. Pa. 1977) (recruitment visits, advertisements, letters, and attendance at industry meetings were de minimis contacts that did not establish venue); *cf. FTC v. BINT Operations LLC*, 595 F. Supp. 3d 740, 755–56 (E.D. Ark. 2022) (defendants "transacted business" where they spent "vast sums of money" in the district, sent emails and text messages to Arkansas residents about the business, and recruited Arkansas residents in an effort to "expand [its] footprint" in the district).

---

[3] Plaintiffs point to a 2022 M&A conference at the University of Chicago attended by Jonathan Duckles, who is listed as a partner and senior legal counsel at "SoftBank." *See* R. 86 at 6 n.38. Fujimura states that Duckles is not and has never been employed by SBG. R. 95-1 at ¶ 4. Plaintiffs also highlight the listing of "Softbank China Venture Capital" in a list of firms with recruiting affiliations with the University of Chicago Booth School of Business. *See* R. 86 at 6 n.39. Fujimura states that SoftBank China Venture Capital has not been a subsidiary or affiliate of SBG since at least 2016. R. 95-1 at ¶ 5.

Thus, because SBG does not "transact business" in this district, venue is not proper under Section 12.

## B. Minimum Contacts

Under Federal Rule of Civil Procedure 4(k)(1)(A), personal jurisdiction is proper whenever a defendant "would be amenable to suit under the laws of the state in which the federal court sits (typically under a state long-arm statute), subject always to the constitutional due process limitations encapsulated in the familiar 'minimum contacts' test." *KM Enters.*, 725 F.3d at 723 (citations omitted). Illinois's long-arm statute allows its courts to exercise personal jurisdiction to the fullest extent allowed by the Illinois and U.S. Constitutions. *Id.* at 732 (citing 735 ILCS § 5/2-209(c)). To satisfy due process, a foreign defendant "generally must have 'certain minimum contacts . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Plaintiffs contend that this Court has specific jurisdiction over SBG. Specific jurisdiction is based on "the relationship among the defendant, the forum, and the litigation." *Id.* at 284. There are three "essential requirements":

> (1) the defendant must have purposefully availed [itself] of the privilege of conducting business in the forum state or purposefully directed [its] activities at the state; (2) the alleged injury must have arisen from the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice.

12

*Lexington Ins. Co. v. Hotai Ins. Co., Ltd.*, 938 F.3d 874, 878 (7th Cir. 2019) (quoting *Felland v. Clifton*, 682 F.3d 665, 673 (7th Cir. 2012)) (cleaned up).[4]

### 1. Purposeful Direction

Where a plaintiff's claim is for an intentional tort, the first prong focuses on whether the conduct underlying the claim was purposefully directed at the forum state. The purposeful direction inquiry "can appear in different guises" but its point is to "ensure that an out-of-state defendant is not bound to appear to account for merely random, fortuitous, or attenuated contacts." *Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 398 (7th Cir. 2020) (citations omitted). "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden*, 571 U.S. at 290. The relevant contacts must be "suit-related," and they must be "contacts that the defendant himself creates with the forum." *Id.* at 284.

With the focus on the defendant's own suit-related contacts with the forum state, the Supreme Court in *Walden* put an important gloss on the express-aiming test set forth in *Calder*. *Calder* stands for the proposition that a court can exercise

---

[4] The Seventh Circuit has explained that "the nature of the purposeful-direction/purposeful-avalment inquiry depends in large part of the type of claim at issue." *Felland*, 682 F.3d at 674. Citing *Tamburo v. Dworkin*, 601 F.3d 693 (7th Cir. 2010), SBG argues that *Calder v. Jones*, 465 U.S. 783 (1984) supplies the proper test for antitrust claims. In *Tamburo*, the Court chose the purposeful direction inquiry because the plaintiff brought intentional tort claims. 601 F.3d at 702. But the Seventh Circuit had already affirmed dismissal of the antitrust claims, such that the intentional tort claims were all that were left. *Id.* at 700. Nonetheless, the parties here argue under both the purposeful direction and the purposeful avalment inquiries, so this Court addresses both.

specific personal jurisdiction based on intentional and allegedly tortious conduct "expressly aimed" at the forum state with knowledge that its effects would be felt in the forum state. *Felland*, 682 F.3d at 674–75. The Supreme Court in *Walden* made clear that to satisfy this test, the defendant's own allegedly tortious conduct must be directly connected to the forum state itself, not just to the plaintiff who resides there. 571 U.S. at 287–88.

Here, Plaintiffs have not alleged suit-related conduct that creates a "substantial connection" between SBG and Illinois. *Id.* at 284. Plaintiffs focus on SBG's role in executing the merger agreement. But Plaintiffs do not allege that any part of SBG's negotiation or signature of the merger agreement took place in Illinois. Plaintiffs also do not allege that any part of the merger agreement specifically targeted Illinois consumers or pricing of mobile services in Illinois. Instead, Plaintiffs assert that SBG negotiated and signed a merger agreement that reduced competition and catalyzed price increases and store closures in all fifty states, including Illinois.

That link between SBG and Illinois is attenuated, at best. Such a relationship necessarily depends on activities beyond SBG's control. Plaintiffs do not allege that SBG had any role in setting prices for T-Mobile customers in Illinois or in T-Mobile's closure of 96 Sprint stores in Illinois. *See* R. 86-1. Indeed, Fujimura attests that following its signature of the merger agreement, SBG had "no input on, or control over, T-Mobile's operations[,] no role in setting or developing T-Mobile's competitive strategy[,] and . . . no role in setting or developing T-Mobile's prices for national retail mobile wireless telecommunications services." R. 77-1 ¶ 16. But even if SBG signing

14

the merger agreement caused third party mobile carriers to increase prices or close stores in Illinois, contacts between third parties and the forum do not satisfy the purposeful direction requirement. *See Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 801 (7th Cir. 2014), as corrected (May 12, 2014); *Monco v. Zoltek Corp.*, 342 F. Supp. 3d 829, 834 (N.D. Ill. 2018) (statements that allegedly caused third parties to terminate a business relationship with plaintiffs in Illinois were insufficient to show purposeful direction).

Plaintiffs emphasize SBG's knowledge that the merger would have nationwide effects. Yet, even if SBG knew that the merger would cause T-Mobile, AT&T, and Verizon to increase their prices for customers in Illinois (and many other states) and cause Sprint to close its stores in Illinois (and other states), "knowing about a potential for harm in a particular state is not the same as acting in that state—and it takes the latter to permit personal jurisdiction under state law." *Ariel Invs., LLC v. Ariel Cap. Advisors LLC*, 881 F.3d 520, 522 (7th Cir. 2018); *see also Monco*, 342 F. Supp. 3d at 834 ("[M]ere foreseeability of harm to plaintiffs who the defendant knows are based in Illinois is insufficient post-*Walden*."). In the end, Plaintiffs' ties to the forum, and those of T-Mobile, AT&T, and Verizon cannot make up for SBG's lack of contacts with Illinois.[5]

---

[5] Plaintiffs also raise the settlement between T-Mobile and Sprint and the State of Illinois. However, while that agreement includes a release of claims for SBG, SBG is not a party or signatory to that agreement. *See* Settlement Agreement at 1, 7. As such, SBG cannot be said to be purposefully directing conduct at Illinois through that agreement.

## 2. Purposeful Availment

The first prong of the specific personal jurisdiction inquiry can also be satisfied by purposeful availment. The defendant "must take some act by which it purposefully avails itself of the privilege of conducting activities within the forum State." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). As with purposeful direction, "the contacts must be the defendant's own choice and not random, isolated, or fortuitous." *Id.* at 1025. And a plaintiff must show that the defendant "deliberately 'reached out beyond' its home—by, for example, 'exploit[ing] a market' in the forum State or entering a contractual relationship centered there.'" *Id.* (quoting *Walden*, 571 U.S. at 385).

Plaintiffs contend that SBG has purposely availed itself of the privilege of conducting business in Illinois through investing in "golden egg" companies in Chicago. However, as previously discussed, those investments were made and managed by corporate entities that are entirely separate from SBG. Allowing a subsidiary's activities to be used as a basis for personal jurisdiction over a parent violates the principle that each defendant's contacts must be assessed individually and thus runs counter to due process. *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 944 (7th Cir. 2000). And even if SBG itself had directly invested in those Chicago-based companies, those contacts would still be insufficient to confer specific jurisdiction because they are wholly unrelated to this suit, which arises out of the allegedly anticompetitive merger between T-Mobile and

Sprint. *See Advanced Tactical*, 751 F.3d at 801 (explaining that a defendant's minimum contacts with the forum must be "suit-related").[6]

Plaintiffs also point to the post-trial settlement agreement between T-Mobile and Sprint and the State of Illinois, which includes a release of claims against SBG and pricing commitments covering Illinois. *See* Settlement Agreement. Certainly, in a breach of contract action, an agreement's "'contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing' may indicate the purposeful availment that makes litigating in the forum state foreseeable to the defendant." *Hyatt Intern. Corp. v. Coco*, 302 F.3d 707, 716 (7th Cir. 2002) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985)). But this is not an action in contract nor does the agreement indicate purposeful availment to Illinois. As detailed in the background section, the settlement arose out of litigation filed in the New York by several State Attorneys General, and the agreement is governed by New York law. *See Incipio, LLC v. Under Armour, Inc.*, No. 20-cv-04800, 2021 WL 3618277, at *3 (N.D. Ill. Aug. 16, 2021) (choice of law provision in settlement agreement opting for New York law weighed against jurisdiction in Illinois). Those

---

[6] Plaintiffs attempt to analogize this case to *Ford Motor Co.* wherein the Supreme Court held that even though the particular cars that injured the plaintiffs in the forum states were designed, manufactured, and first sold outside of the forum states, because Ford had "cultivate[d] a market" in the forum states for the cars, there was a sufficiently strong connection between the defendant, the forum, and the litigation. 141 S. Ct. at 1019. In Plaintiffs' view, SBG has cultivated a market for "golden eggs" in Illinois and one of SBG's "golden eggs" that was produced in another state, the post-merger T-Mobile, injured them in Illinois. But making cars and investing in companies are two very different things. And the holding in *Ford Motor Co.* entirely derives from its nature as a products liability case.

features, along with the release itself, cut against any foreseeability that SBG would have to litigate in Illinois.[7]

### C. Co-Conspirator Doctrine

Plaintiffs alternatively contend that T-Mobile's acts to generate profits in Illinois can be imputed to SBG under the "co-conspirator doctrine" of personal jurisdiction. "The idea behind this theory is that personal jurisdiction is proper over an out-of-state defendant in a forum where one of his co-conspirators has acted as the defendant's agent in furtherance of the conspiracy." *Smith v. Jefferson Cnty. Bd. of Educ.*, 378 F. App'x 582, 585 (7th Cir. 2010). Plaintiffs argue that SBG entered into a conspiracy with the other Defendants to execute an allegedly anticompetitive merger, where the overt act is T-Mobile's closure of Sprint stores in Illinois.

The first problem with this theory is that it "may not be valid in Illinois." *Id.* (citing *Ploense v. Electrolux Home Products, Inc.*, 377 Ill.App.3d 1091, 882 N.E.2d 653, 666 (Ill. App. Ct. 2007) (stating that an Illinois Supreme Court case "effectively scuttl[ed]" the co-conspirator theory of personal jurisdiction); *Knaus v. Guidry*, 389 Ill.App.3d 804, 906 N.E.2d 644, 659–61 (Ill. App. Ct. 2009) (noting the "articulated hesitancy of our supreme court . . . to adopt the conspiracy theory of jurisdiction in Illinois")). But even if the theory remains viable, it does not help Plaintiffs here because this is not conspiracy case. Indeed, the terms "conspiracy," "conspirator," "overt act" and the like do not appear in the complaint. *See* R. 1; *cf. Bittman v. Fox*,

---

[7] SBG concedes that there would be jurisdiction in New York. *See* Tr. at 6.

No. 14 C 08191, 2015 WL 5612061, at *6 (N.D. Ill. Sept. 23, 2015) ("[E]ven if the conspiracy theory of personal jurisdiction were valid, it would not apply here because the 'conspiracy' is only hinted at."); *In re Honey Transshipping Litig.*, 87 F. Supp. 3d 855, 873 (N.D. Ill. 2015) (holding that conspiracy theory did not confer jurisdiction as to company defendant where class plaintiffs' complaint generally alleged "Defendants" participated in a conspiracy). And while Plaintiffs cite antitrust cases where courts applied the conspiracy theory of jurisdiction, those cases all involved alleged price fixing conspiracies. *See In re Packaged Seafood Prods. Antitrust Litig.*, 2022 WL 3161673, at *2 (S.D. Cal. Aug. 8, 2022); *United States v. Maruyasu Indus. Co.*, 229 F. Supp. 3d 659, 672 (S.D. Ohio 2017). The parties have not identified nor is the Court aware of any case where conspiracy jurisdiction has been applied in the context of a merger. Retrofitting a disfavored theory of jurisdiction to these circumstances is inconsistent with due process.

### D. Jurisdictional Discovery

As an alternative to dismissal, Plaintiffs request leave to seek jurisdictional discovery. In order to obtain jurisdiction discovery, a plaintiff must first make a "colorable" showing of personal jurisdiction. *Reimer*, 230 F.3d at 946.[8] "Generally

---

[8] In *Reimer*, the Seventh Circuit stated that "the plaintiff must establish a colorable or prima facie showing of personal jurisdiction before discovery should be permitted." As several other district courts have noted, since a "prima facie" showing based on the written submissions is sufficient to establish personal jurisdiction, "*Reimer*'s heightening of the standard to secure discovery seems to be unintentional." *See, e.g.*, *Bradford Victor-Adams Mut. Ins. Co. v. Electrolux Home Prod., Inc.*, No. 418CV04167, 2019 WL 3604594, at *4 n.4 (C.D. Ill. Aug. 6, 2019). Therefore, the Court will apply a "colorable" standard to this request for jurisdictional discovery.

courts grant jurisdictional discovery if the factual record is ambiguous or unclear on the issue, but when a lack of personal jurisdiction is clear, jurisdictional discovery would serve no purpose and should not be permitted." *Medline Indus., Inc. v. Diversey, Inc.*, No. 20 C 4424, 2020 WL 5763637, at *4 (N.D. Ill. Sept. 28, 2020) (citations omitted).

Plaintiffs contend that the Fujimura declarations "leave several things unclear." R. 86 at 15. First, Plaintiffs say that the declarations fail to address SBG's activities in the Chicago area. *Id.* But the declarations addressed that topic in ample detail. As discussed earlier in this opinion, the declarations make clear that the Chicago-based investments that Plaintiffs identify belong to Vision Fund II, not SBG; explain the corporate distinction between SBG, Vision Fund II, and other subsidiaries; and confirm that other subsidiaries manage those investments. *See generally* R. 77-1; R. 95-1. Additionally, Plaintiffs seek information on SBG's "influence on and contribution to the effects of the merger in Illinois and nationwide." R. 86 at 15. In other words, Plaintiffs seek information that would support SBG's purposeful direction of suit-related conduct at this forum. But because SBG has never conducted any business in Illinois, any connection between SBG and Illinois in the aftermath of the merger would be through the contacts of third parties like T-Mobile. And the record is clear that SBG had no input on or control over T-Mobile's operations, competitive strategy, or pricing after signing the merger agreement. *See* R. 77-1 ¶¶ 9–21. Plaintiffs do not indicate what other fact could exist that would make a difference here. Because there is no ambiguity, and Plaintiffs do not make out a

colorable basis for personal jurisdiction over SBG, jurisdictional discovery is not warranted.

## II.     Defendants' Motion to Dismiss

T-Mobile and SBG also move for dismissal under Rule 12(b)(6) on the grounds that Plaintiffs lack "antitrust standing," fail to adequately allege direct or indirect evidence of anticompetitive effects, and that laches bars the divestiture claim.

### A. Antitrust Standing

Defendants first urge the Court to dismiss this suit for lack of antitrust standing. Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent[.]" 15 U.S.C. § 15(a). Though broadly phrased, the Supreme Court has held "'not every person, however tangentially injured by an antitrust violator'" can recover treble damages. *Loeb Indust., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 484 (7th Cir. 2002) (quoting *Blue Shield of Va., Inc. v. McCready*, 457 U.S. 465, 477 (1982)). The doctrines that have arisen to "clarify the circumstances under which a particular person may recover from an antitrust violator" have often been "incautiously lumped together under the umbrella term

'antitrust standing.'"[9] *Id.* at 480. The two most prominent doctrines were set forth in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), which held that indirect purchasers are prohibited from seeking damages under federal antitrust law, and *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), which imposed a version of proximate causation on antitrust claims. This case implicates the latter.

In *AGC*, the Supreme Court held that only a person whose antitrust injury has been "proximately caused" by a defendant's antitrust violation may recover damages. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (citing *AGC*, 459 U.S. at 532–33). That inquiry involves "a case-by-case analysis [of] the link between a plaintiff's harm and a defendant's wrongdoing." *Loeb*, 306 F.3d at 484. In conducting that analysis, courts may consider:

(1) The causal connection between the alleged antitrust violation and the harm to the plaintiff;
(2) Improper motive;
(3) Whether the injury was of a type that Congress sought to redress with the antitrust laws;
(4) The directness between the injury and the market restraint;
(5) The speculative nature of the damages; and
(6) The risk of duplicate recovery or complex damage apportionment.

---

[9] The Seventh Circuit has noted its concern with the term "antitrust standing" given "its potential for confusion with Article III standing." *See, e.g.*, *McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*, 937 F.3d 1056, 1063 (7th Cir. 2019) (citing *U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003)); *Supreme Auto Transport, LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 743 (7th Cir. 2018) (eschewing the term "antitrust standing" and referring only to "the requirements of bringing a case under the particular statutes involved").

*McGarry*, 937 F.3d at 1065 (citing *Sanner v. Bd. of Trade of City of Chicago*, 62 F.3d 918, 930 (7th Cir. 1995)); *see also AGC*, 459 U.S. at 537–45. "Together, the first three factors relate to what courts commonly refer to as 'antitrust injury.'" *McGarry*, 937 F.3d at 1065 (citations omitted). "The remaining factors address whether the plaintiff is among those who can most efficiently vindicate the purposes of the antitrust laws." *Id.* For injunctive relief, the fifth and sixth factors drop out of the analysis. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110–11 (1986).

At the outset, Plaintiffs assert that the third *AGC* factor—the type of injury and whether it was one Congress sought to redress—is the "only required" factor. R. 87 at 16. That contention is flawed for two reasons. First, the *AGC* factors are not "strict requirements nor exclusive analytical tools." *McGarry*, 937 F.3d at 1065. Rather they are guides that "illustrate the areas of inquiry that may be relevant to a case-specific evaluation of 'the plaintiff's harm, the alleged wrongdoing by the defendant, and the relationship between them.'" *Id.* Second, Seventh Circuit case law is clear that pleading antitrust injury is not alone sufficient; a plaintiff must also demonstrate that it can "efficiently vindicate the purposes of the antitrust laws." *Id.* (quoting *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 716 (7th Cir. 2006)).

Defendants argue Plaintiffs are not the proper plaintiffs to bring this suit because their alleged harm is too remote from the antitrust violation, there are more immediate victims, and the damages are impermissibly speculative. The Court takes each argument in turn.

23

### 1. Chain of Causation

Defendants first argue that Plaintiffs cannot show a direct causal link between the merger and the elevated prices that they allegedly paid because Plaintiffs are not customers of the Merging Entities and AT&T and Verizon set their own prices.

As a preliminary matter, the idea that Plaintiffs cannot satisfy the requisite causal link because they are not customers of the Merging Entities runs headlong into the Seventh Circuit's decision in *Gypsum*. In *Gypsum*, the plaintiff and the defendant joint-venture both bought transport services from interstate pipelines. 350 F.3d at 625–26. The plaintiff alleged that the defendant used its control of a substantial fraction of the transport capacity to monopolize and enabled the pipelines to charge more to the plaintiff. *Id.* at 626. The Seventh Circuit held that the plaintiff adequately alleged antitrust injury at the pleading stage even though it was not a customer of the joint venture, and that *Illinois Brick* did not preclude its claims. *Id.* at 626–27. The Court then stated that when "[a] cartel cuts output, which elevates price throughout the market[,] customers of fringe firms (sellers that have not joined the cartel) pay this higher price, and thus suffer antitrust injury." *Id.* at 627. The Court explained "that the buyers from fringe firms suffer antitrust injury, that their complaints cannot be dismissed at the outset under the *Illinois Brick* doctrine, and that the potential to establish injury through elevation of price in the affected market satisfies any distinct 'antitrust standing' requirement." *Id.* at 627–28. The parties disagree on what the last phrase requires a plaintiff to do to adequately plead

antitrust standing.[10] In this Court's view, it means what it says. In a cartel case, an allegation that a fringe firm customer was injured through the elevation of price in the market where the cartel cut output is sufficient to satisfy antitrust standing.

Unlike *Gypsum*, this is not a cartel case. It does not involve an agreement to cut output, nor an agreement to fix prices. *See Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594–95 (7th Cir. 1984) ("An agreement on output also equates to a price-fixing agreement."). In addition, AT&T and Verizon are not fringe firms to the merged T-Mobile. *See* R. 1 ¶ 50 (alleging that the merger "le[ft] a market landscape of three dominant firms of nearly the same scale"). But at the very least, *Gypsum* makes clear that the fact that Plaintiffs did not transact directly with the Merging Entities is not automatically a basis for dismissal. Rather, the focus remains on Plaintiffs' harm, the alleged wrongdoing by the Merging Entities, and the relationship between them. *See AGC*, 459 U.S. at 535.

Here, taking Plaintiffs' allegations as true and drawing all reasonable inferences in their favor, the Court finds that they plausibly allege that their injuries flowed directly from the merger. Plaintiffs do not simply allege in a conclusory fashion that the merger caused them to pay more than they would have otherwise. Rather, Plaintiffs allege *how* the merger reduced competition in the retail mobile wireless market and as a result, market participants AT&T and Verizon charged higher prices

---

[10] Defendants' contention that *Gypsum* did not address antitrust standing is belied by the Seventh's Circuit's explicit reference to "antitrust standing" and *AGC*. 350 F.3d at 627.

than they would have otherwise. R. 1 ¶ 122. The merger consolidated an already highly-concentrated market from four to three mobile network operators. *Id.* ¶¶ 31, 32, 50. The merger also eliminated the two "maverick" firms that were responsible for much of the price competition and innovation among the carriers. *Id.* ¶¶ 35–37, 50. Before the merger, T-Mobile and Sprint aggressively competed with the bigger brands (AT&T and Verizon) through offering discounts and new plans. *Id.* ¶¶ 39–40. As alleged, Sprint was financially viable and would have continued to compete vigorously absent the merger. *Id.* ¶¶ 59–62, 76. Additionally, Plaintiffs allege that by making the newly merged T-Mobile's scale and cost structure more like the other two big players, the merger curtailed its incentive to compete. *Id.* ¶ 57. In a market with high barriers to entry, transparent pricing, and signaling between competitors, these structural changes exacerbated the risk of price coordination. *Id.* ¶¶ 34, 53–57. Moreover, in the two years since the merger, DISH has failed to fill Sprint's role as an active fourth competitor, instead losing hundreds of thousands of subscribers. *Id.* ¶¶ 76, 90–91

Accordingly, Plaintiffs allege, as soon as the merger was signed, AT&T and Verizon began slowing their competitive efforts, including their aggressiveness in responding to prices. *Id.* ¶ 81. This manifested in stagnant pricing, low customer attrition or "churn" rates, increasing wireless service revenue, and decreasing offers of plan changes. *Id.* ¶¶ 82–85. Bureau of Labor Statistics ("BLS") data in the complaint shows a steady decline in quality-adjusted pricing for consumer wireless services in the years leading up to the merger and a sharp jump a few months after

the merger closed. *Id.* ¶ 80. Further, AT&T and Verizon increased their prices in the spring of 2022. *Id.* ¶¶ 106–08.

Defendants argue that the complaint itself attributes the 2022 price increases to other causes. They highlight a handful of the hundreds of footnotes in the complaint that cite news articles and earnings transcripts discussing price increases in the context of inflation, R. 1 ¶¶ 106–08 nn.167–70, and otherwise acknowledge the COVID-19 pandemic and the shift from 4G to 5G, *id.* ¶¶ 82 n.123; 83 n.125. But the Court does not understand Plaintiffs to be alleging that the 2022 price increases were caused by these other factors. Rather, Plaintiffs' allegations—read altogether and drawing all reasonable inferences in their favor—attribute those price increases to the merger. Nor are Plaintiffs required to prove causation (or any other element of their claims) at the pleading stage. "A court's role in evaluating pleadings is to decide whether the plaintiff's allegations are plausible—not which side's version is more probable." *Hughes v. Nw. Univ.*, 63 F.4th 615, 630 (7th Cir. 2023); *see also Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("[I]t is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences."). For that reason, the mere possibility that other factors affected AT&T and Verizon's pricing decisions does not negate the plausibility that the merger proximately caused those two companies to stop lowering their prices, stop offering new promotions, and start raising their

prices.[11] Defendants likewise argue that the length of time between the date of the merger and the 2022 price increases undermines any contention that the former caused the latter. Perhaps it is true that the plausibility of Plaintiffs' allegations decreases as the length of time increases. But again, Plaintiffs do not have to prove their case in the complaint. Defendants have presented no argument that undermines the *plausibility* of Plaintiffs' allegation that the merger's effects lasted several years. Taking the allegations together, and viewing them in Plaintiffs' favor, Plaintiffs have adequately alleged that their injury (elevated prices) is a direct effect of the merger.

Defendants argue that without a rigid linkage between AT&T, Verizon, and T-Mobile's pricing, Plaintiffs cannot show that their injuries are "surely attributable" to the merger, as described in *Lexmark*. In *Lexmark*, the defendant's counterclaim alleged that the plaintiff's false advertising injured the defendant's customers' business, thereby injuring the defendant. 572 U.S. at 120–21. While acknowledging the "general tendency not to stretch proximate causation beyond the first step," *id.* at 139, the Supreme Court nevertheless held that this indirect injury was sufficiently proximate to state a claim because the defendant's reduced sales "follow[ed] more or less automatically" from its customer's reduced sales, "without the need for speculative proceedings or intricate, uncertain inquiries," *id.* at 140.

---

[11] This conclusion would not change if the Court were to take judicial notice of the full content of the two articles cited in the footnotes about Verizon's price increases that Defendants request. *See* R. 79-1 ¶¶ 5–6.

But Plaintiffs' injury is not analogous to the indirect injury in *Lexmark*. Plaintiffs do not claim, for example, that the merger harmed AT&T and Verizon, which in turn harmed them as customers of those companies. Courts have held that such indirect injuries are too remote. *See*, *e.g.*, *AGC*, 459 U.S. at 533 (Union was not a proper plaintiff because its injuries were an "indirect result" of the harm suffered by select union contractors whose business was diverted to non-union contractors); *cf. McGarry*, 937 F.3d at 1065 (injury was too remote where price-fixing conspiracy allegedly caused an estate to pay a higher fee, which reduced the funds available in the estate to pay claims, which caused creditors to receive a smaller distribution); *Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1378 (7th Cir. 1987) ("Merely derivative injuries sustained by employees, officers, stockholders, and creditors of an injured company do not constitute "antitrust injury" sufficient to confer antitrust standing."). Instead, Plaintiffs allege that the merger curbed competition in the retail wireless market, which caused market-wide prices to be higher than they would have been otherwise. And they allege that as consumers in that market, Plaintiffs themselves were injured by paying those elevated prices.

By the same token, Defendants' reliance on *Loeb* for a rigid price linkage requirement is unavailing. In *Loeb*, purchasers of copper on the cash market alleged that copper merchants and brokers conspired to manipulate the price of copper on the futures market. 306 F.3d at 474–78. Applying *AGC*, the Seventh Circuit held that one of the purchasers established that its injury was sufficiently direct because the price it paid to its suppliers was "directly and explicitly linked" to the price the

29

defendants manipulated in the futures market. *Id.* at 489. But the Court reached that conclusion after a close examination of the record following discovery, and there is no such record in this case as of yet. Further, *Loeb* addressed whether anticompetitive conduct in one market (copper futures) proximately caused injury in another market (copper wire). In that scenario, it was important that "one market tends to move in lockstep with the other." *Sanner*, 62 F.3d at 929. Here, however, Plaintiffs are direct purchasers in the same market that was allegedly affected by the merger. *Loeb*'s facts and holdings do not warrant dismissal here.[12]

Defendants' reliance on several out-of-circuit cases fares no better. The one bearing the closest resemblance to this case also involved an antitrust claim in the merger context. In *Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*, operators of laser eye clinics who did not purchase equipment from the merging parties, alleged that a merger caused them to pay higher prices for certain equipment to a non-merging supplier in the same market. 116 F. Supp. 2d 1159, 1167 (C.D. Cal. 2000) The Court held that any injury suffered was indirect due to the "necessary intervening actions" taken by the non-defendant supplier, which had no part in the merger. *Id.* at 1169. However, *Garabet* was decided on summary judgment. Likewise, Defendants cite other cases where courts granted summary judgment to defendants who did not transact directly with plaintiffs. *E.g.*, *In re Aluminum Warehousing*

---

[12] *Marion Diagnostic Ctr. LLC v. Becton Dickinson & Co.* also does not help Defendants on this point because although the Seventh Circuit affirmed dismissal for lack of antitrust standing, it did so on *Illinois Brick* grounds. 29 F.4th 337, 347–48 (7th Cir. 2022).

*Antitrust Litig.*, 520 F. Supp. 3d 455, 486 (S.D.N.Y. 2021); *In re Online DVD Rental Antitrust Litig.*, No. M 09–2029, 2011 WL 1629663, at *7 (N.D. Cal. Apr. 29, 2011). To the extent there is factual similarity between these cases and this suit, the fact that they were decided on summary judgment suggests that Plaintiffs' claims require discovery and should survive this Rule 12(b)(6) motion. It may be that discovery reveals that the prices paid by AT&T and Verizon customers following the merger were wholly independent of and unaffected by the merger. But that is a question of fact, and taking the allegations as true and drawing all reasonable inferences, the Court cannot reach that conclusion at this juncture.

Relatedly, *In re American Express Anti-Steering Rules Antitrust Litig.* was an antitrust suit brought against American Express ("Amex") by a class of merchants who did not accept Amex credit cards. 19 F.4th 127, 135 (2021). They alleged the "anti-steering" rules in Amex's contracts with Amex-accepting merchants, combined with Amex's higher fees, created a price umbrella under which other credit card companies increased their fees. *Id.* at 136, 138. The Second Circuit held that the antitrust violation was a remote cause, not a direct cause, of their injuries. *Id.* at 141. The court explained that "at the first step, Amex restrained trade to raise its own prices; only later did its competitors follow suit." *Id.* at 135. Amex "enabling" other companies to raise their own fees was insufficient to establish a direct causal link. *Id.* at 141. However, *American Express* did not involve a merger. Plaintiffs do not allege that at the "first step," the newly merged T-Mobile raised prices, which then "enabled" AT&T and Verizon to raise their prices too. Rather, Plaintiffs allege that at the "first

31

step," the merger consolidated and reduced competition in the entire market, which drove the remaining firms, including AT&T and Verizon, to stop lowering their prices, stop offering new promotions, and then subsequently increase their prices. That is sufficient to plead a causal link at this stage.

## 2. More Immediate Victims

Defendants further argue that T-Mobile customers are the more immediate victims of the alleged antitrust violation, and therefore better-situated enforcers. In *AGC*, the Supreme Court explained that "the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general." 459 U.S. at 542.

The problem for Defendants is that T-Mobile customers were not any more directly injured by the merger than AT&T or Verizon customers. As alleged, customers of these three companies were all injured at the "first step." *Lexmark*, 572 U.S. at 139 (citation omitted). All are direct consumers in the market where the merger allegedly increased concentration and reduced competition. *Cf. Loeb*, 306 F.3d at 484 (scrap dealers were not proper plaintiffs because they were "quintessential examples of indirect victims" who were further down an "exceedingly complex" distribution chain); *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 598 (7th Cir. 1995) (suppliers of rental space to grocery stores were not proper plaintiffs to challenge alleged monopolistic activities in retail grocery market as compared to grocery consumers); *Leeder v. Nat'l Ass'n of Realtors*, 601 F. Supp. 3d 301, 313 (N.D. Ill. 2022)

32

(home buyers were not proper plaintiffs because home sellers, "as the direct purchasers of buyer-broker services," were necessarily more directly injured by defendants' alleged antitrust violations).[13] Plaintiffs have alleged that they are sufficiently immediate victims.

### 3. Speculative Nature of Damages

Defendants also contend that damages are speculative. Given that antitrust litigation necessarily involves a level of complexity, this factor turns on whether damages are "inherently speculative." *Loeb*, 306 F.3d at 493. Put differently, the question is whether a claim "'rests at bottom on some abstract conception or speculative measure of harm.'" *AGC*, 459 U.S. at 543 (quoting *Blue Shield*, 457 U.S. at 475 n.11). That is not the circumstance presented here. Plaintiffs allege that they paid higher prices than they would have paid had the merger not occurred. Both parties can offer proof concerning the pricing of retail wireless services vis-à-vis the merger. Calculating damages may not be an easy exercise. It will likely involve

---

[13] Plaintiffs' argument that they are the *only* enforcers of this antitrust action because T-Mobile customers are subject to an arbitration agreement is without merit. The fact that T-Mobile customers would have to arbitrate their claims may explain why they are not the plaintiffs in this suit, but it does not disqualify them as enforcers. As the Supreme Court explained in *American Express Co. v. Italian Colors Restaurant*, "the fact that it is not worth the expense involved in *proving* a statutory remedy does not constitute the elimination of the *right to pursue* that remedy." 570 U.S. 228, 236 (2013) (emphasis in original). The class-action waiver "no more eliminates the parties' right to pursue their statutory remedy than did federal law before its adoption of the class action relief." *Id.* In other words, "the individual suit that was considered adequate to ensure 'effective vindication' of a federal right before adoption of class action procedures did not suddenly become 'ineffective vindication' upon their adoption." *Id.* at 236–37. However, the fact that T-Mobile customers may appear the more logical enforcers does not mean they are the only eligible ones.

parsing various factors that played into the pricing decisions of AT&T and Verizon, and considering how the absence of the merger would have affected the prices Plaintiffs paid. But the fact that a damages calculation may require complex analysis does not render it inherently speculative as to warrant dismissal. *Sanner*, 62 F.3d at 930 (rejecting claim that damages analysis requiring expert analysis was "beyond the ken of the federal courts"); *see also Loeb*, 306 F.3d at 493 (rejecting claim that damages were unduly speculative notwithstanding the difficulty in discerning how much of the overcharge was attributable to the price manipulation). As such, this factor does not weigh in favor of dismissal. Even if it did, the "potential difficulty in ascertaining damages is not . . . an *independent* basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects." *Lexmark*, 572 U.S. at 135 (emphasis in original).[14]

In sum, Plaintiffs have adequately alleged antitrust standing.

### B. Anticompetitive Conduct

To state a Section 1 claim, Plaintiffs must plausibly allege that the challenged restraint had "substantial anticompetitive effect[s]." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). Likewise, to state a Section 7 claim, Plaintiffs must plausibly

---

[14] Defendants also raised in reply and at oral argument that the complexity of this case generally weighs in favor of dismissal. But the *AGC* factors refer to the complexity of damages apportionment, not the complexity of a case generally. *See Loeb*, 305 F.3d at 486, 489. Therefore, to the extent that this case will involve third party discovery, that fact does not contribute one way or the other to whether Plaintiffs have adequately alleged antitrust standing here.

allege "an appreciable danger" of anticompetitive effects in the relevant market. *Fed. Trade Comm'n v. Advoc. Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016) (quoting *Hosp. Corp. of Am. v. Federal Trade Comm'n*, 807 F.2d 1381, 1389 (7th Cir. 1986)). A plaintiff can allege either "direct evidence" or "[i]ndirect evidence" of anticompetitive effects. *Ohio*, 138 S. Ct. at 2284. "Direct evidence" in this context refers to "actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Id.* "Indirect evidence" here refers to "proof of market power plus some evidence that the challenged restraint harms competition." *Id.*

Here, Plaintiffs have adequately alleged direct evidence of anticompetitive effects. First, relying on the BLS data, Plaintiffs point to the steady decline in quality-adjusted pricing leading up to the merger and the sharp jump just a few months after its close. R. 1 ¶ 80. They further allege that AT&T and Verizon slowed their aggressiveness in responding to prices after the merger's announcement and closure, and then increased their prices in 2022. *Id.* ¶¶ 89, 107–08. Further, while Plaintiffs acknowledge the regulatory commitments not to raise the prices of T-Mobile and Sprint legacy plans until certain conditions were met, they allege how T-Mobile took advantage of "loopholes" to increase taxes, fees, and surcharges; pass through increases in the cost of third-party benefits; modify or cancel third-party benefits; and increase the cost of device and headset offerings and protection plans. *Id.* at ¶¶ 89, 102–05.

35

"Even in a concentrated market," however, "the occurrence of a price increase does not in itself permit a rational inference of . . . supracompetitive pricing." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993). A plaintiff must allege that a price increase is traceable to a restraint on trade. *Intel Corp. v. Fortress Inv. Grp. LLC*, No. 21-16817, 2022 WL 16756365, at *2 (9th Cir. Nov. 8, 2022). In Defendants' view, Plaintiffs do not plausibly allege that the elevated prices were caused by the merger because they ignore alternative explanations for the price increases. True, "[i]f the allegations give rise to an obvious alternative explanation then the complaint may stop short of the line between possibility and plausibility of entitlement to relief." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (cleaned up) (citing *Iqbal*, 556 U.S. at 682; *Twombly*, 550 U.S. at 557, 567). Defendants offer a variety of alternative explanations, and in so arguing, ask this Court to take judicial notice of 22 documents either cited in the complaint or part of the public record. *See* R. 79-1. But even if this Court were to consider all of those documents in their entirety, the alternative explanations proffered are not so obvious that they render the inference that the merger caused elevated prices unreasonable. *See Hughes*, 63 F.4th at 629 ("[W]hether a claim survives dismissal necessarily depends on the strength or obviousness of the alternative explanation that the defendant provides.").

Beginning with the BLS data, Defendants emphasize that the data does not account for the shift from 4G to 5G. In their view, the observed price jump is entirely explained by the increases in quality from the 5G services. It may be that, as a general

matter, higher-quality goods are more expensive, but it is not at all clear that the same axiom applies in the context of 4G versus 5G cell services, or that the timing or magnitude of that shift corresponds with the observable jump in the BLS data. Nor does the proposed explanation overcome the close temporal connection between the merger closing and the jump in price. That Plaintiffs did not include allegations detailing specific price increases by each of the carriers during this time does not negate the reasonable inference that market-wide price increases flowed from the merger.

Relatedly, Defendants highlight how regulatory commitments prevent T-Mobile from raising prices on legacy rate plans until 2025. But that does not mean that T-Mobile customers did not pay higher prices, whether by having to separately pay taxes and fees that were previously included in the plan prices, paying new fees and surcharges, or paying more for device protection plans or accessories. The fact that certain of T-Mobile's actions may have been allowed under the FCC's order does not mean that T-Mobile consumers did not pay more as a result of the merger or preclude private enforcement. Likewise, Defendants contend that the AT&T and Verizon's price increases in 2022 are explained by inflation and increasing cost pressures. But, as described above, AT&T and Verizon representatives publicly discussing increasing prices in the context of inflation and cost pressures does not make it implausible that those price increases derived from the merger. Defendants also contend that the length of time between the 2022 price increases and the merger undermine any plausible causal connection between the two. As this Court explained

previously, Defendants point to no rule—legal, economic, or otherwise—that limits the anticompetitive effects of a merger to certain period of time less than two years. And given the large structural changes effectuated by the merger, it is reasonable to infer that the effects would continue in the years that followed its close.

Defendants lastly contend that Plaintiffs fail to account for the COVID-19 pandemic, which began in March 2020. But as with prior alternative explanations, it is far from obvious that COVID-19 would have caused consumers to pay higher prices for wireless services. At bottom, "[a]sking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough factual matter to suggest" that the alleged effects are traceable to merger. *Twombly*, 550 U.S. at 545. Plaintiffs have provided sufficient factual matter here.

The cases relied upon by Defendants do not support a different outcome. Both *Ohio* and *Brooke* involved jury trials with the benefit of a full evidentiary record; neither addressed what a plaintiff must allege at the pleading stage. Similarly, while *In re AMR* challenged plaintiffs' reliance on the timing of events to prove causation, that case also arose after a trial on the merits and dealt with evidence, not allegations. 625 B.R. 215, 266 (Bank. S.D.N.Y. 2021). Lastly, while *Fortress* involved a challenge to anticompetitive effects at the pleading stage, the plaintiff failed to point to any instance where it actually paid more after the alleged antitrust violation. 2022 WL 16756365, at *2. As detailed above, that is not the case here. Therefore, Plaintiffs plausibly allege direct evidence of anticompetitive effects. As such, the Court need

not reach the parties' arguments regarding indirect evidence of anticompetitive effects.

### C. Laches

Defendants further argue that Plaintiffs' claim for divestiture is barred by laches. Laches "bars a plaintiff from maintaining a suit if he unreasonably delays in filing a suit and as a result harms the defendant." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121 (2002). Accordingly, Defendants must demonstrate "(1) an unreasonable lack of diligence by the party against whom the defense is asserted and (2) prejudice arising therefrom." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999).

Beginning with the issue of reasonable diligence, many courts use the Clayton Act's four-year statute of limitations as a "guideline" for evaluating whether a plaintiff acted with reasonable diligence in bringing the suit. *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014); *see also New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 35 (D.D.C. 2021) (citing cases). That practice is "particularly appropriate" here because the typical remedy of divestiture, "if ordered well after the merger has closed, will usually prejudice the defendant by inflicting substantial 'hardship and competitive disadvantage,' especially where its 'business operations [have been] combined' with those of the acquired company." *Facebook*, 549 F. Supp. 3d at 35 (quoting *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1235 (8th Cir. 2010)).

Plaintiffs are well within the statute of limitations. Plaintiffs filed this suit in June 2022, a little over two years after the merger was executed. Defendants urge

39

this Court to calculate the time to file from the date of the merger's announcement, April 2018, not its consummation, April 2020. But generally, "[a] Section 7 action challenging the initial acquisition of another company's stocks or assets accrues at the time of the merger or acquisition," *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1050 (8th Cir. 2000), giving a plaintiff four years from that time to sue. *See also Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 604 (6th Cir. 2014) (same); Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application, ¶ 320c5 (agreeing with this rule on policy grounds).

That the merger was publicly announced, or was subject to agency and federal court review, does not persuade this Court otherwise. Indeed, as Defendants recount, the Merging Entities made various commitments over the course of two years of review. And Plaintiffs' suit is focused on the effects of the merger, subject to those conditions, after it was effectuated in April 2020. For those reasons, the Court respectfully disagrees with those cases finding a lack of reasonable diligence where there were delays shorter than four years. *E.g.*, *Ginsburg*, 623 F.3d at 1235 (suit filed two months after merger announcement and before closing); *Garabet*, 116 F. Supp. 2d at 1173 (suit filed six months after merger announcement); *Taleff v. Sw. Airlines Co.*, 828 F. Supp. 2d 1118, 1124 (N.D. Cal. 2011) (suit filed one day after closing). Because the Court finds that Plaintiffs have acted with reasonable diligence in bringing this suit, the Court leaves for another time the issue of the prejudice that would result from divestiture.

40

## Conclusion

For the foregoing reasons, SBG's motion to dismiss pursuant to Rules 12(b)(2) and 12(b)(3) [76] is granted, and Defendants' motion to dismiss pursuant to Rule 12(b)(6) [78] is denied.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: November 2, 2023