IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY DALE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 22 C 3189 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| DEUTSCHE TELEKOM AG, and T-MOBILE US, INC, | ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

"The discovery rules are not a ticket to an unlimited, never-ending exploration of every conceivable matter that captures an attorney's interest. Parties are entitled to a reasonable opportunity to investigate the facts—and no more."

*Vakharia v. Swedish Covenant Hosp.*, 1994 WL 75055, at *2 (N.D. Ill. 1994)(Moran, J.).

**INTRODUCTION**

The plaintiffs have moved to compel T-Mobile to use their proposed custodian list. [Dkt. #195]. The present discovery dispute is about whether three custodians – out of a list of fifty – must be included as part of the defendant's discovery inquiry. All three of the disputed custodians are in-house counsel for T-Mobile. The present impasse came after six months of negotiations. From the outside looking in, it would appear – at least to some – that the plaintiffs got the better of the deal. In other words, the defendant moved more, and the plaintiffs moved less. We shall not go into the detail of the negotiations, but just try to provide a basic sense of the proceedings. On March 24, 2024, defendant proposed a list of 29 custodians. Six weeks passed before the plaintiffs made a counter-proposal that more than doubled the defendants' offering. The 60 proposed custodians included at least four attorneys: Laura Buckland (Senior Vice President, Chief Cyber Transformation

Officer); Kathleen Ham (former Senior Vice President, Government Affairs); Dave Miller (former Executive Vice President and General Counsel); and Mark Nelson (Executive Vice President and General Counsel).[1] Defendant spent another six weeks or so considering that demand before the parties met and conferred on June 10th. The defendant was willing to add 10 of the plaintiffs' 31 additional custodians, but did not like the addition of the four attorneys. The plaintiffs believed, however, they had relevant information and thus, would not budge.

The haggling continued. Defendant agreed to add one more custodian from the plaintiffs' 60-person list, but stood fast against adding the four lawyers, mostly because their documents, it was claimed, would likely be privileged. But the defendant also thought they would not have much relevant information and, if they did, it would be available from someone among the other 40 custodians. Plaintiffs offered to drop one of the four lawyers from their proposal. Defendant then offered to agree to 50 custodians if plaintiffs would simply drop the attorneys. That was unacceptable to the plaintiffs and so the negotiations continued. In exchange for keeping the three lawyers on the list – Ham, Miller, and Nelson – plaintiffs offered to drop three non-lawyers, keeping the total at 50. The defendant had already agreed to plaintiffs' demand to double the number of custodians, so dropping three of those extra names in exchange for the three lawyers was not much of a compromise, if it could be called one at all. But, plaintiffs simply would not budge on the three lawyers, and so the parties' dispute proved unsolvable. They have applied here for resolution.

Like all discovery disputes, the instant controversy is to be resolved by application of the broad discretion courts unquestionably have in resolving discovery disputes. *Crawford-El v. Britton*,

---

[1] Of course, lawyers are not sacrosanct or immune from error or even spells of mendacity. *See, e.g. FTC v. Advocate Health Care Network*, 162 F.Supp.3d 666, 671 (N.D. Ill. 2016); *Tellabs v. Fujitsu*, 283 F.R.D. 374 (N.D.Ill. 2012).

523 U.S. 574, 598 (1998); *Alicea v. Cnty. of Cook*, 88 F.4th 1209, 1218 (7th Cir. 2023). Discretion, it cannot be too often emphasized, denotes the absence of hard and fast rules. *Langnes v. Green*, 282 U.S. 531, 541 (1931). Being a range, not a point, discretion allows two decision-makers – on virtually identical facts – to arrive at opposite conclusions, both of which can constitute appropriate exercises of discretion. *See McCleskey v. Kemp*, 753 F.2d 877, 891 (11th Cir. 1985), *aff'd, McCleskey v. Kemp*, 481 U.S. 279, 289-290 (1987). *Accord Mejia v. Cook County, Ill.*, 650 F.3d 631, 635 (7th Cir. 2011). *Compare United States v. Boyd*, 55 F.3d 239 (7th Cir. 1995) *with United States v. Williams*, 81 F.3d 1434 (7th Cir. 1996). After review of the parties' submissions, it has to be said that the discretionary needle points in the defendant's favor.

## ANALYSIS

Among other uncomplimentary descriptions, modern day discovery has been called a "runaway train," *Eggleston v. Chicago Journeymen Plumbers' Loc. Union No. 130, U. A.*, 657 F.2d 890, 901 (7th Cir. 1981), a "monster on the loose," *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1013 (4th Cir. 1986), and the "bane of modern litigation." *Rossetto v. Pabst Brewing Co., Inc.*, 217 F.3d 539, 542 (7th Cir. 2000)(Posner, J.). Call it what you will. The inescapable reality is that discovery has come to dominate civil litigation. Courts are today required by the Federal Rules of Civil Procedure to review discovery requests, with an eye toward "proportionality," which takes into consideration "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery

outweighs its likely benefit." Rule 26(b)(1).[2] Proportionality, like other concepts, it is not self-defining; it requires a common sense and experiential assessment. *See, e.g., BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, 326 F.R.D. 171, 175 (N.D. Ill. 2018). Indeed, Chief Justice Roberts' 2015 Year-End Report on the Federal Judiciary noted that the addition of "proportionality" to Rule 26(b) "crystalize[d] the concept of reasonable limits on discovery through increased reliance on the common-sense concept of proportionality." *Id*. (emphasis added). In other words, all are agreed that discovery has gotten out of hand over the years and needs to be reigned in. But, just because counsel in this case insist that there are 50 or 60 stones to be looked under, does not mean they get to look under every one of them.[3]

---

[2] The concept of proportionality did not make its first appearance in the Federal Rules of Civil Procedure with the 2015 Amendments. It originally appeared years ago as part of Rule 26(b)(2)(C)(iii). *See Henry v. Morgan's Hotel Grp., Inc.*, 2016 WL 303114 (S.D.N.Y. 2016). Renumbering the proportionality requirement and placing it in Rule 26(b)(1) was designed to put a greater emphasis on the need to achieve proportionality than was thought to previously have existed given its placement in the structure of Rule 26. *Velez v. City of Chicago*, 2021 WL 309028, at *1 (N.D. Ill. 2021). The renumbering of the proportionality requirement was thought to restore and emphasize the role proportionality was to play in discovery. *Boehringer Ingelheim Pharma GMBH & Co. KG v. Teva Pharm. USA, Inc.*, 2016 WL 11220848, at *3 (D.N.J. 2016). *See* the lengthy and informative discussion in Linda Simard, *Seeking Proportional Discovery: The Beginning of the End of Procedural Uniformity in Civil Rules*, 71 Vanderbilt L.Rev., 1919 (2018).

[3] Plaintiffs think it is the defendant's burden to prove that the discovery at issue is not proportional to the needs of the case. They quote *Young v. City of Chicago*, 2017 WL 25170, at *9 (N.D. Ill. Jan. 3, 2017), as saying that the producing party has to show that "proposed custodians are not proportional to the needs of the case." [Dkt. #203, at 8]. But, that quote does not appear in *Young*, which had nothing to do with custodian lists. In any event, courts tend to go both ways regarding whose burden it is to show discovery is proportional or disproportional. *Compare Bigfoot 4×4, Inc. v. Individuals, Corps., Ltd. Liab. Companies, Partnerships, & Unincorporated Associations Identified on Schedule A Hereto*, No. 1:22-CV-06758, 2024 WL 1376059, at *3 (N.D. Ill. Apr. 1, 2024); *Contreras v. Illinois State Bd. of Elections*, No. 21-CV-3139, 2021 WL 7709552, at *2 (N.D. Ill. Oct. 14, 2021); *Sols. Team v. Oak St. Health, MSO, LLC*, No. 17 CV 1879, 2021 WL 3022324, at *3 (N.D. Ill. July 16, 2021), with *Cty. of Cook v. Bank of Am. Corp.*, No. 14 C 2280, 2019 WL 5393997, at *6 (N.D. Ill. Oct. 22, 2019)(Harjani, M.J.); *Taylor v. Cnty. of San Bernardino*, No. 5:21-CV-02088-JGB-SHK, 2024 WL 3915194, at *13 (C.D. Cal. May 7, 2024); *J.T.F. v. D.C.*, No. CV 21-1453 (RC), 2023 WL 5528037, at *6 (D.D.C. Aug. 28, 2023).

Eiher way, it is for the court to assure that parties do not dictate the scope of discovery or that things
(continued...)

First of all, frankly, fifty custodians is a lot. And, it's *really* a lot when they are essentially all of the requesting parties' choosing. *See, e.g.*, The Sedona Conference, The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production A Project of the Sedona Conference Working Group on Electronic Document Retention and Production, 19 Sedona Conf. J. 1, 52 (2018)("6. Responding parties are best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronically stored information."). So, even if plaintiffs' motion is denied – and it is – they get pretty much everything they want in terms of custodians: they get almost double the number of custodians the defendant opened with; they just do not get the three lawyers they have insisted on. Local Rule 37.2 is about compromise, and, it is "the nature of a compromise [that] [n]either side gets everything it wants." *All. for Water Efficiency v. Fryer*, 808 F.3d 1153, 1157 (7th Cir. 2015). Even without the three attorneys, fifty custodians is quite a lot – to say the least. Indeed, some might even say it is too many.

Significantly, plaintiffs say nothing in their Motion about how these fifty particular custodians, or more importantly, the three lawyers, are "proportional" to the needs of their case. The gist of their case – they don't explain it much in their Motion – is that post-merger, prices went up, even for non-customers of the merging companies like the plaintiffs. As best the court can tell from the Complaint, the yearly cost for a putative class member went up between $16 and $72 a year since

---

[3](...continued)
get out of hand. *See, e.g., United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242, 259 (3rd Cir. 2016); Fed.R.Civ.P. 26(b)(1)(advisory committee's notes to 2015 amendment)(the amended Rule is intended to "encourage judges to be more aggressive in identifying and discouraging discovery overuse" by emphasizing the need to analyze proportionality before ordering production of relevant information). So talking about one side's or another's burden of proof might not be terribly helpful.

2022. [Dkt. #1, Pars. 107, 108]. That is not exactly inconsequential. It would be nice to have some, perhaps a little cost certainty in life; but neither is it necessarily staggering which, obviously, is why the case is being brought as a class action. *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004)("The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30."). And doesn't the rising price of wireless service have to be regarded against the backdrop of rising prices of just about everything over the last few years?

It is because individual monetary stakes are not infrequently meager in large class action suits that counsel invariably point to the "the importance of the issues at stake in the action." Fed.R.Civ.P. 26(b)(1). Plaintiffs do not go into that here, but if they did, they might say that beyond whatever payout the class members might get, they hope to see "justice done" by unraveling a merger that they believe ought not to have happened. But, that merger was vetted and vetted and vetted again. As Judge Durkin wrote almost a year ago, the merger was subjected to "significant scrutiny" by the Federal Communications Commission, the United States Department of Justice Antitrust Division, 14 State Attorneys General, two federal judges, and others. [Dkt. #114, at 1-2]. Perhaps the plaintiffs are right, and all that undoubted scrutiny by so many responsible individuals was inadequate. Perhaps the merging companies wove a tapestry of lies, and the government agencies and courts were all gulled or made mistakes and legal error after legal error. But, all that scrutiny does not make a court exercising "discretion" over a motion to compel a lot of discovery on top of a lot of discovery think, in essence, that "this merger was so fishy that plaintiffs are entitled to whatever they desire, damn the burdens, costs, and judicial resources."

And, certainly, it is naive to think that the discovery that is being sought in this case from several attorneys would not be time-consuming and costly – and not just for the immediate parties. Obviously, privilege claims as to documents from the lawyers would far exceed privilege claims as to non-attorneys. There would be a privilege log for each lawyer – their files total 442 gigabytes. How many pages would that be? Your results may vary, but it seems safe to say the number would be staggering.[4] Each privilege log would undoubtedly be huge. And, it would be a legitimate prediction – based on experience with class action discovery and privilege logs – that plaintiffs would challenge most, or at least, many of the claims of privilege. Perhaps rightfully so; perhaps not. But it is certain that, regardless, the parties would be back in court, with an extensive dispute, demanding an *in camera* review – a process which is not only time-consuming and burdensome, but all too often not terribly accurate as the process is conducted blind since a court can never fully grasp the context of the hundreds or thousands of documents under consideration.[5] This is not conjectural.

---

[4] *See, e.g., Sec. & Exch. Comm'n v. Jarkesy*, _U.S._, 144 S. Ct. 2117, 2141 (2024)(estimating 700 gigabytes of data to be the equivalent of between 15 and 25 million pages of information); *Riley v. California*, 573 U.S. 373, 394 (2014) ("Sixteen gigabytes translates to millions of pages of text, thousands of pictures, or hundreds of videos."); *Snider v. Danfoss*, No. 15 CV 4748, 2017 WL 2973464, at *2 n.5 (N.D.Ill. July 12, 2017)(". . . one gigabyte of e-mails is over 100,000 pages of documents, assuming there are not attachments, which is a faulty assumption."); *Desmond as Tr. for Est. of Yellow Cab Affiliation, Inc. v. Taxi Affiliation Servs., LLC*, No. 17 CV 8326, 2021 WL 4498909, at *1 (N.D. Ill. Jan. 15, 2021)(500 gigabytes of electronically stored information are the equivalent of approximately 1.3 million documents).

[5] It would be naive to think that the defendants would make *only* valid claims of privilege across the thousands of documents they would undoubtedly seek to withhold. Merely designating a document as privileged does not settle the matter. Indeed, case after case confirms that all too often claims of privilege are rejected. *See, e.g., Towne Place Condo. Ass'n v. Philadelphia Indem. Ins. Co.*, 284 F. Supp. 3d 889, 899–900 (N.D. Ill. 2018)(email stating, "[p]lease contact me with any questions. We hope you have a good weekend" was not privileged); *Rossman v. EN Eng'g, LLC*, No. 19 C 5768, 2020 WL 5979554, at *5 (N.D. Ill. Oct. 8, 2020)(email stating, "[t]hanks again for your time today. Here are the Word versions you requested. Have a great weekend!" was not privileged); *Urb. 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4, LLC*, 334 F.R.D. 149, 162 (N.D. Ill. 2020)("Claiming that a balance sheet sent by the other side in a purchase option negotiation is the work product of your in-house counsel is, at best, frivolous and, it inspires a healthy degree of skepticism toward any other claims the defendants make."); *Urb. 8 Fox Lake*
(continued...)

Indeed, the Supreme Court has emphasized that "we cannot ignore the burdens in camera review places upon the district courts, which may well be required to evaluate large evidentiary records without open adversarial guidance by the parties." *United States v. Zolin*, 491 U.S. 554, 571 (1989).

Notably, once the parties are back in court, the cost is not only borne by the defendants, but also by the taxpayers, who, in the final analysis, foot the bill for the expenditure of judicial resources. *See, e.g., Chapman v. First Index, Inc.*, 796 F.3d 783, 787 (7th Cir. 2015)(the public should not be made to subsidize needless disputes); *City of Greenville, Ill. v. Syngenta Crop Prot., LLC*, 764 F.3d 695, 697 (7th Cir. 2014)("litigants ... enjoy publicly subsidized dispute resolution...."). And, the obvious "cost" to dozens of other litigants in other cases, is that they would have to wait for judicial attention while this case's discovery disputes all but monopolize the court's attention and efforts. Indeed, the Seventh Circuit has recognized that "[l]itigation is costly not only for the litigants but also for parties in other cases waiting in the queue for judicial attention." *Chicago Observer, Inc. v. City of Chicago*, 929 F.2d 325, 329 (7th Cir. 1991).

---

[5](...continued)
*Corp. v. Nationwide Affordable Hous. Fund 4, LLC*, No. 18 C 6109, 2019 WL 5963644, at *3 (N.D. Ill. Nov. 13, 2019)(lawyer's comments about an opponent like " 'such a nice guy to decide to follow the documents now' or 'his way of saying, ha ha! Look at what all of your diligence gets ya this time' cannot seriously be argued as necessary to the provision of any legal advice."); *Slaven v. Great Am. Ins. Co.*, 83 F. Supp. 3d 789, 802 (N.D. Ill. 2015)(emails reflecting counsel's attempts to schedule meetings were not privileged); *Bell Microproducts, Inc. v. Relational Funding Corp.*, 2002 WL 31133195, at *1 (N.D. Ill. 2002) (instruction from an attorney to employees to copy him as a recipient on any emails or documents in order to assure they were privileged was not by itself enough to make the document privileged).

The foregoing were all "terrible" claims of privilege, but the "GOAT" in terms of ridiculous privilege claims has to have been a claim of privilege made as to a photograph of a toilet. *Urb. 8 Fox Lake Corp.*, 2019 WL 5963644, at *4 (N.D. Ill. Nov. 13, 2019).

Hopefully the parties and their counsel take this footnote to heart as they proceed through discovery.

8

These types of disputes tend to make a court wonder, which of the court's other cases the requesting party feels deserve to be put on the back burner in favor of theirs. Of course, they would deny that they were seeking any degree of preference. But the inescapable fact is that a court does not have available the vast resources that individual litigants often have at their disposal. This is not to suggest that a lawyer should ever sublimate a client's legitimate interests to a court's "convenience." But discovery demands are not permissible merely because a lawyer has a desire for information. *Vakharia v. Swedish Covenant Hosp.*, *supra.* "'[D]iscovery, like all matters of procedure, has ultimate and necessary boundaries.'" *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). The plaintiffs' current Motion to Compel T-Mobil exceeds those boundaries.[6]

When the foregoing is weighed on the "proportional-to-the-needs-of-the-case" scale, the balance tips decidedly over to the disproportionate side – especially given the unpersuasive arguments regarding the relevance of the discovery from the three lawyers.

---

[6] Given the staggering number of documents likely involved in a privilege review of the 442 gigabytes of information attributable to the lawyers in question, an *in camera* review would be a likely candidate for the appointment of a "special master." *See, e.g., Am. Nat. Bank & Tr. Co. of Chicago v. Equitable Life Assur. Soc. of U.S.*, 406 F.3d 867, 880 (7th Cir. 2005)(400 documents); *Schmucker v. Johnson Controls, Inc*., 2017 WL 6043328, at *1 (N.D. Ind. 2017)(358 documents); *Finnegan v. Myers*, 2014 WL 12789809, at *8 (N.D. Ind. 2014)(600 documents); *In re FedEx Ground Package Sys., Inc*., 2007 WL 79312, at *8 (N.D. Ind. 2007); *Avery Dennison Corp. v. UCB Films PLC*, 1998 WL 703647, at *1 (N.D. Ill. 1998)(800 documents).

Use of a special master is often employed even with relatively few documents at issue. *IQVIA, Inc. v. Veeva Sys., Inc*., 2020 WL 2039836, at *2 (D.N.J. 2020)(34 documents); *In re Lincoln Nat'l COI Litig.*, 2020 WL 1157172, at *1 (E.D. Pa. 2020)(21 documents); *Orexo AB v. Actavis Elizabeth LLC*, 2018 WL 5891690, at *1 (D. Del. 2018)(29 documents); *Nat.-Immunogenics Corp. v. Newport Trial Grp*., 2018 WL 6137597, at *2 (C.D. Cal. 2018)(364 documents); *Engage Healthcare Commc'ns, LLC. v. Intellisphere, LLC.*, 2017 WL 10259774, at *1 (D.N.J. 2017)(58 documents).

It is a device that I have recently employed with exceptional results. *Deal Genius, LLC v. O2Cool, LLC,* 21 C 2046. [Dkt. ##71, 75, 76, 78, 85, 86, 87, 90, 91, 92, 96, 100 102, 103, 109, 110, 111, 112, 113, 114, 119, 123, 126, 127, 128, 138, 146, 148, 170, 174, 177, 178, 200, 204]. Whether it would be necessary in this case remains to be seen.

It is imperative not to forget that this case is about what happened *after* the merger – as the plaintiffs, themselves, have emphasized in the past: "The state case was a pre-acquisition, public enforcer challenge that centered on predictions by the judge about the anticompetitive consequences of the merger. By contrast, this case is a post-acquisition, private class action challenge that will be tried to the jury on the basis of its actual anticompetitive effects. For instance, . . . in a retrospective case . . . the actual pricing data tells the tale. In all, ten days of trial testimony were spent making predictions about the merger. But here, in each instance, both parties will rely on real-world historical evidence to support their positions, not 'a judicial reading of the future.'" [Dkt. # 59, at 14]. And this is not their only reference to the criticality of the post-merger. As to that, the plaintiffs said: "The fact that they relate to the same merger challenged in this action does not show 'direct relation to matters at issue' such that the exhibits may be incorporated by reference." [Dkt.#87-1, at 5]. And there is this: "Nor are these findings central to plaintiffs' claims; the FCC merely predicted how the merger might affect competition post-merger, which cannot be inconsistent with Plaintiffs' allegations of post-merger anticompetitive effects." [Dkt.#87-1, at 8].

Plaintiff tells us that David Miller negotiated the merger between Sprint and T-Mobile and, as a front-line negotiator, would have communications and documents relevant to the transaction. Plaintiff says Kathleen Ham was deeply involved in the merger process. Plaintiff does not have much to say about Mark Nelson, other than he stepped into David Miller's shoes. The three lawyers would seem to have far more to do with things leading into the merger and during all the vetting of the merger than with things *after* the merger, like raising prices. Plaintiff does add that Kathleen Ham had some influence on pricing post-merger, [Dkt. #195, at 6], but from the looks of the job titles on the fifty-person list, so would a lot of others. [Dkt. #195-2].

All things being considered, fifty custodians certainly provide a reasonable opportunity – at the very least – for the plaintiffs to reasonably investigate their case. Adding three or four in-house counsel to that list is out of proportion to the needs of the case. The aphorism, "the book is not worth the candle" is not out of place here.

The plaintiffs' Motion to Compel T-Mobile to use the plaintiffs' proposed custodian list [Dkt. #195] is denied.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 10/4/24