UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTHONY DALE, BRETT JACKSON, JOHNNA FOX, BENJAMIN BORROWMAN, ANN LAMBERT, ROBERT ANDERSON, and CHAD HOHENBERRY, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> T-MOBILE US, INC., *et al.*, <br><br> Defendants. | No. 22-cv-3189 <br><br> Judge Thomas M. Durkin <br><br> Magistrate Judge Albert Berry III |

**ORDER**

For the reasons discussed more fully below, Plaintiffs' Motion to Compel DISH to Produce Discovery Responsive to Plaintiffs Subpoena [253] is granted in part and denied in part, and Defendant T-Mobile US Inc.'s Motion to Compel DISH to Produce Discovery Responsive to Subpoena [254] is granted in part and denied in part. On Plaintiffs' motion [253], the Court rules as follows: 1) Plaintiffs' custodial discovery requests are relevant and proportional to the needs of the case, with the exception of pre-merger documents, which are not relevant to the instant suit; 2) Plaintiffs are entitled to the same structured data on Gen Mobile and Ting Mobile that DISH has already agreed to produce to T-Mobile (Dkt. 329); and 3) Plaintiffs are not entitled to structured data broken down into census blocks or subscriber addresses. On T-Mobile's motion [254], the Court rules as follows: 1) DISH is ordered to produce "go get" documents related to DISH's purchase of network access from AT&T; and 2) T-Mobile's custodial discovery requests are relevant and proportional to the needs of the case, with the exception of pre-merger documents,

1

which are not relevant to the instant suit. The Court denies DISH's request for cost sharing without prejudice. Finally, the Court rejects DISH's request for a protective order against prospective discovery, as that issue is not appropriately before the Court at this time.

## **BACKGROUND**

Plaintiffs are customers of AT&T Mobility LLC ("AT&T") and Verizon Communications, Inc. ("Verizon") who have sued T-Mobile US, Inc. ("T-Mobile") alleging that T-Mobile's 2020 merger with Sprint lowered competition in the wireless services market, which in turn allowed AT&T and Verizon to raise prices and harm Plaintiffs. (Dkt. 1 at ¶¶ 1, 129.) Given the nature of the allegations, third-party subpoena practice has been extensive in this case. DISH Network Corporation ("DISH") received subpoenas from both Plaintiffs and Defendant T-Mobile in this case. And understandably so. DISH is not merely a potential competitor of T-Mobile, AT&T, and Verizon, but was also a central figure in the ratification of the merger between T-Mobile and Sprint. The attorneys general ("AGs") for a number of states filed suit in federal court seeking to enjoin the merger between T-Mobile and Sprint. *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 186 (S.D.N.Y. 2020). After a bench trial, the AGs' request for an injunction was denied. *Id*. at 249. Among the reasons the district court declined to enjoin the merger was the fact that, "[t]he Court [was] persuaded that the presence of DISH as a new entrant [would] constitute a substantial incentive to competition in the [retail mobile wireless telecommunication services] Markets." *Id.* at 226. In particular, DISH's role in the merger was persuasive to the court because: 1) Sprint agreed to divest all of its spectrum holdings in the 800 megahertz band to DISH; 2) Sprint agreed to divest its interest in Boost Mobile and its assets and subscribers to DISH; 3) T-Mobile agreed to provide DISH access to its network at low wholesale rates; 4) DISH would be required to build a purely 5G network, with the option to use cells sites that T-Mobile would otherwise have

2

decommissioned; and 5) "DISH committed to the FCC that if it did not deploy a nationwide 5G network covering at least 70 percent of the population by June 2023, it would pay up to $2 billion in fines and divest up to $12 billion worth of spectrum." *Id.* at 198, 227-232.

Plaintiffs served DISH with a subpoena in the instant suit on October 19, 2022, seeking documents related to DISH's wireless services business. (Dkt. 253 at 7.) After almost two-and-a-half years of negotiations, Plaintiffs filed the instant motion arguing that DISH should be compelled to conduct custodial searches to produce documents relevant to the following categories of documents: 1) DISH's communications with and submissions to the Monitoring Trustee tasked with overseeing DISH's compliance with the terms of the merger; 2) DISH's internal discussions and analyses of the wireless retail market and DISH's ability to compete; 3) documents related to DISH's spectrum assets and network; 4) documents related to DISH's pricing, service bundles, and subscriber data; and 5) documents related to customer perception of DISH's retail mobile wireless service, including network/5G coverage and upload/download speeds. (*Id.* at 9-10.) Plaintiffs have identified eight proposed custodians for these searches, and DISH has agreed to three of them (and a fourth for a limited time period); the rest remain in dispute. (*Id.* at 10.) Additionally, Plaintiffs seek to compel structured data regarding DISH's mobile virtual network operator ("MVNO") subsidiaries, Gen Mobile and Ting Mobile. (*Id.* at 15.) Finally, Plaintiffs seek structured data to be broken down by subscriber "Census Block Groups," instead of Zip Code. (*Id.* at 16.)

T-Mobile served its subpoena on DISH on November 18, 2024. (Dkt. 255 at 2.) T-Mobile and DISH also reached impasse on several issues and T-Mobile filed a motion to compel seeking: 1) structured data from DISH's MVNO subsidiaries Gen Mobile and Ting Mobile; 2) so-called "go get" documents regarding "DISH's costs, profits, customer life time value, payments to AT&T

for network access and mobile plans (including those of its subsidiaries);"[1] and 3) custodial documents concerning DISH's efforts to compete in the wireless service market and expand its mobile business, DISH's need for spectrum, and DISH's internal view on "the favorable deals DISH secured with T-Mobile and AT&T when Sprint's legacy CDMA network was shutdown." (*Id*. at 7, 10.) In their most recent status report, T-Mobile and DISH reported that they were able to resolve many of the issues raised in T-Mobile's motion. (Dkt. 329.) At this juncture, the following issues remain for the Court's resolution: 1) "go get" documents for payments to AT&T for network access and spectrum; and 2) custodial discovery. The Court discusses the issues raised in the motions below.

## DISCUSSION

### I. Plaintiff's Motion

#### A. Custodial Discovery Requests

As discussed above, Plaintiffs' subpoena seeks 1) DISH's communications with and submissions to the Monitoring Trustee tasked with overseeing the parties' compliance with the terms of the merger; 2) DISH's internal discussions and analyses of the wireless retail market and DISH's ability to compete; 3) documents related to DISH's spectrum assets and network; 4) documents related to DISH's pricing, service bundles, and subscriber data; and 5) documents related to customer perception of DISH's retail mobile wireless service, including network/5G coverage and upload/download speeds. (Dkt. 253 at 9-10.) Federal Rule of Civil Procedure 45(d)(3)(A)(iv) requires the Court to quash or modify a subpoena that subjects a person to an undue burden. "Although a non-party subpoena is controlled by Rule 45, the discovery sought must still be within the broad scope of Rule 26." *Roman v. City of Chicago*, No. 20 C 1717, 2023 WL

---

[1] "Go get" documents are not defined, but appear to be documents that can be located and produced without having to run search terms or perform custodial ESI discovery.

121765, at *5 (N.D. Ill. Jan. 6, 2023). In other words, "[t]he scope of material obtainable pursuant to a Rule 45 subpoena is as broad as what is otherwise permitted under Rule 26(b)(1)." *In re Kleimar N.V v. Benxi Iron & Steel Am., Ltd.*, No. 17-CV-01287, 2017 WL 3386115, at *7 (N.D. Ill. Aug. 7, 2017) (internal quotations omitted). Rule 26(b)(1) defines the scope of permissible discovery as "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." With that as the foundation, the Court now considers whether the discovery sought by Plaintiffs in their subpoena to DISH is relevant and proportional to the needs of the case.

1. **Relevance**

For the most part, DISH does not argue that the type of documents Plaintiffs seek are irrelevant. And rightly so – the types of documents Plaintiffs seek are clearly relevant to the allegations in the complaint and will be helpful in showing that the 2020 merger altered competition in a way that allowed AT&T and Verizon to maintain higher prices for their customers. However, DISH does take issue with the temporal scope of Plaintiffs' subpoena, which seeks documents from as early as 2017, three years before the merger. (Dkt. 253-2.) DISH argues that it should not be required to produce any documents from before April 2020 when the merger was effectuated. (Dkt. 289 at 18-19.)

The Court agrees with DISH that its documents from the pre-merger period are not relevant to the instant suit and need not be produced. As my wise predecessor, Judge Cole, astutely noted in an earlier opinion in this case, "[i]t is imperative not to forget that this case is about what

5

happened *after* the merger – as the plaintiffs, themselves, have emphasized in the past." (Dkt. 206 at 10 (emphasis in original).) In fact, Plaintiffs described this case as "a post-acquisition, private class action challenge that will be tried to the jury on the basis of its actual anticompetitive effects." (Dkt. 59 at 14.) Plaintiffs do not explain how DISH's view of the pre-merger landscape or its prognostications about the effects of the merger have any relevance to the case at bar, which alleges that AT&T and Verizon were able to raise prices because the merger between T-Mobile and Sprint lowered competition in the wireless market. DISH's materials are relevant to show that DISH did not, in fact, exert sufficient competitive pressure to create a downward force on prices after the merger, and that will be determined by reviewing what DISH did (or did not do) upon completion of the merger. The Court does not reach whether pre-merger documents from other parties or entities might be relevant to this case. However, as far as DISH is concerned, the Court does not believe that its pre-merger documents are relevant to the case.[2] Therefore, the Court modifies the subpoena to only include documents beginning on the date the T-Mobile/Sprint merger became official - April 1, 2020.

## 2. Undue Burden

DISH estimates that it "would incur $72,900 in hosting fees based on the assumptions that (i) DISH would export 264 GB of data, which represents the Gmail data for Plaintiffs' custodians for January 1, 2017, to June 30, 2024; (ii) 20% of this volume would be removed during processing as duplicative; and (iii) the data would need to be available for six months." (Dkt. 289 at 20.)

---

[2] The cases cited by Plaintiffs are non-binding and readily factually distinguishable. (Dkt. 299 at 8.) Relevance is dictated by the allegations, causes of action, and defenses raised in a suit. Fed. R. Civ. P. 26(b). In *Sidibe v. Sutter Health*, 103 F. 4th 675, 680 (9th Cir. 2024), the plaintiff alleged that defendant engaged in unlawful tying and monopolization, which are completely different claims from those at issue here. Thus, what was relevant in that case, does not dictate the scope of relevance here. In *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, No. 11CV0564BMCPK, 2019 WL 1515231, at *1 (E.D.N.Y. Feb. 21, 2019), all parties agreed that a price-fixing conspiracy existed and the issue at bar was whether the defendant has participated in the conspiracy. Again, these are completely distinct concerns from those before the Court in this case.

Additionally, DISH claims it would expend $2,376,769 in review fees, "based on the assumptions that (i) 3.9 million emails with attachments collected from Gmail for Plaintiffs' custodians for January 1, 2017 to June 30, 2024, include hits on Plaintiffs' search terms; (ii) 1.5 million emails with attachments would remain for review assuming a 60% de-duplication rate; and (iii) DISH would conduct a traditional linear review." (*Id.*) As the party seeking to quash or modify Plaintiffs' subpoena, DISH "bears the burden of demonstrating that the subpoena . . . subjects the party to an undue burden." *Am. Soc. of Media Photographers, Inc. v. Google, Inc.*, No. 13 C 408, 2013 WL 1883204, at *2 (N.D. Ill. May 6, 2013). For several reasons, the Court does not believe that DISH has carried its burden here.

  First, as discussed above, the Court has significantly lowered the burden by narrowing the temporal scope of custodial discovery – a full 39 months have been removed from any production. As such, the figures quoted by DISH are no longer applicable.

  Second, DISH admits that the search terms proposed by Plaintiffs (and T-Mobile) are too complex for the limited search functionality of the Google Vault system DISH's internal discovery team uses. (Dkt. 289 at 15.) As a result, "DISH's discovery team spent approximately 15 hours simplifying and re-formulating the terms so they could be run across email messages stored in Gmail to obtain hit counts." (*Id.*) Because DISH had to rearrange the search terms, DISH is not making an apples-to-apples comparison and the Court cannot determine whether Plaintiffs' proposed search parameters are, in fact, overburdensome. It is entirely possible that simplifying and re-formulating search terms could lead to a significant increase in the hit count, but the Court has no way of evaluating this issue because DISH has not detailed the changes it made or demonstrated how the search terms it chose to apply correlate to the Plaintiffs' proposals.

Finally, the relevant question before the Court is not whether DISH would be burdened by the custodial production, but whether that burden is *undue*. When viewed through this lens, there are many factors that cut in favor of producing custodial files. For example, although the Court is sensitive to DISH's position as a non-party to the litigation, DISH's relationship to the merger puts them in a unique position compared to the average subpoena recipient. As noted above, DISH took an active role in pushing the merger through, ultimately persuading the trial court in the suit brought by several AGs "that, given its extensive preparations and the favorable remedies arranged by the DOJ, DISH fully intends to enter the RMWTS Markets vigorously and assume the mantle of a new maverick." *Deutsche Telekom AG*, 439 F. Supp. 3d at 237. DISH is not an innocent bystander being swept into a suit it had nothing to do with; DISH's post-merger actions are central to the claims being made in this suit, and the documents Plaintiffs seek are highly relevant in this action. Additionally, these documents are not likely to be available to Plaintiff from other sources; they need to come from DISH. Therefore, while the cost may be high to DISH, the Court cannot say that burden would be undue, in light of the facts and circumstances surrounding this case.

To be clear, the Court is not adopting Plaintiffs' search terms wholesale, or ordering that DISH must accept them without objection. The Court is only ruling that DISH must make custodial productions responsive to the subpoena. Following this ruling limiting the temporal scope of the subpoena, Plaintiffs and DISH should work to begin the iterative process of honing search terms to strike an appropriate balance between ensuring that DISH produces relevant documents while not unduly burdening DISH with overly broad search terms that return irrelevant information or false hits. The Court notes that if the parties are unable to come to an agreement on search terms or begin presenting arguments to the Court on specific terms and hit counts, the

8

Court will likely need to appoint a special master to handle disputes of such granular detail for the reasons previously discussed by Judge Cole. (*See* Dkt. 303 at 4-6.)

### 3. Custodians

Having determined that the document requests in the subpoena seek relevant documents and will not be unduly burdensome, the Court turns to the issue of which custodians should be searched. Plaintiff suggested eight custodians, and DISH agreed to produce four of these. The four contested custodians are: 1) Charlie Ergen (Chairman); 2) Will Platz (Senior Finance Manager); 3) Marc Rouanne (Chief Network Officer of DISH); and 4) Rob Hussa (Senior Vice President of Boost Mobile).[3]

Defendants have not presented any argument as to why these custodians should not be searched. While the Court understands that the Sedona Principles generally note that "[r]esponding parties are best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronically stored information," that does not give DISH carte blanche to refuse to search custodians who likely have relevant information. *See* The Sedona Conference, *The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production A Project of the Sedona Conference Working Group on Electronic Document Retention and Prod.,* 19 Sedona Conf. J. 1, 118 (2018). On review of the Plaintiffs' descriptions of the proposed custodians, the Court agrees with Plaintiffs that these individuals are all likely to have discovery that is relevant and responsive to the subpoena. Additionally, the Court does not feel that producing documents from eight custodians presents an undue burden to DISH. By way of example, T-Mobile *agreed* to a list of at least 47 custodians in this suit to meet its discovery obligations. (Dkt. 206 at 1.) The Court

---

[3] The Court assumes DISH will search the agreed custodians from the relevant time period, as defined herein.

understands that the discovery obligations of third parties should be less onerous than those of the named defendant, but an almost six-to-one ratio strikes the Court as reasonable here.

### 4. Substantial Need

DISH asserts that Plaintiffs have failed to demonstrate that they have "substantial need" to receive: 1) information beyond what DISH has shared with regulators; and 2) DISH's "internal assessments of its own competitive position and its strategic spectrum plans." (Dkt 289 at 17.) Federal Rule of Civil Procedure 45(d)(3)(B)(i) allows a court to quash or modify a subpoena if it requires "disclosing a trade secret or other confidential research, developments, or commercial information." However, pursuant to Rule 45(d)(3)(C)(i), the Court may still order production if the serving party "shows a substantial need for the . . . material that cannot be otherwise met without undue hardship."

Here, the information sought by Plaintiffs clearly falls into the category described in Rule 45(d)(3)(B)(i) (*i.e.*, it is confidential commercial information), but the Court finds that Plaintiffs have adequately demonstrated substantial need for the materials. DISH contends that producing its quarterly submissions to the Monitoring Trustee will provide Plaintiffs with all they need to show "DISH's retail mobile strategy, 5G network buildout and deployment, pricing, subscriber acquisition and retention, and spectrum acquisition and usage." (Dkt. 289 at 16.) The Court disagrees; as Plaintiffs rightfully point out, DISH's submissions to the Monitoring Trustee are crafted to demonstrate that it is fulfilling its post-merger obligations to compete with T-Mobile, AT&T, and Verizon. (Dkt. 299 at 5.) Such manicured submissions, alone, are unlikely to present a complete picture of DISH's efforts. As an example, underlying documents used to prepare reports and communication regarding the competitive efforts being put forth by DISH provide a complete picture of the information Plaintiffs seek here. The Court does not believe it is

appropriate to force Plaintiffs to rely on the submissions alone and concludes that Plaintiffs need access to DISH's unvarnished views of its post-merger actions to adequately litigate their claims against T-Mobile and demonstrate the anti-competitive effects of the merger on the wireless services market. This is particularly true given the important role DISH played in the merger's ratification. Moreover, the documents Plaintiffs seek cannot be procured elsewhere without undue hardship; the relevant materials are solely in the possession of DISH.

The discussion immediately above applies with equal force to DISH's arguments that there is not a substantial need for DISH's internal assessments of its competitive position and spectrum plans. These documents are vital to Plaintiffs' ability to prove their claims here (and for T-Mobile to defend against them). One of the principal arguments in this case is that the merger negatively affected competition because DISH has been unable to fill (and will be unable to fill) the role in the market that was vacated when T-Mobile and Sprint merged. To demonstrate that, Plaintiffs will need access to DISH's internal communications regarding their attempts to compete in the wireless market. The Court is sensitive to the proprietary nature of such documents and has recently ruled on amending the Confidentiality Order in this case to protect third parties from unnecessary disclosure of highly confidential information. (Dkt. 328.) But Plaintiffs have a substantial need for this information and cannot get it elsewhere. The Court rejects DISH's arguments that Plaintiffs have failed to show a substantial need for the documents.

### B. Structured Data

The parties have also reached impasse on two areas related to DISH's production of structured data. First, Plaintiffs seek to compel DISH to produce structured data for its MVNO subsidiaries Gen Mobile and Ting Mobile. (Dkt. 253 at 14.) DISH agreed to produce structured data for Boost Mobile, which DISH claims accounts for 91% of DISH's wireless customer base,

11

whereas Gen Mobile and Ting Mobile represent a small fraction of DISH's wireless customers. (Dkt. 289 at 25.) DISH argued that requiring it to produce structured data on Gen Mobile and Ting Mobile would be unduly burdensome, given the low value of such data to the case. (*Id*. at 25-26.) Prior to the Court reaching a decision on the matter, on July 17, 2025, DISH and T-Mobile filed a joint status report stating that they had "reached agreement on Gen Mobile and Ting Mobile structured data that DISH would produce in response to T-Mobile's [subpoena]." (Dkt. 329 at 3.) Given the similarity in the requests between Plaintiffs' and T-Mobile's subpoenas on the issue of structured data from the MVNO subsidiaries, the Court believes that it would be reasonable for DISH to produce the same structured data it agreed to give to T-Mobile to Plaintiffs, and so orders.

Additionally, Plaintiffs maintain that DISH should be ordered to provide structured data that breaks down into subscribers' census blocks, instead of their Zip Code. (Dkt. 253 at 16.) DISH has stated that it does not maintain census block data for Boost subscribers. (Dkt. 289 at 28.) Alternatively, Plaintiffs seek the address of the subscribers. (Dkt. 253 at 16.) The Court will not order DISH to turn over structured data with that level of specificity, given the privacy concerns it presents to Boost subscribers and the limited marginal utility of such data. The Court is not persuaded that Plaintiffs need such minute details to adequately assess the effects of the merger on the wireless markets and believes that Zip Codes will be sufficient for their expert's analysis. The Court concludes that the structured data DISH has provided is adequate and will not require more.

### C. Cost Sharing

DISH also argues that the Court should order cost sharing for the custodial production; this request is denied without prejudice.[4] (Dkt. 289 at 32.) Pursuant to Federal Rule of Civil Procedure

---

[4] The sections on cost sharing and a prospective protective order apply with equal force to Plaintiffs and T-Mobile. The section presenting these arguments in DISH's brief did not distinguish between the two, and the Court believes that its analysis covers both Plaintiffs and T-Mobile. (Dkt. 289 at 32-34.)

45(d)(2)(B)(ii), if a subpoena recipient is ordered to produce documents over their objection, the order compelling production "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance." "Courts have considered three equitable factors when considering cost-shifting and non-parties: (1) whether the nonparty has an interest in the outcome of the case; (2) whether the nonparty can more readily bear its costs than the requesting party; and (3) whether the litigation is of public importance." *DeGeer v. Gillis*, 755 F. Supp. 2d 909, 928 (N.D. Ill. 2010). Here, the Court believes that these factors cut against cost sharing.

First, although DISH does not have an interest in the outcome of the case, it is also not "the quintessential innocent, disinterested bystander," given their role in the merger. *See In re First Am. Corp.*, 184 F.R.D. 234, 242 (S.D.N.Y. 1998). Some courts have held that "[w]here a nonparty was 'substantially involved in the underlying transaction and could have anticipated'" that it would "'reasonably spawn some litigation,' expenses should not be awarded." *Id.* Here, given the interrelationship between DISH and the parties to the merger – DISH absorbing Boost from Sprint, the spectrum and tower deals with T-Mobile, etc. – the Court believes DISH could have anticipated it may have been involved in some litigation relating to the merger. Therefore, at best, this factor is neutral for DISH.

Additionally, DISH can bear the costs more readily than the Plaintiffs. DISH is a large company with significant resources, whereas Plaintiffs are individual consumers. (Dkt. 253 at 12-14.) T-Mobile is a similarly positioned company to DISH in terms of absorbing the costs of production. Again, at best, the second factor is neutral for DISH vis-à-vis T-Mobile and weighs against cost sharing vis-à-vis the Plaintiffs.

Finally, the Court finds that this case has public importance, as it concerns antitrust issues in the wireless services industry. Today, almost every American increasingly needs to have a cell phone subscribed to one of the networks to function in day-to-day life and the pricing of those services is important to those consumers. The Court believes this factor also cuts against cost sharing.

The Court notes that it denies DISH's request for cost sharing without prejudice. There is additional work to be done honing search terms and producing documents. The decision on this issue does not give the parties carte blanche to inundate DISH, a non-party, with unreasonable requests. The Court hopes that the parties will work with DISH in a spirit of cooperation and compromise to reach reasonable solutions to lessen the burden on DISH. However, if the parties fail to approach DISH's production "with a spirit of cooperation or efficiency," the Court may reconsider the issue of cost sharing. *DeGeer*, 755 F. Supp. 2d at 929. If it becomes clear that the only way to ensure reasonableness on the part of Plaintiffs or T-Mobile is to force them to have skin in the game so that they "carefully consider whether the future electronic searches they have proposed to undertake are proportionate to the likely benefit," the Court may opt to do so.[5] *See id.* at 930. For now, because the factors weigh against cost sharing, the Court denies DISH's request.

### D. Protective Order

Lastly, DISH petitions the Court to enter a protective order to limit the number and scope of depositions the parties may seek in any future subpoenas to DISH. That issue is not ripe and has not been presented to the Court; the Court will not issue an advisory opinion on a matter not appropriately teed up for resolution. The Court rejects DISH's request for a protective order and

---

[5] The issue of cost sharing is closely intertwined with the scope of search terms, and likely would also be a matter for a Special Master.

will consider that issue at the appropriate time; of course, the Court strongly urges the parties to work cooperatively to find a compromise position that limits the need for court intervention as they begin to serve deposition subpoenas.

**II. T-Mobile's Motion**

As discussed above, the parties were able to voluntarily resolve many of the issues originally raised in T-Mobile's motion to compel. (Dkt. 329.) The Court sincerely commends the parties on those efforts and hopes that future disputes can similarly be resolved amicably, ideally before motion practice is required. Two issues remain for the Court's consideration: 1) go get documents regarding DISH's purchase of spectrum or network access from AT&T; and 2) custodial searches. The Court considers those issues in turn below.

**A. "Go Get" Documents Regarding Spectrum Purchases from AT&T**

The Court orders DISH to produce the "go-get" documents showing the amount charged by and paid to AT&T for access to AT&T's network. (*See* Dkt. 255 at 9; Dkt. 256-1 at RFP 6.) Plaintiffs' complaint contains the following allegation:

> In July 2021, DISH signed a new 10-year network-services agreement that gives DISH wholesale access to AT&T's network in exchange for at least $5 billion annually. Far from becoming a true competitor to the MNOs, DISH is now heavily incentivized not to undercut either company because it exists at the mercy of AT&T and T-Mobile, who could easily crush DISH because they have lower operating costs and provide the sole infrastructure by which DISH can have customers at all. Unless and until DISH can somehow construct its own wireless network—unlikely given DISH's lack of progress and available capital—DISH will always be subordinate to the three established national MNOs, just like the other MVNOs who resell wireless services.

(Dkt. 1 at ¶ 97.)

It seems clear to the Court that documents related to DISH's purchase of Spectrum from AT&T are relevant to the allegations in Plaintiffs' complaint. Although DISH contends that it has

15

not conceded the relevance of such documents, (Dkt. 329 at 6), its brief in opposition does not present any argument that the documents T-Mobile seeks related to spectrum purchases are irrelevant. (Dkt. 289 at 24.) Even if DISH had, the Court would reject any such argument, as such documents are plainly relevant to the allegations in Plaintiffs' complaint highlighted above.

Instead, DISH focuses primarily on arguing that T-Mobile does not have a substantial need for such documents because the relevant information can be gleaned from DISH's SEC filings (which contain DISH's wireless services profits and costs) as well as DISH's submissions to the Monitoring Trustee and FCC. (Dkt. 289 at 24.) DISH argues that T-Mobile's experts can then reverse engineer the costs by analyzing these filings. (*Id.*) However, as T-Mobile points out, the materials DISH points to are bottom-line numbers that do not break out the specific cost of spectrum purchase from AT&T. (Dkt. 255 at 13; Dkt. 297 at 7.) The Court is at a loss as to how T-Mobile's experts would be able to retrieve the data they seek from the materials DISH claims are sufficient, and DISH provides no explanation. The Court rejects this argument and finds that T-Mobile has a substantial need for these documents, as the material is not otherwise available.

Lastly, although this issue is not fully fleshed out in the briefs filed with the Court, the Court does not believe it would be unduly burdensome to produce these documents. This is a discrete set of documents that the Court believes should be readily available to DISH and relatively easy to find and produce. The Court concludes that these documents are relevant to the needs of the case, not unduly burdensome to produce, and T-Mobile has a substantial need for them. DISH is ordered to produce these documents showing the charges and payments for DISH's access to AT&T's network.

### B. Custodial Searches

As discussed above, T-Mobile seeks custodial discovery from DISH on the following subjects: 1) "DISH's internal assessment and discussions concerning the favorable deals DISH secured with T-Mobile and AT&T when Sprint's legacy CDMA network was shutdown;" 2) "DISH's spectrum needs, acquisition and intended use;" 3) "how DISH determines its prices, promotions, marketing, and plan features to compete with other carriers and the effectiveness of its competitive efforts in gaining subscribers;" and 4) "DISH's internal assessment of its growth prospects, as well as communications . . . about the expansion of DISH's mobile business." (Dkt. 255 at 13-14.)

These categories almost perfectly overlap with Plaintiffs' requests for custodial discovery. The only category that does not perfectly line up is DISH's internal assessment of the favorable deals DISH secured from T-Mobile and Sprint, but that is subsumed within Plaintiffs' requests for documents related to DISH's spectrum assets and network. (*See* Dtk 253 at 9.) As such, the Court will not belabor the points it made earlier regarding the relevance of these documents, and that discussion applies equally to T-Mobile's subpoena. With the exception of pre-merger documents, which are not relevant as discussed earlier in this opinion, the categories of documents T-Mobile seeks are relevant.

Similarly, the Court rejects DISH's arguments that custodial discovery is unduly burdensome. The figures presented by DISH for T-Mobile's subpoena – $69,000 in hosting fees and $347,479 in managed review fees – were significantly lower than those presented for Plaintiffs' subpoena. Because the Court found that DISH had failed to demonstrate undue burden relating to Plaintiffs' subpoena, it finds that the lower burden attributed to T-Mobile's subpoena is also reasonable under the circumstances for the same reasons articulated above.

17

Finally, as with Plaintiffs' subpoena, DISH does not explain why any of the custodians listed by T-Mobile are irrelevant or unduly burdensome. From T-Mobile's description, the individuals listed seem likely to be in possession of relevant materials. (Dkt. 255 at 15- 18.) DISH listed eight custodians, six of whom overlap with Plaintiffs' list of custodians. (*Id.* at 13.) The Court does not believe that searching two additional custodians tips the scales in favor of finding undue burden and orders DISH to run searches on these custodians' files. Again, the Court is not making a ruling on specific search terms and expects the parties to collaborate to reach a workable compromise. Failure to do so may force the Court to appoint a Special Master and refer this case for negotiation of search terms and potential cost sharing arrangements. The Court strongly encourages DISH and T-Mobile to work cooperatively to manage the custodial production. In sum, the Court finds that the categories of documents and proposed custodians are relevant and proportional to the needs of the case, with the exception of pre-merger documents (prior to April 1, 2020), and DISH is ordered to produce that discovery pursuant to T-Mobile's subpoena and this order.

**CONCLUSION**

For the reasons discussed more fully below, Plaintiff's Motion to Compel DISH to Produce Discovery Responsive to Plaintiffs Subpoena [253] is granted in part and denied in part, and Defendant T-Mobile US Inc.'s Motion to Compel DISH to Produce Discovery Responsive to Subpoena [254] is granted in part and denied in part.

DATED: October 3, 2025

_____
Albert Berry III
United States Magistrate Judge