**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANTHONY DALE, JOHNNA FOX, BENJAMIN BORROWMAN, ANN LAMBERT, ROBERT ANDERSON, and CHAD HOHENBERY, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>T-MOBILE US, INC.,<br><br>Defendant. | Case No. 1:22-cv-03189<br><br>Hon. Thomas M. Durkin<br><br>Hon. Albert Berry III |

**PLAINTIFFS' MOTION TO COMPEL DEFENDANT T-MOBILE US, INC. TO PRODUCE DOCUMENTS RELATED TO T-MOBILE US, INC.'S PRICE INCREASES AND ITS AFFIRMATIVE DEFENSES**

**[REDACTED]**

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........ 1
II. BACKGROUND ........ 2
III. LEGAL STANDARD ........ 4
IV. ARGUMENT ........ 5
A. The Requested Documents Are Relevant. ........ 5
B. The Proportionality Factors Support Plaintiffs' Request. ........ 9
C. Plaintiffs' Request Is Timely. ........ 13
D. T-Mobile's Refusal to Produce 2024 to 2025 Documents Is Prejudicial. ........ 15
V. CONCLUSION ........ 15

# I. INTRODUCTION

This case arises from the anticompetitive merger of Defendant T-Mobile US, Inc. ("T-Mobile") with Sprint, which closed on April 1, 2020. While regulators and the Southern District of New York tried to predict the merger's effects, "this case does not focus on the *wisdom* of the merger, but rather its *consequences*." *Dale v. Deutsche Telekom AG*, No. 1:22-cv-03189, 2023 WL 7220054, at *2 (N.D. Ill. Nov. 2, 2023) (Durkin, J.) (emphasis added) ("*Dale I*"). Those anticompetitive consequences continue today.

Before the merger, T-Mobile promised that it would "use these advantages [of the merger] to *lower prices* and thus *compete more effectively* against AT&T and Verizon." *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 208 (S.D.N.Y. 2020) (emphasis added) ("Trial Order"). Events proved otherwise. [redacted] Breaking its promise, T-Mobile also raised prices. Five years and *one day* after the merger closed, for example, it imposed a nationwide $5-per-month price increase worth *hundreds of millions of dollars per year*.[2]

This motion seeks to compel T-Mobile to produce documents dated January 1, 2024, through December 31, 2025, from six custodians. Plaintiffs filed this case in 2022, served requests for production ("RFPs") on T-Mobile in 2023, and negotiated seventy-five search terms and fifty custodians in 2024. At the time, the parties set a provisional cutoff of December 31, 2023, and expressly deferred the question of productions from later time periods. After a thorough review of the existing production, Plaintiffs now seek updated productions from only

---

[1] Declaration of Sarah D. Zandi in Supp. of Mot. to Compel ("Zandi Decl.") Exhibit ("Ex.") 30 at TMO_Dale_00326730–31; Ex. 37 at TMO_Dale_05040288.

[2] Ex. 22 at 1.

six of those fifty custodians, using just twenty of the original search terms.

T-Mobile refuses, though these documents cover the very period in which it raised prices outright. Worse, T-Mobile intends to rely on that same period itself: its interrogatory responses claim that [redacted][3] And T-Mobile has not disclaimed the right to offer its own testimony about post-2023 events. T-Mobile cannot use the post-2023 record as both a sword and a shield. The Court should grant the motion.

## II. BACKGROUND

Plaintiffs—AT&T and Verizon subscribers—seek redress for the 2020 T-Mobile-Sprint merger, which reduced the retail mobile wireless telecommunications services market for cell phones ("retail wireless market") from four major competitors to three, eroded competition, and ushered in a new era of price increases. *See* ECF No. 233 at 2–5; ECF No. 257 at 2–5.

On November 13, 2023, eleven days after the Court denied T-Mobile's motion to dismiss, Plaintiffs served requests for production covering the time period of January 1, 2010, forward and addressing pricing, promotions, network quality and buildout, and competition, among other topics.[4] Plaintiffs served a second set of RFPs seeking documents and ESI concerning T-Mobile's defenses on February 23, 2024.[5] Both sets impose a continuing obligation on T-Mobile to supplement its responses when it obtains additional information.[6]

For many months in 2024, the parties negotiated custodians and search terms, and of necessity, agreed to a provisional cutoff date for the *initial production*: December 31, 2023. Both sides understood, however, that Plaintiffs reserved the right to seek a "refresh" of the

---

[3] Ex. 16 at 33 [redacted]

[4] Ex. 12 at 9 ¶ 14.

[5] Ex. 14 at 7.

[6] *Id.* at 6; Ex. 12 at 10.

production to capture more recent documents. Plaintiffs' February 2, 2024, confirmatory letter stated: "The parties will consider whether it is appropriate to refresh data at one or more points throughout the litigation."[7] On February 5, T-Mobile responded: "[W]e think it is premature to discuss refreshes of productions before any production has even occurred and explained that we would prefer to defer this issue."[8] After months of negotiation, T-Mobile ran seventy-five search terms across the custodial files of fifty current and former employees, and substantially completed that production on April 30, 2025. ECF No. 381 at 1. The production consists of approximately 1.7 million documents unique to this case and 3.9 million documents previously produced to regulators. Plaintiffs spent many months reviewing this production and, beginning in early 2026, deposed thirteen T-Mobile witnesses.[9]

On July 13, 2026, Plaintiffs requested a refresh of the production.[10] Plaintiffs used what they learned in depositions and document review to narrow the request to only seven of the fifty original custodians plus two new custodians, current CEO Srini Gopalan and current Chief Strategy Officer Stefan Bewley. Through the meet-and-confer process, Plaintiffs have further narrowed that request to the six custodians requested by this motion. Plaintiffs have cut the proposed search terms from seventy-five to twenty, narrowing several and limiting six to messaging-platform files.[11]

Over four months, the parties met and conferred three times and exchanged twenty-two letters and emails.[12] Although T-Mobile itself asked to defer the issue, T-Mobile steadfastly refused to collect, analyze, or produce anything, relying in large part on timeliness objections.

---

[7] Zandi Decl. ¶ 3; Ex. 1 at 2.
[8] Ex. 2 at 1.
[9] Zandi Decl. ¶ 5.
[10] Ex. 3 at 1–2.
[11] *Id.*
[12] Zandi Decl. ¶¶ 6–25.

On July 30, 2026, T-Mobile rejected the refresh request wholesale, offering cost estimates for collection, review, and production based on what Plaintiffs understand to be an inflated hit count of the terms on the *existing* production.[13] The parties met and conferred on August 13, 2026, to no avail. On August 27, Plaintiffs asked T-Mobile to provide by September 4 a concrete counterproposal specifying the conditions under which it would produce the requested discovery.[14] T-Mobile refused, and insisted that Plaintiffs provide additional grounds for their request.[15] On September 25, Plaintiffs restated—again—the basis for seeking refreshed documents.[16] The parties met and conferred again on October 2, 2026.[17] Over the balance of October, the parties reached agreement on a few dozen "go-get" documents, but T-Mobile never relented in its refusal to even collect and analyze updated ESI from the requested custodians.[18] On November 11, 2026, the parties met and conferred, confirming impasse and negotiating a briefing schedule and page limits.[19]

## III. <u>LEGAL STANDARD</u>

Litigants may discover any "nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Once the movant shows relevance, "the party resisting production has the burden of showing why the request is improper." *Hum. Rts. Def. Ctr. v. Jeffreys*, No. 18 CV 1136, 2022 WL 4386666, at *2 (N.D. Ill. Sep. 22, 2022). Proportionality turns on the needs of the case, "considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant

---

[13] Ex. 5 at 4–5.
[14] Ex. 4 at 8–9.
[15] *Id.* at 6–8.
[16] *Id.* at 4–6.
[17] Zandi Decl. ¶ 18.
[18] Ex. 8 at 1–2; Ex. 9 at 1–2; Ex. 10 at 1.
[19] Zandi Decl. ¶ 25.

information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Dale v. T-Mobile US, Inc.*, No. 22-cv-03189, 2025 WL 4059469, at *2 (N.D. Ill. Oct. 3, 2025) (quoting Fed. R. Civ. P. 26(b)(1)) ("*Dale II*"). "Undue burden or expense, actual or potential, must be shown by a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Papst Licensing GmbH & Co. KG v. Apple, Inc.*, No. 17 C 1853, 2017 WL 1233047, at *3 (N.D. Ill. Apr. 4, 2017) (citation omitted). "Phrased differently, one claiming undue burden must do more than intone the phrase." *Id.* Objections also carry less force in antitrust cases, because such litigation "concerns broad public interests transcending the private objectives of the parties." *Associated Milk Dealers, Inc. v. Milk Drivers Union*, 422 F.2d 546, 552 (7th Cir. 1970). Accordingly, courts "take an expansive view of relevance and permit broad discovery." *Kleen Prods. LLC v. Packaging Corp. of Am.*, No. 10 C 5711, 2012 WL 4498465, at *13 (N.D. Ill. Sep. 28, 2012).

## IV. ARGUMENT

### A. The Requested Documents Are Relevant.

The relevance analysis is straightforward. Plaintiffs seek 2024-2025 documents on T-Mobile's assessment of retail wireless competition, the merger's competitive effects, T-Mobile's retail pricing, and T-Mobile's plan features, promotions, and bundles, which T-Mobile has previewed it will cite to justify higher post-merger prices.[20] *See Dale I*, 2023 WL 7220054, at *15 ("In [Defendant's] view, the observed price jump is entirely explained by the increase in quality from the 5G services."). These documents go to the heart of the case: the merger's impact on pricing and competition in the retail wireless market.

[20] *See* Exs. 12 & 14 at RFP Nos. 6–10, 12–13, 15–21, 23, 27, 31, and 45.

**Relevance of the Time Period.** The Class Period, which runs through the present (Compl. ¶ 110), makes documents from January 1, 2024, to December 31, 2025, presumptively relevant. "[U]nless and until that period is limited through motion practice . . . the scope of discovery should be molded to fit the reasonable contours of the Class Period defined in the . . . Complaint." *See Coyer v. Univar Sols. USA Inc.*, No. 22-cv-0362, 2024 WL 6864195, at *2 (N.D. Ill. Jan. 4, 2024). Here, T-Mobile's own conduct has put the 2024 to 2025 time period directly at issue. To get the merger approved, T-Mobile promised prices would go down after its merger commitments expired. Trial Order, 439 F. Supp. 3d at 208. T-Mobile also agreed to hold legacy prices steady for three years nationwide, and for five years as a settlement of the case brought by thirteen attorneys general.[21] [redacted][22] And then, five years and *one day* after the merger closed, T-Mobile raised prices nationwide by $5 per month on tens of millions of people.[23] Not satisfied, in June 2026, T-Mobile announced that it would forcibly migrate customers on legacy plans to pricier plans.[24]

T-Mobile contends that because Plaintiffs paid AT&T and Verizon, not T-Mobile, its own pricing documents do not matter.[25] But no company raises prices in a vacuum; it considers the competitive landscape and how rivals might react. Indeed, the Supreme Court has explained

---

[21] Mem. Op. & Order, Decl. Ruling, & Order of Proposed Modification at 92, *In re Applications of T-Mobile US, Inc. & Sprint Corp.*, WT Dkt. No. 18-197 (Fed. Commc'ns Comm'n Nov. 5, 2019), https://docs.fcc.gov/public/attachments/FCC-19-103A1.pdf; Settlement Agreement and Release of Claims Among T-Mobile US, Inc., Sprint Corp., and Plaintiff States at 2 (Mar. 10, 2020), https://ag.hawaii.gov/wp-content/uploads/2020/03/Plaintiff-States-Settlement-Agreement-Fully-Executed-1.pdf.
[22] Ex. 23 at 184:7–24; Ex. 31 at TMO_Dale_06741244.
[23] Ex. 22 at 1.
[24] *See Here's Every T-Mobile Experience Migration Plan, Along With Prices*, The Mobile Rep. (July 1, 2026), https://tmo.report/2026/07/heres-every-t-mobile-experience-migration-plan-along-with-prices/.
[25] *See, e.g.*, Ex. 5 at 4.

that price coordination, which may substantially lessen competition, occurs when "firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993). The record of T-Mobile's decision to raise its prices will speak volumes about the level of competition after the merger. *See Green Light Nat'l, LLC v. Kent*, No. 17 C 6370, 2018 WL 11436766, at *3 (N.D. Ill. July 27, 2018) (to the extent "relevance is in doubt, courts should err on the side of permissive discovery" (citation omitted)). T-Mobile has previewed a competing narrative that competition increased and prices fell in 2024 and 2025 and [redacted] in its interrogatory responses.[26]

**Relevance of the Custodians.** The six proposed custodians' files will very likely contain documents concerning T-Mobile's pricing strategy, plans and promotions, competitive analyses, and merger commitments. Exhibit A describes the relevance of each custodian. In summary:

Mike Katz. [redacted]

Siddharth Lal. As Vice President of Marketing – Consumer Postpaid Voice Acquisition

[26] *See, e.g.*, Ex. 16 at 33.
[27] Ex. 25 at 35:6–36:3.
[28] *Id.* at 68:8–69:6; Ex. 17 at 1.
[29] Ex. 38 at TMO_Dale_07612319.

between 2021 and 2025, [redacted][30] Mr. Lal has testified that a price war [redacted]

The other four custodians round out T-Mobile's pricing and competition decision-makers: Senior Director of Market & Channel Insights [redacted]

**Limited and Proportional Search Terms.** T-Mobile should run Plaintiffs' twenty proposed search terms. As Exhibit B details, each term targets T-Mobile's pricing strategy and analysis, rate plan initiatives, merger commitments, or competitive position. Of these, fourteen use proximity connectors, capturing only documents in which key words share a substantive link, such as "price" near "war." Six others reach only messaging-platform files, the likeliest source of candid discussions, which spares T-Mobile a file-wide search. Plaintiffs have dropped the other fifty-five terms and narrowed several of those that remain.[34]

---

[30] Ex. 18 at 1–3; Ex. 25 at 30:11–31:3, 126:4–127:5.
[31] Ex. 25 at 113:8–114:12.
[32] *Id.* at 141:4–143:3; *see also* Ex. 33 at TMO_Dale_03718559.
[33] *See* Ex. A.
[34] Zandi Decl. ¶ 6.

### B. The Proportionality Factors Support Plaintiffs' Request.

"[T]he relevant question before the Court is not whether [T-Mobile] would be burdened by the custodial production, but whether that burden is *undue*. When viewed through this lens," every proportionality factor "cut[s] in favor of producing custodial files." *Dale II*, 2025 WL 4059469, at *4.

**Failure to Substantiate Burden.** This Court has granted motions to compel where the opposing party "ma[de] virtually no attempt to carry [its] burden in its response." *See, e.g.*, ECF No. 340 at 5 (citing ECF No. 282 at 13). It should do so again here. T-Mobile asserts that Plaintiffs' proposal "would cost at least hundreds of thousands of dollars in additional fees and costs and would take roughly four to five months to complete," including "hundreds of hours of attorney time."[35] Further, it claims that the twenty search terms could "capture[] over 300,000 documents," an estimate based on running Plaintiffs' terms "against a sample set of the already produced documents . . . for a comparable two-and-a-half-year window (July 1, 2021-December 2023)."[36] But T-Mobile never described its "sample set"—its size, composition, or selection.

T-Mobile's numbers do not add up. Using the same time period as T-Mobile, Plaintiffs ran the twenty proposed search terms against the "already produced documents" of the six requested custodians in this motion, plus a seventh, Mike Sievert, limiting term Nos. 15–20 to messaging platform files, as Plaintiffs propose.[37] The terms hit on only 82,449 documents. Even with document "families" (i.e., related documents) included, the total rises only to 198,938. And, after deduplication, which the ESI Order requires, it falls to approximately 116,916.[38] That

[35] Ex. 5 at 4–5.
[36] *Id.*
[37] Plaintiffs included Sievert's files—a custodian whose files Plaintiffs do not currently request—in order to make their estimate more conservative.
[38] Zandi Decl. ¶ 10; *see* ECF No. 181 ¶ 4 (ESI Order requiring deduplication). Plaintiffs modified proposed Search Term No. 11 to reference the Federal Communications Commission instead of the

number is less than half of T-Mobile's estimate and only a fraction of the 1.7 million documents T-Mobile previously produced unique to this case.

But in any event, the correct process would have been to collect the ESI, provide hit counts on individual searches and custodians, and then negotiate an appropriate balance of burden and utility. Consistent with guidance from other courts within this district, "as part of the meet and confer process and to allow the parties to assess burden, [T-Mobile] should have provided hit counts for searches run with each of the proposed terms regardless of whether it believed the terms were appropriate." *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, No. 1:21-cv-00305, 2023 WL 4181198, at *11 (N.D. Ill. June 26, 2023) ("*Outpatient I*") ("Without a specific showing as to how [the party opposing discovery] reached this estimate, it is impossible for the Court to understand whether this cost estimate seems reasonable or overstated."). The parties should then "have collaborated to refine search[] terms and address burden concerns." *Id.* T-Mobile "should also have shared hit counts on more restrictive searches to allow Plaintiffs to modify specific search terms and parameters . . . . In addition, the parties could have engaged in sampling to see if search terms were producing responsive documents or excessive irrelevant hits." *Id.* T-Mobile's approach made all these things impossible.

Instead, T-Mobile claimed that generating hit counts would itself be unduly burdensome because it would require collecting the custodians' post-2023 files; but T-Mobile has not offered a specific, substantiated cost or time estimate for that effort either.[39] It is therefore unknown "what the costs would be to export, host, and review this data, whether deduplication could limit the burden of review, or how many hours it would take to review the ESI." ECF No. 340 at 5

---

Federal Trade Commission, which increases the number of hits to 116,954 after deduplication. Zandi Decl. ¶ 10.

[39] Ex. 5 at 4–5.

(citing ECF No. 282 at 13). These deficiencies leave "[t]he Court . . . completely in the dark . . . about such costs and potential burdens. Without more, the Court cannot find that [T-Mobile] has adequately demonstrated undue burden." ECF No. 340 at 5; *see also RVassets Ltd. v. Marex Cap. Mkts. Inc.*, No. 1:23-cv-14192, 2025 WL 1928056, at *5 (N.D. Ill. July 14, 2025) (Berry, M.J.) (similar). T-Mobile's failure to explain "why these approaches were not used" is fatal to its burden objection, and demonstrates its true purpose: obstructing access to important evidence. *Outpatient I*, 2023 WL 4181198, at *11.

**Claimed Burden Does Not Outweigh the Likely Benefit.** T-Mobile argues that its prior production, most of which simply reproduced documents from the pre-merger litigation, excuses it from any further time or expense.[40] This argument fails on three fronts.

*First*, T-Mobile overstates its prior burden. Over 3.9 million of the roughly 5.6 million documents produced were wholesale reproductions from the pre-merger litigation and investigations.[41] Only 1.7 million were new, post-merger documents responsive to this case.[42] Furthermore, by definition prior productions cannot be used to defeat the duty to supplement. *See In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, No. 1:21-cv-00305, 2024 WL 4188728, at *3–4 (N.D. Ill. Sep. 13, 2024) ("*Outpatient II*") (no undue burden for supplemental searches where party had already produced nearly 900,000 documents in antitrust case).

*Second*, the described cost—"hundreds of thousands of dollars"—is neither high nor undue in a case where the defendant, a company worth nearly two hundred billion dollars, has retained at least three law firms with dozens of lawyers and other personnel, and the stakes reach into the billions of dollars. *See Dale II*, 2025 WL 4059469, at *3 (burden not undue where third

---

[40] *Id.* at 4–5.
[41] Zandi Decl. ¶ 5.
[42] *Id.*

party faced an estimated $72,900 in hosting fees and $2,376,769 in review fees). Further, T-Mobile "does not explain why an 'attorney' must review each document," nor could it, given that technology-assisted review and Plaintiffs' proposed terms confine the scope of the search, and the parties' Stipulated 502(d) Order (ECF No. 194) obviates the privilege waiver concern that might otherwise warrant linear review. *See Outpatient II*, 2024 WL 4188728, at *4.

*Third*, the importance of the requested 2024 to 2025 discovery is substantial. For the entire period of the current production—2020 to 2023—T-Mobile's merger commitments prohibited it from raising prices outright on legacy plans. Then, in 2024 and 2025—when T-Mobile's legal obligations expired—it raised prices on exactly those plans. Given T-Mobile's own conduct, and its claims about post-2023 competition, excluding this period from discovery will distort the record. And, of course, Plaintiffs cannot get the requested information elsewhere. Only T-Mobile's internal files will disclose T-Mobile's true thinking about the relationship of its price increases to the state of competition in the market. *See Dale II*, 2025 WL 4059469, at *4–5; *Outpatient I*, 2023 WL 4181198, at *10 ("[T]he bulk of the information contained in that ESI is not available to Plaintiffs through any other avenue."). "The burden [T-Mobile] cite[s] does not outweigh this likely benefit." *Coyer*, 2024 WL 6864195, at *2 (no undue burden to produce 2019–2024 documents because "the Class Period currently extends beyond 2018" and plaintiffs needed the documents to prove excessive post-2018 fees).

**Public Importance.** "[T]his case has public importance, as it concerns antitrust issues in the wireless services industry. Today, almost every American increasingly needs to have a cell phone subscribed to one of the ['Big Three'] networks to function in day-to-day life and the pricing of those services is important." *Dale II*, 2025 WL 4059469, at *7; *see also Associated Milk Dealers*, 422 F.2d at 552 ("Illegality under the antitrust laws concerns broad public interests

transcending the private objectives of the parties.”). This factor supports production.

### C. **Plaintiffs’ Request Is Timely.**

T-Mobile contends—despite asking to defer this issue until substantial discovery had occurred—that this request comes too late because Plaintiffs did not revisit this issue between February 2024 and July 2026.[43] Neither the parties’ dealings nor the law supports this argument.

T-Mobile has been on notice of this issue for over two and a half years. As discussed above, in early 2024, the parties set a provisional December 31, 2023, cutoff for the initial production and expressly deferred the question of future productions; they never agreed to forgo them.[44] A deferral means the parties will revisit the issue. Yet T-Mobile did not complete that initial production until over a year later, and depositions of T-Mobile witnesses did not commence until 2026.[45] Once that discovery was in hand, Plaintiffs did exactly what the deferral contemplated: in July 2026, they served narrow, targeted requests based on the discovery obtained.[46] Those requests were timely, coming more than seven months before the close of fact discovery. *See* ECF No. 370. If anything has delayed resolution, it is T-Mobile’s own conduct: refusing to negotiate while demanding months of correspondence and meetings in order to delay a declaration of impasse.

T-Mobile’s timeliness objection amounts to arguing that the approaching fact cutoff deadline excuses it from its discovery obligations *before* that cutoff has even passed. Not so. If that were true, parties would *never* have to supplement discovery; but the duty to supplement even “extends *beyond* the close of [fact] discovery.” *United States v. DISH Network, L.L.C.*, No. 09-3073, 2016 WL 29244, at *6 (C.D. Ill. Jan. 4, 2016) (collecting cases) (emphasis added).

---

[43] Ex. 5 at 1–3.
[44] Zandi Decl. ¶¶ 3–4.
[45] *Id.* ¶ 5.
[46] *Id.* ¶ 6.

*DISH Network* is instructive. There, the plaintiffs sought both relief for DISH's past telemarketing violations and an injunction against future ones. Fact discovery closed in June 2012. *DISH Network*, 2016 WL 29244, at *2. Nearly three years later, on the eve of trial, DISH produced documents post-dating its 2012 production. *Id.* at *3–4; Text Order, *United States v. DISH Network, L.L.C.*, No. 09-3073 (C.D. Ill. May 23, 2012) (granting DISH's consent motion to extend the schedule). The plaintiffs claimed prejudice, emphasizing that DISH had previously refused to supplement after the discovery cutoff. *DISH Network*, 2016 WL 29244, at *5. DISH argued that "its duty to respond [to the plaintiffs' discovery requests] terminated once DISH responded" and that "there is no on-going duty to supplement during the entire case." *Id.*

The court disagreed. Because the requests expressly "***impose[d] a continuing obligation*** [to supplement,] . . . . [r]esponsive documents that you obtain or discover after your initial production must be produced promptly by supplemental production." *Id.* at *6 (emphasis added). The court was also "***troubled . . . by the position*** that DISH took [in 2013] in this litigation ***that evidence beyond the close of discovery was not relevant***," particularly because "Dish has known since the beginning of this case that Plaintiffs sought a permanent injunction." *Id.* at *9 (emphasis added). The court sanctioned DISH, reopened discovery on the permanent injunction, and warned that, if DISH did not produce all necessary supplemental discovery, "then the evidence will not be admitted." *Id.* If the duty to supplement survived nearly three years past the discovery cutoff in *DISH Network*, the duty to refresh its document production applies to T-Mobile here, where fact discovery remains open. Every consideration that drove the decision in *DISH Network* is present here: T-Mobile itself has put the period at issue,[47] Plaintiffs' RFPs expressly impose a continuing obligation to supplement,[48] T-Mobile has long known Plaintiffs

---

[47] *See* Ex. 16 at 33.
[48] Ex. 12 at 10; Ex. 14 at 6.

would seek post-2023 documents,[49] and the case concerns an ongoing harm for which Plaintiffs have sought injunctive relief from the outset. Compl. at 61.

Nor would granting this motion derail the case schedule. In fact, no schedule has been set in the case other than completion of fact discovery. Four of the witnesses have not yet been deposed.[50] Completing the requested productions and managing any further depositions should not require much additional time. In the event the Court orders production, Plaintiffs request that it modify the scheduling order accordingly.

### D. <u>T-Mobile's Refusal to Produce 2024 to 2025 Documents Is Prejudicial.</u>

T-Mobile's refusal also prejudices Plaintiffs. Without the requested 2024 to 2025 discovery, the record would be one-sided. T-Mobile could still offer its own evidence on pricing and competition during that period; its executives and experts will presumably testify that the retail wireless market is competitive, perhaps more so now than ever. That imbalance would permeate expert discovery, class certification, summary judgment, and trial. Tellingly, T-Mobile has never forsworn its right to exploit this advantage, and has referenced the post-2023 time period as a basis for its affirmative defenses. *See In re Broiler Chicken Antitrust Litig.*, No. 1:16-cv-08637, 2017 WL 6569720, at *4 (N.D. Ill. Dec. 22, 2017) (if defendants "expand the time period used in their analyses, they will have to supplement their production").

## V. <u>CONCLUSION</u>

For the foregoing reasons, the Court should compel T-Mobile to produce the requested 2024 to 2025 documents and modify the scheduling order accordingly. In the alternative, the Court should preclude T-Mobile under Rule 37(c)(1) from using evidence concerning events after December 31, 2023, to support its claims of procompetitive merger benefits.

---

[49] Zandi Decl. ¶¶ 3–4.
[50] Lal was deposed on May 11, 2026. Patterson was deposed on September 30, 2026.

Dated: November 18, 2026

Respectfully submitted,


/s/ Brendan P. Glackin
Brendan P. Glackin (*pro hac vice*)
Lin Y. Chan (*pro hac vice*)
Nicholas W. Lee (*pro hac vice*)
Sarah D. Zandi (*pro hac vice*)
Jules A. Ross (*pro hac vice*)
Courtney J. Liss (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Phone: (415) 956-1000
bglackin@lchb.com
lchan@lchb.com
nlee@lchb.com
szandi@lchb.com
jross@lchb.com
cliss@lchb.com

Eric L. Cramer (*pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (215) 715-3256
ecramer@bergermontague.com

Robert Litan (*pro hac vice*)
BERGER MONTAGUE PC
1001 G St., N.W. Suite 400 East
Washington, D.C. 20001
Phone: (202) 559-9740
rlitan@bergermontague.com

Joshua P. Davis (*pro hac vice*)
Kyla Gibboney (*pro hac vice*)
Julie Pollock (*pro hac vice*)
BERGER MONTAGUE PC
505 Montgomery Street, Suite 625
San Francisco, CA 94111
Phone: (415) 689-9292
jdavis@bergermontague.com
kgibboney@bergermontague.com
jpollock@bergermontague.com

Gary I. Smith, Jr. (*pro hac vice*)
HAUSFELD LLP
580 California Street, 12th Floor
San Francisco, CA 94104
Phone: (267) 702-2318
gsmith@hausfeld.com

Swathi Bojedla (*pro hac vice*)
Jose Roman Lavergne (*pro hac vice*)
Shana R. Herman (*pro hac vice*)
HAUSFELD LLP
1200 17th Street NW, Suite 600
Washington, D.C. 20036
Phone: (202) 540-7200
sbojedla@hausfeld.com
jlavergne@hausfeld.com
sherman@hausfeld.com

Renner Walker (*pro hac vice*)
William Hayden Dwyer (*pro hac vice*)
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Phone: (646) 357-1100
rwalker@hausfeld.com
wdwyer@hausfeld.com

Daniel P. Margolskee (*pro hac vice*)
HAUSFELD LLP
325 Chestnut St., Suite 900
Philadelphia, PA 19106
Phone: (215) 985-3270
dmargolskee@hausfeld.com

*Interim Co-Lead Class Counsel for Plaintiffs and the Proposed Class*

Kenneth N. Flaxman ARDC No. 830399
Joel Flaxman ARDC No. 6292818
LAW OFFICES OF KENNETH N. FLAXMAN P.C.
200 S Michigan Ave., Suite 201
Chicago, IL 60604
Phone: (312) 427-3200
knf@kenlaw.com
jaf@kenlaw.com

*Interim Liaison Counsel for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

I certify that on November 18, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send electronic copies to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Brendan P. Glackin*
Brendan P. Glackin